IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 06-cv-01872-RPM-MEH

JACK MUST,

Plaintiff,

vs.

AMERICAN FURNITURE WAREHOUSE CO., a Colorado corporation, d/b/a
AMERICAN FURNITURE WAREHOUSE

Defendant.

---

**BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

s/ Andrew W. Volin
**Andrew W. Volin, Esq.**
SHERMAN & HOWARD L.L.C.
633 Seventeenth Street, Suite 3000
Denver, CO 80202
Telephone: (303) 297-2900
Facsimile:  (303) 298-0940
E-Mail:      Avolin@sah.com

Gary J. Benson, Esq.
DWORKIN CHAMBERS WILLIAMS YORK
   BENSON & EVANS, P.C.
3900 E. Mexico Avenue, Suite 1300
Denver, CO  80210
Phone:(303) 584-0990
Fax:(303) 584-0995
E-mail:gbenson@dnvrlaw.com


*Attorneys for Defendant*
*American Furniture Warehouse*

# TABLE OF CONTENTS

Page

I.      SUMMARY OF CLAIMS AND DEFENSES:.................................................... 1

II.      DETAIL ABOUT THE FACTS AND ISSUES IN THE CASE: ....................................... 3

     A.      Background About AFW And Mr. Must, Including His Prior Furniture Sales Experience At AFW And Elsewhere:.......................................................3

     B.      Mr. Must Is Rehired Into Sales At AFW:.................................................4

     C.      Mr. Zuppa Promotes Mr. Must From Sales Into Management:................................5

     D.      Mr. Must Starts As A Management Trainee At The Westminster Store; A Year And A Half Later Mr. Zuppa Promotes Him To Assistant Manager After Passing Him Over In The Interim For Openings At That Store And Other Stores: .............6

     E.      Mr. Zuppa Promotes Mr. Must To Store Manager, Replacing A Younger Store Manager Who Mr. Zuppa Moves Back Into Sales; Mr. Zuppa Also Moves Another Younger Store Manager Into Sales As Well:.............................................8

     F.      Mr. Must's Troubles Begin His First Year As Store Manager:.............................10

     G.      Mr. Must's Second Year As Store Manager Starts Poorly, Continues Poorly, And Ends Poorly:............................................................................12

     H.      Mr. Must's Third Year As Store Manager Continues Poorly And He Makes Things Worse At The End, Leading To The Request That He Return to Sales: ...15

     I.      The Signature Capture System Problem:...............................................15

     J.      Mr. Zuppa Saves Mr. Must From Being Fired After Mr. Must Is Disrespectful To Mr. Buscietta:...........................................................................17

     K.      Mr. Must Complains About Mr. Zuppa To Mr. Jabs And Learns Mr. Zuppa Has Been Instructed To Evaluate Whether To Retain Him: ........................................20

     L.      Mr. Jabs Moves Upper Management To Different Positions Without Notice: .....22

     M.      Mr. Zuppa Visits The Store, But Sometimes Mr. Must Is Not There, And The Store's Assistant Manager Complains About Mr. Must And Asks To Return To Sales:.....................................................................................23

     N.      Mr. Zuppa Saves Mr. Must From Being Fired A Second Time After Mr. Must Tells The New Assistant General Manager, Mr. Pepper, He Does Not Want To Work The July 4th Holiday, Which Is A Mandatory Work Day for Store Managers:................................................................................32

     O.      Mr. Zuppa Decides to Return Mr. Must to Sales, Consistent with Past Practice: .35

     P.      Mr. Morrison Makes Changes At Westminster; Ms. Gurecki Replaces Him: ......42

     Q.      Mr. Must Intends to Sue But Does Not Contact Mr. Jabs, HR, Or File A Grievance And Instead Sees A Lawyer and Destroys Documents:......................43

     R.      Age Discrimination Allegations and Age Related Evidence:...............................44

     S.      The Tape Recorded Conversation:.....................................................45

     T.      The Allegations In The Complaint, Paragraph 11:................................46

     U.      Mr. Must Makes More In His New Career Than If He Had Stayed A Store Manager At AFW: ...................................................................50

i

III.   ARGUMENT: .................................................................................................... 53

    A.    The Age Discrimination Claim Fails on the Merits...............................53

        1.    Mr. Must Cannot Establish A Prima Facie Case: .....................................53

                a.    Mr. Must Cannot Show his Work Was Satisfactory: ..................... 54

                b.    Mr. Must Cannot Show He was Discharged; His Refusal to Return to Sales Is not A Constructive Discharge: ..................................... 57

        2.    There Is Not Sufficient Evidence Of Pretext To Deny Summary Judgment:63

    B.    The Age Discrimination Claim Fails Because Mr. Must Has No Damages..........74

IV.    CONCLUSION: ............................................................................................................. 75

EMPLOY\284850.1

## I.   SUMMARY OF CLAIMS AND DEFENSES:

Plaintiff Jack Must ("Mr. Must") brings a claim for age discrimination arising out of the termination from his employment as a Store Manager for Defendant American Furniture Warehouse ("AFW") at age 49.  However, he admits AFW did not fire him and instead asked him to return to his prior position as a member of the sales staff.  AFW's request that he return to sales was consistent with AFW's past practice in dealing with Store Managers who AFW's upper management believes are not performing well (including Mr. Must's predecessor as Store Manager, who at age 29 AFW removed as Store Manager and returned to sales, creating the opening into which AFW promoted Mr. Must).  AFW also believed Mr. Must could earn as much in sales as he did as a Store Manager, and that working in sales would be more consistent with his desired work schedule.  When Mr. Must was asked to return to sales, he chose to reject this request on the spot, resulting in a resignation.

His age discrimination claim fails for several reasons.  First, Mr. Must cannot establish two elements of his prima facie case.  He cannot establish the element that he was performing satisfactory work.  Also, he cannot show AFW's request that he return to a sales position rises to the level required to establish a constructive discharge.

Second, even if he established a prima facie case, AFW can show that the decision to move him back into sales had nothing to do with his age.  Instead, AFW's management had a good faith belief that Mr. Must did not perform up to its expectations.  To support this belief, AFW can show a pattern of problems over a period of years culminating in a series of significant incidents including, but not limited to: (1) beliefs by upper management he should be immediately fired for two separate incidents: (a) his disrespect to the General

1

Manager, and (b) his complaints to the Assistant General Manager about working on a holiday that was a mandatory work day; (2) complaints by his own Assistant Store Manager about him; (3) continued decline in sales performance at the store, and (4) continued complaints by upper management about his sales force. Mr. Must cannot show AFW's decision to move him into sales was a pretext for age discrimination.

Third, for several reasons, Mr. Must's burden to establish pretext is even more difficult than in the usual case. AFW can assert the "same actor" defense. The people who decided to move Mr. Must back to a sales position, Jake Jabs and Andrew Zuppa, are also the same people who had promoted him to the Store Manager position. Also, in the month prior to asking Mr. Must to return to sales, Mr. Zuppa twice prevented the remaining members of the upper management team from firing Mr. Must for his disrespect and complaints to them. Must admits these decision-makers and key witnesses, most of whom are either older than him or about the same age, have not made any derogatory remarks about age to him.

As a separate matter, Mr. Must destroyed documents about the last two months of his employment, which should result in sanctions precluding his ability to offer evidence about events during this time period. This issue is more fully discussed in AFW's Motion For Sanctions, which is filed with this Motion, and also addressed in both the fact sections and legal argument of this Motion.

Fourth, in addition to the weakness of his claim on the merits, Mr. Must has earned more in his new employment than he would have had he remained employed at AFW, and so he has no damages. This is a separate reason to grant summary judgment.

2

II.   **DETAIL ABOUT THE FACTS AND ISSUES IN THE CASE[1]:**

A.   <u>**Background About AFW And Mr. Must, Including His Prior Furniture Sales Experience At AFW And Elsewhere:**</u>

1.   AFW is a furniture retailer with multiple stores in Colorado; most are in the Denver metro area and along the front range. Ex. A-1, Crystal Hayes Affidavit paragraph 2.

2.   AFW's president and CEO is Jake Jabs; his date of birth is November 23, 1930. Ex. A-2, Jake Jabs Affidavit paragraphs 1-2.

3.   Mr. Must was born on October 23, 1954. Ex. A-3, Jack Must Deposition Transcript page 8, line 21.

4.   In 1988, (while Mr. Must was in his mid to late 30's) he began work for AFW as a salesperson and stayed for about three and a half years (until 1991). Ex. A-3, Jack Must Deposition Transcript, page 16, lines 20 thru 25.

5.   Before going to work for AFW in 1988, he already had six years experience in furniture sales with two Weberg's Furniture stores in Grand Junction and Denver. Ex. A-3, Jack Must Deposition Transcript, page 19, lines 1-8.

6.   Mr. Must had no complaints about the way he was treated during this stint as an AFW salesperson. Ex. A-3, Jack Must Deposition Transcript, page 17, line 8.

---

[1] As noted in the Summary, AFW has filed a motion for sanctions based on Plaintiff's destruction of documents concerning the last two months of his employment, and has sought relief in the form of an order precluding Plaintiff from testifying about events during this critical period. Nevertheless, in the event the Court does not grant AFW the requested relief, this statement of facts (the critical time period is set forth in subsections III.I. – O.), is based on Plaintiff's version of events.

7.      He was not unhappy at all with AFW, but he quit because he had an offer to move to Florida to go work for another furniture retailer, Ed Jansen Furniture.  Ex. A-3, Jack Must Deposition Transcript, page 17, lines 15 thru 21.

8.      That job lasted less than a year.  Ex. A-4, Deposition Exhibit 1 Page 153.

9.      Mr. Must's next job, with Rhodes doing furniture sales in Florida, lasted just over three years.  Ex. A-4, Deposition Exhibit 1 Page 153.

10.      Mr. Must later went to work as a salesperson for a third furniture company in Florida, Levitz, for two years.  Ex. A-4, Deposition Exhibit 1 Page 153.

11.      Levitz closed the Florida store and moved Mr. Must to a Denver store as a salesperson, which then closed after six months.  Ex. A-3, Jack Must Deposition Transcript, page 13, line 21 thru page 14, line 12.

**B.**    **Mr. Must Is Rehired Into Sales At AFW:**

1.      At the end of June 1998, AFW re-hired Mr. Must into a furniture store sales position (he was 43 at the time and already had 10 years experience in furniture sales, including three from his first stint with AFW).  Ex. A-3, Jack Must Deposition Transcript, page 19, lines 14 thru 16.

2.      Mr. Must was assigned to AFW's Thornton location.  Ex. A-3, Jack Must Deposition Transcript, page 19, line 18.

3.      In 1998, Thornton was AFW's main store and warehouse location, and also corporate headquarters.  Ex. A-1, Crystal Hayes Affidavit paragraph 3.

4

**4.**    Mr. Must was paid entirely on commissions, pursuant to AFW's commission based system for sales staff.  Ex. A-3, Jack Must Deposition Transcript, page 19, line 20.

**5.**    Mr. Must's annualized earnings that first year were about $51,000.00. Ex. A-3, Jack Must Deposition Transcript, page 68, line 15.

**C.**    **Mr. Zuppa Promotes Mr. Must From Sales Into Management:**

**1.**    In June 1999, almost a year after AFW rehired Mr. Must, Andrew Zuppa promoted Mr. Must from the sales force into the management training program (he was 44 at the time).  Ex. A-3, Jack Must Deposition Transcript, page 34, lines 15 thru 20; Ex. A-6, Andrew Zuppa Deposition Transcript, page 53, line 2 thru page 54, line 12.

**2.**    At the time, Mr. Zuppa was AFW's Human Resources Director.  Ex. A-6, Andrew Zuppa Deposition Transcript, page 39, line 9; page 42, line 17.

**3.**    Mr. Must had no complaints about the way he was treated from the time he was hired until the time he was promoted into the management training program.  Ex. A-3, Jack Must Deposition Transcript, page 36, line 6.

**4.**    As part of the promotion, Mr. Zuppa changed Mr. Must's compensation, from strictly commission, to a $500.00 per week salary and a $400.00 per week draw against a quarterly bonus.  Ex. A-3, Jack Must Deposition Transcript, page 34, lines 21 thru page 35, line 1.

**5.**    Also, at that time, AFW paid the entire amount of the cost of health insurance for management and their dependents.  Ex. A-3, Jack Must Deposition Transcript, page 36, line 16 thru 18.

5

6.      The reason Mr. Zuppa promoted Mr. Must is that AFW's management had an urgent need for management candidates at the time, and Mr. Must was one of several people suggested to Mr. Zuppa.  Ex. A-6, Andrew Zuppa Deposition Transcript, page 53, line 2 thru page 54, line 12.

7.      Mr. Must did not have any management experience, however, in either retail sales generally or the retail furniture industry specifically.  Ex. A-3, Jack Must Deposition Transcript, page 18, lines 16-19.

8.      Mr. Zuppa recalls that Mr. Must had various concerns before accepting the promotion, including his lack of management experience, the perception that store management were not treated well by upper management, and the work schedule demands of management.  Ex. A-6, Andrew Zuppa Deposition Transcript, page 55, lines 17-24.

9.      The work schedule was (and still is) different for store management as opposed to store sales staff.  AFW stores are generally open seven days per week, including most holidays.  Full-time sales staff generally work only 40 hours per week, spread over morning or evening shifts during the seven day period.  Store management, however, work longer hours, usually over 50 hours, spread over morning or evening shifts that start sooner, and end later, than the sales staff shifts.  Ex. A-7, Andrew Zuppa Affidavit paragraph 12.

D.      **Mr. Must Starts As A Management Trainee At The Westminster Store; A Year And A Half Later Mr. Zuppa Promotes Him To Assistant Manager After Passing Him Over In The Interim For Openings At That Store And Other Stores:**

1.      After Mr. Must accepted the promotion, Mr. Zuppa assigned Mr. Must to the Westminster store.  Ex. A-3, Jack Must Deposition Transcript, page 37, line 12.

6

**2.** The Westminster store already had a Store Manager and Assistant Store Manager in place when Mr. Must started. Ex. A-3, Jack Must Deposition Transcript, page 37, lines 19-25.

**3.** Mr. Zuppa saw that store as a good training ground, because he felt it was an easy store to run. Ex. A-6, Andrew Zuppa Deposition Transcript, page 129, line 16 thru page 130, line 9.

**4.** The Westminster store was the smallest Denver AFW location at the time; it had by far the lowest sales volume of the Denver metro area locations during his first year at the store from July 1999 – June 2000; sales at the other locations were either about double (the Southwest store) or six times (the main Thornton location, and the Southeast location, which consists of the Aurora store and the Park Meadows store (when it was open) and the Compark location (when it was open)) the volume of the Westminster location. Ex. A-8, Lori Tielke Affidavit paragraph 2.

**5.** There were management openings at the Westminster store and other stores while Mr. Must was a trainee, but Mr. Zuppa did not consider Mr. Must's performance strong enough to merit promotion to any of those openings when they occurred. Ex. A-7, Andrew Zuppa Affidavit paragraph 3.

**6.** In February 2001, over a year and half after being made a trainee, Mr. Zuppa promoted Mr. Must to the Assistant Store Manager position at the Westminster store (Mr. Must was 46 at the time). Ex. A-3, Jack Must Deposition Transcript, page 39, lines 10 thru 15; Ex. A-3, Jack Must Deposition Transcript, page 41, line 19; Ex. A-6, Andrew Zuppa Deposition Transcript, page 60, line 22.

7

7.     There was already an Assistant Store Manager at the time.  Ex. A-3, Jack Must Deposition Transcript, page 41, line 7.

8.     The reason for the promotion was Mr. Must had been in the trainee program for a long time, Mr. Zuppa did not want to lose him, and he felt there was no reason not to give him that title.  Ex. A-6, Andrew Zuppa Deposition Transcript, page 61, lines 1 thru 21.

