IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 06-cv-01872-RPM-MEH

JACK MUST,

      Plaintiff,

vs.

AMERICAN FURNITURE WAREHOUSE CO., a Colorado corporation, d/b/a
AMERICAN FURNITURE WAREHOUSE

      Defendant.

---

# EXHIBIT A-6

## ANDREW ZUPPA DEPOSITION TRANSCRIPT EXCERPTS

### Submitted By Defendant
### In Support Of Its Motion For Summary Judgment

---

Respectfully submitted this 14th day of January, 2008.

                s/ Andrew W. Volin
                **Andrew W. Volin, Esq.**
                SHERMAN & HOWARD L.L.C.
                633 Seventeenth Street, Suite 3000
                Denver, CO 80202
                Telephone: (303) 297-2900
                Facsimile:  (303) 298-0940
                E-Mail:     AVolin@sah.com

                Gary J. Benson, Esq.
                DWORKIN, CHAMBERS & WILLIAMS, P.C.
                3900 E. Mexico Avenue, Suite 1300
                Denver, CO  80210
                Phone:(303) 584-0990
                Fax:(303) 584-0995
                E-mail:gbenson@dnvrlaw.com
                *Attorneys for Defendant*
                *American Furniture Warehouse*

Andrew Zuppa

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Case No. 06-CV-01872-RPM-MEH

---

JACK MUST,

      Plaintiff,

vs.

AMERICAN FURNITURE WAREHOUSE CO., a Colorado
corporation, d/b/a AMERICAN FURNITURE WAREHOUSE,

      Defendant.

---

DEPOSITION OF ANDREW ZUPPA

---

PURSUANT TO NOTICE, the
above-entitled deposition was taken on behalf of
the Plaintiff at the offices of Buchanan, Jurdem &
Cederberg, PC, 1621 18th Street, Suite 260, Denver,
Colorado, on August 27, 2007, at 1:35 p.m., before
Jana Mackelprang, Certified Realtime Reporter,
Registered Professional Reporter, and Notary
Public.

b6ff1c8d-8a86-442e-9678-82f9922148ef

Andrew Zuppa

Page 39

1     Q.     Well, maybe I'm confused, because you
2  gave me some dates having to do with months, and I
3  thought you said you started late '96.
4     A.     I'm going to say either that I started
5  December or January, December '96, January '97.
6           I'm sorry.  I'm sorry.  I'm sorry.
7  March of '98.  You had asked me the question when I
8  became human resource director.  If I said March of
9  '97, that was incorrect.  It was March of 1998.
10    Q.     Okay.  That sounds more like it.
11    A.     Let's say, roughly, 14, 15 months went
12 by during that period.
13    Q.     While you were store manager at South
14 University, what were the -- first of all, does AFW
15 have any revenue goals for its stores?
16           MR. BENSON:  Object to the form.  Time
17 frame?
18    Q.     (By Mr. Buchanan)  Have they ever had?
19    A.     Do they have any revenue goals?
20    Q.     Yes.  In other words, do you ever say,
21 This store, this month, you shall make X, and that's
22 a quota, like it was at Homestead House?
23    A.     No, not like that.
24    Q.     Given your management of the store at
25 South University when you were the store manager,

Andrew Zuppa

1   had been in the job was leaving.  My management

2   degree as an undergraduate, while there was no

3   specific degree, you had emphasis within management.

4   And I forget what all of them was, but human

5   resources was one.  It was something that I had had

6   an interest in.

7         Q.     Who had been your successor as HR

8   director?

9         A.     The person before me or after me?

10         Q.     I meant to say your predecessor.

11         A.     Okay.  Thank you.  It was a person,

12   Carol Martin.

13         Q.     And was Ms. Hayes your successor?

14         A.     Yes.

15         Q.     How long were you the HR director?

16         A.     Well, job titles after that sort of

17   overlapped.  I'm going to say three years.

18         Q.     During the time you were HR director,

19   did you have any function as a store manager?

20         A.     Did I function as a store manager?

21   No.  My office was located in Thornton, which means

22   I had day-to-day interaction with the store.  I

23   still was involved in furniture-related activities.

24   I may have occasionally done sales meetings.  I may

25   have done them on Saturdays, at one point, every

b6ff1c8d-8a86-442e-9678-82f9922148ef

Andrew Zuppa

Page 53

1    management trainee position.  Is that right?

2         A.     Actually, I think I played "the" role

3    in promoting him into a manager trainee role.  I

4    promoted him.  It was my decision to give him that

5    job.

6         Q.     Tell me why.

7         A.     There had become some reason -- there

8    was a lot of rapid growth during that period.  I

9    mean, crazy rapid growth, not necessarily that we

10   were expanding our operation, but the Rhodes thing

11   came along in '98, or the tail end, plus business

12   was just going up.

13              I remember in Jack's case, there was

14   some urgent need to pop somebody in.  There was a

15   schedule void, or there was -- there was a reason

16   why we needed somebody other than we just needed a

17   trainee.

18        Q.     But, I take it, you don't remember

19   specifically what it was?

20        A.     I remember an urgency for it, so I'm

21   going to say that there was a vacancy.  Just out of

22   pure -- I mean, that was a while ago, but I'm going

23   to say there was an urgency that I had to fill the

24   job.

25        Q.     And why did you focus on Jack

b6ff1c8d-8a86-442e-9678-82f9922148ef

Andrew Zuppa

Page 54

1    specifically?

2         A.    Generally, what I'll do was --

3    because, you know, I wasn't, you know, personally

4    aware of a lot of salespeople.  You know, I would

5    talk to some, just in passing or whatever, but you

6    would ask store managers for recommendations.

7         Q.    Did you do that in this case?

8         A.    Yes.

9         Q.    What were you told?

10        A.    I don't know that I was told anything.

11   I was given a list, I believe, of a few people.  I'm

12   going to say three or four.

13        Q.    And this would be by the store manager

14   at Thornton?

15        A.    We had a sales manager at that time.

16   I'm trying to remember if we even specifically had a

17   store manager at Thornton at that time.

18        Q.    Well, actually, my specific question

19   was:  You were given a list of three or four people,

20   all of whom were salespeople at the Thornton store?

21        A.    No, I can't say for sure.  It could

22   have been metro-wide at that point.  I mean, I would

23   have been asking metro-wide if it was a metro job

24   vacancy.  And premium would have been given to

25   people with proximity to wherever the job vacancy

b6ff1c8d-8a86-442e-9678-82f9922148ef

Andrew Zuppa

Page 55

1    was, just because . . .

2          Q.      Proximity in terms of where they

3    lived?

4          A.      Yes.

5          Q.      So why did you focus on Jack out of

6    the three or four names that you were given?

7          A.      Well, at that time, he probably had a

8    five- or ten-minute interview.

9          Q.      Was that with you?

10         A.      Yeah.  And I remember with Jack, he

11   wasn't 100 percent sold on the idea.  I remember

12   that because I remember following up by calling him

13   at home and telling him I needed a decision or I

14   needed to move on.

15         Q.      What were his concerns, if you

16   remember?

17         A.      I remember he wasn't -- and -- there

18   was something to the extent of he may have not had a

19   ton of management experience or the schedule or, you

20   know, the way store managers had always been treated

21   by senior management -- I mean, these are issues

22   that I get when interviewing for the job.  But I do

23   remember having to pursue Jack and kind of hold him

24   down to get an answer.

