IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 06-cv-01872-RPM-MEH

JACK MUST,

     Plaintiff,

vs.

AMERICAN FURNITURE WAREHOUSE CO., a Colorado corporation, d/b/a
AMERICAN FURNITURE WAREHOUSE

     Defendant.

---

## EXHIBIT A-9

## JACOB "JAKE" JABS DEPOSITION TRANSCRIPT EXCERPTS

### Submitted By Defendant
### In Support Of Its Motion For Summary Judgment

---

Respectfully submitted this 14th day of January, 2008.

s/ Andrew W. Volin
**Andrew W. Volin, Esq.**
SHERMAN & HOWARD L.L.C.
633 Seventeenth Street, Suite 3000
Denver, CO 80202
Telephone: (303) 297-2900
Facsimile:  (303) 298-0940
E-Mail:     AVolin@sah.com

Gary J. Benson, Esq.
DWORKIN, CHAMBERS & WILLIAMS, P.C.
3900 E. Mexico Avenue, Suite 1300
Denver, CO  80210
Phone:(303) 584-0990
Fax:(303) 584-0995
E-mail:gbenson@dnvrlaw.com
*Attorneys for Defendant*
*American Furniture Warehouse*

# Jacob Jabs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Case No. 06-CV-01872-RPM-MEH

JACK MUST,

Plaintiff

vs.

AMERICAN FURNITURE WAREHOUSE CO., a Colorado
corporation d/b/a/ AMERICAN FURNITURE WAREHOUSE,

Defendant.

---

### DEPOSITION OF JACOB JABS

---

PURSUANT TO NOTICE, the above-
entitled deposition was taken on behalf of the
Plaintiff at 1621 18th Street, Suite 260, Denver,
Colorado, on August 29, 2007, at 2:36 p.m., before
Dawn E.  Eastman (Calderwood), Certified Shorthand
Reporter, Registered Professional Reporter, and
Notary Public.

Jacob Jabs

Page 19

1    at American Furniture Warehouse, other than just

2    looking in his personnel file, would there be any

3    way to do that?

4         A.      I guess probably talk to his

5    supervisor.

6         Q.      To his manager?

7         A.      (Deponent nods head.)

8         Q.      Okay.  Any other documents that you

9    would look at, outside the personnel file?

10        A.      Probably not, no.

11        Q.      Okay. were you involved in the

12   decision to promote Jack to the manager position at

13   American -- at the Westminster store?

14        A.      In the sense that I would approve

15   that.

16        Q.      Okay.

17        A.      Once they get to the manager, I

18   approve managers.  But I -- there again, I pretty

19   much take the recommendation of basically whoever is

20   sponsoring them or wanting them to move up.

21        Q.      In this particular case, Andrew Zuppa

22   says he made that decision.  Does that mesh with

23   your recollection?

24        A.      Sounds right, yeah.

25        Q.      Do you remember anything specific

Calderwood-Mackelprang, Inc. 303.477.3500

4ad69690-9ebe-4a05-a936-13357abfbe1a

Jacob Jabs

Page 23

1    Q.      Let me ask you this question:   Your
2  name is on both of these memos; correct?
3    A.      Yes.
4    Q.      But because your name is on them does
5  not necessarily mean that you wrote them; correct?
6    A.      That's correct, yes.
7    Q.      And, in fact, in both of these
8  instances, it sounds to me like you are saying that
9  someone else wrote them; but it says that it's from
10  you?
11    A.      Yes.
12    Q.      Okay.  Now, the program is based on
13  the consolidated profit of the company; right?
14    A.      That's correct.
15    Q.      And, obviously, there are, you know,
16  probably as many different ways to do a bonus
17  program as there are companies.
18            Why did you choose to do your bonus
19  program based on the consolidated profits rather
20  than any one of the number of other ways?
21    A.      Well, I guess I've always accepted
22  responsibility for the profits of the company.  I do
23  the advertising.  I do most of the buying.  I sign
24  all the checks.
25            So I think I'm the one that

Jacob Jabs

Page 24

1    controlled -- whether the company is successful or

2    not really is, I think, dependent on how good I buy,

3    how good I advertise.  You know, I control the

4    expenses by signing the checks.

