IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 06-cv-01872-RPM-MEH

JACK MUST,

    Plaintiff,

vs.

AMERICAN FURNITURE WAREHOUSE CO., a Colorado corporation, d/b/a AMERICAN FURNITURE WAREHOUSE

    Defendant.

---

## EXHIBIT A-10

## WILLIAM MICHAEL BUSCIETTA
## DEPOSITION TRANSCRIPT EXCERPTS

**Submitted By Defendant
In Support Of Its Motion For Summary Judgment**

---

Respectfully submitted this 14th day of January, 2008.

        s/ Andrew W. Volin
        **Andrew W. Volin, Esq.**
        SHERMAN & HOWARD L.L.C.
        633 Seventeenth Street, Suite 3000
        Denver, CO 80202
        Telephone: (303) 297-2900
        Facsimile:  (303) 298-0940
        E-Mail:    AVolin@sah.com

        Gary J. Benson, Esq.
        DWORKIN, CHAMBERS & WILLIAMS, P.C.
        3900 E. Mexico Avenue, Suite 1300
        Denver, CO  80210
        Phone:(303) 584-0990
        Fax:(303) 584-0995
        E-mail:gbenson@dnvrlaw.com

William Michael Buscietta

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Case No. 06-CV-01872-RPM-MEH

JACK MUST,

Plaintiff

vs.

AMERICAN FURNITURE WAREHOUSE CO., a Colorado corporation d/b/a/ AMERICAN FURNITURE WAREHOUSE,

Defendant.

---

DEPOSITION OF WILLIAM MICHAEL BUSCIETTA

---

PURSUANT TO NOTICE, the above-entitled deposition was taken on behalf of the Plaintiff at 1621 18th Street, Suite 260, Denver, Colorado, on August 29, 2007, at 9:15 a.m., before Dawn E. Eastman (Calderwood), Certified Shorthand Reporter, Registered Professional Reporter, and Notary Public.

1  mean?
2       Q.    That's the way I would use revenues.
3       A.    Yeah, total sales for the store.
4       Q.    So I guess my question is:  Is that
5  what you mean by "store volume"?
6       A.    Yes, yes.  I'm sorry; I'm sorry.
7       Q.    That's fine.  That's one of those sort
8  of misunderstandings that we can straighten out.
9  That's fine.
10      A.    Got it.
11      Q.    So the total sales that a store would
12 experience during a quarter would be at least one of
13 the factors that you might look at in terms of
14 giving someone the full amount of their bonus or
15 cutting it; correct?
16      A.    Could be.
17      Q.    Were there any sort of standards that
18 you understood?  In other words, if the store's
19 volume, as you put it, were to drop 2 percent
20 relative to the last quarter, 3 percent, something
21 like that?
22      A.    There were no standards.
23      Q.    In your own mind, without there being
24 an actual standard, was there sort of a benchmark
25 that you would think:  Boy, if we dropped that much,

1           A.      Yes.
2           Q.      As you reflect on that meeting,
3  Mr. Buscietta, do you have any recollection of why
4  it is that that meeting occurred in your office and
5  didn't occur where the larger managers meeting had
6  been?
7           A.      I don't understand the reason behind
8  that.  If it was to address something with an
9  individual, it wouldn't be with a group, then.
10          Q.      In other words, you wanted some
11 privacy?
12          A.      I would guess.  I don't remember who
13 initiated it, so. . .
14          Q.      What do you remember about that
15 meeting?
16          A.      The only thing that I really remember
17 that sticks out about it was how belligerent Jack
18 was.
19          Q.      Tell me what you mean.
20          A.      Raising his voice.  I don't know if I
21 could say he was condescending.  But I guess, as the
22 general manager or even as a manager, if I have an
23 employee come to me now and they raise their voice,
24 you don't -- you hope that they respect you a little
25 bit more.  But he was very belligerent in that

1    meeting, and that's what sticks out the most.
2         Q.    Okay.
3         A.    Because I didn't have managers do
4    anything like that in the past.
5         Q.    Let me understand.  When you
6    characterize him as "belligerent," tell me what you
7    mean specifically?
8         A.    Raising his voice.
9         Q.    Okay.
10        A.    Talking over me, not listening.
11        Q.    Okay.  Was there anybody in this
12   meeting, other than you and Jack?
13        A.    I believe Andrew -- I don't know if he
14   was there from the start, but I remember Andrew
15   being there.
16        Q.    Did Andrew speak to Jack?
17        A.    He probably did, I would guess.
18        Q.    Did you raise your voice?
19        A.    I don't remember.
20        Q.    Did Andrew raise his voice?
21        A.    I don't remember that, either.
22        Q.    Was Andrew condescending?
23        A.    Don't remember that, either.
24        Q.    Do you have an opinion whether Andrew
25   can, from time to time, be condescending?