9.     Mr. Zuppa increased Mr. Must's compensation to $1,000.00 per week, and he remained eligible for a quarterly bonus.  Ex. A-3, Jack Must Deposition Transcript, page 40, lines 12 thru 15.

10.     As of the time of this promotion, Mr. Must had no complaints about the way he had been treated at AFW.  Ex. A-3, Jack Must Deposition Transcript, page 40, line 8.

E.     **Mr. Zuppa Promotes Mr. Must To Store Manager, Replacing A Younger Store Manager Who Mr. Zuppa Moves Back Into Sales; Mr. Zuppa Also Moves Another Younger Store Manager Into Sales As Well:**

1.     On May 14, 2001, Mr. Zuppa moved the Westminster Store Manager, Chris Smatla, back into a sales position (Smatla had started at AFW in sales) (Mr. Smatla was 29 years of age).  Ex. A-1, Crystal Hayes Afffidavit paragraph  4.

2.     Although Westminster store sales in the eleventh month period ending May 2001 had increased from than the prior eleventh month period, the percentage of the increase (about 2 %) was by far the lowest (seventh of seven) of the various AFW locations along the front range.   Ex. A-8, Lori Tielke Affidavit paragraph 3.

3.     Mr. Zuppa concluded Mr. Smatla was not a good Store Manager and did not like him.  Ex. A-6, Andrew Zuppa Deposition Transcript, page 67, line 21; page 70, line 5.

4.      Mr. Zuppa's beliefs about Mr. Smatla were reinforced by Mr. Must [who was then assistant manager]; Mr. Must complained to Mr. Zuppa about Mr. Smatla's work habits, while also telling Mr. Zuppa positive things about his own.  Ex. A-6, Andrew Zuppa Deposition Transcript, page 68, line 9 thru page 69, line 23.

5.      At the same time he moved Mr. Smatla into sales, Mr. Zuppa also moved Carl Willey, Southwest Store Manager, back into a sales position. Ex. A-12, Crystal Hayes Deposition Transcript, page 105, line 20 thru page 106, line 9.

6.      Mr. Willey was 30 years of age when he was moved back into sales. Ex. A-1, Crystal Hayes Affidavit paragraph 6.

7.      The Southwest's store's percentage increase in sales (about 6%) over the same  eleventh month period ending in May 2001 was better than the Westminster store's, but was still close to the bottom compared to the other front range locations.  Ex. A-8, Lori Tielke Affidavit paragraph 4.

8.      At the end of June, 2001 [about six weeks after moving Mr. Smatla out of the Store Manager position], AFW promoted Mr. Must to replace Mr. Smatla as the Store Manager (Mr. Must was still 46).  Ex. A-3, Jack Must Deposition Transcript, page 44, line 10.

9.      Again, Mr. Zuppa made the decision to promote Mr. Must to Store Manager.  Ex. A-6, Andrew Zuppa Deposition Transcript, page 74, line 9.

10.      Mr. Zuppa made the decision to promote Mr. Must because there was an urgency to fill the position [he removed Mr. Smatla on May 14], and Mr. Must had offered strong opinions about Mr. Smatla, and so Mr. Zuppa concluded it was his "turn" to run the store. Ex. A-6, Andrew Zuppa Deposition Transcript, page 76, line 24 thru page 77, line 13.

9

**11.** Mr. Zuppa's promotion decision was approved by Mr. Jabs. Ex. A-9, Jake Jabs Deposition Transcript, page 19, lines 14-24.

**12.** Mr. Zuppa's decision to promote Mr. Must [the third time he had done so] resulted in a salary increase to $60,000.00. Ex. A-3, Jack Must Deposition Transcript, page 46, line 8. (In addition, he was still eligible for a discretionary quarterly bonus at the level known as "half bonus"). Ex. A-3, Jack Must Deposition Transcript, page 46, line 25.

**13.** Mr. Must's $60,000.00 annual salary rate was never increased during his employment. Ex. A-3, Jack Must Deposition Transcript, page 46, line 12.

**14.** Mr. Must did not have any complaints about the way he was treated from the time he was promoted to the Assistant Manager position up to the time he was promoted to Store Manager. Ex. A-3, Jack Must Deposition Transcript, page 45, lines 21 thru 46, line 1.

**F.** **Mr. Must's Troubles Begin His First Year As Store Manager:**

**1.** Mr. Must had no complaints about the way he was treated during his first year as Store Manager. Ex. A-3, Jack Must Deposition Transcript, page 72, line 25.

**2.** In October 2001, Mr. Zuppa raised Mr. Must's quarterly bonus level to .001 percent of company profits, which is referred to as "full bonus" (as opposed to his prior level, known as "half bonus"). Ex. A-3, Jack Must Deposition Transcript, page 68, lines 17 thru page 69, line 4; Ex. A-6, Andrew Zuppa Deposition Transcript, page 86, line 9.

**3.** The bonus is based on company-wide [as opposed to store specific] profits, but it is discretionary, and Mr. Must knew that management could cut or withhold his bonus based on what they thought of his performance. Ex. A-3, Jack Must Deposition Transcript, page 69, lines 5 thru 15.

**4.**     Store sales can be a factor in cutting a Store Manager's bonus.  Ex. A-10, William Michael Buscietta Deposition Transcript, page 68, line 16.

**5.**     While he was Store Manager, corporate management often came by the store to visit during the week and on Saturdays.  Ex. A-3, Jack Must Deposition Transcript, page 59, line 9.

**6.**     The purpose is for corporate to come in to provide a third party perspective and observe and notice problems with staffing, displays, or the property.  Ex. A-3, Jack Must Deposition, page 58, line 8.

**7.**     The Store Manager has to prioritize what gets done, but anything Mr. Jabs, Mr. Buscietta (then the General Manager), or Mr. Zuppa say to do needs to be done right away. Ex. A-3, Jack Must Deposition Transcript, page 58, lines 9- 23.

**8.**     Mr. Must admits that Mr. Zuppa came in a lot and was "very supportive" at first during his first year as the Store Manager.  Ex. A-3, Jack Must Deposition Transcript, page 70, lines 15 thru 24.

**9.**     During Mr. Must's first year as the Store Manager, Mr. Jabs promoted Mr. Zuppa [to Assistant General Manager].  Ex. A-6, Andrew Zuppa Deposition Transcript, page 42, line 17.

**10.**     After Mr. Zuppa became Assistant General Manager, he visited the Westminster store more often.  Ex. A-3, Jack Must Deposition Transcript, page 61, line 10.

**11.**     Mr. Must felt that Mr. Zuppa gradually grew more negative in his comments to him.  Ex. A-3,  Jack Must Deposition, page 71, line 11.

11

12.     By the end of the first year Mr. Must was the Westminster Store Manager, store sales had *declined* over 3% from the year before.  Ex. A-8, Lori Tielke Affidavit paragraph 5.

13.     The Westminster's store's performance *decline* the first year of Mr. Must's tenure as Store Manager from the prior year was by far the worst performance of the front range locations, which were either about flat or showed significant *increases* of between 5% to 10%.  Ex. A-8, Lori Tielke Affidavit paragraph 6.

14.     Mr. Must does not recall anything that would have negatively impacted sales numbers his first year.  Ex. A-3, Jack Must Deposition Transcript, page 75, line 11.

G.      **Mr. Must's Second Year As Store Manager Starts Poorly, Continues Poorly, And Ends Poorly:**

1.      Mr. Must does not have any complaints about the way he was treated his second year as Store Manager.  Ex. A-3, Jack Must Deposition Transcript, page 73, line 22.

2.      At the beginning of his second year, right after the July 4th holiday, 2002, he received a "write-up."  Ex. A-3, Jack Must Deposition Transcript, page 76, line 4; Ex. A-22, Deposition Exhibit No. 12.

3.      At AFW, write-ups for Store Managers are rare, because Mr. Jabs believes feedback at that level should be verbal:

> "From my personal visits to the store and, you know, telling him to shape up, a lot of verbal -- I think what you are kind of relating to is I think, on a lower level, you do written reviews.  That's basically the way the company works.  If you are a dock guy, and you screw up, you get it in writing.
>
> But when you get to be a manager, you don't really -- you know, you tell a manager verbally.  And you really assume that that's all

you need to do.  To sit down and reduce it to writing is probably:
You're fired.  You know, that's when the  writing starts.

I think pretty much, in our company, if the thing's in writing, that
means pretty much you're -- it's the end of the road.  I can't
remember the last time I reviewed a manager, for example, in
writing."

Ex. A-9, Jake Jabs Deposition Transcript, page 32, line 21 thru page 33, line 13.

       **4.**     Mr. Must understood management felt he had problems managing his

staff.  Ex. A-3, Jack Must Deposition Transcript, page 76, line 7.

       **5.**     Mr. Must understood management felt he was letting some staff come in

late.  Ex. A-3, Jack Must Deposition Transcript, page 76, line 11.

       **6.**     Mr. Must understood management felt he was not holding daily sales

meetings correctly.  Ex. A-3, Jack Must Deposition Transcript, page 76, line 15.

       **7.**     Mr. Must understood management felt he did not have the store cleaned

and ready when it was time to open.  Ex. A-3, Jack Must Deposition Transcript, page 76, line 19.

       **8.**     Later that month, he received a letter from Mr. Jabs complaining about

his management of the store's sales staff.  Ex. A-3, Jack Must Deposition Transcript, page 77,

line 17; Ex. A-23, Deposition Exhibit No. 13.

       **9.**     He knew Mr. Jabs felt he was getting lax with the sales staff.   Ex. A-3,

Jack Must Deposition Transcript, page 77, line 20.

       **10.**     He knew Mr. Jabs felt it was the Store Manager's responsibility to make

sure the sales staff was doing their job correctly.   Ex. A-3, Jack Must Deposition Transcript,

page 77, line 24.

EMPLOY\284850.1

**11.**    In 2003, during Mr. Must's second year as Store Manager, Mr. Jabs cut his quarterly bonus in half. Ex. A-8, Lori Tielke Affidavit paragraph 8.

**12.**    Mr. Must was the only Store Manager in the bonus program whose bonus was cut during his second year. Ex. A-8, Lori Tielke Affidavit paragraph 9.

**13.**    Mr. Jab's explained the decision to cut Mr. Must's bonus as follows:

> "Well, just when I would go to the stores, and I would walk into Westminster; and there would be customers and not enough salesmen; Jack wouldn't be around. I'm trying to find out why we didn't have enough -- customers would come up to me and want me to wait on them, which I don't really have time to wait on customers. And he just -- so it got so I went there more often trying to help Jack get on track. And I went over a few mornings, and I'd go in for the morning sales meeting and -- we would have a meeting every morning, the salesmen. And Jack would be holding the meeting, and salesmen were just lollygagging around.
>
> Jack just didn't seem like he could take any instruction from me. He was basically unsupervisable. Never, ever improved his performance. He was just -- in my 52 years of business, he was probably the worst manager I ever saw.
>
> It sort of accumulated to where – you know, when I was personally trying to help him and make him better, it was just like I was talking to the wall."

Ex. A-9, Jake Jabs Deposition Transcript, page 28, lines 14 thru page 29, line 14.

**14.**    Mr. Must was aware that management felt during his second year that his store's performance needed to be improved. Ex. A-3, Jack Must Deposition Transcript, page 79, lines 22 thru page 80, line 1.

**15.**    By the end of Mr. Must's second year as Store Manager, the Westminster store had another *decline* in store sales compared to the year before he took over as Store Manager; again, the percentage decline (7.24%) was the worst of all the front range locations,

most of which had sales *increases* of either 6 or 19%.  Ex. A-8, Lori Tielke Affidavit paragraph 7.

16.     Mr. Must acknowledges that Mr. Zuppa began to be critical on his visits to the store – he complained about everything and always had something to complain about.  Ex. A-3, Jack Must Deposition Transcript, page 60, line 17; page 64, line 21.

17.     Mr. Must says he viewed Mr. Zuppa's comments as "harassment."  Ex. A-3, Jack Must Deposition Transcript, page 60, line 20; page 61, line 23 thru page 62, line 5.

18.     For example, Mr. Must viewed Mr. Zuppa's comments about the store's [sales] numbers as harassment.  Ex. A-3, Jack Must Deposition Transcript, page 62, line 8.

19.     Mr. Must does not recall anything that would have negatively impacted sales numbers his second year.  Ex. A-3, Jack Must Deposition Transcript, page 75, line 15.

### H.     Mr. Must's Third Year As Store Manager Continues Poorly And He Makes Things Worse At The End, Leading To The Request That He Return to Sales:

1.     Mr. Must concedes he has no complaints about the way he was treated during his third year, up until the last month, June, 2004.  Ex. A-3, Jack Must Deposition Transcript, page 74, line 11.

2.     In 2003, during his third year as Store Manager, Mr. Jabs cut Mr. Must's quarterly bonus in half again.  Ex. A-8, Lori Tielke Affidavit paragraph 11.

3.     Mr. Must was the only Store Manager whose bonus was cut in half during his third year.  Ex. A-8, Lori Tielke Affidavit paragraph 12.

### I.     The Signature Capture System Problem:

1.      The signature capture system was a new, expensive technology that AFW had implemented in all the stores to reduce theft and improve customer invoice processing.  Ex. A-6, Andrew Zuppa Deposition Transcript, page 169, lines 10 thru page 173, line 19.

2.      In late May, 2004, while Mr. Jabs was on a store visit at the Westminster location, Mr. Must told Mr. Jabs that the signature capture system at the store had not been working properly *for four or five months*.  Ex. A-3, Jack Must Deposition Transcript, page 86, line 6.

3.      Mr. Jabs felt that as a Store Manager, Mr. Must should have addressed the problem and had it taken care of.  Ex. A-9, Jake Jabs Deposition Transcript, page 61, line 20 thru page 62, line 4.

4.      Mr. Must concedes Mr. Buscietta (the General Manager at the time) may have felt it was Mr. Must's responsibility to make sure the system was working.  Ex. A-3, Jack Must Deposition Transcript, page 85, line 16.

5.      Mr. Zuppa felt it was "absolutely" Mr. Must's responsibility.  Ex. A-6, Andrew Zuppa Deposition Transcript, page 175, line 12.

6.      Mr. Zuppa felt Mr. Must should have called the IT department and made sure it was fixed, and called him or Mr. Buscietta if that didn't work.  Ex. A-6, Andrew Zuppa Deposition Transcript, page 177, lines 10 thru 17.

7.      Mr. Must concedes it was his responsibility to report problems and make sure they are fixed, nevertheless, he felt it was not his responsibility to make sure the system was working.  Ex. A-3, Jack Must Deposition Transcript, page 84, lines 14 thru 20.

16

**8.**     Mr. Must concedes it is possible that the first time corporate management learned that the system in his store had not been working was when he told Mr. Jabs.  Ex. A-3, Jack Must Deposition Transcript, page 87, line 12.

**9.**     Mr. Jabs called Mr. Buscietta, and the problem was fixed.  Ex. A-3, Jack Must Deposition Transcript, page 85, lines 17 thru 25.

**10.**     Mr. Buscietta was in charge of the IT Department.  Ex. A-9, Jake Jabs Deposition Transcript, page 62, line 20.

**11.**     Mr. Buscietta was upset with Mr. Must because he believed he had failed to take personal responsibility for the signature capture system in the Westminster store, and failed to report the problem for several months.  He was also upset with Mr. Must because of manner in which this problem was brought to his attention.  He felt Mr. Must was not performing his job as Store Manager.  Ex. A-11, William Michael Buscietta Affidavit paragraph 2.