25         Q.      And this was just to become a

Andrew Zuppa

Page 60

1      Q.     Are there separate challenges to

2  Westminster that you don't have at Thornton?

3      A.     Well, you don't have the HR department

4  upstairs.  You don't have marketing upstairs.  I'm

5  talking about that time period, not now.  You didn't

6  have Mike Buscietta upstairs.  You didn't have Jake

7  upstairs.  You didn't have me upstairs.  I mean,

8  those are both positives.  So it's different being

9  out at satellite stores.  Having done both, you

10  know, there's a difference.

11      Q.     And just so we're clear on terminology

12  here, a satellite store at that point in time would

13  be anything other than Thornton, correct?

14      A.     That is correct.

15      Q.     Thornton being what you might call the

16  flagship?

17      A.     Yeah.  Yeah, that's true.

18      Q.     All right.  The materials that were

19  submitted to the EEOC also indicate that you played

20  some role in promoting Jack to an assistant manager

21  position.

22      A.     Yeah, I think I did promote him to an

23  assistant manager position.

24      Q.     Is that because he performed well as a

25  management trainee?

b6ff1c8d-8a86-442e-9678-82f9922148ef

Andrew Zuppa

Page 61

1      A.      If I recall.  I mean, you don't want

2  to leave them with a trainee title for awhile.  You

3  either need to -- you know, I mean, you're not going

4  to have a manager trainee for two years.  I mean, I

5  probably had the title for two months -- I mean, I

6  don't know -- if I had it at all.  I'm not sure.

7              But, you know, at some point, you're

8  going through, looking at your roster, and you say,

9  Well, he's been around for a while.  You know, if

10 you don't have any specific reason not to -- and at

11 that time we could find -- it was hard -- well,

12 actually, it still is -- it's hard to find managers.

13 You don't want to get rid of a manager unless, you

14 know, you have to.  I mean, you want people to stay

15 in those jobs.

16             So I don't remember any specific

17 reason for why he did get the job.  I probably just

18 didn't have one that he shouldn't be called up.

19 Particularly, if he was -- and I have to go back to

20 that term, "live fire" -- if they're effectively

21 doing the job, then let them have the job title.

22             If I didn't answer the question, I'll

23 start over.

24      Q.      Let me ask the question this way:  One

25 of my frustrations in this case is, I have this

Calderwood-Mackelprang, Inc.  303.477.3500

b6ff1c8d-8a86-442e-9678-82f9922148ef

Andrew Zuppa

1   review, it was oral in nature?

2          A.      Yeah.   One of the things that I

3   inherited was the habit of them keeping personnel

4   stuff in the store.   So if that would have existed

5   in the store at that time, it was possible, you

6   know, they didn't know about it.   But I doubt that

7   was the case.   I doubt Chris would have bothered to,

8   one way or the other.

9          Q.      You don't have a very high opinion of

10  Chris Smatla?

11         A.      No.

12         Q.      And you never had any specific

13  information that they had any written documents,

14  personnel documents, in the store?

15         A.      No.

16         Q.      Did you ever learn anything negative

17  about Jack Must in his job as an assistant manager

18  in Westminster?

19         A.      The problem is, I wouldn't have had a

20  source for it.   You know, Chris and I did not get

21  along.   I did not like Chris.   I didn't necessarily

22  think he was a very good manager.   I wouldn't have

23  solicited his opinion on much.

24         Q.      So coming back to my question, did you

25  hear anything negative about Jack Must's function as

b6ff1c8d-8a86-442e-9678-82f9922148ef

Andrew Zuppa

1   an assistant manager?

2        A.      Neither negative nor positive.  Again,
3   I didn't have a source.

4        Q.      That you trusted, it sounds like?

5        A.      That I trusted or that I actually
6   would have asked at all.

7        Q.      Did you observe anything yourself
8   about Jack Must functioning as assistant manager?

9        A.      Not really.  Jack would talk to me
10  occasionally, and Jack was a big fan of Jack's, and
11  that's about it.

12       Q.      Jack Must was a big fan of Jack
13  Must's; is that what you're saying?

14       A.      Yeah.  So -- my information came from
15  Jack.

16       Q.      Why do you say Jack Must was a big fan
17  of Jack Must?

18       A.      You know, Jack would go out of his way
19  to say positive things about Jack.  He would go out
20  of his way to say things that weren't necessarily
21  positive about Chris.

22       Q.      Okay.

23       A.      But, again, I had no other source of
24  information on that subject.

25       Q.      Okay.  What do you remember him saying

Andrew Zuppa

1  that was not necessarily positive about Chris?

2       A.     He had a lot of complaints about

3  Chris' work habits, and I don't specifically

4  remember what they were.  I'd always suspected Chris

5  as just kind of a -- I don't know -- I didn't like

6  Chris.  For whatever reason, I didn't like him.  You

7  know, sometimes you have to admit to personal bias.

8  I didn't like Chris.

9       Q.     Do you remember anything specific?

10 Did he say he comes in late, he falls asleep in the

11 back, he smokes cigarettes?

12      A.     You know, I know you talked some

13 things about merchandising, and, you know, I don't

14 remember about Chris' work habits.  I was never

15 overly impressed with him, so I probably -- I didn't

16 need any help reinforcing things on Chris, although

17 I do know that Jack used to say -- you know, make

18 comments about him.  But since I had largely already

19 formed my own opinion on the subject, I wasn't . . .

20      Q.     It sounds to me like you had a very

21 low opinion of Chris that was reinforced by Jack

22 Must; is that fair?

23      A.     Yeah, I think that's fair.

24      Q.     Was there anybody there that was a fan

25 of Chris Smatla's?

Calderwood-Mackelprang, Inc. 303.477.3500

b6ff1c8d-8a86-442e-9678-82f9922148ef

Andrew Zuppa

Page 70

1    A.     I don't remember.  Again, I probably
2  wouldn't have cared.  So I don't remember that
3  specifically.
4    Q.     You wouldn't have cared because why?
5    A.     I didn't like Chris.  I didn't think
6  he was a good manager.
7    Q.     Okay.  Let me ask you this:  In terms
8  of the salespeople that work at various stores, who
9  hires the salespeople?
10   A.     It depends.  A lot of the store
11  managers at that time, you know, were doing most of
12  it.  Like today they hire their own.  Some get
13  applications from other locations.  Sometimes they
14  share them.  Sometimes HR will hire them.  It just
15  really depends.  When I was a store manager, I hired
16  my own salespeople.
17   Q.     Store manager for AFW?
18   A.     Yes.
19   Q.     During the time that Jack Must was the
20  store manager in Westminster -- I'm just going to
21  recite for the record that that's roughly June
22  of '01 through July 6th of '04, basically three
23  years -- who was hiring salespeople at that time?
24   A.     For the company, or at his store?
25   Q.     Well, I guess what I'm trying to

b6ff1c8d-8a86-442e-9678-82f9922148ef

Andrew Zuppa

Page 74

1    that time, was a -- there was a health club that was

2    like the hottest, you know, health club in

3    Westminster going on there.  So the place was packed

4    all the time.  There was all this sort of extra

5    traffic going on there.  So "help wanted" signs were

6    effective at that location at that time.

7         Q.     You promoted Jack to store manager,

8    correct?

9         A.     Yes.

10        Q.     In Westminster?

11        A.     Yes.

12        Q.     And he was to replace Chris Smatla,

13   correct?

14        A.     Yes.

15        Q.     Was Smatla terminated?

16        A.     I don't know if he was sent back into

17   sales, if he quit, if he was terminated.  I don't

18   remember, but Chris wasn't having a good time at

19   that store.