5                    And I don't think -- I can't blame

6    managers, individual store managers or my delivery

7    driver manager or my, you know, warehouse manager

8    for the profit of the company.  I always accepted

9    that as my responsibility, to make the company

10   profitable.  And so I never try to blame it on

11   individual store managers or individual warehouse

12   managers or somebody else.

13        Q.     Okay.  And, therefore, you just felt

14   that the bonus program should be based on the

15   companywide profits, you know, sort of a:  We're all

16   in this together type of mentality?

17        A.     Exactly.

18        Q.     Has it ever been different?  Has there

19   ever been a time when your bonuses were more

20   targeted as -- you know, I'm just thinking through

21   the possibilities -- but a flagship store like the

22   Thornton store that does a larger percentage of your

23   business, the manager of that store would get a

24   considerably larger bonus than, for instance, the

25   guy that manages the Westminster store?

Jacob Jabs

1        A.      No, we've never done that.

2        Q.      And is that, again, because of this

3   we're all in this together type of mentality?

4        A.      Yes.

5        Q.      You said something very interesting

6   about how the company -- and these are not going to

7   be your words, I'm just paraphrasing what I heard to

8   be the idea -- but the company kind of goes up and

9   down with the quality of your buying; correct?

10        A.      Yes.

11        Q.      And by that, I take it you mean all

12   aspects of buying -- buying styles that will sell,

13   buying them at costs that you can sell them for and

14   still make at least a buck on; correct?

15        A.      Yes.

16        Q.      And other aspects of buying that I

17   can't think of because I'm not a buyer.  But it's

18   based on all of those factors; correct?

19        A.      Yes.

20        Q.      Is that, in your mind, the single

21   biggest driver of the revenue of the company?

22        A.      Yes.

23        Q.      And for managers, individual store

24   managers, as long as they're selling the stuff that

25   you have bought and ordered for the company really

Jacob Jabs

Page 26

1    don't have a lot of control over whether it's going
2    to sell or not?
3            A.      That's correct.
4            Q.      Let me show you, Mr. Jabs, what we
5    have marked as Exhibit 28 to these series of
6    depositions.  And I'll just tell you that this is a
7    spreadsheet documenting the payment of bonuses to
8    various management personnel at AFW basically during
9    the entire time that Jack Must was either an
10   assistant manager or manager.  Okay?
11           And I've got a couple of questions
12   about just a couple of these pages.  The first are
13   pages 48 and 49.  Do you see down here at the bottom
14   there's a stamp?
15           A.      0031?
16           Q.      Yeah.  I'm looking at the last two
17   digits, and I want you to turn to page 48?
18           A.      Okay.  I see what you mean.
19           Q.      And, again, let me just get you
20   oriented here if I can.  Pages 48 and 49 are what
21   appear to be kind of a rough draft and the final
22   draft of the bonuses for the quarter, which includes
23   November and December of '02 and January of '03; do
24   you see that?
25           MR. BENSON:  If you don't mind me,

Calderwood-Mackelprang, Inc.  303.477.3500

4ad69690-9ebe-4a05-a936-13357abfbe1a

Jacob Jabs

1   bonus money because we thought he was doing a lousy

2   job of running the store.

3        Q.     Now, as I understand it, you would

4   normally present these checks a month after the

5   quarter had ended; correct?

6        A.     Yes.

7        Q.     So they would be distributed in, say,

8   late February, perhaps even early March of '03;

9   correct?

10        A.     Yes.

11        Q.     Do you remember anything specific, any

12   specific episodes of misconduct on Jack's part, as

13   of that period of time?

14        A.     Well, just when I would go to the

15   stores, and I would walk into Westminster; and there

16   would be customers and not enough salesmen; jack

17   wouldn't be around.  I'm trying to find out why we

18   didn't have enough -- customers would come up to me

19   and want me to wait on them, which I don't really

20   have time to wait on customers.

21               And he just -- so it got so I went

22   there more often trying to help Jack get on track.

23   And I went over a few mornings, and I'd go in for

24   the morning sales meeting and -- we would have a

25   meeting every morning, the salesmen.  And Jack would

Calderwood-Mackelprang, Inc.  303.477.3500

Jacob Jabs

Page 29

1   be holding the meeting, and salesmen were just

2   lollygagging around.