William Michael Buscietta

Page 120

```
 1         A.    I don't remember him being there.
 2         Q.    His office was in the same location;
 3   correct?
 4         A.    It is, correct.
 5         Q.    This was at the Englewood location at
 6   the Compark store?
 7         A.    Correct.
 8         Q.    You eventually did give him his bonus;
 9   correct?
10         A.    I believe so.
11         Q.    Do you recall it was in the full
12   amount?
13         A.    I don't recall.
14         Q.    Did you have a discussion with Andrew
15   Zuppa after that meeting?
16         A.    I believe that I did.
17         Q.    What do you remember about that
18   discussion?
19         A.    I think, because of Jack being
20   belligerent, I wanted to fire him.
21         Q.    You wanted to fire him?
22         A.    I wanted to fire him.
23         Q.    What did you say?
24         A.    That I wanted to fire him.
25         Q.    And what did Andrew respond?
```

Calderwood-Mackelprang, Inc. 303.477.3500

27f94b17-6b43-4bf9-abb3-77e9369bffbc

William Michael Buscietta

Page 121

```
 1         A.    Andrew's response was -- I think
 2   Andrew said something to the effect:  He's my
 3   responsibility; let me work with him.
 4         Q.    Did you direct Andrew Zuppa to fire
 5   him?
 6         A.    No.
 7         Q.    Was the basis for the firing the
 8   belligerence?
 9               MR. VOLIN:  Object to form.
10               THE DEPONENT:  I'm not sure.  It
11   wasn't involved with anything, other than that, with
12   Jack.
13         Q.    (By Mr. Buchanan)  My question is:
14   Your feelings that afternoon when you said you
15   wanted to fire him, was the basis the belligerence?
16         A.    Yes.
17         Q.    You felt disrespected?
18         A.    Yes.
19         Q.    And you communicated that to him, I
20   assume?
21         A.    To Jack or Andrew?
22         Q.    To Jack.
23         A.    I would assume.
24         Q.    Do you remember anything else about
25   the discussion?
```

Calderwood-Mackelprang, Inc. 303.477.3500

27f94b17-6b43-4bf9-abb3-77e9369bffbc

William Michael Buscietta

Page 128

1    manager of the Westminster store?
2         A.    I didn't have input.  You need to
3    probably word that differently.  I didn't have
4    input; I was asked an opinion.  How's that?
5         Q.    By whom?
6         A.    By Andrew.
7         Q.    What were you asked?
8         A.    Did I have anybody that he thought
9    could manage the Westminster store.
10        Q.    And what did you say?
11        A.    I said Nolan.
12        Q.    You were the one that suggested Nolan?
13        A.    I'm the one that suggested Nolan, yes.
14        Q.    When was that?
15        A.    I'm not sure, not sure.  I don't know.
16   I remember him asking me, but I don't know -- I
17   think it was the day that it happened; but I'm not
18   sure, though.
19        Q.    The day what happened?  I'm sorry.
20        A.    That Jack quit.
21        Q.    Okay.  The day he was handed a bunch
22   of checks?
23        A.    I don't know about that.  I wasn't
24   there.  I heard that he quit.
25        Q.    So he asked your opinion as of that

William Michael Buscietta

Page 129

1  day, and you told him Nolan Morrison?
2        A.    Yes.
3        Q.    Based on what?
4        A.    Based on Nolan's probably one of the
5  few people there that's as good as I am. Not that
6  I'm that great, but. . .
7        Q.    Good at what?
8        A.    At running stores, working at American
9  Furniture.
10       Q.    To my understanding, he had never run
11 a store before that; correct?
12       A.    I don't believe that he had. I don't
13 know what his prior career was; I couldn't tell you.
14       Q.    I'm sorry I keep interrupting you. By
15 that time, you had become the store manager in
16 Thornton; correct?
17       A.    Correct.
18       Q.    Did Andrew Zuppa ask you your opinion
19 when you were the store manager?
20       A.    I don't understand.
21       Q.    Well, several things happened in the
22 same time frame.
23       A.    Okay.
24       Q.    And I'll show you a memo here if you
25 need it. There was a memo that went out June 14,

William Michael Buscietta

Page 131

```
1      A.      He didn't say, didn't say.
2      Q.      How long a conversation was this?
3      A.      It was very short, very short.
4      Q.      You had been his general manager for
5   ten years?
6      A.      Uh-huh.
7      Q.      Answer is yes?
8      A.      The answer is yes.
9      Q.      Did you feel you were owed an
10  explanation?
11     A.      No.
12     Q.      Did you have any forewarning that this
13  was going to occur?
14     A.      No.
15     Q.      Where did it happen?
16     A.      Where did Jake tell me?
17     Q.      Yes.
18     A.      In his office.
19     Q.      I asked if you had any forewarning.
20  Did you have any inkling that's what he wanted to
21  talk to you about?
22     A.      No, huh-uh.
23     Q.      I want to make a change, and that was
24  it?
25     A.      That was it.
```