**J.**     **Mr. Zuppa Saves Mr. Must From Being Fired After Mr. Must Is Disrespectful To Mr. Buscietta:**

**1.**     A few days later, at the monthly meeting for Store Managers in early June, 2004 at which bonus checks were distributed, Mr. Buscietta did not give Mr. Must a bonus check and told him that he wanted to speak with him in his office after the meeting.  Ex. A-3, Jack Must Deposition Transcript, page 91, lines 21 thru page 92, line 4.

**2.**     Mr. Must met with Mr. Buscietta in his office; Mr. Zuppa was also there and the door was open.  Ex. A-3, Jack Must Deposition Transcript, page 94, lines 14 thru 22.

**3.**     In his office, Mr. Buscietta said he did not think Mr. Must should receive any bonus at all.  Ex. A-3, Jack Must Deposition Transcript, page 95, line 17.

17

    **4.**     Mr. Buscietta told Mr. Must he was upset about the problem with the signature capture system.  Ex. A-3, Jack Must Deposition Transcript, page 95, line 21.

    **5.**     Mr. Zuppa described the context of the conversation as generally about accepting personal responsibility, and responsibility for the business and job functions.  Ex. A-6, Andrew Zuppa Deposition Transcript, page 178, line 10.

    **6.**     Mr. Buscietta felt Mr. Must was very belligerent, raising his voice and talking over him and not listening to him.  Ex. A-10, William Michael Buscietta Deposition Transcript, page 110, line 16 thru page 111, line 10.

    **7.**     Mr. Must admits raising his voice to Mr. Buscietta in the meeting. Ex. A-3, Jack Must Deposition Transcript, page 98, line 6.

    **8.**     Mr. Must concedes it was the first time he had done that, and he was not aware of any other manager who had raised their voices with Mr. Buscietta.  Ex. A-3, Jack Must Deposition Transcript, page 98, lines 12 thru 20.

    **9.**     Mr. Buscietta had never had an employee treat him like that. Ex. A-10, William Michael Buscietta Deposition Transcript, page 111, line 13.

    **10.**    Mr. Must then changed the topic completely by claiming he had "a *good* May."  Ex. A-6, Andrew Zuppa Deposition Transcript, page 178, line 15.

    **11.**    Mr. Zuppa felt that when Mr. Must changed the topic it showed that he just didn't "get it" and couldn't address what management felt was the important issue.  Ex. A-6, Andrew Zuppa Deposition Transcript, page 179, line 10.

**12.** Mr. Zuppa told Mr. Must he should not be "patting himself on the back" about the store's May sales numbers. Ex. A-3, Jack Must Deposition Transcript, page 96, line 20.

**13.** Mr. Zuppa felt May had been a *bad* month relative to what the store could do. Ex. A-6, Andrew Zuppa Deposition Transcript, page 179, line 5.

**14.** In fact, the Westminster store May, 2004 sales figures had *declined* from the prior May, and the Westminster's store's performance for that month compared to the prior May was the worst of the front range locations, all of which had sales increases, with the exception of the Southwest store, which had a smaller decline than the Westminster store. Ex. A-8, Lori Tielke Affidavit paragraph 13.

**15.** After the meeting, Mr. Buscietta told Mr. Zuppa that he wanted to fire Mr. Must for being belligerent and disrespectful to him. Ex. A-10, William Michael Buscietta Deposition Transcript, page 120, line 14 thru page 121, line 18.

**16.** AFW's personnel policies (which Mr. Must was aware of) specifically indicate disrespect to management is grounds for immediate termination. Ex. A-16, Deposition Exhibit No. 4, page 16, Item 35; Ex. A-17, Deposition Exhibit No. 2, page 2, Item 23.

**17.** Mr. Zuppa asked Mr. Buscietta not to fire him, and said something to the effect of "he's my responsibility, let me work with him." Ex. A-10, William Michael Buscietta Deposition Transcript, page 121, lines 1 thru 3.

**18.** Mr. Buscietta also spoke with Crystal Hayes, the Human Resources Director, and told her about how disrespectful Mr. Must had been and how upset about he was. Ex. A-12, Crystal Hayes Deposition Transcript, line 95, line 1 thru page 96, line 20.

19.     She followed up with Mr. Zuppa, who told her she had "enough on her plate" and that he would take care of it.  Ex. A-12, Crystal Hayes Deposition Transcript, page 95, line 21.

20.     Mr. Must knew that they felt his performance was unacceptable, and he felt his job was in jeopardy.  Ex. A-3, Jack Must Deposition Transcript, page 97, lines 6 thru 12.

21.     Mr. Must did not feel Mr. Buscietta's and Mr. Zuppa's complaints about his performance were because of his age, but he did feel *Mr. Zuppa* was "out to get him."  Ex. A-3, Jack Must Deposition Transcript, page 112, line 22.

22.     Mr. Must then began keeping notes of some of his interactions with management, beginning with this meeting.  Ex. A-3, Jack Must Deposition Transcript, page 92, line 15 thru page 93, line 21.

### K.     Mr. Must Complains About Mr. Zuppa To Mr. Jabs And Learns Mr. Zuppa Has Been Instructed To Evaluate Whether To Retain Him:

1.     By early June, 2004, Mr. Must felt that Mr. Zuppa did not like the store, and had made negative comments about it, such as it was "somewhere off planet earth" and "they'd all starve if they had to live on it."  Ex. A-3, Jack Must Deposition Transcript, page 113, line 17.

2.     Mr. Must decided to complain to Mr. Jabs about Mr. Zuppa, claiming Mr. Zuppa had been harassing him about the store's numbers.  Ex. A-3, Jack Must Deposition Transcript, page 111, line 22 thru page 112, line 1.

**3.**     Mr. Jabs does not like to discipline employees himself, because he is the owner of the company, and instead he talks to their supervisors, so he can wear the "white hat." Ex. A-9, Jake Jabs Deposition Transcript, page 30, line 10.

**4.**     Mr. Jabs told Mr. Must that he thought Mr. Zuppa should not be harassing Mr. Must about the numbers because Mr. Must had no control over them.  Ex. A-3, Jack Must Deposition Transcript, page 112, line 6.

**5.**     Mr. Jabs explains that he is responsible for company profits because he does the buying and advertising, and signs checks for expenses; because what he buys is critical, he does not believe Store Managers have a lot of control over whether what he buys will sell. Ex. A-9, Jake Jabs Deposition Transcript, page 23, line 21 thru page 26, line 2.

**6.**     Mr. Must understood he had some control, but not a lot of control: his attitude was that as long as he ran the store well and had the sales staff taking care of the customers, the store would "do what it was going to do." Ex. A-3, Jack Must Deposition Transcript, page 112, lines 11 thru 17.

**7.**     Mr. Must understood he was expected to do everything he could to maximize sales in the store. Ex. A-3, Jack Must Deposition Transcript, page 50, line 25.

**8.**     Mr. Must understood his job was to make sure the store was in a position to maximize sales. Ex. A-3, Jack Must Deposition Transcript, page 51, line 24.

**9.**     Mr. Must agrees what the Store Manager does or does not do can impact sales. Ex. A-3, Jack Must Deposition Transcript, page 51, line 25 thru page 52, line 3.

**10.**     He knew management expected him to do all that he could to make store sales as high as possible. Ex. A-3, Jack Must Deposition Transcript, page 52, line 7.

21

**11.**     He also knew he was expected to fix any problems that might be preventing the store from selling all that it could.  Ex. A-3, Jack Must Deposition Transcript, page 52, line 11.

**12.**     After Mr. Must's conversation with Mr. Jabs complaining about Mr. Zuppa, Mr. Zuppa called Mr. Must.  Ex. A-3, Jack Must Deposition Transcript, pages 113, line 25 thru page 114, line 2.

**13.**     Mr. Must was sure Mr. Zuppa was unhappy with him for complaining to Mr. Jabs about him.  Ex. A-3, Jack Must Deposition Transcript, page 114, line 5.

**14.**     Mr. Zuppa told Mr. Must that Mr. Jabs had instructed him to evaluate the store and Mr. Must and Mr. Ward [the Assistant Manager].  Ex. A-3, Jack Must Deposition Transcript, page 114, line 9.

**15.**     Mr. Zuppa told him he needed to find ways to increase sales.  Ex. A-3, Jack Must Deposition Transcript, page 114, line 12.

**16.**     Mr. Zuppa also told him that if sales did not increase he would do the paperwork necessary to remove him as Store Manager.  Ex. A-3, Jack Must Deposition Transcript, page 114, lines 16 thru 19.

**17.**     Mr. Zuppa also told him that if anything happened like what had happened in Mr. Buscietta's office, it would happen right away.  Ex. A-3, Jack Must Deposition Transcript, page 115, line 8.

**18.**     Mr. Must felt his job was on the line.  Ex. A-3, Jack Must Deposition Transcript, page 115, line 15.

**L.**     **Mr. Jabs Moves Upper Management To Different Positions Without Notice:**

22

     **1.**     In mid-June, 2004, Mr. Jabs decided to change upper management, promoting Mr. Zuppa from Assistant General Manager to General Manager, promoting Dale Pepper from the Manager of the Thornton facility to Assistant General Manager, and moving Mr. Buscietta from General Manager to Manager of the Thornton facility.  Ex. A-5, Plaintiff's Document No. 12.

     **2.**     Mr. Buscietta had been the General Manager for 10 years; without any warning, Mr. Jabs simply told him he "wanted to make a change."  Ex. A-10, William Michael Buscietta Deposition Transcript, page 131, lines 1thru 25.

     **3.**     Mr. Must concedes that Mr. Buscietta's move could be seen as a demotion.  Ex. A-3, Jack Must Deposition Transcript, page 110, line 10.

     **M.**     **Mr. Zuppa Visits The Store, But Sometimes Mr. Must Is Not There, And The Store's Assistant Manager Complains About Mr. Must And Asks To Return To Sales:**

     **1.**     When he took over as General Manager, Mr. Zuppa increased his visits to the various stores, including the Westminster store, in order to develop a more direct relationship with the Store Managers.  Ex. A-6, Andrew Zuppa Deposition Transcript, page 121, line 20 thru page 122, line 6.

     **2.**     Mr. Zuppa would visit two or three times a week.  Ex. A-3, Jack Must Deposition Transcript, page 61, line 21.

     **3.**     Mr. Zuppa had a route that took him to various stores (including the Fort Collins location) throughout the day, and sometimes he would not arrive at the Westminster store until the evening.  Ex. A-6, Andrew Zuppa Deposition Transcript, page 185, line 22 thru page 186, line 11.

    **4.**      Mr. Zuppa would have his staff call so Mr. Must would know that he was planning on coming. Ex. A-6, Andrew Zuppa Deposition Transcript, page 186, line 20.

    **5.**      Sometimes Mr. Must was there when Mr. Zuppa would come by in the evenings, but sometimes he wasn't. Ex. A-3, Jack Must Deposition Transcript, page 106, line 9.

    **6.**      Mr. Zuppa was unhappy with the fact that Mr. Must was not always there for his visits; he felt he was interrupting his day to see Mr. Must, and being there was part of the job, just as he would have been there if his boss had asked him. Ex. A-6, Andrew Zuppa Deposition Transcript, page 187, lines 7 thru 15.

    **7.**      When Mr. Must was not there for his visits, Mr. Zuppa also felt that Mr. Must was letting him down after he had so often tried to help him, including recently saving his job after Mr. Buscietta had wanted to fire him for being disrespectful to him. Ex. A-7, Andrew Zuppa Affidavit paragraph 4.

    **8.**      If Mr. Must was not there, Mr. Zuppa met with the Assistant Store Manager, Tom Ward. Ex. A-6, Andrew Zuppa Deposition Transcript, page 187, line 1.

    **9.**      The Assistant Store Manager, Tom Ward, was born on July 13, 1949 (he is age 58). Ex. A-13, Thomas K. Ward Deposition Transcript, page 8, line 17.

    **10.**      Mr. Ward started with AFW in April, 1999 (he was almost 50 years of age when he was hired). Ex. A-13, Thomas K. Ward Deposition Transcript, page 17, line 6.

    **11.**      Mr. Ward became the Assistant Manager at the Westminster store in October, 2001, at the request of Mr. Must. Ex. A-13, Thomas K. Ward Deposition Transcript, page 19, line 17 thru page 20, line 14.

12.     Mr. Must complained to Mr. Ward about AFW management and their expectations, and called Mr. Zuppa "crazy." Ex. A-13, Thomas K. Ward Deposition Transcript, page 121, lines 8 thru 18.

13.     Mr. Must complained to Mr. Ward about Mr. Zuppa, Mr. Buscietta, and Mr. Pepper, and saying he felt they expected too much, like with policies, working on days off or mandatory holidays, and finding problems on store visits, and expecting Mr. Must to be there in the evenings for Mr. Zuppa's store visits. Ex. A-13, Thomas K. Ward Deposition Transcript, page 123, line 25 thru page 124, line 19; page 126, lines 12 thru 15.

14.     Mr. Must would talk to Mr. Ward about these things where it would not be hard for other staff to hear. Ex. A-13, Thomas K. Ward Deposition Transcript, page 123, lines 4-11.

15.     Mr. Must concedes that he may have made negative comments about Mr. Zuppa to Mr. Ward, as well as other employees. Ex. A-3, Jack Must Deposition Transcript, page 55, line 23 thru page 56, line 10.

16.     One of the nights that Mr. Zuppa met with Mr. Ward because Mr. Must had not waited for him, Mr. Ward told him that Mr. Must had been complaining about upper management, making negative comments about Mr. Zuppa and Mr. Buscietta, and that Mr. Must was generally disgruntled about work schedules and very unhappy, and was making that known to subordinate employees. Ex. A-6, Andrew Zuppa Deposition Transcript, page 193, line 23 thru page 194, line 20.

17.     Mr. Ward told Mr. Zuppa that he did not want to work any longer in management with Mr. Must; he said he wanted to go back into sales, because the store was "out

25

of control" and the employees did not respect Mr. Must.  Ex. A-13, Thomas K. Ward Deposition Transcript, page 73, line 21 thru page 75, line 14.

18.     Mr. Ward was not the only Westminster management employee with complaints about Mr. Must's management of the store. The year before, in August, 2003, Nolan Morrison transferred to the Westminster store as a trainee for the "turnkey manager" position. Ex. A-14, Nolan P. Morrison Deposition Transcript, page 19, lines 8 thru 23.

19.     Mr. Morrison began his employment with AFW in 2001, but he had worked in the furniture business since 1993, including management positions.   Ex. A-15, Nolan P. Morrison Affidavit paragraph 2.

20.     At AFW, Mr. Morrison had worked in sales at the large Thornton facility, and served as a management trainee on the loading dock at Thornton and in warehouse management in Thornton, before the turnkey trainee position at the Westminster store.  Ex. A-14, Nolan K. Morrison Deposition Transcript, page 18, line 10 thru page 20, line 7.

21.     Mr. Morrison felt the Westminster salespeople took extended lunches, stayed in the break room, showed up late or not at all, and were "mouthy" in sales meetings.  Ex. A-14, Nolan P. Morrison Deposition Transcript, page 38, lines 7 thru 12.

22.     Mr. Morrison felt the salespeople didn't take their job seriously, didn't abide by company rules, and didn't respect the managers.  Ex. A-14, Nolan P. Morrison Deposition Transcript, page 37, lines 7 thru 13.

23.     Mr. Morrison felt the salespeople respected Mr. Must the least of the managers. Ex. A-14, Nolan P. Morrison Deposition Transcript, page 38, line 3.

26

24.     Mr. Morrison left the Westminster store to take over as Sales Manager at the Thornton facility. Ex. A-14, Nolan P. Morrison Deposition Transcript, page 19, line 22 thru page 20, line 2.