20        Q.     So you don't remember which way it

21   was?

22        A.     No.

23        Q.     Okay.  You didn't give Chris Smatla

24   the opportunity to become a salesperson again?

25        A.     I might have.

b6ff1c8d-8a86-442e-9678-82f9922148ef

Andrew Zuppa

1    burn any potential bridges?

2            Chris wasn't a good manager, I didn't

3    think.  In my opinion, he wasn't a good manager.

4    Was he dishonest with me?  Was he stealing from us?

5    Was he -- you know, those are things that are far

6    different, and I just -- I don't remember with

7    Chris.  I don't remember.

8            Q.    You don't remember one way or the

9    other whether he was stealing from you?

10           A.    No, that's not what I'm saying.  I

11   don't remember whether he was given the opportunity

12   to go back into sales.  I don't remember that

13   specifically.

14           Q.    All right.  So you promoted Jack into

15   the manager's position, correct?

16           A.    Yes.

17           Q.    And does three years sound about right

18   as far as his tenure in that position?

19           A.    I'm going to say Smatla was roughly

20   2001.  So, yeah, let's say roughly three years.

21           Q.    What were your reasons for promoting

22   Jack into that position as opposed to any other

23   person that might have been a candidate for it?

24           A.    I don't know that we had a ton of

25   candidates at that time.  Jack had been there for a

Andrew Zuppa

Page 77

1   while.  Jack seemed to have an opinion on things as

2   far as, you know -- he didn't care much for Smatla.

3   I don't know, it was kind of his turn, I guess.

4        Q.     Well, I guess what I'm asking is:  Did

5   you sit down and sort of weigh the pluses and

6   minuses of Jack Must and conclude that he should be

7   promoted?

8        A.     Necessity was a huge driving factor at

9   that time.  The job had become vacant.  While I

10  don't specifically remember the conditions for which

11  Smatla left, I do know it wasn't sort of -- you

12  know, we didn't have an indefinite amount of time to

13  fill the position.  We had to fill it.

14       Q.     Let me ask you this question:  Was it

15  exclusively your decision?

16       A.     With Jack at that time, I would

17  probably have to get approval, but I probably would

18  have been able to get a hand wave on Jack, that, you

19  know, absent any other information, I would have got

20  approval on that just at a very superficial level.

21       Q.     If you got approval, it would have

22  been from whom?  Mike Buscietta?

23       A.     Probably Mike and Jake.  I probably

24  would have laid out my recommendation.  And absent

25  anybody having another opinion on it, it would have

b6ff1c8d-8a86-442e-9678-82f9922148ef

Andrew Zuppa

1    43, pertaining to the monthly bonus from August to

2    October of '01, Jack Must's percentage is changed to

3    .0010, effective, it looks like, 10/9/01, correct?

4            A.      Uh-huh.

5            Q.      The answer is yes?

6            A.      Yes.  Sorry.

7            Q.      And you were the person that decided

8    to do that?

9            A.      Yeah, it looks that way, yes.

10           Q.      Do you know what "2196" means?

11           A.      It could be his employee number.

12           Q.      I think his employee number is 3014,

13   or something like that.

14           A.      Oh, okay.  Hold on a second.  I'm

15   thinking -- and I'm going to guess here -- that he

16   may have entered management or changed jobs to like

17   store manager somewhere within that period.  I don't

18   know.  So they used a prorated formula for that.

19           Q.      All right.

20           A.      So let me just say that I think what

21   it means is that, if he would have been a store

22   manager, and this would have been in effect the

23   entire time, he would have had the bonus that looks

24   more like the 3544 number.

25           Q.      I see what you're saying.

b6ff1c8d-8a86-442e-9678-82f9922148ef

Andrew Zuppa

1   episode?

2           A.      I'm thinking of several involving me

3   and some involving Jack, absolutely.

4           Q.      That's the sort of thing I'm looking

5   for.  Tell me what they were.

6           A.      Jake had commented on occasions that

7   when he was over in the store, he would witness

8   salespeople walking out the door, or not being able

9   to find them, as customers went over unattended.

10                  When I would go over there, I would

11  see largely the same thing, assuming I could still

12  find Jack at work by the time -- and let's just cut

13  to the specific time.  When I became general

14  manager --

15          Q.      June 14th, '04.

16          A.      Somewhere in there, whatever.

17          Q.      I'll show you a memo, if you want.

18          A.      No, I believe you.  You've got an

19  honest face.

20                  So I'm starting to be out in the

21  stores.  I want to make sure that everybody is cool

22  with having a new guy in the position; I want to be

23  assuring people that things are fine and everybody

24  is fine and things are okay.  But you also want to

25  develop a one-on-one relationship with store

b6ff1c8d-8a86-442e-9678-82f9922148ef

Andrew Zuppa

1    managers because you rely on them.  I can't be out

2    in the stores as much as I honestly want.  You rely

3    on those people.  There's only, let's say, 10 or 11

4    people that are in these positions, so there's no

5    excuse, in my opinion, to not have a direct

6    relationship with them.

7              So I go out to the stores, and I'm

8    already aware of what Jake's opinion is, that

9    there's not enough salespeople, and this has been

10   going on for a while.  And I'm looking at Jack and I

11   would ask him things like:  Jack, where are your

12   salespeople?  We just walked the store.  That's an

13   easy store because it's not big, you can pretty much

14   see stem to stern, you can walk around it pretty

15   quickly.  And I'm watching customers, and I'm

16   watching couples, and I've worked in furniture for a

17   very long time, and I've worked in retail a very

18   long time, and you're witnessing things.  And you're

19   specifically pointing out:  Jack, those people

20   should be with a salesperson right now.  Where are

21   they?

22             Oh, I've got four people in the store.

23   Well, we just walked the store.  I'm looking at one

24   over there.  Where are the other people?  Sometimes

25   there's one person; sometimes there's two.  But

Andrew Zuppa

122

1 managers because you rely on them. I can't be out
2 in the stores as much as I honestly want. You rely
3 on those people. There's only, let's say, 10 or 11
4 people that are in these positions, so there's no
5 excuse, in my opinion, to not have a direct
6 relationship with them.
7          So I go out to the stores, and I'm
8 already aware of what Jake's opinion is, that
9 there's not enough salespeople, and this has been
10 going on for a while. And I'm looking at Jack and I
11 would ask him things like: Jack, where are your
12 salespeople? We just walked the store. That's an
13 easy store because it's not big, you can pretty much
14 see stem to stern, you can walk around it pretty
15 quickly. And I'm watching customers, and I'm
16 watching couples, and I've worked in furniture for a
17 very long time, and I've worked in retail a very
18 long time, and you're witnessing things. And you're
19 specifically pointing out: Jack, those people
20 should be with a salesperson right now. Where are
21 they?
22          Oh, I've got four people in the store.
23 Well, we just walked the store. I'm looking at one
24 over there. Where are the other people? Sometimes
25 there's one person; sometimes there's two. But