3              Jack just didn't seem like he could

4   take any instruction from me.  He was basically

5   unsupervisable.  Never, ever improved his

6   performance.  He was just -- in my 52 years of

7   business, he was probably the worst manager I ever

8   saw.

9         Q.     And, yet, he served as your manager

10  there for three years?

11        A.      It sort of accumulated to where -- you

12  know, when I was personally trying to help him and

13  make him better, it was just like I was talking to

14  the wall.

15        Q.     Well, okay.  I need to go back and

16  talk about some of the specifics there.

17              We got into this discussion by me

18  asking you why his bonus was cut, and I was trying

19  to understand if there was some specific episode.

20              And it sounds to me, from your answer,

21  like it was really just an accumulation of a number

22  of things that you feel were out of place?

23        A.      That's right.

24        Q.     Did you make any attempt, Mr. Jabs,

25  to -- and I know it probably -- this irritates you,

Jacob Jabs

Page 30

1   and, frankly, I can understand why it would irritate

2   you, but you have to answer the question.  Did you

3   make any effort to document these things with Jack?

4   Sit down and say:  Look, Jack, here's the list of

5   things you are doing wrong, and we need some

6   improvement on.  Here's a remedial plan; I want you

7   to meet these goals; you need to meet them.  And if

8   you don't meet them, you will be out of here?  Did

9   you ever do that?

10       A.      Not in writing.  Basically, the way

11  the systems works is, you know, if his performance

12  didn't improve, I would go to his supervisor.  I

13  don't believe in really disciplining people myself.

14  I mean, I don't think that's my -- as the owner of

15  the store, I need to wear the white hat, I guess you

16  might say.

17          So, basically -- I didn't personally

18  review people or do what you were saying.  I went to

19  the supervisor and said:  Hey, you know, this guy is

20  not doing his job; and you need to step in and try

21  to make him do his job.

22       Q.      And so during the time that Jack was a

23  manager of the store, you would have gone to Mike

24  Buscietta and/or Andrew Zuppa and said those things;

25  correct?

Calderwood-Mackelprang, Inc.  303.477.3500

4ad69690-9ebe-4a05-a936-13357abfbe1a

Jacob Jabs

Page 32

1    about that?

2         A.      I don't remember that, no.

3         Q.      Would you normally do that?

4         A.      Probably not.  There again, I think

5    it, you know, would go through the supervisor.  I'd

6    let the supervisor handle that.

7         Q.      Okay.  And if the supervisor didn't

8    handle that and didn't say anything specific to him,

9    would Jack have any way of knowing that his bonus

10   was half of what it would normally be?

11        A.      Theoretically, that could be correct,

12   I guess.

13        Q.      Okay.  You don't enclose a note with

14   it saying:  Jack, we have cut your bonus this much;

15   and here are the reasons why?  Anything like that?

16        A.      No.  I think Jack knew why his bonus

17   was cut in half.

18        Q.      And that's what I'm trying to

19   understand.  What are you relying on when you say

20   that?

21        A.      From my personal visits to the store

22   and, you know, telling him to shape up, a lot of

23   verbal -- I think what you are kind of relating to

24   is I think, on a lower level, you do written

25   reviews.  That's basically the way the company

Jacob Jabs

1    works.  If you are a dock guy, and you screw up, you

2    get it in writing.

3              But when you get to be a manager, you

4    don't really -- you know, you tell a manager

5    verbally.  And you really assume that that's all you

6    need to do.  To sit down and reduce it to writing is

7    probably:  You're fired.  You know, that's when the

8    writing starts.

9              I think pretty much, in our company,

10   if the thing's in writing, that means pretty much

11   you're -- it's the end of the road.  I can't

12   remember the last time I reviewed a manager, for

13   example, in writing.

14        Q.    Let me ask you to flip forward in the

15   exhibit to pages 53 and 54.