25.     In that position, Mr. Morrison supervised between 70 – 90 sales people, directly reported sales to Mr. Jabs, and was responsible in the evening for closing the showroom and warehouse facility. Ex. A-15, Nolan P. Morrison Affidavit paragraph 3.

26.     After hearing from Mr. Ward about Mr. Must's complaints and Mr. Ward's desire to return to sales rather than work with Mr. Must any longer, Mr. Zuppa concluded Mr. Must was unhappy as Store Manager, that Mr. Must did not want the long hours associated with being a Store Manager, and that his attitude was hurting the store. Ex. A-7, Andrew Zuppa Affidavit paragraph 5.

27.     On June 16, 2004, Mr. Zuppa came to the store for a store visit and met with both Mr. Must and Mr. Ward, and Mr. Must tape recorded some of the discussion. Ex. A-3, Jack Must Deposition Transcript, page 115, line 25 thru page 116, line 3.

28.     Mr. Must felt Mr. Zuppa was going to get him fired and something might happen and he wanted to protect himself; he did not tell anyone he was tape recording the discussion or ask permission. Ex. A-3, Jack Must Deposition Transcript, page 116, line 11 thru page 117, line 23.

29.     Mr. Must did not begin the recording until about ten minutes after Mr. Zuppa arrived at the store, and he does not recall what happened before or after the recording. Ex. A-3, Jack Must Deposition Transcript, page 118, line 21 thru page 119, line 21.

27

**30.** A transcript of the recording is Deposition Exhibit 31. Ex. A-6, Andrew Zuppa Deposition Transcript, page 124, line 6 thru page 126, line 16; Ex. A-18, Deposition Exhibit 31.

**31.** By this time Mr. Zuppa was becoming frustrated with Mr. Must, because he was not accustomed to having to say things over and over, and he had taken personal responsibility for Mr. Must after promoting him and sticking up for him and trying to coach him, but he felt he was "hitting a complete wall with him." Ex. A-6, Andrew Zuppa Deposition Transcript, page 125, line 20 thru page 126, line 16.

**32.** At the outset, Mr. Zuppa reminded Mr. Must that he was very disappointed about what had happened in Mr. Buscietta's office. Ex. A-18, Deposition Exhibit No. 31, page 1, line 12.

**33.** Mr. Zuppa told Mr. Must he needed to increase sales and decrease costs at the store. Ex. A-3, Jack Must Deposition Transcript, page 119, line 24 thru page 120, line 2; Ex. A-18, Deposition Exhibit No. 31, page 2, line 6.

**34.** Mr. Zuppa said the store sales had declined from where they were before Mr. Must became Store Manager. Ex. A-6, Andrew Zuppa Deposition Transcript page 136, line 23.

**35.** Mr. Zuppa felt the store should have been doing better than it was, and that there was no reason for it to performing poorly, particularly compared to the rest of the business, which had grown as a result of the "nesting" that took place after 9/11. Ex. A-6, Andrew Zuppa Deposition Transcript page 144, line 18 thru page 145, page 24.

EMPLOY\284850.1

36.     When Mr. Zuppa explained his belief that store sales should be higher to Mr. Must, he did not disagree. Ex. A-18, Deposition Exhibit No. 31, pages 4 thru 6.

37.     By saying he wanted to decrease costs, Mr. Zuppa meant he wanted to decrease the number of front office staff working in the evening; when he had arrived, he saw three front office staff when he felt only one was necessary. Ex. A-6, Andrew Zuppa Deposition Transcript, line 128, line 16 thru page 129, line 10.

38.     Mr. Zuppa said that if they couldn't fix the problem, he would bring in someone who could, because the store was a "good training ground" and he could bring in a "ball breaking" person to run it and increase sales. Ex. A-18, Deposition Exhibit No. 31, page 2, lines 13-26.

39.     By "training ground" Mr. Zuppa meant that he felt it was an easy store to run, and by then Mr. Must should have moved on to a store with more responsibility if he had been doing a good job. Ex. A-6, Andrew Zuppa Deposition Transcript, page 129, line 25 thru page 130, line 14.

40.     By "ball-breaking", Mr. Zuppa meant someone who would be effective. Ex. A-6, Andrew Zuppa Deposition Transcript, page 132, line 9.

41.     Mr. Zuppa told them he felt that having three managers [besides Mr. Must and Mr. Ward, there was another manager] was excessive at that store given the sales levels and issues in the store. Ex. A-18, Deposition Exhibit No. 31, pages 2, line 30 thru page 4, line 8.

42.     Mr. Zuppa also told Mr. Must he thought the store needed a better sales staff.   Ex. A-3, Jack Must Deposition Transcript, page 120, line 8.

29

**43.**     Mr. Zuppa told Mr. Must he thought there was a problem because he did not see enough sales staff on the floor when he visited at night.  Ex. A-3, Jack Must Deposition Transcript, page 121, line 10.

**44.**     Mr. Zuppa mentioned "flushing out dead weight" and "getting more aggressive help." Ex. A-18, Deposition Exhibit No. 31, page 4, line 12.

**45.**     Mr. Must did not disagree, he responded that he was "in the process" of doing that.   Ex. A-18, Deposition Exhibit No. 31, page 4.

**46.**     Mr. Zuppa felt that the sales staff were often not doing their jobs when he visited. Ex. A-6, Andrew Zuppa Deposition Transcript, page 133, line 4 thru page 134, line 1.

**47.**     Mr. Zuppa told Mr. Must that when he came to the store there were sales staff at McDonald's or outside smoking or somewhere other than in the store itself.  Ex. A-3, Jack Must Deposition Transcript, page 124, line 15.

**48.**     Mr. Jabs had also complained to Mr. Zuppa that when Mr. Jabs visited the stores, he saw sales staff leaving the store, or could not see sales staff, and customers were unattended.  Ex. A-6, Andrew Zuppa Deposition Transcript, page 121, lines 6 thru 12.

**49.**     Mr. Jabs believes sales staff should be visible in the vicinity even if a customer has indicated they are "just looking."  Ex. A-9, Jake Jabs Deposition Transcript, page 37, lines 6 thru 19.

**50.**     Mr. Must knew that it was important to AFW and to Mr. Jabs that customers were treated right in the stores, that Mr. Jabs felt it was important that every customer have a positive experience with the sales staff when they visit the store, and that making sure

30

customers are treated right is the key to making sales. Ex. A-3, Jack Must Deposition Transcript, page 25, lines 7 thru 19.

51.     Mr. Ward had heard customer complaints about this issue as well, and would point out to Mr. Must if a customer left without being waited on. Ex. A-13, Thomas K. Ward Deposition Transcript, page 46, line 20 thru page 47, line 24.

52.     Mr. Zuppa felt he had gone over this issue, which was very important to Mr. Jabs – and satisfying Mr. Jabs is the number one priority --- with Mr. Must many times, and that Mr. Must's excuses were inadequate. Ex. A-6, Andrew Zuppa Deposition Transcript, page 127, line 12 thru page 128, line 1.

53.     Mr. Zuppa felt that Mr. Must should have had the staff "lined up like a zone defense" if that was what he and management were asking Mr. Must to do, rather than have management keep telling him to do it over and over. Ex. A-6, Andrew Zuppa Deposition Transcript, page 132, line 19 thru page 133, line 3.

54.     There were only four sales staff on the clock at the Westminster store the evening of June 16, 2004. Ex. A-8, Lori Tielke Affidavit paragraph 16.

55.     Mr. Must concedes Mr. Zuppa had complained to him about this before June 2004, but Mr. Must felt that all of Mr. Zuppa's complaints were unfair, and he considered them "harassment" because he was always negative and never had anything positive to say. Ex. A-3, Jack Must Deposition Transcript, page 64, line 15 thru 23.

56.      Mr. Zuppa met again with Mr. Must during a store visit on June 30, 2004, and Mr. Zuppa again complained about seeing customers who were not being helped by sales staff. Ex. A-3, Jack Must Deposition Transcript, page 127, line 14.

31

**57.**     There were only four sales staff on the clock at the Westminster store the evening of June 30, 2004.  Ex. A-8, Lori Tielke Affidavit paragraph 17.

**58.**     As of the end of June, 2004, Westminster store sales for the prior twelve months had again *declined* (about 6%) from the level they were the year before he took over as Store Manager. Again, the Westminster store's performance was the worst among the front range locations (most of which had *increases* ranging from 12 – 34%).  Ex. A-8, Lori Tielke Affidavit paragraph 10.

**59.**     Mr. Must does not recall anything that would have negatively impacted sales numbers during his third year.  Ex. A-3, Jack Must Deposition Transcript, page 75, line 20.

**60.**     Mr. Must acknowledges the store's performance could have been improved every year.  Ex. A-3, Jack Must Deposition Transcript, page 79, line 21.

N.      **Mr. Zuppa Saves Mr. Must From Being Fired A Second Time After Mr. Must Tells The New Assistant General Manager, Mr. Pepper, He Does Not Want To Work The July 4th Holiday, Which Is A Mandatory Work Day for Store Managers:**

**1.**     AFW policy is that holidays are mandatory work days for Store Managers; Mr. Must signed off on a March 2003 policy about this, which specifically lists Independence Day as a mandatory work day.  Ex. A-4, Deposition Exhibit No. 14; Ex. A-3, Jack Must Deposition Transcript, page 80, line 7.

**2.**     Mr. Must knew the reason for this policy is that furniture sales often increase on holidays.  Ex. A-3, Jack Must Deposition Transcript, page 30, line 16.

**3.**     Mr. Must knew this was just one of the aspects in which working in the retail furniture industry can require difficult hours.  Ex. A-3, Jack Must Deposition Transcript, page 30, line 21.

32

4.      In 2004, July 4th was a Sunday.  Ex. A-19, Dale Pepper Deposition Transcript, page 28, line 22.

5.      Before the weekend began, Mr. Pepper, the new Assistant General Manager, contacted all the stores.  Ex. A-19, Dale Pepper Deposition Transcript, page 29, line 24.

6.      Store Managers are normally off on Sundays and Mondays, and many holidays are observed on a Monday (*e.g.* Labor Day), but because July 4th that year was on a Sunday, he wanted to remind the Store Managers they were expected to work both Sunday (the Holiday) as well as Monday.  Ex. A-19, Dale Pepper Deposition Transcript, page 31, line 18 thru page 32, line 25.

7.      None of the other Store Managers objected  - they expected it and did not indicate they were disappointed.  Ex. A-19, Dale Pepper Deposition Transcript, page 33, lines 8 thru 22.

8.      The only one who indicated they had other plans was Mr. Must.  Ex. A-19, Dale Pepper Deposition Transcript, page 33, line 23 thru page 34, line 3.

9.      Mr. Must said he did not want to work both days and had a family to go home to.  Ex. A-3, Jack Must Deposition Transcript, page 133, lines 15 thru 21.

10.     Mr. Must told Mr. Pepper he understood it was company policy but he didn't want to work both days.  Ex. A-3, Jack Must Deposition Transcript, page 133, line 25.

11.     Mr. Must told Mr. Pepper that he would work Monday but didn't want to work Sunday [which was the holiday].  Ex. A-3, Jack Must Deposition Transcript, page 134, line 6.

33

12.     Mr. Must said he did not think it was fair to the Store Manager to work both days.  Ex. A-3, Jack Must Deposition Transcript, page 134, line 21.

13.     Mr. Must claims he told Mr. Pepper he would work if he had to, and Mr. Pepper told him that this was the policy, but if Mr. Must "did not want to work Sunday, he didn't have to."  Ex. A-3, Jack Must Deposition Transcript, page 134, lines 18 thru 24.

14.     Mr. Must interpreted that remark as a "set-up."  Ex. A-3, Jack Must Deposition Transcript, page 134, line 25 thru page 135, line 1.

15.     Mr. Must concedes that Mr. Pepper did not know after their conversation whether Mr. Must was going to work on Sunday.  Ex. A-3, Jack Must Deposition Transcript, page 137, line 22.

16.     Mr. Must also complained to Mr. Ward about having to work over the holiday.  Ex. A-3, Jack Must Deposition Transcript, page 103, line 23.

17.     Mr. Pepper was so "pissed" about his conversation with Mr. Must that he wanted to go to the store, fire him, and run the store himself until closing, and he went to Mr. Zuppa to tell him.  Ex. A-19, Dale Pepper Deposition Transcript, page 48, line 19 thru page 49, line 17.

18.     Mr. Zuppa told him he would handle it.  Ex. A-19, Dale Pepper Deposition Transcript, page 48, line 19 thru page 49, line 17.

19.     The store sales figures for Sunday, July 4, 2004 show the Westminster location nearly *doubled* its sales compared to each of the prior days that month [which corroborates Mr. Pepper's desire that Mr. Must be there].  Ex. A-8, Lori Tielke Affidavit paragraph 14.

**O.**     **Mr. Zuppa Decides to Return Mr. Must to Sales, Consistent with Past Practice:**

**1.**     In July 2004, after the latest episode where the new Assistant General Manager, Mr. Pepper, wanted to fire Mr. Must, Mr. Zuppa felt he had done all he could for Mr. Must to save his position as Store Manager.  Before this, all the other members of the corporate management team and his own Assistant Store Manager had complained about him: (1) Mr. Jabs had complained about him and had repeatedly cut his bonus; (2) the prior General Manager, Mr. Buscietta, had wanted to fire him the month before for being disrespectful; (3) the Assistant Store Manager, Tom Ward, had reported to him Mr. Must's complaints about management and the company, and asked to return to sales so he would no longer have to work for him; and (4) Mr. Zuppa felt the problems with the sales force and store sales had continued, even after he had expressly warned Mr. Must that if the problems were not fixed he would bring in someone new. Despite this background, Mr. Must had upset the new Assistant General Manager Mr. Pepper so much that he had to talk Mr. Pepper out of firing him the day before the busy July 4th holiday weekend.  At this point, he decided Mr. Must could not remain as the Store Manager.  Ex. A-7, Andrew Zuppa Affidavit paragraph 6.

**2.**     Mr. Zuppa decided to move Mr. Must back into sales. Ex. A-7, Andrew Zuppa Affidavit paragraph 7.

**3.**     Moving Mr. Must back into sales was consistent with what he had done with Mr. Smatla and Mr.Willey in 2001, as well as other non-Store Managers since then. Ex. A-7, Andrew Zuppa Affidavit paragraph 9.

**4.**     In 2002, AFW moved a Sales Manager and Assistant Store Manager back into sales positions, and one Warehouse Manager into an hourly warehouse position.     Ex. A-1, Crystal Hayes Affidavit paragraph 9.

**5.**     At AFW, being moved out of a management position is not permanent. One of the managers moved out of management in 2002, Mr. Villa, has since been re-promoted two times, and is now the warehouse manager at the Compark location, which is AFW's largest warehouse. Ex. A-1, Crystal Hayes Affidavit paragraph 10.

**6.**     During 2003, AFW did not fire any Store Managers or move any of them out of that position, but it did move two other non-Store Managers into sales. Ex. A-1, Crystal Hayes Affidavit paragraph 11.

**7.**     One of the managers moved into sales in 2003, Mr. Stevenson, has been re-promoted twice, and is now a Store Manager. Ex. A-1, Crystal Hayes Affidavit paragraph 12.

**8.**     Sometimes managers moved back into sales at their request, like how Mr. Ward had asked Mr. Zuppa to move into sales because he was unhappy with Mr. Must's management of the store. In 2004, prior to this situation with Mr. Must, AFW moved another manager, Mr. Bode, back into sales at Mr. Bode's request. Ex. A-12, Crystal Hayes Deposition Transcript, page 109, line 12.

**9.**     Also, just a few weeks before, Mr. Jabs had moved Mr. Buscietta out of the General Manager position. (See subsection II.L. above.)