123

1 it's 5 o'clock now. When people come into furniture
2 stores as couples to make buying decisions, they do
3 that generally after work. It's not the middle of
4 the day. So between 5, 7, 8 o'clock, not only do
5 you have customers in the store, you have buying
6 customers in the store. Both decision-makers are
7 there. You don't have to worry about the husband is
8 there alone or the wife is there alone. Now you've
9 got couples in there; your decision-makers are
10 there. And I would observe these people, and I
11 would take Jack over and show him. Or customers
12 would ask us for help while we were walking around
13 looking at merchandising or other things, and I
14 would point that out to Jack.
15     Q.     Let me stop you and ask you something.
16 You're referring to some specific episodes that
17 happened between June 14th, 2004, when you became
18 general manager, and when you terminated him on July
19 6th, 2004, correct?
20     A.     Sure.
21     Q.     How many episodes are we talking
22 about?
23     A.     I'm going to say four occasions during
24 that period.
25     Q.     And did you -- I know there's a memo

124

1 in here, which I'm going to show you in a moment.
2 It's dated July 2004. Do you have any more specific
3 information about what you saw on what particular
4 occasions and in what circumstances than that
5 written document?
6     A.     No. I mean, I had specific
7 conversations with Jack when I was out in the stores
8 during that period.
9     Q.     One of which he recorded?
10     A.     Yes, yes.
11     Q.     And you've seen a transcript of it?
12     A.     Yes.
13     Q.     Have you listened to the recording
14 itself?
15     A.     No, I looked at the transcript.
16     Q.     Does the transcript remind you of the
17 conversation itself?
18     A.     Yeah, it wasn't unlike previous
19 conversations. That one was starting to express
20 growing frustrations on the same issues.
21          (Exhibit 31 was marked for
22 identification.)
23     Q.     (By Mr. Buchanan) I'm showing you
24 what we've marked as Exhibit 31, which, as I
25 understand it, is a transcript of a conversation

125

1 that you had with Jack Must and Tom Ward at the
2 Westminster store on June 16th, 2004. Is that the
3 transcript that you reviewed?
4     A.     As far as I know, it is.
5     Q.     And this was a conversation that
6 occurred, as I understand it, back in the warehouse
7 area of the Westminster store?
8     A.     I don't know. It appears to be a
9 portion of a conversation. Where it occurred in the
10 store and whether or not it was that exact date, I
11 don't know. It's not inconsistent with
12 conversations Jack and I were having at that period.
13 It is an incomplete conversation. It picks up
14 somewhere in the middle. It ends before the
15 conversation ends.
16     Q.     Is there any portion of that
17 transcript that, reading through it, it struck you
18 as just downright inaccurate, can't be right, must
19 have been recorded wrong?
20     A.     No. I didn't have a huge problem with
21 the transcript. I mean, I was becoming frustrated
22 with Jack, and that's obvious. When you have the
23 same conversation over and over and you're not
24 getting anywhere. And having experienced Jack, I'm
25 sure you're familiar.

32 (Pages 122 to 125)

Andrew Zuppa

1   that you had with Jack Must and Tom Ward at the

2   Westminster store on June 16th, 2004.  Is that the

3   transcript that you reviewed?

4           A.      As far as I know, it is.

5           Q.      And this was a conversation that

6   occurred, as I understand it, back in the warehouse

7   area of the Westminster store?

8           A.      I don't know.  It appears to be a

9   portion of a conversation.  Where it occurred in the

10  store and whether or not it was that exact date, I

11  don't know.  It's not inconsistent with

12  conversations Jack and I were having at that period.

13  It is an incomplete conversation.  It picks up

14  somewhere in the middle.  It ends before the

15  conversation ends.

16          Q.      Is there any portion of that

17  transcript that, reading through it, it struck you

18  as just downright inaccurate, can't be right, must

19  have been recorded wrong?

20          A.      No.  I didn't have a huge problem with

21  the transcript.  I mean, I was becoming frustrated

22  with Jack, and that's obvious.  When you have the

23  same conversation over and over and you're not

24  getting anywhere.  And having experienced Jack, I'm

25  sure you're familiar.

b6ff1c8d-8a86-442e-9678-82f9922148ef

Andrew Zuppa

Page 126

1    Actually, I'll stop right there.  You
2   do get -- at times, my language may get colorful,
3   which again is just a reflection of being
4   frustrated.  I'm not accustomed to having repeated
5   conversations with managers.  I'm not someone who
6   typically has to say the same things over and over
7   to managers.
8    On top of that, I took personal
9   responsibility for Jack, having, I felt, stuck up
10  for him, promoted him, and tried to coach him
11  through years and years, and I'm hitting a complete
12  wall with him.  And I think that's what this largely
13  -- even though it is a portion of a conversation,
14  not a complete conversation, transcripts don't
15  always do a good job of indicating context, but I
16  read through it, yeah, it's pretty accurate.
17       Q.    When you say you coached Jack, what
18  did you coach him on?
19       A.    I encouraged him a lot.  I told him
20  about ways to -- you know, what was important with
21  the company, things to do, ways of becoming a good
22  manager in this company -- not just a good manager,
23  a good manager in this company -- the types of
24  things that you needed to do to be successful here,
25  to be well regarded, the things that you needed to

b6ff1c8d-8a86-442e-9678-82f9922148ef

Andrew Zuppa

1    do to stick around.

2            Q.      And what were those?   It sounds like

3    satisfy Jake Jabs' whim.

4            A.      Yeah, that would be the top one.   And

5    the one I would give him is that if Jake is telling

6    you to do something, just go do it, just

7    specifically go do it, or have a compelling reason

8    for why you're not.

9            Q.      Can you give me any examples of things

10   that Jake Jabs, or Jake Jabs through you,

11   communicated to Jack Must to do that he did not do?

12           A.      Yeah, specifically, have salespeople

13   there at those times in the late afternoon when

14   we're busy.   For the 50 thousandth time -- you know

15   when we're busy -- if I come by at 5 o'clock in the

16   afternoon, please have more than one or two

17   salespeople around -- we're in the store; we're

18   looking at them -- and don't have customers

19   unattended.   Don't have them coming up to us asking

20   for help.   Don't sit there watching customers giving

21   off obvious buying signals and knowing they're not

22   being helped.   Don't tell me that you have more than

23   this amount of salespeople in the store when we just

24   walked the store, and they're not here.   Don't tell

25   me you have four people here; we just counted two.

b6ff1c8d-8a86-442e-9678-82f9922148ef

Andrew Zuppa

1   Fine, where are the other two?  Don't do that.

2          Q.      And, yet, you also say things to him

3   like:  We need to cut costs.  Costs would include

4   labor, correct, salespeople?

5          A.      No, not salespeople.  Salespeople pay

6   for themselves.  Salespeople are largely free.  They

7   work on commission.

8          Q.      There's a cost associated with them,

9   isn't there, paying out health insurance and so

10  forth and so on?

11         A.      Well, you pay the same health

12  insurance whether they're there at 5 o'clock or not,

13  whether they're there at 2 in the afternoon,

14  watching paint dry, or they're there when customers

15  are.

16         Q.      What did you mean when you referred to

17  "cut costs"?

18         A.      Again, this being a fractionated

19  conversation, I walk in that night and he has three

20  front office people in the office.  And I ask Jack:

21  We don't have office -- we don't need office people

22  here, like three people.  Maybe one.  You don't need

23  two.  You need one here at a time.  I've told you

24  before:  Have one front office person here.

25              Again, we're not selling -- you know,

b6ff1c8d-8a86-442e-9678-82f9922148ef

Andrew Zuppa

1    salespeople ring up their own invoices.  You need

2    one front office person here.  He mentioned things

3    about the shift change or whatever.  Honestly, you

4    could find more front office clerks than you could

5    salespeople.  You know, we had this conversation

6    over and over again.