16        A.    (Deponent complied.)

17        Q.    And, again, I have a question here.

18   I'm looking at Jack Must's line, which is the third

19   one where there is handwriting.  And it says that

20   his bonus is basically cut in half.  And the

21   sentence is:  "Do we pay Jack full amount."  And

22   then there's an okay with what appear to be initials

23   above that.

24             Are those your initials there, or can

25   you tell?

Jacob Jabs

Page 37

1   basically say:  Look, we're just looking; we're

2   fine.  Correct?

3          A.      Absolutely.

4          Q.      And what do you expect a salesman to

5   do under that set of circumstances?

6          A.      Leave them alone.  We don't ask them

7   to follow the customer.  We ask them to leave them

8   alone; let them look.  They need to be available.

9   Seems like people today are -- they're different

10  types of customers, of course.

11              A lot of customers are in a hurry.

12  The salesman should be visible.  We make them all

13  wear red shirts so that, you know, when a customer

14  walks around the store, they can see a red shirt,

15  which means that's a salesman.  They should be maybe

16  cleaning their area, straightening pillows, but be

17  available so that when a customer does want

18  information about a sofa or fabric or a mattress,

19  the salesman is there ready to help them.

20         Q.      Okay.  But it is not necessarily a bad

21  thing in your stores for customers to be wandering

22  around the aisles looking at furniture, but there's

23  no salesman in the immediate vicinity?

24         A.      No, that's not a bad thing.

25         Q.      In fact, that happens quite a bit?

4ad69690-9ebe-4a05-a936-13357abfbe1a

Jacob Jabs

1   have been on the record over this issue in every

2   deposition that's taken place so far.  So I'm just

3   going to object to the form, as I believe a proper

4   record has already been established regarding the

5   term "termination."

6            MR. BUCHANAN:  That's fine.

7            THE DEPONENT:  We offered Jack to go

8   back on the sales floor.  That was my decision.

9   When Andrew and I decided Jack wasn't working out, I

10  said:  Well, let's offer Jack to go back to what he

11  was before, which was selling on the floor.

12       Q.     (By Mr. Buchanan)  Let me understand

13  when that happened.  You indicated that you had --

14  it was your decision to offer him a position back on

15  the sales floor?

16       A.     Yes.

17       Q.     Was it your decision to terminate him

18  as the store manager?

19            MR. BENSON:  Object to form.

20       Q.     (By Mr. Buchanan)  Let me make sure we

21  understand each other here, Mr. Jabs, because I'm

22  having trouble with why I keep drawing this

23  objection, to be honest.

24            You agree -- and I'll just tell you

25  that on July 6, 2004, was the day that Andrew Zuppa

Jacob Jabs

Page 52

1    came in and gave Jack Must seven checks.  Okay?

2         A.    All right.

3         Q.    You would agree, wouldn't you, that he

4    was terminated as the manager of the Westminster

5    store on that day?

6              MR. BENSON:  Same objection.  Go ahead

7    and answer if you can.

8              THE DEPONENT:  Yes, we were just

9    trying to change him from manager to going back into

10   sale.  He wasn't working out as a manager, so we

11   wanted to change his job to what he was doing

12   before.

13        Q.    (By Mr. Buchanan)  Okay.  He did not

14   have the option of coming in the next day and being

15   the manager of that store?

16        A.    That's correct.

17        Q.    And he was no longer going to be paid

18   a base salary or any base salary; correct?

19        A.    The salesmen are guaranteed, you know,

20   minimum wage hours.  They're guaranteed -- in those

21   days, it was about $10.50 an hour.  Because under

22   the Wage and Hour Act, you've got to guarantee a

23   salesman two times minimum wage retroactive the

24   first hour, if they're on straight commission.  So

25   they were guaranteed $10.50 an hour, or something,

4ad69690-9ebe-4a05-a936-13357abfbe1a

Jacob Jabs

Page 54

1    guess.

2          Q.    All of those circumstances together,

3    could a guy believe he had been terminated as a

4    store manager?

5                THE DEPONENT:   Object to form, lack of

6    foundation.

7          Q.    (By Mr. Buchanan)  Would that be a

8    reasonable conclusion from all of those things?

9          A.    I think it was very clear to Jack that

10   he was changing positions back to sales.

11         Q.    So you believe he thought he was going

12   to be a salesperson again?