**10.**     Mr. Zuppa thought that sales would offer Mr. Must a work schedule that required fewer hours; he thought Mr. Must was unhappy about the work schedule expected of a

EMPLOY\284850.1

manager, based on the comments by Mr. Ward, Mr. Must's complaint to Mr. Pepper about working on the July 4th holiday, his own problems meeting with Mr. Must in the evenings for store visits, and his recollection that when he first contacted Mr. Must about the management trainee program, concern about the work schedule was one issue that Mr. Must had raised with him. Ex. A-7, Andrew Zuppa Affidavit paragraph 11.

  **11.** Mr. Zuppa also thought Mr. Must could make as much in sales as he did as a Store Manager based on his experience [he had over 14 years retail furniture experience by then]. Ex. A-6, Andrew Zuppa Deposition Transcript, page 188, line 12 thru page 189, line 6.

  **12.** AFW had many sales employees earning close to or more than Mr. Must's Store Manager salary. For example, in 2003, 49 sales employees earned over $50,000.00, including 16 who earned between $60,000.00 and over $80,000.00. In 2004, there were again 49 sales employees with earnings over $50,000.00, including 13 who earned between $60,000.00 and over $85,000.00. In 2005, there were over 50 sales employees with earnings over $50,000.00, including 21 who earned between $60,000.00 and over $98,000.00. Ex. A-8, Lori Tielke Affidavit paragraph 21.

  **13.** These figures are even better for people who started in sales in 1998 at AFW (when Mr. Must was rehired). Notably, *all* the sales staff who started in sales in 1998 and who were employed in sales in 2003-2005 ("1998 hires") were included in these over $50,000.00 per year groups. These individuals were at the top end every year of the earnings scale, earning between almost $55,000.00 and almost $72,000.00 in 2003, up to almost $86,000.00 in 2004, and over $98,000.00 in 2005. In fact, their average earnings were more than $59,000.00 in 2003, $63,000.00 in 2004 and over $67,000.00 in 2005. When they worked together in sales in 1998,

Mr. Must earned more than most of them if their 1998 earnings were annualized (Mr. Must made over $50,000.00 annualized in sales before he was promoted into management in 1999), and he was within $10,000.00 of the other two. Ex. A-8, Lori Tielke Affidavit paragraphs 22-24.

14.   In 2002, after Mr. Zuppa returned Mr. Willey to sales, he earned over $58,000.00 in sales.  Ex. A-8, Lori Tielke Affidavit paragraph 18.

15.   In 2003, another manager who returned to sales, Mr. Stevenson, earned over $50,000.00.  Ex. A-8, Lori Tielke Affidavit paragraph 19.

16.   In 2004, another manager moved into sales, Mr. Bode, earned over $63,000.00; he earned over $72,000.00 in 2005. Ex. A-8, Lori Tielke Affidavit paragraph 20.

17.   On Monday, July 5, or Tuesday, July 6, Mr. Zuppa spoke with Mr. Jabs about moving Mr. Must into sales.  Ex. A-6, Andrew Zuppa Deposition Transcript, page 203, line 11; Ex. A-9, Jake Jabs Deposition Transcript, page 51, line 7 thru page 52, line 12.

18.   They agreed it was time to remove him from the Store Manager position and move him into sales.  Ex. A-9, Jake Jabs Deposition Transcript, page 72, line 4 thru page 73, line 6.

19.   Mr. Must's age had nothing to do with the decision to move him from the Store Manager position back into sales.  Ex. A-7, Andrew Zuppa Affidavit paragraph      8; Ex. A-2, Jake Jabs Affidavit paragraph 3.

20.   On Tuesday, July 6, Mr. Zuppa requested payroll cut checks for Mr. Must for his unused vacation and sick pay [he had over a month's worth of pay accumulated], and additional salary for the rest of that week and the next week so he could either take a week off or

build up his commission back order; it was a nice thing to do for him.  Ex. A-6, Andrew Zuppa Deposition Transcript, page 209, lines 12 thru 24.

21.    At or around the time of a change from a salaried management position to a non-salaried position, if the employee had a significant amount of accumulated vacation and sick pay,  AFW typically paid it off at the management level compensation rate at which it had been earned.  Ex. A-8, Lori Tielke Affidavit paragraph 30.

22.    In 2003, AFW adopted a new practice when moving management level staff into sales, of continuing their former salary for the first week or so in sales, to provide a transition period for the employee. All the managers moved in 2003 and 2004 (Messrs. Stevenson, Moore, and Bode) received this benefit, as did Mr. Must, and Mr. Sale after that.  Ex. A-8, Lori Tielke Affidavit paragraph 29.

23.    If Mr. Zuppa had been intending to fire Mr. Must, he would not have brought him the two checks for additional pay for the rest of the week and for the following week. Ex. A-7, Andrew Zuppa Affidavit paragraph 14.

24.    Prior to the July 4th holiday, Mr. Ward had already told Mr. Zuppa that he was not interested in working as the Westminster Store Manager.  Ex. A-7, Andrew Zuppa Affidavit paragraph 15.

25.    Mr. Zuppa spoke with Mr.Buscietta to see if he had any suggestions about who could serve as the new Store Manager; Mr. Buscietta suggested Nolan Morrison (who had worked at the Westminster store the summer before and was serving as the sales manager at the Thornton location), because Mr. Buscietta felt he was one of the few people as good as he was at

39

running AFW stores.  Ex. A-10, William Michael Buscietta Deposition Transcript, page 128, line 2 thru page 129, line 9.

26.     Mr. Jabs is involved with Store Manager decisions and approved the decision to promote Mr. Morrison to the Westminster Store Manager position.  Ex. A-9, Jake Jabs Deposition Transcript, page 19, line 17; page 77, line 24.

27.     Mr. Jabs did not know the ages of Mr. Must or of Mr. Morrison.  Ex. A-9, Jake Jabs Deposition Transcript, page 78, line 13.

28.     On the afternoon of Tuesday, July 6, 2004, Mr. Zuppa came to the store to meet with Mr. Must.  Ex. A-3, Jack Must Deposition Transcript, page 138, line 22 thru page 139, line 18.

29.     Mr. Zuppa asked Mr. Must to go with him upstairs to the leather area. Ex. A-3, Jack Must Deposition Transcript, page 140, line 12.

30.     Mr. Zuppa wanted to talk to him in a more private area.  Ex. A-6 Andrew Zuppa Deposition Transcript, page 201, line 12.

31.     Mr. Zuppa told Mr. Must "we're going in a different direction in this store, and we want you to go back into sales."  Ex. A-3, Jack Must Deposition Transcript, page 140, line 12.

32.     Mr. Must knew that AFW had the right to choose whatever corrective action that it wanted to with employees, including up to termination, that progressive discipline was not necessary, and that nothing restricted AFW's ability to demote employees.  Ex. A-3, Jack Must Deposition Transcript, page 31, line 6 thru 33, line 4.

**33.** Mr. Must also knew that he was an at-will employee, his employment could be terminated at any time, and that there was no contract of employment at AFW. Ex. A-3, Jack Must Deposition Transcript, page 23, line 16 thru page 24, line 19.

**34.** Mr. Must understood he could have accepted the offer to take a sales position. Ex. A-3, Jack Must Deposition Transcript, page 147, line 19.

**35.** Mr. Jabs thought it was very clear Mr. Must was changing back to sales. Ex. A-9, Jake Jabs Deposition Transcript, page 54, line 9.

**36.** Mr. Zuppa expected Mr. Must to accept the transfer to sales, as other managers had before, and as he thought Mr. Must was no longer interested in the responsibilities that came with the Store Manager position, and wanted a better work schedule. Ex. A-7 Andrew Zuppa Affidavit paragraph 13.

**37.** Mr. Must told Mr. Zuppa "I can't do that." Ex. A-3, Jack Must Deposition Transcript, page 140, line 16.

**38.** Mr. Must told Mr. Zuppa he could not afford to take a pay cut and had a family to support. Ex. A-3, Jack Must Deposition Transcript, page 140, line 23.

**39.** Mr. Zuppa was surprised by Mr. Must's response, because he thought Mr. Must could make as much in sales as Store Manager. Ex. A-6, Andrew Zuppa Deposition Transcript, page 188, line 8.

**40.** Mr. Zuppa handed Mr. Must the checks he had brought with him and asked him for his keys and to clean out his desk, and Mr. Must said "I'll see you in court." Ex. A-3, Jack Must Deposition Transcript, page 141, lines 13 thru 20.

**41.** Then Mr. Must said it again, just to see Mr. Zuppa's reaction. Ex. A-3, Jack Must Deposition Transcript, page 141, lines 22 thru 24.

**42.** Mr. Zuppa completed paperwork reflecting that Mr. Must refused to accept the transfer to sales, and that the termination would be treated as a resignation. Ex. A-20, Deposition Exhibit No. 58.

### P. Mr. Morrison Makes Changes At Westminster; Ms. Gurecki Replaces Him:

**1.** Mr. Morrison immediately decided to make changes at the Westminster store, including train and improve the current staff, hire more sales staff for better coverage, and change schedules that were more conducive to the customer load. Ex. A-14, Nolan P. Morrison Deposition Transcript, page 46, lines 11-17.

**2.** Mr. Morrison was also going to try to reverse what he perceived as a "lackadaisical free for all that was going on there." Ex. A-14, Nolan P. Morrison Deposition Transcript, page 46, line 18.

**3.** The following Thursday, Mr. Zuppa came to the store and told him he wanted better coverage of the sales staff on the floor, and he felt there was a big problem about helping customers. Ex. A-14, Nolan P. Morrison Deposition Transcript, page 45, line 10.

**4.** They also talked about floor display and the other employees such as warehouse, design, and front office staff. Ex. A-14, Nolan P. Morrison Deposition Transcript, page 45, line 20.

**5.** Mr. Morrison started interviewing applicants for sales positions and worked on training the existing sales force. Ex. A-14, Nolan P. Morrison Deposition Transcript, page 48, lines 3 thru 19.

6.      During July and August 2004, after Mr. Morrison first started as the Store Manager, he hired five sales people and six quit or were fired.  Ex. A-8, Lori Tielke Affidavit paragraph  31.

7.      Mr. Zuppa later reported to Mr. Morrison that they were not receiving as many complaints about people not being helped, which Mr. Zuppa said he appreciated.  Ex. A-14, Nolan P. Morrison Deposition Transcript, page 67, line 22.

8.      Mr. Ward confirms that things improved after Mr. Must left.  Ex. A-13, Thomas K. Ward Deposition Transcript, page 78, line 2.

9.      In April 2005, Beth Gurecki replaced Mr. Morrison as the Store Manager. Her age is 49.  Ex. A-1, Crystal Hayes Affidavit paragraph 18.

10.     By the end of the twelve month period after Mr. Must quit, sales had increased, and by the following year, sales had significantly increased.  Ex. A-8, Lori Tielke Affidavit paragraph  32.

**Q.      Mr. Must Intends to Sue But Does Not Contact Mr. Jabs, HR, Or File A Grievance And Instead Sees A Lawyer and Destroys Documents:**

1.      At the time he quit, Mr. Must intended to take the company to court.  Ex. A-3, Jack Must Deposition Transcript, page 90, line 25.

2.      Mr. Must was already thinking about suing for age discrimination.  Ex. A-3, Jack Must Deposition Transcript, page 143, lines 9 thru 16.

3.      Mr. Must did not contact Mr. Jabs about his termination, or the Human Resources Director Ms. Hayes, and did not file a grievance under AFW's policy, even though he thought he had been discriminated against and he knew AFW policy prohibits age discrimination and that he could go to Ms. Hayes with any concerns of discrimination.  Ex. A-3, Jack Must

43

Deposition Transcript, page 26, lines 10 thru 13; page 27, line 23; page 154, line 11 thru page 155, line 19.

    **4.**    Rather than filing a grievance, he wanted to speak to an attorney, which he did within a week or two of his termination.  Ex. A-3, Jack Must Deposition Transcript, page 155, line 24.

    **5.**    Mr. Must also destroyed his notes of manager's meetings and other personal notes he had kept about his employment, including "probably two months worth of stuff."  Ex. A-3, Jack Must Deposition Transcript, page 89, line 13 thru page 91, line 15.

    **6.**    The only notes he retained are some notes of his interactions with management beginning with the meeting in Mr. Buscietta's office; he destroyed everything else.  Ex. A-3, Jack Must Deposition Transcript, page 92, line 22, page 93, line 21.

    **7.**    Mr. Must explained that he does not recall anything that happened during this period covered by the notes (June 2 – July 6, 2004) other than what is in the notes he kept; he kept only what he thought was "relevant to what I needed."  Ex. A-3, Jack Must Deposition Transcript, pages 115, line 23, pages 128, lines 18 thru page 131, line 18.

    **R.**    **Age Discrimination Allegations and Age Related Evidence:**

    **1.**    Mr. Must concedes the only event he alleges was age discrimination was what he calls the termination of his employment (as opposed to his resignation); he is not alleging any discrimination with respect to events that occurred prior to his termination.  Ex. A-3, Jack Must Deposition Transcript, page 170, line 16.

**2.** Mr. Must admits he has not heard any derogatory comments about people's age from Mr. Jabs, Mr. Buscietta, Mr. Pepper, Mr. Zuppa, or Mr. Ward. Ex. A-3, Jack Must Deposition Transcript, page 179, line 18 thru page 181, line 23.

**3.** Mr. Must admits he had not heard from other people that Mr. Jabs, Mr. Buscietta, Mr. Pepper, Mr. Zuppa, or Mr. Ward have made derogatory comments about people's age. Ex. A-3, Jack Must Deposition Transcript, page 179, line 18 thru page 181, line 23.

**4.** The only information he has that supports his belief of age discrimination are what Mr. Zuppa said in the tape recorded conversation (Ex. A-18, Deposition Exhibit No. 31), and the information alleged in paragraph 11 of his complaint. Ex. A-3, Jack Must Deposition Transcript, page 171, line 15.

**S.** **The Tape Recorded Conversation:**

**1.** With respect to what Mr. Zuppa said in the June 16 tape recorded conversation, Mr. Must identifies several comments that he believes references age. Ex. A-3, Jack Must Deposition Transcript, page 143, line 17 thru page 144, line 4.

**2.** First, Mr. Must interpreted the reference to a "ball breaker manager" to mean someone who was younger and inexperienced, because it would be somebody who did not know how to treat salespeople with respect. Ex. A-3, Jack Must Deposition Transcript, page 144, line 12 thru page 145, line 7.

**3.** However, as Mr. Zuppa explained, he meant someone who could be effective. Ex. A-6, Andrew Zuppa Deposition Transcript, page 132, line 9.

**4.** Second, Mr. Must interpreted the reference to the Westminster store as a "training ground" to mean AFW would bring in someone younger who was paid less, even

45

though this was the same store he had started at only three years before at the same salary. Ex. A-3, Jack Must Deposition Transcript, page 144, line 13 thru page 145, line 22.

      5.     However, by "training ground" Mr. Zuppa meant that he felt it was an easy store to run, and by then, if he had been doing a good job, Mr. Must should have moved on to a store with more responsibility and more employees. Ex. A-6, Andrew Zuppa Deposition Transcript, page 129, line 25 thru page 130, line 14.

      6.     Third, Mr. Must interpreted the comment the managers were being paid "pretty healthy" to mean AFW wanted to pay a replacement less, who would probably be younger. Ex. A-3, Jack Must Deposition Transcript, page 144, line 17.

      7.     When AFW promoted Mr. Morrison to Store Manager at Westminster, it changed Mr. Morrison's salary and bonus to the same Mr. Must received when he was made the Store Manager. Ex. A-1, Crystal Hayes Affidavit paragraph 17.