7                  I told him that I did not want to see

8    more than one front office person there at a time

9    when I walked in.  These are costs we did not need

10   to incur.  There was nothing for them to do.

11        Q.      Okay.  Let me go through a couple of

12   the highlights in this conversation here.  You talk

13   about the Westminster store being a training area.

14   I'm just picking out --

15        A.      I'm sorry, you're on which page?

16        Q.      I'm on page 2.  I'm looking at the

17   second time you're talking.  It's lines 15 through

18   17.  You say, "It's a chance to give somebody else a

19   shot at running a store that's such a good training

20   ground to run, you know, and I want to be straight,

21   but, you know" . . .

22                  Down on line 21:  "You know, but it's

23   a training area."

24                  What did you mean by that?

25        A.      Jack should have long since progressed

Calderwood-Mackelprang, Inc.  303.477.3500

b6ff1c8d-8a86-442e-9678-82f9922148ef

Andrew Zuppa

1   out of that store.  Jack should have been moving up

2   through the company.  He should have moved on a long

3   time ago.  I mean, he's basically in a position

4   where I'm defending his job, when he should have

5   moved on from there.  This is not a hard store to

6   run.  It's an easy store to run.  He has been given

7   specific instruction that is not hard to achieve,

8   and he's either ignoring it or he's just not doing

9   it.  He either doesn't care or can't do it.

10         Q.     What do you mean by, "He should have

11   moved on long ago"?

12         A.     He should have been in a bigger store.

13   He should have had more responsibility.  He should

14   have been managing more people.

15         Q.     And, yet, you tell me that Jake Jabs

16   had this horrible opinion of him.  How would he do

17   that?  What opportunity would he have --

18         A.     He had all the opportunity in the

19   world.  He had all the opportunity during the period

20   he was there to change people's impressions, to step

21   up, to improve his relationship with Jake, to follow

22   simple instruction, to work on his relationship with

23   Mike Buscietta, which is important when you work in

24   management.  You need to get along with senior

25   management; you absolutely do.  I have to.  I don't

Calderwood-Mackelprang, Inc.  303.477.3500

Andrew Zuppa

1    A.    Yeah, yeah.  If he did, I don't know
2  what it was.  You know, contribution is a big deal.
3  So you've got this guy who's not progressing, who's
4  not moving along.  Forget the downside, what's your
5  upside?  What's your upside?  What does he bring?
6    Q.    You referred to bringing in a
7  ball-breaking guy to come in and run it.  What did
8  you mean by that?
9    A.    Somebody that's effective.  I should
10 have used the word "effective."  I used
11 "ball-breaking."  I believe the term is hyphenated.
12 It was colorful and it was frustrating, and the word
13 I should have used was "effective," but I used that
14 term, meaning just get this done.  You've been told
15 what to do.  Just do it.  Please do it.
16    Q.    And "this" in that sentence, the
17 primary focus seems to be:  Have enough salespeople
18 in here when there are customers in the store?
19    A.    Why wouldn't you have just had them
20 lined up like a basketball zone defense?  If this is
21 all they wanted, meaning senior management, why
22 wouldn't you just go out and do it?  Why would you
23 continue to have these conversations with me, who I
24 will assure you is the last person on the plant you
25 want to have tell you a second time to do something,

Andrew Zuppa

1   so unaccustomed to it, so -- I mean, why wouldn't

2   you just do that?  Why would you allow people to

3   keep talking about that, over and over again?

4        Q.      Okay.  Did you -- I'm looking at

5   page 4 now, lines 12 and 13.  You talk about -- 11

6   through 13 -- you say, "I think we need to do a

7   better job of flushing out dead weight and getting

8   some more aggressive help."

9            Now, did you have the opinion that

10  some of his salespeople were not up to snuff, were

11  not very good?

12       A.      Well, I had the opinion that you would

13  ask him, "How many salespeople do you have here

14  tonight?"  He would say, "Four."  But there would

15  clearly be one or two in the store.

16           You've got two possibilities:  Either

17  Jack is letting them leave during critical times or

18  they're walking out, hitting the McDonald's over

19  there or smoking somewhere outside, you know -- so

20  if you want to give Jack the benefit of the doubt --

21  and I really did for a long, long time; I absolutely

22  wanted to give Jack the benefit of the doubt -- but

23  if you give him the benefit of the doubt, it means

24  that you have people just wandering out the doors

25  and walking around as they will, and they're not

Andrew Zuppa

Page 134

1    doing a good job at being responsive to you.

2         Q.     Let me ask you something.  You had the

3    authority to fire people, didn't you?

4         A.     Oh, absolutely.

5         Q.     Did you ever fire any of his

6    salespeople?

7         A.     No, I wouldn't have had the -- I would

8    have had anecdotal experiences with them

9    individually.

10        Q.     So what?

11        A.     Well, that's a fine company.

12        Q.     You've just stated that when you were

13   in there, you would see -- giving Jack the benefit

14   of the doubt, these people are just walking out on

15   him -- did you ever see anybody do that?

16        A.     No.  I didn't see hardly anybody at

17   all.  That was the problem.

18        Q.     At one point, you referenced seeing

19   three people smoking out front.  Do you remember

20   that?

21        A.     At one point -- I don't know.

22        Q.     Did you fire them?

23        A.     No, I didn't fire them.

24        Q.     Why not?

25        A.     Why would I fire somebody else's

b6ff1c8d-8a86-442e-9678-82f9922148ef

Andrew Zuppa

1    Teresa or somebody that's not that.  That's why you

2    have store managers.  That's why you pay them these

3    dollars.

4           Q.      So, in other words, you felt it was

5    his job to fire whoever he felt it was appropriate

6    to fire and not yours?

7           A.      I was making available to him any

8    tools that he needed to fix the problem.  If I'm

9    wrong about what I'm observing, fine, fix it your

10   way; do whatever you want.  I'm giving Jack as much

11   ammunition to fix the problem, and as much leeway,

12   as I possibly can.  I'm giving him ultimate

13   decision-making to -- you want to keep them, Jack,

14   you keep them.  You want to get rid of them, you get

15   rid of them, but you fix this problem.  It's on you;

16   it's not on me.  We've got 330 salespeople; it's not

17   my job.  I've got 11 store managers; they're my job,

18   and I take that very, very seriously.

19          Q.      One of the things you say, on page 4

20   of this transcript, is, "We're doing less business

21   in this store now than the day we opened the son of

22   a bitch."

23          A.      Yeah, that sounds true.

24          Q.      Is that true?

25          A.      Yeah, that sounds true, yeah, and that

Andrew Zuppa

1    I'm not really ready to make, yeah, okay.

2            Q.        Then the next year, there's a bit of a

3    dip to 10.960 million, correct?

4            A.        Yeah, that would be a bit of a dip.

5            Q.        And then back up in '03 and '04 to

6    11.1, correct?

7            A.        Yes, it rockets up to roughly

8    25 percent of a day-wide company business, yes.

9            Q.        It's always been about 25 percent of a

10   day-wide, company-wide business, hasn't it?

11           A.        I would say that if our business

12   reflected this as a company, we would have some

13   problems right now.

14           Q.        But the point is that the Westminster

15   store has always represented something like less

16   than 5 percent of the business of this company,

17   hasn't it?

18           A.        It's proportionality.  It travels.  It

19   travels.  And something incredible was happening in

20   2001, 2002, 2003.  Something incredible was

21   happening with our business and our furniture and

22   customer buying habits during that period.