13         A.    Certainly could have been, absolutely.

14         Q.    Are you aware that he never showed up

15   for sales?

16         A.    I wasn't aware of that, not

17   specifically.  I think, as time went by, I was, of

18   course.  But right away, whether he showed up the

19   next day or next week, I wasn't sure.

20         Q.    All right.  Do you know whether Andrew

21   Zuppa ever got on the telephone and said:  Jack, why

22   aren't you here; we want you as a salesman?

23         A.    I have no knowledge of that.

24         Q.    Let me step back in time.  Are you

25   aware of a meeting that Jack Must had with Mike

Jacob Jabs

Page 61

1    him, but I don't deny it.  If I did, it was to say:

2    Let's get this problem taken care of.

3         Q.     That's what I'm struggling with,

4    Mr. Jabs.  If it's literally plugging it into the

5    wall, you could have the janitor plug it into the

6    wall.  It sounds like if you called Mike Buscietta,

7    it was more than just plugging it into the wall; am

8    I right?

9         A.     I never checked to see if it was

10   plugged into the wall.  I never -- I just knew it

11   wasn't working.

12        Q.     Okay.

13        A.     We all have our good things and bad

14   things.  And one of my bad things is I'm not a

15   technical guy.

16        Q.     Okay.  And, frankly, if Jack Must was

17   not a technical guy, you wouldn't want him trying to

18   get the thing up and running if it was a technical

19   problem; would you -- him, personally?

20        A.     I think, as a store manager, he should

21   have addressed the problem and had it taken care of

22   whatever it would have taken.  Let's put it that

23   way.

24               I mean, I wasn't going to -- I'm not

25   an IT guy.  I wasn't going to go do it.  Jack Must's

Jacob Jabs

Page 62

1  responsibility was if the lights weren't working or

2  the heater wasn't working or the signature cap isn't

3  working, as store manager, he should have had that

4  taken care of.

5  Q.    Okay.  Is it fair to say that when you

6  say something needs to get done at AFW, it gets done

7  pretty fast?

8  A.    I hope so.

9  Q.    But, in general, a guy who runs your

10  smallest store might not have the same clout;

11  wouldn't you agree?

12  A.    People hopefully pay more attention to

13  me, yes.

14  Q.    It eventually did get up and running,

15  I take it?

16  A.    I'm sure it did.

17  Q.    Okay.  Assuming you made a call to

18  Mike Buscietta, was he in charge of the IT

19  department?

20  A.    Yes.

21  Q.    Okay.  And do you recall, during that

22  same floor walk, that Jack communicated to you that

23  Andrew Zuppa had been hassling him about the store

24  numbers, the revenues in the store?

25  A.    No.

Jacob Jabs

Page 72

1   to what you told me.  You indicated that it was your

2   decision to offer Jack a position on the sales

3   floor?

4        A.      Yes.

5        Q.      But you did that in response to Andrew

6   Zuppa coming to tell you that he was going to

7   terminate him; correct?

8        A.      Yes.

9        Q.      He had made the decision he was going

10  to terminate him?

11              MR. BENSON:  Object to the form.

12  Answer if you can.

13              THE DEPONENT:  Yes, I think it was

14  probably a little bit of a joint, I guess.  You

15  know, it was a while back.  But I think the

16  consensus between upper management, if you will, was

17  that it was time for Jack to move on.

18        Q.      (By Mr. Buchanan)  But the impetus for

19  the sales position came from you, not from Andrew?

20        A.      Yes.  I've always really believed in

21  that, I guess.  You know, in other words, obviously,

22  he was okay when he was a salesman; or he wouldn't

23  have been -- if he was okay as a salesman, I was

24  going to give him the opportunity to go back.  A lot

25  of salesmen do pretty good.  I don't know what Jack

4ad69690-9ebe-4a05-a936-13357abfbe1a

Jacob Jabs

Page 73

1    did.  I don't have -- I don't track salesmen or how

2    much they sell.  But I assume he did okay in the

3    sales force.

4              So it was an opportunity for him,

5    instead of having to find a new job, to go back and

6    have a job.

7         Q.    Do you have a standard formula at AFW

8    to determine how many salesmen a store should have?