      8.     Mr. Must was neither one of the older Store Managers nor one of the most highly paid Store Managers at AFW during his tenure. As of the beginning of Mr. Must's second year as Store Manager, in July 2002, most of the nine Store Managers at the time were older than him (as was Mr. Jabs), and most were paid a higher salary than him (both older and younger Store Managers). Ex. A-8, Lori Tielke Affidavit paragraph 27.

      9.     As of the beginning of Mr. Must's third year as Store Manager, and also as of the end of that year, most of the other Store Managers (as well as Mr. Jabs) were older than Mr. Must, and paid a higher salary. Ex. A-8, Lori Tielke Affidavit paragraph 28.

      T.     **The Allegations In The Complaint, Paragraph 11:**

    **1.**     Paragraph 11.a. alleges AFW would not retain older workers when the same job could be performed by younger workers with less seniority, and consequently lower salaries and bonuses, as well as lower heath insurance costs.  (<u>See</u> Complaint.)

    **2.**     Mr. Must admits he does not know of any employee who was let go based on a decision that the job could be performed at a lower cost by a younger employee.  Ex. A-3, Jack Must Deposition Transcript, page 173, line 9.

    **3.**     Mr. Must admits he has no reason to believe his salary, or anyone else's, was linked to seniority.  Ex. A-3, Jack Must Deposition Transcript, page 172, lines 4-8.

    **4.**     His salary remained the same the entire time he was Store Manager. Ex. A-3, Jack Must Deposition Transcript, page 172, line 12.

    **5.**     Mr. Must also admits the bonus program is based on company wide profits, and does not know anyone who received a bonus based on seniority.  Ex. A-3, Jack Must Deposition Transcript, page 172, lines 15 thru 19.

    **6.**     In fact, salary and bonus were not, and are not, linked at AFW to age or seniority.  Ex. A-1, Crystal Hayes Affidavit paragraph 16.

    **7.**     Mr. Must also admits he has no information that health insurance costs are based on age.  Ex. A-3, Jack Must Deposition Transcript, page 172, line 24 thru page 173, line 3.

    **8.**     In fact, health insurance costs at AFW were not, and are not, were not, and based on age.  Ex. A-1, Crystal Hayes Affidavit paragraph 13.

    **9.**     Paragraph 11.b. of the complaint alleges Mr. Must's compensation was based in part on his seniority and that he received a benefit package.  (<u>See</u> Complaint.)

10.    Mr. Must explained the only portion of his compensation he alleges was based on his seniority was the health insurance; he admits that was a benefit for all managers, and he does not know if that was based on seniority.  Ex. A-3, Jack Must Deposition Transcript, page 173, line 10 thru page 174, line 13.

11.    In fact, when AFW paid the entire cost of health insurance for Managers such as Mr. Must during part of his employment, that benefit was not based on seniority, or age. Ex. A-1, Crystal Hayes Affidavit paragraph 14.

12.    Paragraph 11.c. of the Complaint alleges Mr. Must was replaced by a younger employee with less seniority and experience, who was paid less and cost less for health insurance.  (See Complaint.)

13.    Mr. Must admits that this is only a guess on his part.  Ex. A-3, Jack Must Deposition Transcript, page 174, line 14 thru page 175, page 12.

14.    In fact, Mr. Morrison had about the same amount of time in management with AFW as Mr. Must did before he was promoted to Store Manager (plus prior management experience), he was paid the same salary and bonus as AFW paid Mr. Must when he became Store Manager, and AFW's health insurance rates were not based on age.  Ex. A-14, Nolan P. Morrison Affidavit paragraphs 2-3; Ex. A-1 Crystal Hayes Affidavit, paragraphs 13; 17.

15.    Mr. Zuppa replaced Mr. Morrison with Beth Gurecki as Store Manager in April, 2005; Ms. Gurecki is 49 years of age (the same age Mr. Must was when Mr. Zuppa removed him as Store Manager).  Ex. A-1, Crystal Hayes Affidavit paragraph18.

16.    Paragraph 11.d. alleges AFW terminated other Store Managers over the age of 40 and replaced them with younger managers.

48

17.     Mr. Must could identify only Mr. Tomasek, Mr. Glavey, and Mr. Sanner, and, after his own termination, Mr. Dawson.  Ex. A-3, Jack Must Deposition Transcript, page 175, line 13 thru page 177, line 6.

18.     Mr. Glavey was not a Store Manager at AFW; he was fired in 2002 as a Sales Manager after four years of employment, and replaced by Mr. Tomasek.  Ex. A-1, Crystal Hayes Affidavit paragraph 20.

19.     Mr. Tomasek was later promoted to Store Manager at AFW; he voluntarily resigned, but that was after Mr. Must's employment ended.  Ex. A-1, Crystal Hayes Affidavit paragraph 21.

20.     Steve Sanner was hired for a sales position in 1998 (at age 45), promoted to Store Manager at the Southwest location in October, 2001 (at age 47), and terminated about seven months later in May 2002 for poor performance. He was replaced by Richard Dawson, who had been hired the year before (Mr. Dawson was age 51 when he replaced Mr. Sanner.) Ex. A-1, Crystal Hayes Affidavit paragraph 8.

21.     The Southwest store that Mr. Dawson had managed was the second worst performing front range location (after the Westminster store).  Ex. A-8, Lori Tielke Affidavit paragraph 15.

22.     AFW fired Mr. Dawson him in April, 2005 (almost 10 months after Mr. Must quit), because Mr. Zuppa believed Mr. Dawson had lied to him about being at the store when he was not, and had instructed a subordinate to lie to Mr. Zuppa, which followed a period of performance issues. Ex. A-7, Andrew Zuppa Affidavit paragraph 16.

49

23.     Paragraph 11.e. of the Complaint alleges that at the time of Mr. Must's termination, Mr. Jabs made comments to the effect of "going younger" in hiring and retention decisions, that "high school girls" could sell AFW merchandise, and that AFW should terminate its sales staff and replace them with "high school girls." (See Complaint.)

24.     Mr. Must did not hear these statements himself; he claims he heard something like these from someone he does not recall, in 2000, about a year before he was made Store Manager. Ex. A-3, Jack Must Deposition Transcript, page 165, line 21 thru page 167, line 16; page 177, line 13 thru page 179, line 15.

25.     From the perspective of Mr. Jabs, who is age 76, Mr. Must was young. Ex. A-9, Jake Jabs Deposition Transcript, page 87, line 8.

26.     Mr. Jabs denies making the statements alleged in the Complaint.  Ex. A-2, Jake Jabs Affidavit paragraphs 4-5.

27.     In fact, with respect to the hiring aspect of this allegation, while Mr. Must was in management from 2001-2004, the number of sales people AFW hired that were over the age of 40 increased each year and more than doubled during this period, including 34 people who were between age 60 and 77.  Ex. A-8, Lori Tielke Affidavit paragraph 26.

28.     In fact, with respect to the retention aspect of this allegation, all but one member of the sales force hired in 1998 that was still employed in 2004 was older than Mr. Must, and the one who was younger was only about six months younger. Ex. A-8, Lori Tielke Affidavit paragraph 25.

U.     **Mr. Must Makes More In His New Career Than If He Had Stayed A Store Manager At AFW:**

1.      Mr. Must chose to quit without having started to look for another job. Ex. A-3, Jack Must Deposition Transcript, page 182, line 13.

2.      After he quit, he took a vacation for two weeks.  Ex. A-3, Jack Must Deposition Transcript, page 182, line 23.

3.      When he returned, he applied for sales and management jobs with two of AFW's competitors, but did not receive any interest.  Ex. A-3, Jack Must Deposition Transcript, page 183, line 19 thru page 184, line 13.

4.      In August, 2004, he decided to go back to automobile sales, which had been lucrative for him before his furniture career began.  Ex. A-3, Jack Must Deposition Transcript, page 185, line 2 thru page 186, line 5.

5.      From August 23, 2004, to the present he has been selling cars at JR Motors.  Ex. A-3, Jack Must Deposition Transcript, page 187, line 9.

6.      Mr. Must is paid by commission for making sales.  Ex. A-3, Jack Must Deposition Transcript, page 187, line 5.

7.      Mr. Must earned $21,617 at JR Motors in 2004.  Ex. A-3, Jack Must Deposition Transcript, page 191, line 10.

8.      His wife was working full time as a teacher in 2004 and 2005 as well. Ex. A-3, Jack Must Deposition Transcript, page 192, line 21.

9.      Mr. Must was able to cut his expenses in 2004 to coincide with what he earned the rest of the year.  Ex. A-3, Jack Must Deposition Transcript, page 192, line 10.

10.      In 2005, Mr. Must earned about $58,000.00 at JR Motors.  Ex. A-3, Jack Must Deposition Transcript, page 192, line 17.

11.     Mr. Must does not recall any financial hardship in 2005.  Ex. A-3, Jack Must Deposition Transcript, page 192, line 25 thru page 193, line 5.

12.     Mr. Must's gross earnings in 2004 from JR Motors were $21,617.00, in 2005 were $58,027.00, in 2006 were $103,230.00, and in 2007 were $101,098.00, totaling **$283,972.00**.  Ex. A-3, Jack Must Deposition Transcript, page 191, line 10; Ex. A-21, Plaintiff's Document No. 367.

13.     If Mr. Must had remained employed as Store Manager at Westminster, and continued to be paid like he was in 2003 (full bonus for two quarters of the year and half bonus for the other two quarters), his earnings would have been $27,928.00 for the rest of 2004, $75,757.00 in 2005, $78,742.00 in 2006, and $74,397.00 in 2007, for a total of **$256,825.00**.  Ex. A-8, Lori Tielke Affidavit paragraph 33.

14.     Thus, Mr. Must has earned over 10% more by quitting as a Store Manager at AFW and switching careers to automobile sales.

EMPLOY\284850.1

## III.    ARGUMENT:

### A.    <u>The Age Discrimination Claim Fails on the Merits</u>

Mr. Must does not have any direct evidence of age discrimination. Therefore, he must pursue his claim under the burden shifting framework regularly used in discrimination cases.

The Tenth Circuit has described this process as requiring the plaintiff to show the following:

> In evaluating ADEA claims, the Tenth Circuit uses the three-stage analysis outlined in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) to prove discrimination when no direct evidence of discrimination exists. At the first stage, the plaintiff must prove a prima facie case of discrimination, i.e., that (1) he is "within the protected age group;" (2) he "was doing satisfactory work;" (3) he "was discharged;" and (4) his position was filled by a younger person. <u>Cone v. Longmont United Hospital Ass'n</u>, 14 F.3d 526, 528-30 (10th Cir.1994). In the second stage, the defendant must carry the burden to provide a legitimate nondiscriminatory reason for plaintiff's termination. Id. If defendant articulates a legitimate, nondiscriminatory reason for its action, the burden of production shifts back to the plaintiff, who as plaintiff must also carry the burden of persuasion. In the third stage, plaintiff must show that age was a determinative factor in defendant's employment decision, or show that the defendant's explanation was merely a pretext. <u>Id.</u>; <u>Faulkner v. Super Valu Stores, Inc.</u>, 3 F.3d 1419, 1425 (10th Cir.1993).

<u>McKnight v. Kimberly Clark Corp.</u>, 149 F.3d 1125, 1128 (10th Cir. 1998).

### 1.    **Mr. Must Cannot Establish A Prima Facie Case:**

Here, Mr. Must can only show two of the four required elements – element (1), that he was within the protected age group, and element (4), that he was replaced (temporarily)[2]

---

[2] Nolan Morrison initially replaced Mr. Must in July 2004, but less than a year later, in April 2005, Beth Gurecki replaced Mr. Morrison as the Store Manager at the Westminster location.

by a younger person. However, he cannot show element (2), that he was "doing satisfactory work," and he cannot show element (3), that he was "discharged".

>    a.    *Mr. Must Cannot Show his Work Was Satisfactory:*

Mr. Must cannot show he was doing satisfactory work because of the evidence of ongoing problems with his performance as a Store Manager throughout his tenure, leading up to the series of significant problems that arose just prior to his removal. Summarized below, this evidence is overwhelming and precludes Mr. Must from being able to prove he was satisfactorily performing.  Therefore, he cannot establish this element of his prima facie case.

At the end of his first year, store sales had declined from the prior 12 month period, the decline was the worst performance of AFW's front range locations, and Mr. Zuppa began complaining to Mr. Must. During his second year, Mr. Must received a "write up" for problems managing his sales staff, Mr. Jabs sent him a letter complaining about his sales staff, the store sales again declined in the worst performance of AFW's front range locations, and Mr. Jabs cut his bonus (Mr. Must was the only Store Manager whose bonus was cut). His third year, Mr. Jabs again cut his bonus (and again, he was the only Store Manager whose bonus was cut), and again store sales showed a decline and the worst performance of AFW's front range locations, which provides the context for the series of problems that ended with the request that he move back to a sales position.

During his last approximately five weeks, there were approximately six incidents, including: (1) Management learned of Mr. Must's failure to take responsibility for the signature capture system at the store, which had not been working for months, leading to the possibility

---

Ms. Gurecki is 49, the same age Mr. Must was when he was removed. Therefore, any inference of discrimination created by Mr. Morrison's temporary role in the position is very meager.

54

that Mr. Must's bonus would be entirely withheld; (2) Mr. Must showed disrespect to Mr.

Buscietta when they met in Mr. Buscietta's office, which required Mr. Zuppa to talk Mr.

Buscietta out of terminating Mr. Must's employment then; (3) Mr. Zuppa's repeated complaints

that additional sales people be present on the floor in the evening (which were motivated by Mr.

Zuppa's own observations as well as complaints relayed to him by Mr. Jabs); (4) Mr. Must's

failure to wait for Mr. Zuppa to arrive for evening store visits, causing Mr. Zuppa to question

Mr. Must's attitude about work; (5) the Assistant Store Manager, Mr. Ward, told Mr. Zuppa

about Mr. Must's complaints about AFW, including AFW management and Mr. Zuppa in

particular, and asked to be returned to sales so that he would not have to work with Mr. Must,

and then (6) Mr. Must's complaints to Mr. Pepper, the new assistant general manager, about

working a mandatory holiday, which required Mr. Zuppa to save Mr. Must from being fired for

the second time in about a month.

     Mr. Jabs, whose opinion is very significant, concluded Mr. Must was the worst

manager he had ever had.

     The Court should not permit Mr. Must to dispute this evidence, because Mr. Must

destroyed documents about his employment shortly after quitting.[3] He had a belief at the time

that he had been a victim of discrimination, twice his stated intention to sue AFW, and saw a

lawyer. In these circumstances, the Court should impose a sanction against Mr. Must that

precludes him from testifying or otherwise offering evidence concerning the last two months of

his employment.

---

[3] This issue is also addressed in AFW's Motion for Sanctions.

Sanctions for spoliation are appropriate if (1) "the plaintiff had a duty to preserve the evidence because it knew or should have known that litigation was imminent, and [(2)] defendant was prejudiced by the destruction of the evidence." 103 Investors I, L.P. v. Square D Co., 470 F.3d 985, 988-89 (10th Cir. 2006)(affirming sanction of refusing to allow party to offer testimony in light of destroyed documents, as that was "the least severe sanction that would be appropriate to balance out the prejudice to the defendant" and rejecting the argument that movant had to establish non-movant acted in bad faith in connection with destruction).

Here, both of these elements are satisfied. First, at the time Mr. Must quit he believed he had been a victim of discrimination, he had twice announced his intention to sue AFW, and he had decided to see a lawyer. Thus, he clearly had a duty to preserve *all* information about his employment during the last two months. Indeed, he chose to preserve his self-serving notes and a secret tape recording of part of a conversation he had with AFW management; but he only preserved the materials "he needed." He failed to preserve the rest of the information, and instead destroyed all the remaining documents of his last two months of employment.