23                   And, no, can I explain what happened

24   at that store to represent a decrease, when

25   everything I knew to be true should have been

Andrew Zuppa

1    showing it going the other direction?  No, I can't

2    explain it.  It should not have been going down.

3            Q.      Is it your testimony here today, sir,

4    that every other store was making more money than it

5    had the year before?

6            A.      Making more money or selling more

7    furniture?  No, my comment is that this store should

8    have been doing better than what it was doing.

9            Q.      Why?

10           A.      Because there were no other factors.

11   We were not opening additional stores over there.

12   It was in a bedroom community.  Something incredible

13   had happened with our business following 9/11, with

14   home furnishing and nesting.  And there's no reason,

15   in my opinion, that that should have been occurring

16   there.  And that was my opinion.

17           Q.      And after 9/11, in the nine months

18   following 9/11, the revenues in that first column,

19   2001-2002 are 11.452.  It appears that did occur at

20   this store, didn't it?

21           A.      We're still not even back to the

22   numbers when we opened the place.  Business is not

23   increasing.  It's hovering below where we were,

24   which makes my statement to him factually accurate.

25                   Are you saying that wasn't accurate?

b6ff1c8d-8a86-442e-9678-82f9922148ef

Andrew Zuppa

1   You're a little unclear as to how you became

2   involved in it.  You've told us that.  What do you

3   remember happening in that meeting?

4        A.      I remember walking in, and there was

5   an exchange that was overly heated between Mike and

6   Jack.  It was on the subject of signature capture.

7   What they were arguing over, I guess, was who was to

8   blame for the incident.

9        Q.      What was the incident?

10        A.      A signature capture device -- should I

11   explain what that is?

12        Q.      Let me state what I think it is.  It

13   has to do with an electronic system that you see,

14   for instance, in Home Depot where you use the pen to

15   sign; it never looks like your signature, but that's

16   some evidence that you picked up a delivery?

17        A.      Partially.  The significance to it is

18   that it closes an invoice.  And if you don't want me

19   to go into it, I just need to --

20        Q.      Go ahead.

21        A.      You want me to go into it?

22        Q.      Yeah, tell me why it's significant.

23        A.      We have done a pretty good job of

24   controlling theft, both customer and employee, but

25   there were holes in the system.  One of the holes

b6ff1c8d-8a86-442e-9678-82f9922148ef

Andrew Zuppa

Page 170

1   was -- and I'm going back years from when I picked

2   up the company, started working there -- a customer

3   would pick up their merchandise at a location.  They

4   would sign for it.  They would sign a physical

5   invoice, a pen on a physical piece of paper.  The

6   invoice would then get tossed into a basket.

7            After enough had been put in the

8   basket or at the end of the day, somebody from the

9   warehouse would carry the invoices up to the front

10  office, where the person would look at them and say,

11  "Okay, that's been picked up" -- lock out changes to

12  the invoice.  If somebody went back into the invoice

13  after that period, it would be clear that somebody

14  had picked up the merchandise.  If somebody hasn't,

15  we all know that there's a problem because we can

16  tell an open invoice, which is somebody hasn't

17  picked it up, from one where changes are locked out,

18  where somebody says, "This has been closed."  We

19  have moved the invoice from us to the customer.

20           One of the holes in the system was

21  this lag that existed between the customer signing

22  for it and whoever in the front office being in in

23  an hour or being in 12 hours later and closing out

24  the invoice.

25           What would prevent me from taking a

b6ff1c8d-8a86-442e-9678-82f9922148ef

Andrew Zuppa

1  duplicate copy of the invoice to another location,

2  picking up the same merchandise?  While that invoice

3  was open, it may look like the merchandise was in

4  the wrong area or whatever, but it would look

5  largely like the customer didn't pick up the

6  merchandise.  If you were slick, if the person on

7  the dock wasn't sharp, you could pick up the same

8  merchandise more than once.

9            Also, we had a lot of ex-employees by

10  this point.  A lot of years had gone by, and you

11  literally have thousands of ex-employees.  But this

12  wasn't exactly trade secret, let's put it that way.

13  People knew this, particularly the people who

14  handled it, where the hole was.  So signature

15  capture:  Not only do you capture the signature,

16  which you still need -- and it isn't so much that

17  you have an exact signature -- how many times do you

18  sign a receipt in a restaurant when it looks

19  anything like it? -- but what it does do is it

20  freezes the invoice out now.  And it can only happen

21  one time.

22            Now they go to pick it up and have a

23  closed invoice.  You could have only been there a

24  week, but you know that there's a problem, plus

25  you're frozen out from being able to move

Calderwood-Mackelprang, Inc.  303.477.3500

b6ff1c8d-8a86-442e-9678-82f9922148ef

Andrew Zuppa

1   merchandise, too, then.  You're going to have to go

2   to a supervisor, who's going to see the locked-out

3   situation, he's going to call the other store.

4   Anyway, it's a big problem.  It's a big deal.  And

5   if I didn't explain it --

6          Q.      That's a very good explanation.  I

7   understand it.

8                  Now, I guess my question is:  This was

9   a program that AFW had initiated storewide?

10         A.      Yes.

11         Q.      Company-wide, I should say, all their

12   locations?

13         A.      Yes, yes.

14         Q.      And just tell me, was the Westminster

15   store a particularly difficult -- or a store where

16   you had a lot of the problems you've described, or

17   do you know?

18         A.      No, I don't know that it was or that

19   it wasn't.  It was a hole in our game that we knew

20   about.  It was a big deal to get it to this.  We had

21   to push the software manufacturer.  For this

22   software manufacturer, who largely does mom-and-pop

23   businesses that don't really look like what American

24   furniture does today -- this sort of technology is

25   not that big of a deal.  You may not even have

b6ff1c8d-8a86-442e-9678-82f9922148ef

Andrew Zuppa

Page 173

1    merchandise being picked up; you may deliver

2    everything.    But you don't have thousands of

3    pickups, so it's not a big deal.

4              The fact that Home Depot had it was

5    not a light year away from us having it.    We had to

6    develop it.    Was the signature good enough?    Did it

7    satisfy, you know, whoever's needs, whether it was

8    the accounting department?    Did it satisfy Visa.

9    Who was the signature okay with?    We had to jump

10   through a lot of hoops.    Then we had to develop the

11   technology.    Then we had to go out to a third party

12   and say, "Who makes it," because our software

13   manufacturer doesn't make it.    That requires an

14   interface to a custom program that fits a unique

15   software.

16        Q.    Let me jump in.    I understand it was a

17   very complicated thing.    It sounds like it was very

18   expensive; took a lot of time to develop it.

19        A.    Yeah.

20        Q.    Apparently, there was a decision made

21   that we're going to put them in all of our stores?

22        A.    Right, that do pickups, yes.

23        Q.    What was the issue, as far as you

24   understood it, between Buscietta and Must, and why

25   were they trying to place blame for it?

Calderwood-Mackelprang, Inc.  303.477.3500

b6ff1c8d-8a86-442e-9678-82f9922148ef

Andrew Zuppa

1       Jack, maybe you should have called me;
2  I would have sent somebody over there.
3       Well, it wasn't my fault, Mike.  I'm
4  not in the IT department.  This isn't my fault.  And
5  they're having this exchange.  And as stupid as that
6  sounds, I just want to assure you the actual
7  conversation was much, much worse.
8       Q.     Who was in charge of getting these
9  things up and running in the stores?
10      A.     In my opinion?
11      Q.     Yes.
12      A.     Jack.  The store manager absolutely
13  was.
14      Q.     The store manager in each location?
15      A.     Oh, absolutely.
16      Q.     Is the IT function -- that's a
17  separate corporate function that covers the whole
18  company, right?
19      A.     Yes, and we have it at a couple of
20  locations.
21      Q.     What all is involved in hooking it up
22  from an IT standpoint?
23      A.     That device, after all the programming
24  had been done, would have basically been a 15-minute
25  implementation.  They go over, hook it up, and

b6ff1c8d-8a86-442e-9678-82f9922148ef

Andrew Zuppa

1   floor.  They knew that.  Store managers knew their

2   responsibility to that.