9         A.    We have a -- I want to call it a

10   guideline.  If a store is doing, let's say,

11   $2 million a month, they should have X amount of

12   salesmen.  If they're doing 4 million a month, they

13   should have X amount of salesmen.

14        Q.    And let me just ask you to assume --

15   and you probably know this perfectly well -- that

16   the Westminster store, in those days, was doing, you

17   know, somewhere between 850 in a relatively slow

18   month to a million maybe, you know, snuggling up to

19   a million one in a month.

20        A.    That sounds correct.

21        Q.    How many salesmen would you expect in

22   that store?

23        A.    Normally, we divide that by 90,000.

24   So that would be nine, ten salesmen, I guess, in

25   that area.

4ad69690-9ebe-4a05-a936-13357abfbe1a

Jacob Jabs

Page 77

1    A.    Yes, sir.

2    Q.    And how did you know him?

3    A.    I believe he was a manager trainee.

4  I'm guessing now; I'm not sure.  I think he was a

5  manager trainee.

6    Q.    Okay.  And did he -- had you had

7  interaction with him before?  Did you have an

8  opinion about him as a manager?

9    A.    Not really.

10    Q.    Okay.  Whose decision was it to make

11  him the replacement for Jack Must?

12    A.    Probably was between Andrew and Mike.

13    Q.    Okay.  Did you sign off on that

14  decision?

15    A.    I don't know what "sign off" means.

16    Q.    I meant to say sign off.  If I said --

17    A.    Approved?

18    Q.    Approved, whatever.

19    A.    I'm not sure.  Did Jack Must -- did

20  Nolan become manager after Jack?  I don't know that

21  for sure.

22    Q.    That's my understanding.

23    A.    Okay.  I don't know that for sure.

24  I'd have to check.  If Nolan did become the manager

25  after Jack, I probably approved that, yes.

Jacob Jabs

1    Q.    Okay.  Because you indicated earlier
2  that at the manager level, you tend to be involved
3  in those decisions; correct?
4    A.    Right.
5    Q.    But you can't tell me anything
6  specific about the discussion?
7    A.    I don't.  I try to stay out of those
8  as much as I can.
9    Q.    At the time, at least, information
10  would have been available to you to know that Jack
11  Must was 49 years old; and Nolan Morrison was about
12  29 years old, true?
13    A.    I have no clue how old either one of
14  those individuals were.
15    Q.    But you certainly have information
16  within the company files that could tell you that;
17  don't you?
18    A.    If I went hunting for it, I guess I
19  could find it.  I don't read the applications, and
20  so I have no knowledge of how old they were.
21    Q.    Let me show you a couple of other
22  exhibits that we have from earlier depositions.  I'm
23  just going to show you these.  And I have a
24  relatively straightforward, simple question.
25          Exhibit 32 is a spreadsheet from

4ad69690-9ebe-4a05-a936-13357abfbe1a

Jacob Jabs

Page 87

1   cause you to look into the matter and see if it's

2   true?

3          A.     You know, I think this lawsuit is so

4   bogus it's unbelievable.  I think I pay attention to

5   things that are a problem.  If I felt this lawsuit

6   had some justification, at 49 years old for a

7   manager, I mean, you know, we've got a lot of

8   managers -- I'm 76 years old, by the way.  And so I

9   look at 49 as young.

10         Q.     Sure.  But you also own all the stock

11  of the company; don't you?

12         A.     I'm just saying that I think older --

13  I don't believe it's a problem in this business,

14  age, you know.  We have a lot of older salesmen and

15  a lot of older managers.  We have some younger ones,

16  too.  I think we tend to shift to a little older

17  degree in the furniture business because there's

18  more mature, more experience, more savvy.

19                So this lawsuit will not change my --

20  I will not start keeping track of ages because I

21  think it's a 100 percent bogus lawsuit.

22         Q.     Okay.  You have pretty strong feelings

23  about the civil justice system; don't you?

24         A.     Civil justice system?

25         Q.     Yes.  As distinct from the criminal

Calderwood-Mackelprang, Inc. 303.477.3500

4ad69690-9ebe-4a05-a936-13357abfbe1a