Second, AFW is prejudiced. Mr. Must claims not to recall his other activities and interactions with management during this time period. These missing documents presumably would indicate details about those interactions. Those interactions would likely support AFW's version of events, but without them, AFW is without helpful evidence.

In these circumstances, in order to balance the prejudice to AFW, the Court should preclude Mr. Must's testimony concerning events during this time period – the last two months of his employment. 103 Investors I, L.P, supra. (affirming this sanction).

56

EMPLOY\284850.1

For all these reasons, the Court should find that Mr. Must cannot show satisfactory performance sufficient to establish that element of a prima facie case.

> b.      *Mr. Must Cannot Show He was Discharged; His Refusal to Return to Sales Is not A Constructive Discharge:*

The second defect in Mr. Must's prima facie case is that he cannot show he was discharged. He admits he was offered a chance to return to sales, which he rejected on the spot. The evidence is overwhelming that this opportunity was consistent with AFW's past practice. The evidence is also overwhelming that Mr. Zuppa had good reason to believe Mr. Must could earn as much in sales as he was paid to be a Store Manager, and that moving him into sales would ease his work schedule, which Mr. Zuppa understood was apparently one of Mr. Must's complaints.

In the Tenth Circuit, the "bar is quite high" to establish a constructive discharge. Garrett v. Hewlett-Packard Co., 305 F.3d 1210, 1221 (10th Cir.2002)(stating "[t]he bar is quite high in such cases: a plaintiff must show he had no other choice but to quit.").  Affirming summary judgment by this Court on this issue, the Tenth Circuit recently stated the standard as follows:

> We apply an objective standard to determine whether constructive discharge has occurred:
>
> Constructive discharge occurs when the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign.  Essentially, a plaintiff must show that she had no other choice but to quit.  The conditions of employment must be objectively intolerable;  the plaintiff's subjective views of the situation are irrelevant.

Sandoval v. City of Boulder, 388 F.3d 1312, 1325 (10th Cir.2004) (internal citations and quotations omitted)(affirming summary judgment by this Court on this issue).

"If an employee resigns of her own free will, even as a result of the employer's actions, that employee will not be held to have been constructively discharged." Jeffries v. Kansas, 147 F.3d 1220, 1233 (10th Cir.1998).

Here, it is undisputed that Mr. Must had the opportunity to return to the sales job for which he was originally hired, consistent with AFW's past practice. At AFW, it was not unusual for people to be moved out of management positions either at AFW's initiative or at their own request; in 2001, AFW moved two Store Managers (including Mr. Must's predecessor, Mr. Smatla) into sales, and it continued to move people from other management positions in the years after that. In 2004, Mr. Jabs had just moved Mr. Buscietta, who was the General Manager, the "number two" position in the company, out of the position he had held for 10 years without any warning whatsoever. In addition, AFW had just returned a sales manager to sales at his own request. Significantly, neither the two Store Managers moved back to sales in 2001, nor any of the subsequent managers moved felt they had no choice but to quit on the spot like Mr. Must. Also, several of these workers have been re-promoted, including one who is now a Store Manager and one who is now a Warehouse Manager. This underscores that his decision to quit was rash as well as unreasonable.

In addition, it is undisputed that Mr. Must had complained about the work schedule as a Store Manager immediately before being asked to return to sales, and that he had been unavailable for store visits by Mr. Zuppa, and that Mr. Zuppa believed he wanted an easier

58

schedule.  The objective facts are that the work hours for a commissioned sales person are much less than those of a Store Manager.

The Tenth Circuit has repeatedly rejected constructive discharge claims arising out of a resignation when, as here, the employer has made it clear that there are alternatives to resignation. See, e.g., Baca v. Sklar 398 F.3d 1210, 1216-17 (10th Cir. 2005) (affirming summary judgment on discriminatory discharge claim because plaintiff could not establish constructive discharge and therefore could not make out a prima facie case, where employer had offered continued employment even though it had removed some supervisory responsibilities and said plaintiff would have to move offices); Exum v. U.S. Olympic Committee, 389 F.3d 1130, 1135-36 (10th Cir. 2004)(affirming summary judgment on basis there was no constructive discharge; evidence that employer had offered employee alternative to resignation meant that decision was employee's own "free choice" and did not "come close" to showing constructive discharge); Sandoval v. City of Boulder, Colo., 388 F.3d 1312, 1326 (10th Cir. 2004)(affirming summary judgment on constructive discharge claim brought by employee who had been reassigned); Sanchez v. Denver Public Schools, 164 F.3d 527, 534 (10th Cir. 1998)( affirming summary judgment; employee quit even though there was an opportunity to transfer); Yearous v. Niobrara County Memorial Hosp. By and Through Bd. of Trustees , 128 F.3d 1351, 1356-57 (10th Cir. 1997)(reversing jury verdict for employees and remanding for entry of judgment in favor of hospital because there were alternatives to employees' hasty decisions to resign, and so the employees' resignations were a result of their "free choice").

Another fact that precludes a finding of constructive discharge is that rather than listen to Mr. Zuppa's offer to return to sales, Mr. Must rejected it on the spot, twice taunting the

very person who had saved his job "I'll see you in court." These circumstances should also preclude a constructive discharge claim. In E.E.O.C. v. PVNF, L.L.C., a manager who alleged ongoing acts of sexual harassment resigned on the spot after being presented with a warning notice and notice of a new pay plan, without finding out how the new pay plan would impact her. 487 F.3d 790, 805-06 (10th Cir.2007). The Tenth Circuit affirmed entry of judgment as a matter of law against the plaintiff's constructive discharge claim. In doing so, it cited its prior decision in Garrett, supra, where it affirmed summary judgment dismissing a constructive discharge claim, because the plaintiff "resigned before he had complete details about the position into which [the employer] was in the process of transferring him." Id.

Mr. Must's explanation – he would rather quit than work in a commissioned sales job because of his subjective belief it might result in a decrease in his compensation, and that he could not "afford to live" with a pay cut – is insufficient to establish constructive discharge. At the outset, it must be noted this explanation: (1) ignores that his wife had full-time employment throughout his tenure as a Store Manager, and therefore the family income was not completely dependent on him, and (2) is inconsistent with his subsequent decisions, immediately after he rejected Mr. Zuppa's offer to move back into a commissioned sales job, to go on vacation, and then seek jobs in furniture sales and then a career in commission sales dealing with automobiles. Regardless, however, of whether his explanation is inconsistent with the facts and his behavior, his subjective beliefs are irrelevant as a matter of law. Sandoval, supra.

The objective facts concerning his compensation if he moved to sales are that he would not necessarily have had a pay cut at all, just as Mr. Zuppa believed. Both general and more specific compensation information supports this conclusion. Generally, AFW offered the

60

opportunity for sales staff to earn as much or more than Mr. Must's salary, and many did so. About 50 sales persons earned more than $50,000.00 in sales each year during 2003, 2004, and 2005. In 2003, 16 earned between $60,000.00 and over $80,000.00. In 2004, 13 earned between $60,000.00 and over $85,000.00. In 2005, 21 earned between $60,000.00 and over $98,000.00.

More specific compensation information supports the conclusion that Mr. Must would have been among these groups if he had accepted AFW's offer. First, Mr. Must's earnings his first year after he was hired in 1998 would have placed him in this group. Second, the additional experience he gained during 1999-2004 could have only helped his sales skills. This is confirmed by the fact that he has been earning more in automobile sales than he ever did as a Store Manager. Third, the fact that as the years passed, more AFW sales people were earning at least $60,000.00, and the top earners were earning ever greater amounts, suggests that the top end of the scale was getting larger every year, so that Mr. Must also could have earned more than he had back in 1998-1999.

Another objective comparison that supports the conclusion Mr. Must would have done well in sales is what happened to others returned to sales. Mr. Willey, the Store Manager who was moved back into sales before him, earned almost $60,000 in sales in 2002. Mr. Stevenson, who was moved back into sales but has since been re-promoted and is now a Store Manager, earned more than $50,000.00 in sales in 2003. Mr. Bode, the sales manager who asked to be moved into sales after that, earned over $63,000 in 2004 and over $72,000 in 2005.

Perhaps the most revealing objective comparison is to the other sales people who started in 1998 like Mr. Must did but who remained in sales. Everyone in this group, the "1998 hires, " earned over well over $50,000.00 in 2003, 2004, and 2005. In fact, their average

61

earnings were more than $59,000.00 in 2003, $63,000.00 in 2004 and over $67,000.00 in 2005, including staff earning over $85,000.00 in 2004 and over $98,000.00 in 2005. When they worked together in sales in 1998, Mr. Must earned more than most of them if their 1998 earnings were annualized (Mr. Must made over $50,000.00 annualized in sales before he was promoted into management in 1999), and he was within $10,000.00 of the others. Therefore, there is reason to believe he would have done better than their averages, if he had accepted the offer to return to sales.

Mr. Must's claim that he rejected the sales job offer because he feared a pay cut is really just a cover-up for his own feeling that he no longer wanted to work hard for AFW and was ready to move on with his career. His employment application shows a trend of sales jobs lasting about 3, 1, 3, and 2 years prior to his 1998 re-hire at AFW. He had served about three years as the manager, which was about as long as he had held a job in the two prior decades. The facts that he had been complaining about Mr. Zuppa to Mr. Jabs and Mr. Ward, disrespectful to Mr. Buscietta, "documenting" some of his interactions with Mr. Buscietta and Mr. Zuppa, tape recording Mr. Zuppa's comments, not staying for all of Mr. Zuppa's store visits, and resisting mandatory work days, show that he was simply unhappy with his job. However, as noted above, his subjective feelings do not establish the required showing to establish a constructive discharge; he cannot quit simply because he is unhappy about the situation. MacKenzie v. City and County of Denver, 414 F.3d 1266, 1282 (10th Cir. 2005) (affirming summary judgment on constructive discharge age discrimination claim, noting that the discipline imposed was a result of the employee's own misconduct, and concluding, "In sum, the City's actions may have made

MacKenzie unhappy, but "not every unhappy employee has an actionable claim of constructive discharge.").

For all these reasons, the Court must conclude it was Mr. Must's free choice to reject AFW's offer to move into sales, and that therefore he cannot show a constructive discharge. Thus, his termination claim fails at the prima facie case stage, and the Court should grant AFW's motion for summary judgment.

### 2.      There Is Not Sufficient Evidence Of Pretext To Deny Summary Judgment:

Even if the Court assumes Mr. Must can establish a prima facie case, he still cannot avoid summary judgment. AFW can easily satisfy its burden to establish a legitimate non-discriminatory explanation for the decision to move Mr. Must back into sales. All it must show is that Mr. Zuppa had a good faith belief (shared by Mr. Jabs) that Mr. Must could no longer remain as a Store Manager due to the numerous and escalating problems with his performance. In fact, the only reasonable view of the evidence is that Mr. Zuppa was extraordinarily patient with Mr. Must, and only decided to move him into sales when he was forced to, after Mr. Must had alienated all the other members of upper management, as well as his own Assistant Store Manager[4]. Indeed, even after Mr. Must complained to Mr. Jabs and Mr. Ward about him, Mr. Zuppa tried to help him and was the only person trying to save Mr. Must's career. If Mr. Zuppa had not twice saved Mr. Must from being fired, he would not have been in a position to offer him a chance to return to sales.

---

[4] The complaints by Assistant Manager Mr. Ward to Mr. Zuppa about Mr. Must are similar to Mr. Must's complaints to Mr. Zuppa, when Mr. Must was Assistant Manager, about Mr. Smatla, which occurred just before Mr. Zuppa removed Mr. Smatla from the Store Manager position.

In order to avoid summary judgment, Mr. Must has to establish this explanation is

a pretext. This is not a typical case (for reasons that follow), but if it were, the Tenth Circuit has

explained the role of pretext on summary judgment as follows:

> Because defendants can show legitimate reasons for Piercy's
> dismissal, the burden shifts back to Piercy to demonstrate why the
> stated reasons are pretextual.  See O'Neal, 237 F.3d at 1252.
> "[S]ummary judgment is appropriate where a plaintiff cannot meet
> the burden of proving that an employer's articulated
> nondiscriminatory reason for an alleged retaliatory action is
> pretextual."  Miller v. Auto. Club of New Mexico, Inc., 420 F.3d
> 1098, 1123 (10th Cir.2005).  In establishing pretext, an employee
> can show "the employer's proffered reason was so inconsistent,
> implausible, incoherent, or contradictory that it is unworthy of
> belief."  Id. (internal quotations omitted).
>
> "[A] challenge of pretext," however, "requires a court to look at the
> facts as they appear to the person making the decision to terminate,
> not the aggrieved employee."  Green v. New Mexico, 420 F.3d
> 1189, 1191 n. 2 (10th Cir.2005); Kendrick v. Penske Transp.
> Servs., 220 F.3d 1220, 1231 (10th Cir.2000).  In this case, the
> relevant eyes through which to view the termination decision are
> those of Undersheriff Goodall and Sheriff Maketa.  "The relevant
> inquiry is not whether [their] proffered reasons were wise, fair or
> correct," but rather we ask whether they believed those reasons to
> be true and "acted in good faith upon those beliefs."  Rivera v. City
> and County of Denver, 365 F.3d 912, 924-25 (10th Cir.2004)
> (quoting Bullington v. United Air Lines, Inc., 186 F.3d 1301, 1318
> (10th Cir.1999)).  Even a mistaken belief can be a legitimate, non-
> pretextual reason for an employment decision.  EEOC v. Flasher
> Co., 986 F.2d 1312, 1322 n. 12 (10th Cir.1992).  Accordingly,
> "[their good faith] perception of the employee's performance ... is
> relevant, not plaintiff's subjective evaluation of [her] own relative
> performance."  Shorter v. ICG Holdings, Inc., 188 F.3d 1204, 1209
> (10th Cir.1999) (internal quotations omitted).
>
> We have recently elaborated on the "quantum of evidence" that
> must be shown for a trier-of-fact in a discrimination claim to
> reasonably infer that an employer is acting in bad faith to cover up
> a discriminatory purpose.  Young, 468 F.3d at 1250.  The fact
> finder must be able to conclude "discrimination was a

determinative factor in the employer's actions--simply disbelieving the employer is insufficient." Id.

Piercy v. Maketa, 480 F.3d 1192, 1200-1201 (10th Cir. 2007)(affirming summary judgment on termination claim for lack of pretext).

A weak prima facie case, such as the one here, requires a correspondingly greater showing of pretext. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148-49, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)(noting that the amount of evidence required to show pretext may depend on the strength of the prima facie case).

This case presents an even greater hurdle for Mr. Must to establish pretext, however. Mr. Zuppa's central role makes it much more difficult for Mr. Must to show pretext, because Mr. Zuppa is the person who three times made decisions to promote Mr. Must, and twice prevented other management from firing him in the weeks prior to decision to return him to sales. Mr. Jabs also approved both the decision to promote him as well as the decision to remove him. This creates a "same actor" defense. See Antonio v. Sygma Network, Inc., 458 F.3d 1177 (10th Cir. 2006)(affirming summary judgment decision by this Court). [5] With this defense, there is a "strong inference" that AFW was not motivated by age discrimination, making it that much more difficult for Mr. Must to establish pretext. 458 F.3d at 1183. This defense is particularly strong in this case, as Mr. Must admits Mr. Zuppa and Mr. Jabs never made any derogatory age based remarks to him.

_____

[5] "We take this opportunity to join our sister circuits and announce that in cases where "the employee was hired and fired by the same person within a relatively short time span," there is "a strong inference that the employer's stated reason for acting against the employee is not pretextual." We emphasize, however, that "[t]he plaintiff still has the opportunity to present countervailing evidence of pretext," and that "same actor" evidence gives rise to an inference, rather than a presumption, that no discriminatory animus motivated the employer's actions." (internal citations omitted).