3          Q.      In other words, it was

4   their responsibility to get them up and running?

5          A.      Yeah.

6          Q.      But they needed IT to do that?

7          A.      Sure.

8          Q.      IT was Mike Buscietta's

9   responsibility?

10         A.      We had an IT manager.  I mean, it

11  would not have had to risen to the level to have

12  Mike do it, with a store manager that was paying

13  attention to it.  Had they called Mike or had they

14  called me, it would have been done that afternoon.

15  If I was a store manager, it would have been done

16  that afternoon, without me calling anybody other

17  than the IT department.

18         Q.      Did AFW ever determine that it had

19  actually lost some inventory because of the delay in

20  getting the signature capture software up and

21  running at the Westminster store?

22         A.      That was so not the point.  Not even a

23  consideration.

24         Q.      I understand your argument.  My

25  question is:  Did you ever determine that you lost

b6ff1c8d-8a86-442e-9678-82f9922148ef

Andrew Zuppa

Page 178

1   any --

2          A.     We never looked at that specific

3   subject because it wasn't in the top two or three

4   major points in the argument.  We did not assume

5   that we had.  We did not look into it.

6          Q.     Do you recall a time shortly after

7   this -- well, let me ask you -- you've talked about

8   the signature capture incident or issue -- were

9   there any other issues discussed at that meeting?

10         A.     We were discussing personal

11  responsibility, ability to take responsibility for

12  your business and your specific job functions,

13  raising your voice to the company's general manager.

14  And then, at the end, Jack flips out:  We had a good

15  May.  And then we had to have that conversation.  So

16  that was sort of a --

17         Q.     Okay.  You disagreed that they had a

18  good May?

19         A.     We were talking about personal

20  responsibility.  We were talking about basic job

21  function.

22         Q.     Let me stop you.  Did you disagree

23  that they'd had a good May?

24         A.     Yes.

25         Q.     Why?

b6ff1c8d-8a86-442e-9678-82f9922148ef

Andrew Zuppa

1    A.    The numbers weren't outstanding.   They

2    were roughly similar to months that we'd had -- May

3    is a good month for us.   Those numbers weren't

4    extraordinary.   That, I would say, would have been a

5    bad month in what my opinion of the business should

6    have been.

7           But largely past that, it was just not

8    the issue.   The central theme with Jack, if I had to

9    put something next to his name, would be:   I don't

10   get it.   I don't get it.   Jack Must:   I don't get

11   it.   I can't stay on point.   I can't address what's

12   in front of me.

13          Again, I don't have to tell you about

14   that.   You know that.   Now, here we were again on

15   this same subject.

16   Q.    You agree that the store earned,

17   according to these documents, in May of 2004,

18   $1,021,856, correct?

19   A.    I don't know.   Again, I'm unfamiliar

20   with that.   I just prefer going back to this, if

21   it's okay.

22   Q.    That's okay.   It's my understanding

23   that this is the digest of that information.

24   A.    Well, you can work it out with them as

25   to what that is.

Calderwood-Mackelprang, Inc.  303.477.3500

Andrew Zuppa

1   are you?  We want you as a salesperson."

2        A.    The next day, the last thing he said

3   to me was repeating the phrase, I'll see you in

4   court.  The first time, I might have let that go,

5   but the second time, I guess I knew where he was

6   going.

7        Q.    So you didn't call him up --

8        A.    No, I'll see you in court pretty much

9   says everything.

10        Q.    In other words -- well, strike that.

11        Coming back to Exhibit 36, was it

12   right after that that you sat down and wrote this

13   down?

14        A.    I believe it was the next morning.

15        Q.    I want to make sure I understand some

16   things.  We've talked about a great deal of what's

17   in here already, so I don't want to overdo this.

18   When you say that you'd been leaving FC early does

19   that mean Fort Collins early?

20        A.    Yeah, I'd been leaving Fort Collins.

21        Q.    Why would you be in Fort Collins?

22        A.    Because as I did tours of stores, I

23   wanted to work around Denver traffic.  So I tried to

24   be out of the metro area and up in Fort Collins.

25   That gave me the option later to largely miss

Andrew Zuppa

1    southbound traffic, because you were above it,

2    north, take the Northwest Parkway, which you're the

3    only car on it and can drive backwards at 100 miles

4    an hour, if you have to.  I had a toll pass for

5    that.

6                So you take that over to Wadsworth,

7    and you can shoot over, and it was a good route to

8    take.  That way I could hit Southwest as my last

9    store, Store 20, South Wadsworth, Lakewood, and then

10   I could be finished and could go home at 8 o'clock

11   or whenever.

12               Q.     Now, it says, "Jack won't stay after 5

13   to 6 p.m., even when I called to say I was coming.

14               A.     Yeah.

15               Q.     You mean you called and said to Jack,

16   "Please wait for me," and he'd leave?

17               A.     I would have to start doing that

18   because if I came any time after that, he wouldn't

19   be there.  So as much as possible, I would try to

20   tell somebody:  Go ahead and give him a call, let

21   him know I'm coming.

22               Q.     And when you did that, did he stay?

23               A.     Not always.  Sometimes I missed him.

24   In fairness, I was not always there by 5:30 or 6;

25   sometimes I was there at 6:30 or 7.  But he was not

b6ff1c8d-8a86-442e-9678-82f9922148ef

Andrew Zuppa

1   waiting for me, and then I was there with Tom.

2          Q.      And you had an understanding, didn't

3   you, that he was working from whenever they opened

4   in the morning, or before they opened, until 6, and

5   that it was Tom or Joe Buzzuto (phonetic) that was

6   closing the store?

7          A.      Yeah, except if I was coming, in which

8   case I so didn't care.  I didn't.  I mean, I tried

9   to work my schedule to be there as close to 6 as I

10  could.  I mean, I was willing to interrupt my day.

11  But at the end of the day -- you know, it's not a

12  bank; these are not banker's hours.  This is part of

13  what you sign on for.  And, trust me, if my boss was

14  coming, I would absolutely be there, if it

15  was 10 o'clock at night.

16          Again, I don't get it.  I never will.

17          Q.      It says here that you found one

18  salesperson here on one night and two on another

19  night, correct?

20          A.      Yes.

21          Q.      Can you specify which nights those

22  were?

23          A.      Previous visits.  I don't know.

24          Q.      Is there any way to reconstruct it?

25  Do you keep any records --

b6ff1c8d-8a86-442e-9678-82f9922148ef

Andrew Zuppa

1      A.      No, I didn't.  Some of the buyers keep

2   sheets or would have them for a short period, but I

3   didn't fill them out.  I didn't keep -- I didn't

4   keep notes.  That's why I sat down with this.  And I

5   only did it after Jack surprised me with the fact he

6   wasn't returning to a sales position.

7      Q.      That actually surprised you?

8      A.      Yeah, it did.  Yeah, it did.

9      Q.      It was Jack's perception that he would

10  make about half as much as he was making in a sales

11  position.