65

A second unique aspect of this case that militates against a finding of pretext is that the only incident Mr. Must claims was age discrimination was the decision to ask him to return to sales when he was 49. The other witnesses who played a role in this decision besides Mr. Zuppa and Mr. Jabs – Mr. Buscietta, Mr. Pepper, and Mr. Ward -- are for the most part either older than Mr. Must or about the same age, and he admits they also have not made any age based remarks to him. The decision to move him into sales was approved by Mr. Jabs, who is in his late 70's and much older than Mr. Must; Mr. Must admits he has never heard any discriminatory comments by Mr. Jabs. Mr. Ward, the Assistant Store Manager who complained about Mr. Must and asked to be returned to sales so that he would not have to work with Mr. Must any longer, is 58. Again, Mr. Must admits he has never heard any discriminatory comments by him. Both Mr. Buscietta and Mr. Pepper wanted to fire Mr. Must; both of them are 51 years of age, and again, Mr. Must admits he has never heard any discriminatory comments by either of them. This Court recently dismissed an age discrimination claim in such circumstances. Layman v. Guiterrez, 2007 WL 4190709*6 (D.Colo. Nov. 20, 2007)(dismissing failure to promote age discrimination claim where decision makers were in protected group and there was no evidence of prior discriminatory conduct against the plaintiff, citing Green v. New Mexico, 420 F.3d 1189-1195-96 (10th Cir. 2005), for the propositions "absence of past discriminatory conduct by decisionmaker militated against a finding of intentional discrimination" and "decisionmaker's membership in the protected group at issue militated against a finding of intentional discrimination").

Several other points further preclude the possibility of pretext. First, the notion that AFW would be biased against older managers is not logical to begin with, because as noted

above, the CEO, Jake Jabs, is a high profile leader and is in his late 70's. The two members of the senior management team who wanted to fire Mr. Must – Mr. Buscietta and Mr. Pepper -- were about the same age as Mr. Must (they are both 51). The overwhelming majority of the store managers were well over the age of 40. Even the Assistant Store Manager at the Westminster store, Tom Ward, is significantly older than Mr. Must.

Second, if there were age bias at AFW against older Store Managers, Mr. Must would not have been a target because he was a relatively young manager (as Mr. Jabs noted). Most of the other Store Managers were significantly older than Mr. Must, and in their late fifties or sixties, as reflected in the charts showing the ages of the Store Managers as of July 2002, 2003, and 2004.

Third, if there were age bias at AFW against older Store Managers, the charts showing the ages of the Store Managers as of July 2002, 2003, and 2004 should show the older Store Managers being replaced by younger ones. However, those charts do not show any pattern of termination of the older Store Managers.

Fourth, if there were age bias at AFW against older Store Managers, one would not expect to see AFW promoting older workers to that position. But that is exactly what happened with (1) Mr. Must, who was promoted in 2001 at age 46 to replace someone younger, (2) Mr. Dawson, who was promoted in 2002 at age 51 to replace someone younger, and (3) Ms. Gurecki, who was promoted in 2005 to be the Westminster Store Manager to replace someone younger, and who is the same age Mr. Must was when he was removed as Westminster Store Manager.

In summary, the only reasonable inference from the evidence is that AFW favors older Store Managers, rather than having animosity against them because of their age.

A final, independent reason Mr. Must cannot establish pretext stems from the fact that Mr. Must destroyed all his documents about the last two months of his employment shortly after quitting, other than ones he thought would help his case.[6] The Court should not permit Mr. Must to dispute AFW's evidence, because Mr. Must destroyed documents about his employment shortly after quitting. He had a belief at the time that he had been a victim of discrimination, twice his stated intention to sue AFW, and saw a lawyer. In these circumstances, the Court should impose a sanction against Mr. Must that precludes him from testifying or otherwise offering evidence concerning the last two months of his employment.

Sanctions for spoliation are appropriate if (1) "the plaintiff had a duty to preserve the evidence because it knew or should have known that litigation was imminent, and [(2)] defendant was prejudiced by the destruction of the evidence." 103 Investors I, L.P. v. Square D Co., 470 F.3d 985, 988-89 (10th Cir. 2006)(affirming sanction of refusing to allow party to offer testimony in light of destroyed documents, as that was "the least severe sanction that would be appropriate to balance out the prejudice to the defendant" and rejecting the argument that movant had to establish non-movant acted in bad faith in connection with destruction).

Here, both of these elements are satisfied. First, at the time Mr. Must quit he believed he had been a victim of discrimination, he had twice announced his intention to sue AFW, and he had decided to see a lawyer. Thus, he clearly had a duty to preserve *all* information about his employment during the last two months. Indeed, he chose to preserve his

---

[6] This issue is the subject of AFW's Motion for Sanctions, which is filed at the same time as this motion.

self-serving notes and a secret tape recording of part of a conversation he had with AFW management; but he only preserved the materials "he needed." He failed to preserve the rest of the information, and instead destroyed all the remaining documents of his last two months of employment.

Second, AFW is prejudiced. Mr. Must claims not to recall his other activities and interactions with management during this time period. These missing documents presumably would indicate details about those interactions. Those interactions would likely support AFW's version of events, but without them, AFW is without helpful evidence.

In these circumstances, in order to balance the prejudice to AFW, the Court should preclude Mr. Must's testimony concerning events during this time period – the last two months of his employment. 103 Investors I, L.P, supra. (affirming this sanction).

To the extent the Court chooses to consider Mr. Must's evidence of pretext despite his destruction of documents, the Court will find he relies on speculation, rather than evidence, to support his claim. First, he speculates AFW terminated him in order to save money with a younger replacement. The premise itself fails, because even if it were true, motivation to save money is not evidence of age based discrimination, unless salaries are age based to begin with. Hazen Paper Co. v. Biggins, 507 U.S. 604 (1993). Salaries are not age based at AFW, however. At any rate, this fails to explain why Mr. Must would be targeted, as the Store Manager charts for 2002 – 2004 show most of the other Store Managers were paid more than him and were not terminated.

This argument also fails on the merits. Mr. Morrison, his initial replacement,[7] was paid the same salary and bonus was Mr. Must received when he was promoted to Store Manager. Thus, there is no basis to conclude costs savings motivated the decision to ask Mr. Must to return to sales. The Store Manager who took over from Mr. Morrison less than a year later, Ms. Gurecki, is 49, the same age Mr. Must was when he was removed, further minimizing any inference that age bias motivated his removal.

Mr. Must next speculates he was fired to save on health care costs. The premise of this argument fails as well, as there is no correlation between age and health care costs. In fact, AFW's insurance plan did not charge based on the age of employees – AFW paid the same rate regardless of age. Logically, he fails to show how asking him to return to sales could result in savings in health care, as he would be eligible for health insurance in either position. Even assuming AFW had a policy to get rid of workers with high health care expenses (and there is no such evidence), Mr. Must has not provided any evidence that AFW paid relatively high health care expenses for him, and so it makes no sense that AFW would target him. Finally, even if this argument had evidentiary support, it would not support an inference of age based discrimination, as opposed to health care discrimination. Faulkner v. Super Valu Stores, Inc., 3 F.3d 1419, 1433–

---

[7] Mr. Morrison came to AFW with furniture experience, including management experience. Before being promoted to Store Manager at the small Westminster store, he had been sales manager at the large Thornton facility, supervising between 70 and 90 sales people, reporting directly to Mr. Jabs concerning sales information, and having evening responsibility for closing down both the store's showroom and warehouse. Mr. Buscietta, who suggested that Mr. Morrison become the Westminster Store Manager, considers him the best Store Manager he has seen. Although subsequent events are not relevant to cast doubt on AFW's motivation at the time, it is noteworthy that Mr. Morrison immediately took steps to improve the sales force, and the decline in sales at the store stopped and sales have since increased.

34 (10th Cir. 1993)(no violation of ADEA if the evidence shows a violation of some other statute).

Next, Mr. Must alleges in the Complaint, paragraph 11, that AFW's CEO, Mr. Jabs (who is 77) made various age based comments. First, he alleges Mr. Jabs said "high school girls" could sell AFW merchandise and sales staff should be replaced with "high school girls." Second, he alleges Mr. Jabs said he would "go younger" in hiring or retention decisions. These allegations do not create an issue of fact about pretext for several reasons.

First, there is no evidentiary support for them. In Mr. Must's deposition, he admitted he has no personal knowledge of them. He admitted the source is unidentified hearsay who attributed the remarks to a sales meeting, and he cannot even recall the specifics of what he was told. Therefore, this testimony is inadmissible and the Court cannot consider it. See Starr v. Pearle Vision, Inc., 54 F.3d 1548, 1555 (10th Cir.1995) (holding that Rule 56 precludes the use of inadmissible hearsay in depositions submitted in support of, or in opposition to, summary judgment).

Second, Mr. Jabs denies those allegations, and so there is no evidentiary support for these allegations.

Third, even if he did say them, they hardly support an inference of discrimination coming from perhaps the oldest employee in the company! The only reasonable inference about the "high school girls" comment is that Mr. Jabs was using it as a motivation tool, stressing to the sales force how easy it is to sell AFW merchandise. It cannot be reasonably interpreted as indicating age bias. The alleged statement about "going younger" with the sales force obviously bears no relationship to Mr. Must, because it is undisputed AFW asked him to return to the sales

71

force. Moreover, as Mr. Must claims he heard about these alleged remarks the year *before* he was promoted to Store Manager (which took place in 2001), they are four years removed from the decision to ask him to return to sales. In these circumstances, the Court should find these alleged statements are unrelated to Mr. Must and causally unconnected to the decision to ask him to move back into sales, and therefore are no more than "stray remarks" that should be excluded and do not establish pretext. Young v. Dillon Companies, Inc., 468 F.3d 1243, 1252 -1253 (10th Cir. 2006) (articulating the latest statement of this rule); McKnight v. Kimberly Clark Corp., 149 F.3d 1125, 1129 (10th Cir. 1998)(applying this rule in the age discrimination context).

The alleged remarks are also contrary to the facts. With respect to the hiring aspect of this allegation, while Mr. Must was in management from 2001-2004, the number of sales people hired that were over the age of 40 increased each year and more than doubled during this period, including almost three dozen sales people between the ages of 60 and 77. With respect to the retention aspect of this allegation, all but one member of the sales force hired in 1998 that was still employed in 2004 were older than Mr. Must, and the one who was younger was only about six months younger.

Mr. Must also alleges AFW has terminated other Store Managers over the age of 40. However, the only Store Manager fired in the three years prior to him being asked to return to sales was Steve Sanner, and he was replaced by Richard Dawson, who was older than Mr. Sanner. Before that period, two Store Managers were moved out of that position back into sales (like Mr. Zuppa asked Mr. Must to do). These two were aged 29 and 30 at the time, and Mr. Must replaced one of them. Therefore, this argument is unsupported.

72

Mr. Must also points to the fact that almost a year after he quit, AFW fired Store Manager Richard Dawson. The good faith of AFW's reasoning in July 2004 about Mr. Must cannot be second guessed because of a decision it made almost a year later, in April 2005, about Mr. Dawson. In any event, Mr. Dawson was fired under a completely different set of circumstances, and so he is not similarly situated. Aramburu v. Boeing Co., 112 F.3d 1398, 1404 (10th Cir.1997)(comparisons must be to violations of comparable seriousness). Even if that situation is compared, it does not help Mr. Must, because it is undisputed that Mr. Dawson was fired, and so he was not treated *better* than Mr. Must, but in order to use comparisons to argue pretext, the plaintiff must show the comparator was treated better than he was. Id. Also, Mr. Dawson was hired at age 51 and worked only a few years, and so there cannot be any inference of age discrimination in his termination. Any finding otherwise would discourage employers from hiring workers already over the age of 40.

To the extent the Court indulges Mr. Must's claim that other people over 40 were terminated (Mssrs. Glavey, Tomasek, and Sanner), the facts do not help Mr. Must.  AFW did fire Mr. Glavey in 2002 from his position as a Sales Manager, and Mr. Sanner in 2002 from his position as Store Manager, but each of them were employed only about four years, and so just like with Mr. Dawson, the fact of their terminations should not create any inference of age bias that might follow from the termination of a very long term employee.

To the extent that the Court still indulges Mr. Must's argument, additional facts preclude any inference of age discrimination. AFW replaced Mr. Glavey with Mr. Tomasek. AFW then promoted Mr. Tomasek to the position of Store Manager, where he worked for several years. His employment ended because he voluntarily resigned, which did not occur until

73

after Mr. Must's employment had ended. Thus, there is no basis to find Mr. Glavey's termination or Mr. Tomasek's resignation was motivated by age bias.

AFW replaced Mr. Sanner with Mr. Dawson, who was older than Mr. Sanner, which also should preclude any inference that age discrimination motivated the decision.

Finally, this argument focusing on the supposed termination of other employees does not create pretext with respect to Mr. Must, because it is undisputed he was *not* fired – he chose not to accept a transfer that would have saved his employment. Therefore, the only employees he can be compared to are the other two Store Managers moved into sales in 2001. This comparison does not help him, because they were both much younger (29 and 30), treated the same as Mr. Must, and he replaced one of them, all of which precludes any inference of pretext.

In summary, Mr. Must has no evidence of pretext, and therefore summary judgment is appropriate.

### B.      The Age Discrimination Claim Fails Because Mr. Must Has No Damages

Another unique aspect of this case is that Mr. Must has earned tens of thousands of dollars more by changing careers to automobile sales than he would have earned had he remained employed as Store Manager. Mr. Must has earned **$283,972.00** selling cars on commission since July 2004, but if he had remained employed as a Store Manager for AFW,  his earnings would only have been  **$256,825.00.**  Thus, Mr. Must has earned over 10% more by quitting as a Store Manager at AFW and switching careers to automobile sales.

Therefore, in addition to the weakness of his claim on the merits, he has zero damages. This also makes summary judgment proper. See Kliesen v. County Comm'rs, 2007

74

WL 4224215*6 (D. Colo. Nov. 27, 2007)(granting summary judgment on economic damages

portion of ADA retaliation claim); cf., Lintz v. American General Finance, Inc., 76 F.Supp.2d

1200 (D.Kan. 1999)(civil rights plaintiff with zero damages is not a prevailing party).

## IV.    CONCLUSION:

As set forth above, AFW did not discriminate against Mr. Must based on his age

when it asked him to return to a sales position.  The Court should find he cannot establish a

prima facie case of discrimination, he cannot show AFW's explanation for asking him to return

to a sales position is a pretext for age discrimination, and he has no damages. Therefore, the

Court should grant AFW's motion for summary judgment, dismiss the claim with prejudice, and

award AFW its costs incurred in defending this case.

Respectfully submitted this 14th day of January, 2008.

s/ Andrew W. Volin
**Andrew W. Volin, Esq.**
SHERMAN & HOWARD L.L.C.
633 Seventeenth Street, Suite 3000
Denver, CO 80202
Telephone: (303) 297-2900
Facsimile:  (303) 298-0940
E-Mail:       AVolin@sah.com

Gary J. Benson, Esq.
DWORKIN, CHAMBERS & WILLIAMS, P.C.
3900 E. Mexico Avenue, Suite 1300
Denver, CO  80210
Phone:(303) 584-0990
Fax:(303) 584-0995
E-mail:gbenson@dnvrlaw.com

*Attorneys for Defendant*
*American Furniture Warehouse*

75

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of January, 2008, I electronically filed the foregoing **BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following email addresses:

*Via email:  rbhbcolo@aol.com*

Ross B.H. Buchanan, Esq.
BUCHANAN, JURDEM & CEDERBERG, P.C.

s/M. Chona Baxter, Legal Assistant to
Andrew W. Volin, Esq.

76