12     A.      Yeah, I didn't get that.  Jack was a

13  low-paid manager.  Him making that kind of money in

14  sales should have absolutely been achievable.

15     Q.      Let's assume that that's his

16  perception.  Do you believe that it's reasonable for

17  somebody not to take a job at half the pay that

18  they've been receiving?

19     A.      I don't think it's reasonable for him

20  to have assumed that he would have done that.

21  Particularly given his experience with the company,

22  he should have known that was not the case.

23     Q.      Could you live on half the money

24  you're making now?

25     A.      I could have lived on what I made in

b6ff1c8d-8a86-442e-9678-82f9922148ef

Andrew Zuppa

1    sales, which I'm guessing would have been roughly

2    what Jack made, which shouldn't have been that much

3    different than what he was making as a store

4    manager.  What he was making as a store manager was

5    absolutely achievable for someone with Jack's

6    experience.

7         Q.    Are you married?

8         A.    Yes, I am.

9         Q.    Do you have children?

10        A.    No, I don't.

11        Q.    And so with respect to any particular

12   night where you claim there was one salesperson on

13   one night and two on another night, you can't say

14   when they were?

15        A.    Well, a couple of things:  I'm not

16   claiming that.  That's what happened.  And

17   specifically, no.  I was there trying to salvage

18   Jack as a manager.  If I honestly was more concerned

19   about trying to fire him or get rid of him, yes, I

20   probably would have done a better job of notating

21   things.  But I assumed, like I always assume with

22   our managers, that again when I brought stuff to

23   their attention, that they would just resolve it.

24   And if Jack would have been half as interested in

25   wanting to resolve these issues rather than opening

Andrew Zuppa

Page 193

1   work in retail, this is when you work.  I can't do

2   business with anybody -- I can't be on the phone, so

3   I might as well be out in the stores.  You're not

4   necessarily looking for managers.  You're just

5   making sure that things look like they're running.

6          Q.     So despite whatever complaints he had

7   about working on the 4th, in point of fact he did

8   work on the 4th?

9          A.     Yes, he worked the mandatory days that

10  he was required to work as a condition of his

11  employment.  He did the very basic that was required

12  of him on those days.

13         Q.     It says here that "Tom complained" --

14  I'm looking at Exhibit 36 again -- it says, "Tom

15  complained that Jack is negative figures/influence

16  on store.  Talking negative about

17  Company/me/Mike/Dale.  Hurting store."  Correct?

18         A.     Yeah, right.

19         Q.     Tom is Tom Ward?

20         A.     Tom Ward.

21         Q.     And when did he say these things to

22  you?

23         A.     On some of the nights that I would go

24  out that I missed Jack, I was there with Tom, and

25  Tom would bring these subjects up, that Jack would

b6ff1c8d-8a86-442e-9678-82f9922148ef

Andrew Zuppa

1    frequently talk to subordinate employees about being

2    unhappy, about upper management specifically, that

3    he would make negative comments about Mike or me, or

4    he had -- you know, just generally was disgruntled

5    about work schedules and was very unhappy and was

6    making that known to, again, subordinate employees.

7             Q.     Did Tom communicate that to you on

8    more than one occasion?

9             A.     He communicated it on one occasion

10   specifically.  I didn't pursue it with him after

11   that.  I did not want to have those conversations

12   specifically with an assistant store manager.

13            Q.     And I assume that -- well, can you be

14   any more specific as to when that conversation with

15   Tom Ward happened?

16            A.     It would have happened after the

17   period that I became general manager, one of the

18   nights that I had missed Jack and was there after he

19   had left and was walking the floor with Tom.

20            Q.     Next -- and I'm moving along here,

21   guys -- the third page of this exhibit, you say,

22   "Concerned about May's sales figures after signature

23   capture incident."

24                   We've talked about the May sales

25   figures.  We've talked about the signature capture

Calderwood-Mackelprang, Inc.  303.477.3500

b6ff1c8d-8a86-442e-9678-82f9922148ef

Andrew Zuppa

Page 201

1    need to talk."

2            We go upstairs.  There's a mezzanine

3    upstairs.  It doesn't run the full length of the

4    store, you know; it's a mezzanine.  Anyway, there's

5    a quiet area.  There's no way for customers or --

6    there's no back office at that point.  This is the

7    most secluded place in the store.  You can see if

8    somebody is walking by.  You can see that nobody is

9    behind you.  We go up there and talk.

10           Q.     Let me ask you something.  Why did you

11   want to be in a secluded area?

12           A.     Because we needed to have a

13   conversation that was between me and him and not his

14   subordinate staff or customers.

15           Q.     Then what happened?

16           A.     "Jack, we're going in a different

17   direction.  We're going to have to put a different

18   store manager in here.  Listen, you have the

19   opportunity to go back into sales.  That's what

20   we're doing right now."

21           That's about the extent of the initial

22   part of the conversation.  I was not there to debate

23   it.  We had been down that road.  We were absolutely

24   not going to keep him as a store manager.  We had

25   finally reached that decision.  So he was being

b6ff1c8d-8a86-442e-9678-82f9922148ef

Andrew Zuppa

Page 203

1    is it that you want to ask?  Do you want to move off

2    that subject and move on to where you want to go, or

3    do you want to have this conversation, because I can

4    have this one all night?

5            Q.      Why don't you listen to my question.

6            A.      I did.

7            Q.      Did you ever ask Jake Jabs, "Jake, I

8    am going to make it so that Jack Must is not going

9    to be the store manager at Westminster anymore and

10   move him into sales; is that okay"?

11           A.      Yes, I did have that conversation.

12           Q.      And when did that occur?

13           A.      The day of or previous to that.  I

14   don't remember whether it was specifically that day

15   or if it would have been -- I'm trying to think.  I

16   think it was either July 5th or July 6th.  I don't

17   remember which.  But store manager decisions,

18   absolutely, they're all going to have to be vetted

19   by Jake.

20           Q.      And where did that conversation take

21   place?

22           A.      His office.

23           Q.      And this would have been, if our

24   recollection is correct, this would have been a

25   Monday?

Calderwood-Mackelprang, Inc.  303.477.3500

b6ff1c8d-8a86-442e-9678-82f9922148ef

Andrew Zuppa

Andrew Zuppa

1    Colorado Wage Act, when you fire someone, that you

2    have to pay them what they have coming that day?

3         A.    Oh, wow, I see where you're going.

4         Q.    Do you understand that?

5         A.    I understand that this is completely

6    the wrong way to go with this.  This is not what

7    happened.

8         Q.    My question is:  Do you understand

9    that requirement of the Colorado Wage Act, that when

10   you fire somebody, terminate them, you have to pay

11   them what they have coming immediately?

12        A.    Yeah, Jack was not being fired -- to

13   answer your question, yes.  And as he was not being

14   fired, I didn't consider it within the context of

15   this.  And that's not why these multiple checks were

16   given to him.  Multiple checks were given to him so

17   he could have his vacation pay at manager rate, in

18   which he accrued it.  He also would have a week to

19   either build up his backorder or take a week off in

20   between going into sales and not be screwed out of

21   his manager pay and pay that 7.14 an hour, or

22   whatever it was, that a salesperson's pay would be.

23              Yeah, this was being a good guy.  This

24   was acting like a normal human being.

25        Q.    You replaced Jack Must with Nolan

b6ff1c8d-8a86-442e-9678-82f9922148ef