## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 06-cv-01872-RPM-MEH

JACK MUST,

      Plaintiff,

vs.

AMERICAN FURNITURE WAREHOUSE CO., a Colorado corporation, d/b/a
AMERICAN FURNITURE WAREHOUSE

      Defendant.

---

## PLAINTIFF'S BRIEF IN OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

Plaintiff, Jack Must, by and through his attorneys, Buchanan, Jurdem &
Cederberg, P.C., hereby submits his Brief in Opposition to Defendant's Motion for
Summary Judgment, filed January 14, 2008.

### INTRODUCTION

Jack Must, the longest-tenured store manager of American Furniture Warehouse's
("AFW") Westminster Store, was fired on July 6, 2004, when he was a few months shy of
his 50th birthday.  He was replaced by a 28 year old employee without store management
experience, within three weeks of AFW's General Manager Andrew Zuppa's threat to
replace Must with a "ball-breaking guy" and treat the Westminster Store as a "training
ground."

Defendant seeks summary judgment on Plaintiff's claims based upon the Age Discrimination in Employment Act, 29 USC §§621 et. seq. ("ADEA"). Because there are genuine issues of material fact as to Plaintiff's *prima facie* case, AFW's preferred legitimate, non-discriminatory reasons for his termination, and whether those reasons are a mere pretext for unlawful discrimination, Defendant's motion must be denied.

### STATEMENT OF FACTS

I.  **PROMOTION OF JACK MUST TO MANAGEMENT TRAINEE/ASSISTANT MANAGER/STORE MANAGER OF THE WESTMINSTER STORE**

1. Then Assistant General Manager, Andrew Zuppa, promoted Jack Must to a management trainee position from a list of three to four people because there was a vacancy and an urgency. **Exhibit 1,** Andrew Zuppa deposition, p.52, l.23 - p.54, l.12.

2. Mr. Must went to the Westminster Store right away, and had a "live fire" trainee situation, meaning that he was handling a live schedule and did not have the luxury of being "buddied up" with a more experienced manager. **Exhibit 1,** Zuppa depo, p.55, l.25 - p.58, l.8.,

3. Mr. Must was promoted to Assistant Manager of the Westminster Store because he performed well as a management trainee. **Exhibit 1,** Zuppa depo, p.60, l.18 - p.61, l.21.

4. Mr. Zuppa did not hear anything negative or positive about Mr. Must as the Assistant Store Manager. **Exhibit 1,** Zuppa depo, p.67, l.16 - p.68, l.6.

5.    Mike Buscietta, then the General Manager, does not remember hearing anything negative about Mr. Must's performance as the management trainee at the Westminster Store, and has no information to indicate that the decision to make him the Assistant Store Manager was a bad one.  **Exhibit 2,** Mike Buscietta depo, p.62, ll. 3-18.

6.    Mr. Zuppa promoted Mr. Must to Store Manager at the Westminster Store on June 23, 2001, replacing Chris Smalta.  **Exhibit 1,** Zuppa depo, p.74, ll.7-14.  Mr. Must turned out to be the longest-tenured store manager the Westminster Store ever had. **Exhibit 3,** Tom Ward deposition, p.21, l.6 - p.22, l.7.

## II.    EVIDENCE OF JACK MUST'S PERFORMANCE AS STORE MANAGER

### A.    General Lack of Documentation

7.    There were no periodic performance-type reviews for managers during Mike Buscietta's 10 years as General Manager of AFW from approximately 1994 to 2004. **Exhibit 2,** Buscietta depo, p.27, l.13 - P.28, l.25.

8.    However, Mr. Zuppa claims that he was the one who recommended that AFW stop doing periodic reviews because they were done on a "half-assed" basis and inconsistently before he became the Director of Human Resources in approximately March, 1998.  **Exhibit 1,** Zuppa depo, p.61, l.24 - p.63, l.7.  Mr. Buscietta does not remember such performance reviews ever being done for managers.  **Exhibit 2,** Buscietta depo, p.30, l.16 - p.31, l.15.  Human Resources Director Crystal Hayes only remembers seeing such reviews in the personnel files of long-time employees from the early 1970s, but not more recently than that.  **Exhibit 4,** Hayes deposition, p.54, l.2 - p.55, l.25.

3

9.     In any event, there is no document which periodically recorded how Jack Must was performing as a manager at AFW's Westminster's store.  **Exhibit 1,** Zuppa depo, p.63, l.14 - p.64, l.12.

10.     The only documentation of performance of which Mr. Buscietta is aware are "Personnel Action" forms, which have been in place since day one when AFW was established in 1975.  The form is saved on the computer, and can be pulled up and filled out whenever a manager wants to.  **Exhibit 2,** Buscietta depo, p.29, ll.1-17; p.30, ll.1-15.

11.     The document entitled "Reviews" contained guidelines for completing the "Personnel Action" forms, and came from AFW's Human Resources Department, and were the existing guidelines during the time Mr. Buscietta was General Manager. **Exhibit 2,** Buscietta depo, p.32, l.12  - p.33, l.23; **Exhibit 5**, Deposition Exhibit 41.

12.     There is a one-page document entitled "Discharge Guidelines" which is referred to in the "Reviews" document.  **Exhibit 5**, Deposition Exhibit 41.  Despite Ms. Hayes' statement in her deposition that "I know I have a copy," and "I am sure I have a copy" of both the current and archived editions of the "Discharge Guidelines," and a subsequent specific request by Plaintiff that it be produced, AFW claims not to be able to locate it.  **Exhibit 4,** Hayes depo, p.79, l.2 - p.80, l.23; **Exhibit 6**, AFW's Responses to Second Set of Requests for Production of Documents, Response to Request No. 2 at 2-3.

13.     Jack Must's personnel file is not unusual by AFW standards in that there is no indication that he did something particularly well on a particular occasion.  Personnel reviews for AFW employees are usually negative or educational.  AFW does not give

pats on the back, commendations or "'atta boys." According to Human Resources Director Hayes, this is because CEO Jake Jabs believes that employees are there to get a paycheck, and there is no need to give them pats on the back. **Exhibit 4,** Hayes depo, p.70, l.4 - p.72, l.9.

14.    Ms. Hayes estimates that she receives two dozen Personnel Actions a day in the Human Resources Department. **Exhibit 4,** Hayes depo, p.83, ll.16-21.

**B.    The Personnel Action of July 5, 2002**

15.    A full two years before his termination, Jack Must received a Personnel Action dated July 5, 2002, concerning Westminster store employees coming in late, not holding the daily sales meeting, and the cleanliness of the Westminster store. **Exhibit 7**, Deposition Exhibit 29. This is the one and only Personnel Action in his personnel file.

16.    Mr. Zuppa does not remember the circumstances involved in the Personnel Action, but can tell that it was typed by Mike Buscietta in terms of the font, and style of talking. **Exhibit 1,** Zuppa depo, p.111, l.14 - p.112, l.6.

17.    Mr. Zuppa's signature on Exhibit 29 means he witnessed the signing of the document, not the underlying activity it purports to document. **Exhibit 1,** Zuppa depo, p.112, l.11 - p.113, l.2.

18.    Mr. Buscietta believes that he probably prepared the Personnel Action himself, and thinks it was based partly on his own observations and partly those of Jake Jabs and Andrew Zuppa. With respect to the allegation that salespeople were coming in late, he cannot identify the salespeople, does not know why they were late, whether Mr.

Must disciplined them, whether they had called in ahead, or whether he solicited Mr. Must's thoughts on the issue.  **Exhibit 2,** Buscietta depo, p.82, l.8 - p.84, l.12.

19.     Assistant Store Manager Tom Ward says that the Westminster Store's salesmen would make sure the Westminster Store was clean and straight, and believes they kept it reasonably clean and neat, and that neither he nor Jack Must were negligent in that regard.  **Exhibit 3,** Ward depo, p.55, l.21 - p.56, l.23.

20.     The only existing document pertaining to the cleanliness of the Westminster Store while Jack Must was managing it is a store checklist, **Exhibit 8**, Deposition Exhibit 42, completed by AFW buyer Pete Parker which indicates that the housekeeping was "good."  Mr. Buscietta would expect it to be noted if the store was dirty.  **Exhibit 2,** Buscietta depo, p.88, l.15 - p.90, l.3; Deposition Exhibit 42.

21.     Assistant Store Manager Ward testified that, during Jack Must's tenure as Store Manager, there were sales meetings everyday starting at 9:30 a.m., before the store opened for business.  **Exhibit 3,** Ward depo, p.53, 11.8-20.

22.     While he was training for the turnkey manager's position at the Westminster Store for approximately one month in the fall of 2003, Nolan Morrison remembers regular sales meetings also occurring before the start of the closing shift, which lasted half an hour, and involved such issues as reviewing memos, possible problems, ways of dealing with customers, training, trying to train on a new product, developing sales skills, and possibly taking a sales test.  **Exhibit 9,** Nolan Morrison deposition, p.34, l.22 - p.36, l.24.

C.    **The Letter of July 11, 2002**

23.    Less than a week following the July 5, 2002 Personnel Action, on or shortly following July 11, 2002, Mr. Must received a letter, purportedly from Jake Jabs, but it was actually authored by Andrew Zuppa.  **Exhibit 1,** Zuppa depo, p.113, l.23 - p.114, l.11; **Exhibit 10**, Deposition Exhibit 30.  The letter makes reference to perceived laxity with salespeople at the Westminster Store, and management's direction that Mr. Must not make them the "scapegoat" for improvements he was asking his salespeople to make in response to the Personnel Action, **Exhibit 7**.  This is the only such letter in Mr. Must's personnel file.  **Exhibit 1,** Zuppa depo, p.113,l.23 - p.114, l.25.

24.    Mr. Zuppa did not witness the conduct which is the subject of the letter, Deposition Exhibit 30.  **Exhibit 1**, Zuppa depo, p.114, l.12 - p.115, l.10.

25.    It is not unusual for Mr. Jabs to write letters to his store managers.  It is not frequent, but it happens.  Long-time General Manager Buscietta is sure that he received a letter similar to **Exhibit 10** during the time he was a Store Manager, possibly on more than one occasion.  **Exhibit 2**, Buscietta depo, p.99, l.13 - p.100, l.1.

26.    Mr. Buscietta does not remember any sessions where there was any verbal counseling with Jack Must regarding his performance and concerning his need to improve on particular things between July, 2002 (the date of Exhibit 30) and July, 2004 (when he was terminated as a Store Manager) other than at a meeting following the June, 2004 Managers' Meeting.  **Exhibit 2**, Buscietta depo, p.103, l.14 - p.106, l.15.

D.    **Jack Must's Compensation Package Does Not Indicate Problems in His Performance**

- **Base Salary**

27.    Jack Must did not receive a raise in his base salary of $60,000 during his three year tenure as the Store Manager of AFW's Westminster Store.   **Exhibit 11**, Deposition Exhibit 10.

28.    AFW represented to the Equal Employment Opportunity Commission (EEOC) that "Store managers receive pay increases based on their performance.  Mr. Must's failure to receive a pay increase after he was promoted to Store Manager supports AFW's position that his performance continued to be poor and below satisfactory from June 2001 to July 2004."  **Exhibit 12**, Respondent's Position Statement Filed in Response to the Charge of Discrimination in Charge No. 320-2005-01659 (*Must v. AFW*), p.3, n.3.

29.    In point of fact, however, managers rarely receive raises at AFW, and usually only when there has been an increase in responsibilities or a change of store. **Exhibit 4,** Hayes depo, p.45, l.22 - p.47, l.5.

30.    Human Resources Director Hayes states that Mr. Must's annual salary of $60,000 is not uncommon for managers of stores of similar size to the Westminster Store. She is not aware of anyone who has ever managed the Westminster Store being paid more than $60,000 as a base salary.  **Exhibit 4,** Hayes depo, p.47, l.6 - p.48, l.6.

31.    According to Ms. Hayes, it is also not uncommon for Mr. Must to have worked at the Westminster Store for three years and not gotten a raise in base salary.  It is not a reflection on his performance.  **Exhibit 4,** Hayes depo, p.48, ll.7-14.

- **Bonus**

32.     AFW has a bonus program for store managers which is based upon the consolidated net profitability of the Company.  **Exhibit 1,** Zuppa depo, p.84, l.24 - p.85, l.6.

33.     Mr. Must originally got a "half bonus" each fiscal quarter, amounting to one-half of one-tenth of one percent (.0005) of the consolidated net profitability of AFW for the quarter.  **Exhibit 1,** Zuppa depo, p.81, l.21 - p.85, l.6; **Exhibit 18**, Must deposition, p.46, ll.14-25.

34.     As of the fiscal quarter November, 2001 through January, 2002, Mr. Must was increased to a "full bonus" amounting to one-tenth of one percent (.0010) of the consolidated net profitability of AFW for that quarter.  **Exhibit 1,** Zuppa depo, p.85, l.25 - p.86, l.9.

35.     Mr. Must's bonus was cut to the "half bonus" level for the fiscal quarter November, 2002 through January, 2003, but Mr. Zuppa does not recall any specific episode which led to it, and neither does Mike Buscietta, who was then the General Manager.  **Exhibit 1**, Zuppa depo, p.90, l.5 - p.91, l.8; **Exhibit 2**, Buscietta depo, p.64, l.11 - p.66, l.2.

36.     As of late 2002, AFW introduced a third, lowest tier in its managers' bonus program, known as a "quarter bonus."  **Exhibit 4**, Hayes depo, p.35, ll.5-18.  However, Mr. Must never received less than the half bonus during the 19 fiscal quarters he participated in the AFW bonus program.  **Exhibit 13**, Deposition Exhibit 28.

37.     Mr. Must's bonus was again cut to the half bonus level for the fiscal quarter August through October, 2003, but again, neither Mr. Zuppa nor Mr. Buscietta specifically remember why.  **Exhibit 1**, Zuppa depo, p.92, l.9 - p.93, l.17 and p.95, ll.13-22; **Exhibit 2**, Buscietta depo, p.78, l.12 - p.79, l.22.

38.     Mr. Zuppa would like to think that there would be a notation in the file as to why Mr. Must's bonus was cut, "but with Mike and Jake, it's possible that that didn't happen."  **Exhibit 1**, Zuppa depo, p.99, ll.11-18.

39.     Human Resources Director Hayes confirms that there is no document which can be referred to in order to determine why Jack Must's bonus was cut for two of the 19 quarters while he was in management.  For purposes of discovery in this case, she looked for such a document, and has otherwise exhausted the resources available to her, and cannot find any written explanation as to why Jack Must's bonus was cut.  **Exhibit 4**, Hayes depo, p.38, l.1 - p.42, l.13.

40.     Mr. Jabs does not remember communicating specifically with Jack Must regarding the cut of his bonus from the full level to the half level for the November, 2002 through January, 2003 quarter, and would normally let his supervisor handle that. **Exhibit 14**, Jabs depo, p.31, l.22 - p.32, l.6.

41.     Mr. Jabs acknowledges that Mr. Must might not have known that his bonus was half of what it should have been if his supervisor did not tell him.  **Exhibit 14**, Jabs depo, p.32, ll.7-12.

42.    Mr. Buscietta, who as General Manager was Mr. Must's supervisor at the time, does not remember having any discussion with Mr. Must about the reduction of his bonus from the full to the half bonus level for the two quarters referred to above, and does not remember Jack Must contacting him about it.  **Exhibit 2**, Buscietta depo, p.80, l.18 - p.81, l.18.

43.    AFW does not include a note with the bonus checks, and store managers were not given any itemization of how their bonus was calculated.  Accordingly, Mr. Must might not know whether he was getting a half or a full bonus unless he sat down with the sales figures and attempted to calculate it.  **Exhibit 14**, Jabs depo, p.32, ll.7-17; **Exhibit 2**, Buscietta depo, p.81, l.19 - p.82, l.2.

III.    **NUMBER OF SALESPEOPLE AT THE WESTMINSTER STORE**

   A.    **AFW's "Low Pressure" Sales Culture**

44.    AFW is famous for having low pressure salespeople, which cuts down on returns and exchanges, because the customer who is allowed to make their own decision tends to take responsibility for it.  **Exhibit 14**, Jabs depo, p.35, ll.5-24 and p.69, l.11 - p.70, l.11.

45.    Low pressure sales also allows the customer a pleasant shopping experience, and cuts down on customer complaints about high pressure salespeople. **Exhibit 14**, Jabs depo, p.35, l.25 - p.36, l.10 and p.70, ll.12-18.

46.    Low pressure sales also give the salesmen more credibility with the customers, which is terribly important to repeat business.  **Exhibit 3**, Ward depo, p.39,

11

l.10 - p.41, l.6.

47.     If a customer tells an AFW salesperson that they are "just looking," CEO Jake Jabs expects the salesperson to leave that customer alone and not follow him around. It is not a bad thing for customers to be walking in the aisles looking at furniture without a salesperson in the immediate vicinity.  In fact, that happens quite a bit and is part of the pleasant buying experience.  **Exhibit 14**, Jabs depo, p.36, l.23 - p.38, l.6.

48.     For this reason, AFW puts a lot of information tags on its furniture to educate the customer about the furniture so that they can make an informed buying decision, and not become angry because of an unpleasant buying experience with a high-pressure salesman.  **Exhibit 14**, Jabs depo, p.70, 11.12-25.

49.     Tom Ward would give customers who were just browsing their space and leave them alone.  Sometimes, he would turn around and they were gone.  **Exhibit 3**, Ward depo, p.42, l.14 - p.43, l.19.

50.     Mr. Jabs has talked a lot at managers' and employees' meetings about <u>not</u> wanting aggressive salespeople, but experienced salespeople, who are available, but give customers their space.  **Exhibit 14**, Jabs depo, p.39, ll.9-17.

51.     Mr. Jabs would expect Mr. Zuppa to know about this philosophy, which he has had "forever."  **Exhibit 14**, Jabs depo, p.38, ll.7-18.

**B.     <u>The Number of Salespeople at the Westminster Store Was Actually Above AFW's Guideline During Jack Must's Tenure</u>**

52.     AFW has a guideline for determining how many salespeople a particular store should have.  It divides the store's monthly revenue by $90,000, and that gives you

the number of salespeople the store should have.  In the 2004 timeframe, AFW might have been using $80,000 to divide the store's monthly revenue in this formula.  This formula is based upon Mr. Jabs' belief that "a salesman needs to make a decent living, or they don't stay with you."  Based on the assumption that each salesperson would earn an average of 5% commission on each sale, and taking the Westminster Store's average monthly gross revenues of $927,244 during the last year of Jack Must's tenure as Store Manager, this would equate to approximately 10.3 salespeople, each of whom would earn an average annual salary of $54,000 (if AFW used $90,000 in the formula) or 11.6 salesmen, each of whom would earn an average annual salary of $48,000 (if AFW used $80,000 in the formula).  **Exhibit 14,** Jabs depo, p.73, l.7 - p.75, l.14; **Exhibit 15**, Deposition Exhibit 32 (average monthly gross revenues calculated by utilizing $1,126,930 which the Westminster Store earned from July, 2003 through June, 2004 divided by 12 months = $927,244).

53.    As of June 16, 2004, the Westminster Store had 13 salespeople on staff. **Exhibit 16**, Deposition Exhibit 17, transcript of tape recorded conversation, p.10, ll.4-8.

54.    Nolan Morrison, who replaced Jack Must as Store Manager at the Westminster Store after he was terminated, believes that there "around 10" salespeople on staff at the Westminster Store when he arrived as the Store Manager on July 7, 2004. **Exhibit 9**, Morrison depo, p.59, l.24.  Two salesmen had resigned in mid-June, and Mr. Must had hired one additional salesperson approximately ten days later.  **Exhibit 16**, Deposition Exhibit 51.

55.     There is a fundamental tension between having "enough" salespeople to cover the sales floor and having "too many" salespeople sharing the available commissions, such that they will not make a decent living and stay with the Company. Once again, using the sales volume at the Westminster Store during the last year of Jack Must's tenure ($11,126,930) for illustration purposes, if there were 12 salespeople, they would average gross annual income of $46,362.21 ($11,126,930 [annual sales] divided by 12 [salespeople] = $927,244.16 [average annual sales per salesman] x .05 [average commission] = $46,362.21).   If there were 15 salespersons, they would average gross annual income of $37,089.77 ($11,126,930 [annual sales] divided by 15 [salespeople] = $794,780.70 [average annual sales per salesperson] x .05 [average commission] = $37,089.77).  **Exhibit 15**, Deposition Exhibit 32.

56.     To be more accurate, however, these figures would need to be adjusted downwards to account for revenue lost because of customers returning furniture they have purchased and being given their money back, or invoices cancelled for other reasons. Using the Westminster Store's sales figures which are net of such cancelled invoices, reflected on **Exhibit 17**, Deposition Exhibit 34, for the last year of Jack Must's tenure ($10,793,392), 12 salesmen would have averaged gross income of $44,972.47, while 15 salesmen would have averaged annual gross income of $35,977.97.  **Exhibit 4**, Hayes depo, p.58, l.12 - p.59, l.4.

### C.   Mr. Zuppa's Claims of Having Observed Too Few Salespeople at the Westminster Store Are Completely Uncorroborated

57.     Andrew Zuppa claims to have been at the Westminster Store on

approximately four occasions between his promotion to General Manager on June 14, 2004 and the day he terminated Jack Must as Store Manager on July 6, 2004. **Exhibit 1**, Zuppa depo, p.123, ll.15-24.

58.    Mr. Zuppa would ask how many salespeople Mr. Must had on duty, and be told that there were four, but would only see two in the store. **Exhibit 1**, Zuppa depo, p.133, ll.4-15.  The only two nights of which there is independent corroboration that he was physically in the store are June 16, 2004 when he engaged in the conversation which is recorded on **Exhibit 16**, and June 30, 2004, when Mr. Must recorded in a journal that he came to the store.  AFW's records show that there were four salesmen on duty each night until at or about the closing time of 10:00 p.m.  Defendant's Exhibit A-8 (2 of 2), p.35 of 48 and 36 of 48.

59.    Mr. Zuppa claims to have seen three people smoking out front on one occasion, but never took any steps himself to terminate or otherwise discipline those employees. **Exhibit 1**, Zuppa depo, p.134, l.18 - p.136, l.3.

60.    Mr. Zuppa claims to have seen one salesman on duty one night, two on duty on another night, but cannot be specific as to which nights he is talking about, and did not keep any notes. **Exhibit 1**, Zuppa depo, p.187, l.17 - p.188, l.6.

61.    Mr. Zuppa does not know of any way to reconstruct which nights he is talking about. **Exhibit 1**, Zuppa depo, p.190, ll.10-16.

62.    Mr. Zuppa acknowledges having had a conversation with Jack Must and Assistant Store Manager Tom Ward which Mr. Must surreptitiously recorded on June 16,

15

2004, which was not unlike other conversations he had had with Jack Must during that period. **Exhibit 1**, Zuppa depo, p.124, l.23 - p.125, l.15.

63.   Mr. Zuppa reviewed the transcript of that recorded conversation prior to his deposition, and has no reason to believe it is inaccurate. **Exhibit 1**, Zuppa depo, p.125, ll.16-25; **Exhibit 16**, Deposition Exhibit 17.

64.   During that recorded conversation, Mr. Zuppa stated that "I think we need to do a better job of flushing out dead weight and getting some more aggressive help" at the Westminster Store, and "we aren't gonna have any 'Can I help you' sales people in the store." **Exhibit 16**, Deposition Exhibit 17, at p.4, ll.12-13 and p.19, ll.15-16.

## IV.   THE WESTMINSTER STORE'S PERFORMANCE

### A.   AFW's Profitability is Based On Its Advertising and the Quality of Its Buying

65.   Mr. Jabs has always accepted responsibility for profits of AFW because he does the advertising and most of the buying, upon which the success of his stores is based. Quality of his buying is the single biggest driver of revenue at AFW. Mr. Jabs cannot blame individual store members for the profitability of the Company. **Exhibit 14**, Jabs depo, p.23, l.15 - p.25, l.17.

66.   Individual store managers do not have much control over whether merchandise Mr. Jabs buys will sell. **Exhibit 14**, Jabs depo, p.25, l.23 - p.26, l.3.

67.   Long-time Westminster Assistant Store Manager Tom Ward feels that gross revenue is not something he can do much about because he is not the operations manager, does not set prices or sales, and does not buy. **Exhibit 3**, Ward depo, p.155, l.24 - p.156,

16

l.19.

68.     AFW has no sales quota for either the individual stores or salespeople. **Exhibit 14**, Jabs depo, p.67, ll.6-16.

69.     The store manager should understand that Mr. Jabs is not looking for any particular revenue target.  According to Mr. Jabs "I never, ever say: you need to make so much money.  I never play one store against the other on sales contests or profit or nothing." **Exhibit 14**, Jabs depo, p.68, ll.3-14.

70.     In fact, Mr. Jabs is not in the furniture business for the money, but rather for the adventure of it because he is doing what he likes to do.  That's an attitude of doing business that he wants the Company to absorb.  **Exhibit 14**, Jabs depo, p.67, l.17 - p.68, l.2.

71.     If Mr. Zuppa was telling Mr. Must that he needed to get the revenue at the Westminster Store up, that would <u>not</u> be consistent with Mr. Jabs' philosophy and, in fact, would be <u>inconsistent</u> with that philosophy.  **Exhibit 14**, Jabs depo, p.68, l.15 - p.69, l.4.

**B.      Contrary to Mr. Jabs' Philosophy, Mr. Zuppa Blamed Mr. Must for the Westminster Store's Performance, and Threatened to Bring in a "Ball-Breaking Guy" and Use the Store as a "Training Area"**

72.     At a meeting held in Mr. Buscietta's office following the June, 2004 managers' meeting, Mr. Zuppa stated to Mr. Must that "If they had to live off our store, they would all starve."  **Exhibit 18**, Must depo, p.113, ll.15-20; **Exhibit 29**, Deposition Exhibit 15.

17

73.     Two days following his promotion to General Manager, during the conversation which Mr. Must surreptitiously recorded, Mr. Zuppa stated, referring to the Westminster Store, "We have two options.  We either increase sales or we cut costs," and "That's what I feel and, quite frankly, my position now, it's become law."  **Exhibit 16**, Deposition Exhibit 17, p.1, ll.8-9 and 18.

74.     Mr. Zuppa also said that "we're doing less business in this store now than the day we opened the son-of-a-bitch."  **Exhibit 16**, p.4, ll.28-29.

75.     The Westminster Store had had sales volume totaling approximately $11.1 million in the previous 12 months, whereas it had had a sales volume of approximately $11.5 million in the same 12 months in 1999-2000.  **Exhibit 19**, Deposition Exhibit 33.

76.     The approximately $11.4 million and $10.9 million in total sales at the Westminster Store during the same 12-month periods in 2001-02 and 2002-03, respectively, were achieved during times of "soft sales" which Mr. Jabs believes to have been attributable to some kind of recession or down period in 2001-02, as well as increased competition.  **Exhibit 14**, Jabs depo, p.48, ll.5-23; **Exhibit 10**, Deposition Exhibit 30; **Exhibit 19**, Deposition Exhibit 33.

77.     Mr. Zuppa and Mr. Must also briefly discussed the meeting they had had in Mike Buscietta's office following the managers' meeting.  Mr. Must said "I felt like I was put back on my heels and I was being threatened," to which Mr. Zuppa replied, "Well, you were . . . and you are . . .."  Mr. Must said, "But, I don't like being threatened," to which Mr. Zuppa replied, "I don't like making no money. . ."  **Exhibit 16**, Deposition

18

Exhibit 17, p.12, ll.8-18.

## V.   JACK MUST'S TERMINATION AS WESTMINSTER STORE MANAGER

### A.   Andrew Zuppa's Background in Human Resources

78.   Andrew Zuppa largely coordinates the legal affairs of AFW.  **Exhibit 1,** Zuppa depo, p.14, ll.2-9.

79.   Mr. Zuppa became the Director of Human Resources for AFW in March, 1998, and served in that capacity for approximately three years.  **Exhibit 1,** Zuppa depo, p.38, l.18 - p.39, l.12 and p.41, l.15 - p.42, l.17.

80.   Mr. Zuppa had not worked in Human Resources before becoming the Director.  **Exhibit 1,** Zuppa depo, p.41, ll.15-18.

81.   He trained by working with his predecessor, and reading everything in the area of human resources he could get his hands on, including human resource magazines, EEOC compliance books, workers' compensation information, trade journals, Human Resource Society publications, and everything related to the 1964 Civil Rights Act. **Exhibit 1,** Zuppa depo, p.45, l.14 - p.47, l.7.

82.   Mr. Zuppa also read EEOC compliance manuals and had a complete set of the Colorado Revised Statutes.   **Exhibit 1,** Zuppa depo, p.49, ll.14-18.

83.   He educated himself on the Colorado Wage Act, and to some extent those issues come up from time to time.  **Exhibit 1,** Zuppa depo, p.49, l.19 - p.50, l.4.

### B.   The Meeting in Mike Buscietta's Office Following the June Managers' Meeting

84.   Following a monthly managers' meeting on June 2, 2004, Mr. Buscietta and

Mr. Zuppa met with Mr. Must in Mr. Buscietta's office at AFW's corporate offices.  At the outset of the meeting, Mr. Buscietta held up Mr. Must's quarterly bonus check and said, "I just can't think of any reason that I should give you this bonus check, tell me why I should."  Mr. Zuppa criticized the Westminster Store's sales volume.  Mr. Buscietta then raised a "signature capture" system (a new security system for the Company's warehouse operations) which the AFW IT Department had delivered to the Westminster Store's warehouse at some point in the past, but had not hooked up until May 31, 2004. All three participants raised their voices during the meeting.  **Exhibit 18**, Must depo, p.92, l.14 - p.98, l.16; **Exhibit 29**, Deposition Exhibit 15, pp.22-24.

85.    Mr. Buscietta acknowledges that the IT Department was responsible for hooking up the signature capture devices initially, although Mr. Buscietta does not know what was involved from an IT standpoint.  **Exhibit 2,** Buscietta depo, p.113, l.22 - p.114, l.9.

86.    Mr. Buscietta claims that the signature capture system was not less of a priority at the Westminster Store than at the Thornton Store, even though the Westminster Store has a warehouse which is probably the smallest of all the AFW stores, while the Thornton Store handles many multiples of the amount of furniture through its warehouse. **Exhibit 2,** Buscietta depo, p.114, l.17 - p.115, l.20.

87.    Mr. Buscietta does not remember saying "Can you give me one/a reason why I should give you this bonus check" at the outset of the meeting, but acknowledges it is a possibility if he had the bonus check.  **Exhibit 2,** Buscietta depo, p.117, ll.8-24.  Mr.

20

Buscietta believes he eventually gave Mr. Must the bonus check.  **Exhibit 2,** Buscietta depo, p.120, ll.8-13.

88.    Following a discussion with Mike Buscietta the day following his meeting with Jack Must, Human Resources Director Crystal Hayes called Andrew Zuppa and asked whether she needed to do anything.  Mr. Zuppa replied that "he was going to take care of it."  **Exhibit 4,** Hayes depo, p.94, l.1 - p.95, l.22.

### C.    The Misunderstanding Regarding the Application of AFW's Mandatory Workday Policy to Fourth of July Holiday Weekend

89.    AFW's furniture stores are open on most holidays, and all three days of 3-day holiday weekends.

90.    Most store managers', including Jack Must's, normal days off are Sunday and Monday.  **Exhibit 20,** Pepper depo, p.32, ll.3-5.

91.    However, on 3-day holiday weekends, where the holiday is observed on the Monday (e.g., Memorial Day, Labor Day), store managers normally only have Sunday off, and work on the Monday the holiday is observed.  **Exhibit 20,** Pepper depo, p.31, ll.13-21.

92.    This policy is set forth somewhat ambiguously in AFW Memo #2595 dated March 4, 2003.  **Exhibit 21**, Deposition Exhibit 14.

93.    In 2004, the Fourth of July fell on a Sunday.  Therefore, although the Sunday of the 3-day holiday weekend is normally the one managers can take off, in 2004 the Sunday was the actual holiday and a mandatory workday.  According to new Assistant General Manager Dale Pepper's interpretation of Memo #2595, the managers

needed to work both days and did not get a day off that week.   **Exhibit 20,** Pepper depo, p.31, l.13 - p.33, l.11.

94.     On Friday, July 2, 2004, recognizing that AFW store managers "could have read it as a Monday only holiday," Mr. Pepper initiated telephone calls to all store managers in order to inform them that, on this particular holiday weekend, they were expected to be at work on both Sunday, July 4 and Monday, July 5, and would not have a day off.  **Exhibit 20,** Pepper depo, p.45, l.10 - p.48, l.19.

95.     According to Mr. Pepper, when he reached Jack Must, Mr. Must told him that he was not going to work on Sunday, and that Monday was enough.   Pepper responded, "No, I need you there Sunday.  That is the holiday."  Mr. Must said, "Well, we'll see" and Pepper replied, "Yes, we will see."  **Exhibit 20,** Pepper depo, p.29, ll.5-17.  Mr. Must indicated that he had made plans with his family for a day off.  Id. at p.33, l.23 - p.34, l.3.

96.     According to Jack Must, he told Mr. Pepper during the telephone conversation that if he had to work both days of the weekend he would, but he did not agree with the policy because it was not fair to the store managers.  Mr. Pepper told him that if he did not want to work on Sunday, he did not have to.  Mr. Must thought he was being set up.  **Exhibit 18,** Must depo, p.134, l.15 - p.135, l.12.

97.     Mr. Must then apparently faxed a copy of his and the other Westminster store managers' schedules for the Fourth of July weekend to AFW's corporate headquarters.  **Exhibit 18,** Must depo, p.136, l.18 - p.137, l.7.

98.     Mr. Pepper was very upset about his conversation with Mr. Must on July 2, 2004, and reported it to Mr. Zuppa.  He was "pissed" and prepared to go out to the Westminster store and have Mr. Must fired right there and close the store that night. **Exhibit 20,** Pepper depo, p.44, l.24 - p.45, l.9; p.48, l.14 - p.49, l.11.

99.     Mr. Zuppa told him to calm down and that "he would take care of it." **Exhibit 20,** Pepper depo, p.44, l.24 - p.45, l.5.  According to his affidavit filed with Defendant's Motion, at that point, "I decided Mr. Must could not remain as the Store Manager."  Defendant's Exhibit A-7 at 2.

100.    According to Mr. Pepper, Mr. Must called him at corporate headquarters about mid-morning on Sunday, July 4, 2004, identified himself, and said "I'm here."  Mr. Pepper replied, "Good.  We need you there."  **Exhibit 20,** Pepper depo, p.39, l.18 - p.41, l.3.

101.    According to Mr. Must, he did not call Mr. Pepper on Sunday, July 4, 2004, but Andrew Zuppa came to the Westminster store and was there for 15-20 minutes. **Exhibit 18,** Must depo, p.137, 1.12 - p.138, l.12.

### D.    AFW Decided to Terminate Jack Must as the Westminster Store Manager

102.    Mr. Zuppa states that "We were absolutely not going to keep him [Must] as a store manager."  **Exhibit 1,** Zuppa depo, p.201, ll.23-24.

103.    According to Mr. Zuppa, he never asked Mr. Jabs if he wanted to fire Jack Must because his intention was to move Mr. Must back into sales.  **Exhibit 1,** Zuppa depo, p.202, l.3 - p.203, l.11.

23

104.    According to Mr. Jabs, it was a consensus among AFW's upper management that "it was time for Jack to move on."  However, he claims that it was <u>his</u> decision to offer Mr. Must a position on the sales floor, which he did in response to Mr. Zuppa coming to tell him that he was going to terminate Mr. Must.  **Exhibit 14,** Jabs depo, p.71, l.25 - p.72, l.17.

105.    According to Mr. Jabs, the impetus for offering Mr. Must a sales position came from him, not Andrew Zuppa.  **Exhibit 14,** Jabs depo, p.72, ll.18-20.

106.    According to Mr. Zuppa, he offered Mr. Must a position in sales, but "he was no longer going to be the store manager there."  **Exhibit 1,** Zuppa depo, p.182, ll.7-23.

107.    If Mr. Must had come in the next day to the Westminster Store and started performing the store manager's duties, Mr. Zuppa would have been concerned that he was insane because they "had discussed that he was not going to do that anymore." **Exhibit 1,** Zuppa depo, p.182, l.24 - p.183, l.8.

108.    Mr. Buscietta had no input into the decision to terminate Jack Must as the Westminster Store Manager.  Mr. Zuppa did not consult with Mr. Buscietta on that matter.  **Exhibit 2,** Buscietta depo, p.133, l.25 - p.134, l.9.

E.    **The Seven Checks Mr. Zuppa Gave Jack Must on July 6, 2004 Demonstrate That the "Offer" of a Sales Position Was Actually a Sucker Punch When Mr. Zuppa's Real Intent Was to Terminate Mr. Must Altogether**

109.    Prior to going and meeting with Jack Must on the evening of July 6, 2004, Mr. Zuppa ordered seven (7) checks, three (3) for salary and four (4) for accrued sick and

vacation pay, the last of which AFW pays in 40-hour increments. **Exhibit 1**, Zuppa depo, p.205, l.11 - p.206, l.24; **Exhibit 22**, Deposition Exhibit 37.

110.   The salary check for the period ending July 4, 2004 was not actually due until AFW's next regularly scheduled payday, which was July 9, 2004.  Mr. Zuppa was aware of that fact.  **Exhibit 23**, AFW's response to Plaintiff's Interrogatory No. 2; **Exhibit 1**, Zuppa depo, p.207, ll.20-24.

111.   The salary check for the period ending July 11, 2004 would have been paid by check dated July 16, 2004, and distributed that day or July 17, 2004.  Mr. Zuppa was also aware of that fact.  **Exhibit 23,** AFW's response to Plaintiff's Interrogatory No. 2; **Exhibit 1**, Zuppa depo, p.208, ll.3-8.

112.   Mr. Zuppa also brought a third salary check for the period ending July 18, 2004, even though Mr. Must had not and would not work at all during that pay period, which apparently would normally have been paid by check dated approximately July 23, 2004, and distributed either that day or July 24, 2004.  Mr. Zuppa was aware of that fact. **Exhibit 23,** AFW's response to Plaintiff's Interrogatory No. 2; **Exhibit 1**, Zuppa depo, p.208, ll.9-13.

113.   Mr. Zuppa also understood that under the Colorado Wage Act, when an employee resigns, the employer does not need to pay them that day, but rather on the employer's next regular payday, whereas when the employee is fired, the employer must immediately pay them what is owed as of the day of termination.  **Exhibit 1**, Zuppa depo, p.208, l.14 - p.209, l.13.  C.R.S. §8-4-109(1)(a) and (b).

25

114.   At approximately 5:40 p.m. on July 6, 2004, Mr. Zuppa went to the Westminster Store, asked Mr. Must to accompany him up to a mezzanine level, and then to sit down.  He told Mr. Must that the Company was "going in a different direction" and they were going to put a different manager in the Westminster Store.  According to Mr. Zuppa, he told Mr. Must that he had the opportunity to go back into sales, and then attempted to talk him into it by saying he could have the schedule he wanted, and asked him if he wanted to think about it.  Mr. Must responded that he could not afford the pay cut.  **Exhibit 1**, Zuppa depo, p.200, l.21 - p.201, l.20; p.204, l.8 - p.205, l.10.

115.   According to Mr. Must, he told Mr. Zuppa he could not go back into sales because he had a family to support, that he was the main breadwinner for his family, and he could not take that kind of pay cut.  Mr. Zuppa said nothing further, and specifically did nothing to try to talk him into it, and simply opened up a folder he had with the seven (7) checks in it and said, "Here you go.  I need your keys and clean out your desk," which Mr. Must did.  **Exhibit 18**, Must depo, p.140, l.9 - p.141, l.17.

116.   Mr. Must went back downstairs to his desk, cleaned out his personal items, said "good luck" to Tom Ward, and left the Westminster Store.  **Exhibit 3**, Tom Ward depo, p.134, l.4 - p.135, l.3.

117.   In his deposition, Assistant Store Manager Tom Ward, who was born on July 13, 1949, and was 54 years old when Jack Must was fired, was asked three separate times whether he had been offered the job of the Store Manager at the Westminster Store, and he replied in the negative to each question.  He has subsequently changed his answer

to one of the questions to "yes," indicating only "recalled" for the reason, but without any detail as to why he recalled that detail and under what circumstances.  In his deposition, Mr. Ward explained that he did not want the job because he suffers from post traumatic stress disorder as a result of his service in Vietnam.  **Exhibit 3**, Ward depo, p.133, l.6 - p.134, l.3 (response at line 9 changed from "no" to "yes"); p.140, ll.15-18; p.152, l.21 - p.153, l.1; amendment to deposition sheet.

### F.   Mr. Zuppa Attempts to Supplement the Woefully Inadequate Personnel File

118.   Mr. Zuppa prepared a handwritten memorandum pertaining to alleged performance issues of Jack Must the morning after he had told Mr. Must he was no longer going to be the store manager, asked for and obtained the store keys, and told him to clean out his desk.  Because Mr. Must had commented that he would "see you in court," Mr. Zuppa thought that he would briefly recap what he claims to have been the circumstances while they were fresh in his mind.  **Exhibit 1**, Zuppa depo, p.180, l.13 - p.183, l.8 and p.185, ll.11-14; **Exhibit 24**, Deposition Exhibit 36.  This is the first document pertaining to performance issues in Jack Must's personnel file in two years.

119.   In Deposition Exhibit 36, Mr. Zuppa, referring back to the meeting in Mr. Buscietta's office following the June managers' meeting, queried whether Mr. Must was "unsupervisable."   Mr. Zuppa believes "absolutely" that salespeople have to be supervised.  **Exhibit 24**, Deposition Exhibit 36, p.3; **Exhibit 1**, Zuppa depo, p.199, ll.1-3.

## VI.    JACK MUST WAS REPLACED AS WESTMINSTER STORE MANAGER BY 28-YEAR OLD NOLAN MORRISON

120.    It was Andrew Zuppa's decision to replace Jack Must with Nolan Morrison as the Store Manager of the Westminster Store, and both Mr. Jabs and Mr. Buscietta were involved in that decision.  **Exhibit 1**, Zuppa depo, p.209, l.24 - p.210, l.14.

121.    Mr. Morrison had worked with AFW since January, 2002.  He was born on September 7, 1975, and was 28 years old when he replaced Mr. Must as the Westminster Store Manager on July 7, 2004.  **Exhibit 9**, Morrison depo, p.4, ll.16-18 and p.15, ll.14-24.

122.    On Monday, July 5, 2004, Mr. Buscietta came to Mr. Morrison at the Thornton Store, where Mr. Morrison was the Sales Manager, and asked if he was interested in a store manager's position.  Mr. Morrison replied, "absolutely."  **Exhibit 9**, Morrison depo, p.42, l.3 - p.43, l.1.

123.    Mr. Zuppa completed a Personnel Input Data Form pertaining to Mr. Morrison's promotion to Westminster Store Manager, which indicates in his handwriting that Nolan Morrison's raise in connection with that promotion was effective July 5, 2004, the day before Jack Must's termination.  **Exhibit 1**, Zuppa depo, p.210, l.24 - p.212, l.25; **Exhibit 30**, Deposition Exhibit 40.

124.    Although he is a little hazy on this detail, Mr. Morrison believes he reported to work as the Store Manager of the Westminster Store on Wednesday, July 7, 2004.  **Exhibit 9**, Morrison depo, p.44, ll.5-22.

28

## VII.   THE WESTMINSTER STORE'S SALES PERFORMANCE DID NOT IMPROVE DURING MR. MORRISON'S TENURE AS STORE MANAGER

### A.   AFW Management Was Still Dissatisfied With the Number of Salespeople at the Westminster Store After Mr. Morrison Had Been Managing it For Nine Months

125.   On Thursday, July 8, 2004, Mr. Zuppa came to the Westminster Store to meet with Mr. Morrison, the new Store Manager.  Mr. Zuppa indicated that he wanted more sales staff there and better coverage on the floor.  **Exhibit 9**, Morrison depo, p.44, l.23 - p.45, l.18.

126.   During the period June 1, 2004 through August 31, 2004, there were five (5) resignations, one (1) job abandonment, and two (2) firings among the Westminster Store staff.  Six of those positions were salespeople, and one was replaced by Mr. Must on June 22, 2004.  Starting on July 27, and continuing for approximately a month, Mr. Morrison hired five (5) additional new salesmen, for a net loss of one salesman during the first month.  **Exhibit 9**, Morrison depo, p.51, l.11 - p.52, l.19; p.56, l.14 - p.59, l.9; **Exhibit 25**, Deposition Exhibit 51.

127.   Mr. Morrison's goal was to increase the number of salesmen at the Westminster Store from the 10 he inherited from Jack Must to 14 to 15.  **Exhibit 9**, Morrison depo, p.59, ll.10-25.

128.   Mr. Morrison continued to hire during his entire tenure as Manager of the Westminster Store and believed he eventually reached his goal of having 14 to 15 salespeople there.  **Exhibit 9**, Morrison depo, p.64, l.0 - p.66, l.14.

129.   According to Mr. Morrison, it was an ongoing effort to satisfy Mr. Zuppa that there were enough salespeople on the floor at the Westminster Store.  **Exhibit 9**, Morrison depo, p.66, l.19 - p.67, l.6.

130.   On April 20, 2005, after nine months on the job as Store Manager, Mr. Morrison was given a Personnel Action indicating that he *still* did not have enough staff to run the store.  Mr. Morrison acknowledges that there was a limited sales staff on the floor on the night in question.  **Exhibit 9**, Morrison depo, p.69, ll.2-15; **Exhibit 26**, Deposition Exhibit 38.

131.   This Personnel Action was based on observations made either by Mr. Jabs or Fran Coleman, that customers were walking around without being helped, which was substantially the same problem which purportedly was the focus on AFW's management dissatisfaction with Jack Must.  **Exhibit 1**, Zuppa depo, p.213, l.1 - p.214, l.14; **Exhibit 9**, Morrison depo, p.70, l.24 - p.71, l.11.

132.   Approximately five (5) days following the Personnel Action, rather than being fired, Mr. Morrison was promoted to Store Manager of the Southwest Store, where he replaced Richard Dawson, age 53, who had been fired.  Mr. Morrison was 29 years old at the time.  **Exhibit 9**, Morrison depo, p.70, ll.10-15.

133.   Oddly, Beth Gurecki, age 49, who had been the Assistant Store Manager at the Southwest Store since August, 2003, was transferred to the Westminster Store, replacing Mr. Morrison as Store Manager.  Mr. Ward remained as the Assistant Store Manager.  **Exhibit 3**, Ward depo, p.150, l.19 - p.151, l.1; p.153, l.2 - p.154, l.9.

30

**B.**    **The Westminster Store's Sales Volume Decreased Slightly During Mr. Morrison's Management Compared to Mr. Must's**

134.   Comparing the sales for the approximately nine (9) months Mr. Morrison ran the Westminster Store, and giving his regime credit for all of July, 2004 and April, 2005, the Westminster Store had gross sales of $38,262 *less* than it had under Jack Must's leadership during the comparable period of July 2003 - April, 2004.  **Exhibit 27**.  This represents a decrease of approximately four-tenths of one percent in gross sales over that time period.

135.   For the entire year of July, 2004 through June, 2005, during which the store was managed by both Mr. Morrison and his successor, Ms. Gurecki, the Westminster Store had gross sales of $29,505 *more* than it had under Jack Must's leadership during the comparable period of July, 2003 through June, 2004.  This represents an increase of slightly less than three-tenths of one percent in gross sales.  **Exhibit 28.**

136.   Following his nine months at the Westminster Store, Mr. Morrison continued his meteoric rise through AFW, managing the Southwest Store for approximately 5 months, a brand new store on South University for 3 to 4 months, then AFW's second largest store known as Compark for approximately 8 months, then the Glenwood Springs Store for approximately 5 weeks, after which he was promoted to the Store Manager's position in AFW's single largest and newest store in Firestone, Colorado in November, 2006.  **Exhibit 9,** Morrison depo at p.71, l.21 - p.77, l.17.

## VIII. THE FILING OF A GRIEVANCE WITH AFW OVER MR. MUST'S TERMINATION WOULD HAVE BEEN FUTILE

137.    Mr. Must did not file a grievance with AFW pursuant to the Company's grievance procedures because he preferred to talk to an attorney about it.  **Exhibit 18**, Must depo, p.155, ll.5-21.

138.    CEO Jake Jabs is 76 years old.  He and his family own all the stock of AFW.  **Exhibit 14**, Jabs depo, p.13, ll.9-14; p.86, l.25 - p.87, l.21.

139.    At AFW, being liked by Jake Jabs is the number one thing that makes you a good manager, and the number two thing is very distant.  Mr. Zuppa does not remember a time when Jack Must was well-regarded by Mr. Buscietta or Mr. Jabs.  Being liked by your own staff probably does not make the top 100 concerns, and customer or staff complaints are not the issue.  The issue is how effective a manager are you, which is a highly subjective judgment.  **Exhibit 1**, Zuppa depo, p.119, l.2 - p.120, l.15.

140.    Mr. Jabs claims to have regarded Mr. Must as the worst manager he has had in 52 years of business, and believes that this is a "100 percent bogus lawsuit."  **Exhibit 14**, Jabs depo, p.29, ll.6-8; p.87, ll.19-21.

141.    Mike Buscietta had been the General Manager of AFW for ten years.  He had come to AFW in 1980 while his father, Bill Buscietta, was running an AFW store on South Colorado Boulevard.  **Exhibit 2**, Buscietta depo, p.19, l.20 - p.20, l.19.

142.    Mr. Buscietta was appointed General Manager in approximately 1994, and was demoted to Store Manager of the Thornton Store on June 14, 2004, and was replaced as General Manager by Andrew Zuppa.  **Exhibit 2**, Buscietta depo, p.25, ll.1-23 and

p.129, l.24 - p.130, l.3.  Mr. Buscietta is by far the longest serving General Manager AFW has ever had.  Id. at 27, ll.2-12.

143.    Mr. Buscietta was unexpectedly called into a meeting in Mr. Jabs' office, where Mr. Jabs simply told him that he wanted to make a change.  He did not state any reason.  It was a very short conversation, just between the two of them.  Even though he had been General Manager for 10 years, Mr. Buscietta states that he did not believe that Mr. Jabs owed him an explanation.  **Exhibit 2**, Buscietta depo, p.129, l.24 - p.132, l.8.

## ARGUMENT

## I.    PLAINTIFF HAS ESTABLISHED A *PRIMA FACIE* CASE OF AGE DISCRIMINATION UNDER THE ADEA

Plaintiff's claim for age discrimination under the ADEA is analyzed under the familiar framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-804, 93 S.Ct. 1817, 1824-1825 (1973):

> to establish a prima facie case of age discrimination, the plaintiff must show that '(1) he is within the protected age group; (2) he was doing satisfactory work; (3) he was discharged; and (4) his position was filled by a younger person.'  *McKnight v. Kimberly Clark Corp.*, 149 F.3d at 1128 (internal quotation marks omitted).  If the plaintiff establishes a prima facie case, the burden shifts to the employer 'to articulate some legitimate, nondiscriminatory reason' for its action.  *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817.  '[S]hould the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'  *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

*Rivera v. City and County of Denver*, 365 F.3d 912, 920 (10th Cir. 2004).  See, also, *MacDonald v. Delta Air Lines, Inc.*, 94 F.3d 1437, 1441 (10th Cir. 1996).

Defendant concedes, as it must, that Plaintiff Jack Must is a member of the protected class, as he was 49 years old at the time of his termination, and that he was replaced by a younger person, i.e., Nolan Morrison who was 28 years old.  Defendant's Brief at 53-54.

Defendant nonetheless contends that Plaintiff cannot meet the *prima facie* case requirements of satisfactory performance and discharge.  However, it is clear that there are genuine issues of material fact as to these two elements, precluding summary judgment.

**A.    There Are Genuine Issues of Fact as to Whether Plaintiff's Performance Was Satisfactory**

**1.    There is No Documentation of Events Which Should Have Been Documented, If They Occurred**

First of all, it is important to note that this case is remarkable more for the lack of documentation of poor performance, rather that its presence.  Although the testimony of AFW's management team is in conflict on this point, the Company either never has done periodic reviews of management personnel or stopped doing those at or about the time Andrew Zuppa became the Human Resources Director in 1998.  In any event, none were ever performed pertaining to Jack Must, and are not in evidence.  See, *MacDonald, supra*, 94 F.3d at 1441-1442 (lack of "write-ups" for alleged firing offense relied upon to conclude that there were genuine issues of material fact as to satisfactory performance).

34

Second, the only "Personnel Action," which is the standard method by which AFW employees are reviewed, is exactly two years before Plaintiff's termination. This paucity of documentary evidence of unsatisfactory performance is truly remarkable, given AFW's corporate culture with respect to human resources which, according to HR Director Hayes, emphasizes the "negative." Her testimony is that she receives as many as two dozen such Personnel Actions per day. The fact that there are none within two years of Jack Must's termination is strongly suggestive that either his performance was entirely satisfactory to AFW, or if not, any problems simply did not rise to the level of motivating any management personnel to prepare a Personnel Action pertaining to them.

Moreover, AFW's own guidelines clearly indicate that, if it truly had the concerns about Mr. Must's performance it now claims, to have had there would be numerous Personnel Actions in his personnel file. The Review document states that a Personnel Action is to be completed "[w]hen an employee has already been verbally warned," and the subject is "too serious for a verbal warning." Indeed, AFW explicitly warns its management as to how an improperly documented personnel file will be hurtful:

> **VIII.  Discharge**
> **1.  Tenured Employees** - in terminating employees that have been with the company for some time, the following facts should be considered:
>   a.  What is the employee's track record?
>     • If the employee has NOT been reviewed in the past they will appear to have been a good employee. Therefore, a decision to *suddenly* terminate the employee may appear to be wrongful (i.e. discriminatory).
>     • If the employee has been reviewed <u>too</u> many times for the same violation, then the violation may seem

to not be that serious and the termination may still seem wrongful.  Therefore, if we say that we are going to fire an employee if they do it again, we need to follow through.  *Again, don't say it if you don't mean it.*

   b.  Did the incident warrant termination?

      • The final violation prompting termination of a veteran employee should not appear to be for a petty offense.  Finally, the company has established a set of discharge guidelines that must be followed including obtaining approval from the CEO, General Manager, or Human Resources Director **prior** to discharging any employee.

**Exhibit 5**, Deposition Exhibit 41 ("Reviews")(emphasis original).

AFW's failure to document Jack Must's alleged transgressions is therefore not only suspicious, but apparently with full knowledge of what such a failure could mean legally.

    2.   **The Westminster Store's Sales Performance Was Relatively Flat, Both Before and After Jack Must's Termination**

The closest thing that AFW submits to an objective criteria is the sales performance of the Westminster Store.  The tape recording of a conversation between General Manager Zuppa, Assistant Store Manager Ward, and Plaintiff on June 16 gives a rare glimpse into Mr. Zuppa's fanatical focus on revenue.  That tape recording starts off by Mr. Zuppa indicating that revenues needed to increase or costs be decreased, that the store was making less money than he wished, and that his views on the subject had become "law."  The complete disconnect between Mr. Zuppa's fanatical focus on the revenues from AFW's smallest store, and CEO Jake Jabs' indication that he never blames

individual store managers for decreasing sales or attempts to "play one store off against the other" to one side for the moment, the fact of the matter is that the evidence in this case indicates that the Westminster Store was performing at or about its historical level throughout Jack Must's tenure, and in line with the trends experienced by other AFW stores in the Denver metropolitan area.

Defendant's own sales figures demonstrate that the Westminster Store was the lowest performing store, in terms of gross revenues and percentage change in revenues, both before and after Jack Must's tenure as Store Manager.  Like the other AFW stores in the Denver area, the Westminster Store had experienced a decrease in revenues, relative to the benchmark year of July, 2000 through June, 2001 during each of the three years of Jack Must's tenure.  The same was true, of course, of AFW's flagship store in Thornton and its Southwest Store.  The only Denver metro stores which allegedly bucked that trend were the combination of the Aurora, Park Meadows and Compark locations.  AFW does not explain why statistics from those three locations are not broken out separately to allow for a true "apples to apples" comparison.  Defendant's Exhibit A-8, (1 of 2), p.43 of 47; **Exhibit 19**, Deposition Exhibit 33.

Defendant's evidence also demonstrates that, in terms of growth of revenues, the stores located in other metro areas along the Front Range (Colorado Springs, Fort Collins and Pueblo) have experienced more steady growth than those in the Denver metropolitan area.  The combination of the three stores which AFW analyzes under the single heading "Southeast" are located in the south Denver metropolitan area, where the most explosive

37

growth in residential construction has occurred in recent years.  Id.

There are also unique aspects of the Westminster Store which AFW does not explain.  As just one example, besides being the smallest store in the Denver area, it is also the one located closest to the Company's flagship store in Thornton.  According to Assistant Store Manager Tom Ward, 98% of the customers at the Westminster Store would make the 10 to 15 minute drive to the Thornton Store to pick up their furniture because of the minuscule size of the warehouse in the Westminster store.  **Exhibit 3**, Ward depo, p.12, ll.5-25.  If customers were willing to make that drive to pick up their furniture, it stands to reason that they would also be willing to make that drive in order to purchase their furniture in the larger Thornton Store in the first instance, where the selection is greater and inventory readily available, thus depriving the Westminster Store of a potential sale.

The only truly appropriate comparison of the overall sales performance of the Westminster Store for these purposes is that between the store's performance under the management of Nolan Morrison, Jack Must's replacement, compared to the comparable period during the last year of Mr. Must's management.  **Exhibit 27**.  In summary, during the nine months that Mr. Morrison ran the Westminster Store, and after hiring and replacing a large segment of the sales force which Mr. Zuppa regarded as "deadweight," and increasing the overall sales force from approximately 10 to 14-15 salespersons, the Westminster Store actually lost approximately $30,000 relative to the comparable period from a year previously!  For the whole year following Jack Must's termination and

replacement by the combination of Mr. Morrison and Ms. Gurecki, the revenues only increased a paltry three-tenths of one percent, an amount which is literally "caught in the rounding" of the store's overall performance.  Thus, there are genuine issues of material fact as to whether the Westminster Store was truly "under performing" under Jack Must's leadership, precluding summary disposition.[1]

### B.  Plaintiff Maintained an Adequate Sales Staff

AFW's major complaint regarding Jack Must's performance is the alleged lack of adequate sales staff at the Westminster Store.

First of all, the number of salespeople at the Westminster Store was directly in line with AFW's recognized and long-standing formula for calculating the number of salespeople.  The average monthly revenues divided by either $90,000 or $80,000 yields either 10.3 or 11.6 salespeople, and Jack Must stated that he had a staff of 13 as of June 16, 2004.  The formula is obviously intended to determine the "ideal" number of salespeople, i.e., enough to service the customers and yet not too many that the salespeople, who are compensated on an entirely commission basis, cannot make a

---

[1] Defendant's affiant Lori Tielke shamelessly asserts that during the period July, 2005 through June, 2006, Westminster Store's sales had "significantly increased."  What neither Ms. Tielke nor AFW discloses is that, during this period, AFW moved its Westminster store into a newer, much bigger facility, and had a grand opening in approximately May, 2006 which created a "one time bump" of monthly sales essentially doubling what they had ever been before in the store Plaintiff managed.  **Exhibit 1**, Zuppa depo, p.147, l.20 - p.151, l.11.  The "old" Westminster Store had a showroom of approximately 60,000 to 65,000 square feet with a warehouse of 4,000 square feet, whereas the "new" Westminster Store had a showroom and warehouse which are both approximately 100,000 to 110,000square feet and a sales staff of 18 to 20.  **Exhibit 3**, Ward depo, p.12, ll.2-16; p.154, l.10 - p.155, l.23; p.156, l.23 - p.157, l.12.

"decent living."   Based on the formula set forth above, 10 salespeople would make approximately $54,000 per year, and 12 salespeople would make approximately $48,000 per year, based upon the Westminster Store's average monthly earnings in the last year of Jack Must's tenure.  While certainly additional salespeople could be hired, it would be at the price of making the sales jobs increasingly unattractive, since the same pool of revenues would be shared among a larger number of salespeople.  That apparently was the case during Mr. Morrison's nine months as a store manager.  In other words, the 14 or 15 salespeople on his sales force shared commissions generated from virtually the identical amount of revenue that the store had generated under Jack Must's management with fewer salespeople.

Defendant's allegations that Plaintiff Must had inadequate numbers of salespeople on the sales floor are, at best, sporadic and lack detail, and are completely undocumented. Clearly a lack of adequate salespeople is a proper subject for a Personnel Action, since it was the subject of the one given Mr. Morrison on April 18, 2005.  **Exhibit 26**, Deposition Exhibit 38.   See, *MacDonald v. Delta Air Lines*, 94 F.3d 1437, 1442 (10th Cir. 1996)(firing for an incident of unsatisfactory performance which did not result in firing of others who committed same offense evidentiary of satisfactory performance).  The lack of any such Personnel Action in the last two years of Jack Must's tenure strongly suggests that AFW's complaints in this respect are based on fabrications, or at least exaggerations.

### C.    Plaintiff Was Discharged by Andrew Zuppa

Defendant also contends that Plaintiff Must cannot demonstrate that he was

discharged for purposes of the *McDonnell-Douglas prima facie* case.  Defendant's Brief at 57-63.

First, it should be noted that any adverse employment action is adequate to make out a *prima facie* case under the ADEA.  Although the statement of the *McDonnell-Douglas prima facie* case often includes reference to an actual "discharge," the actual language of the statute prohibits an employer from "fail[ing] or refus[ing] to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. §623(a)(1)

As the Tenth Circuit observed in *Sanchez v. Denver Public Schools*, 164 F.3d 527, 532,

> The Tenth Circuit liberally defines the phrase 'adverse employment action.'  *See Gunnell v. Utah Valley State College*, 152 F.3d 1253, 1264 (10th Cir. 1998); *Jeffries v. Kansas*, 147 F.3d 1220, 1232 (10th Cir. 1998).  Such actions are not simply limited to monetary losses in the form of wages or benefits.  *See Berry v. Stevinson Chevrolet*, 74 F.3d 980, 986-87 (10th Cir. 1996).  Instead, we take 'a case-by-case approach,' examining the unique factors relevant to the situation at hand.  *Jeffries*, 147 F.3d at 1232.  Nevertheless, we will not consider 'a mere inconvenience or an alteration of job responsibilities' to be an adverse employment action. *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993); *see also Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, —, 118 S.Ct. 2257, 2268, 141 L.Ed.2d 633 (1998)(conduct is adverse employment action if it 'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits'); *Spring v. Sheboygan Area Sch. Dist.*, 865 F.2d 883, 886 (7th Cir. 1989)(principal's change in

assignment was not an adverse employment action despite her increased commute and belief that the public perceived the transfer 'as a 'nudge towards retirement'.').

Thus, regardless of whether what occurred in the evening of July 6, 2004 at the Westminster Store between Andrew Zuppa and Jack Must is ultimately found by a jury to have been a termination or, as AFW argues, a resignation after an offer to return to sales, in either event it is the requisite adverse employment action for purposes of ADEA liability. Nothing more need be demonstrated at the summary judgment stage.

There certainly are genuine issues of material fact which, if resolved by the jury in Plaintiff's favor, could lead it to conclude that Mr. Zuppa intended to, and did in fact, discharge Jack Must. Among the evidence which supports such a finding is the fact that Mr. Zuppa and Mr. Jabs were of one mind that they "were absolutely not going to keep him as a store manager," and that "it was time for Jack to move on." Mr. Zuppa, whose sophistication in human resources issues generally and the provisions of the Colorado Wage Act in particular, is undisputed, prepared three salary checks which he gave to Mr. Must, which would have been completely unnecessary had he truly anticipated, as he claims to have, that Mr. Must would accept an offer to return to sales, or even resign. The regular paydays upon which those checks would have been due were 3, 10 and 17 days away. However, the fact that they were prepared and given to Mr. Must on July 6, 2004 strongly suggests that Mr. Zuppa was attempting to comply with AFW's statutory obligation to pay those amounts which were due and payable to a terminated employee immediately, pursuant to the Colorado Wage Act.

Finally, at least according to Mr. Must, Mr. Zuppa made no attempt whatsoever to talk him into or persuade him to accept the offer to return to sales, and instead simply opened up his folder containing the checks and said, "Here you go.  I need your keys and clean out your desk."

It is undisputed that Mr. Must was being terminated as the Westminster Store Manager, which was the only position he held in AFW.  In addition, should the jury believe Mr. Must's version of the facts of the evening of July 6, 2004, they could very well determine, as a matter of fact, that Mr. Zuppa intended to, and did, fire Mr. Must altogether, without any sincere anticipation that he would return to sales.  As the Colorado Court of Appeals observed in an early case regarding constructive discharge,

> the fact of discharge does not depend upon the use of formal words of firing.  The test is whether sufficient words or actions by the employer 'would logically lead a prudent person to believe his tenure had been terminated.'  *NLRB v. Trumbull Asphalt Company*, 8 Cir., 327 F.2d 841; *Putnam v. Lower*, 9 Cir., 236 F.2d 561.

*Colorado Civil Rights Commission v. School District No. 1*, 488 P.2d 83, 86 (Colo. App. 1971).  Although the legal test for constructive discharge has evolved since this case was decided, it is clear that the determination of whether or not a discharge has occurred is an issue of fact, which must be decided upon the totality of the circumstances.  Those circumstances include Mr. Zuppa's admonishments to both Ms. Hayes and Mr. Pepper that he would "take care of it," his preparation of Mr. Must's final paychecks, and his musings the morning after the termination that Jack Must might be "unsupervisable?," given his "absolute" belief that salesmen must be supervised.

43

As it has evolved, the test of constructive discharge is as follows:

> Constructive discharge occurs when 'the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign.' *Derr v. Gulf Oil Corp.*, 796 F.2d  340, 344 (10th Cir. 1986).  'Essentially, a plaintiff must show that she had 'no other choice but to quit'.'  *Yearous v. Niobrara County Mem'l Hosp.*, 128 F.3d 1351, 1356 (10th Cir. 1997)(quoting *Woodward v. City of Worland*, 977 F.2d 1392, 1401 (10th Cir. 1992)).  The conditions of employment must be objectively intolerable; the 'plaintiff's subjective views of the situation are irrelevant.'  *Id*.

*Sanchez v. Denver Public Schools*, 164 F.3d 527, 534 (10th Cir. 1998).

Assuming the jury finds that Mr. Zuppa's offer to transfer Mr. Must to sales was a sincere one, and that Mr. Must in effect resigned from his employment, there are genuine issues of fact as to whether such resignation constituted a constructive discharge.  Mr. Must had been compensated at the level of approximately $75,000 during the previous calendar year of 2003 as the Westminster Store Manager, and even higher the year before that.  That compensation package included a base salary of $60,000 and a "full" bonus percentage.  It also included access to health insurance and other benefits.

By contrast, salesmen at AFW are compensated entirely on a commission basis.  AFW utilizes a formula which would indicate that an average salesman would make between $48,000 and $54,000 a year, depending upon whether $90,000 or $80,000 was used in the formula.  While AFW is at great pains to massage their database and attempt to demonstrate that experienced commissioned salespeople make more than the average that the formula suggests, the simple fact of the matter is that Mr. Zuppa's "offer" to

transfer Mr. Must back into sales represented a diminution in salary of at least as much as one-third, by any objective criteria.  Of course, none of the earnings of a commissioned salesperson are "guaranteed," above the statutorily required minimum wage level.  In addition, an AFW salesperson's income is subject to downward adjustments based upon invoices which are cancelled by customers, for whatever reason, since commissions are paid only on delivered merchandise.  Thus, simply put, to have returned to a sales position would have represented a reduction of up to one-third of Mr. Must's total salary, and a much higher level of risk that he would earn anything above the minimum wage at all.  Under the circumstances, Mr. Must was exactly right when he told Mr. Zuppa that "I can't do that."  Thus, there are genuine issues of material fact which the jury could conclude that Mr. Must was constructively discharged.

## II.   AFW'S PURPORTED LEGITIMATE, NON-DISCRIMINATORY REASONS FOR TERMINATING JACK MUST ARE A MERE PRETEXT.

The third prong of the *McDonnell-Douglas prima facie* and burden-shifting paradigm requires that Plaintiff demonstrate that there are genuine issues of material fact as to whether the Defendant's proffered legitimate, non-discriminatory reason for an adverse employment action is a mere pretext.

The test of pretext is well-settled in the courts:

> Pretext can be shown by 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.' *Olson v. General Elec. Astrospace*, 101 F.3d 947, 951-52 (3d Cir. 1996)(quoting

> *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Circ. 1994)(further citation omitted).

*Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997).

Here, the reasons why the factfinder could determine that AFW's purported reasons for terminating Jack Must are pretextual are almost too numerous to count.

First, there is the positively stunning disconnect between the philosophy of CEO Jake Jabs on the retail furniture business when compared with that which had become "law" under General Manager Zuppa's regime. Mr. Jabs believes that it is the advertising and quality of his buying which are the principle factors in the level of sales volume at AFW stores, and consequently he does not blame individual store managers for the profitability of the Company since they do not have much control over the merchandise he buys. Consequently, there are no sales quotas for either individual stores or salespeople, and Mr. Jabs indicates that he never plays one store off against others on sales contests, profits or anything else.

The tape recording which Jack Must made on June 16, 2004 gives a unique insight into the directly contradictory philosophy which Andrew Zuppa was attempting to impose on Jack Must as the Westminster Store Manager. Mr. Zuppa said point blank that Mr. Must either had to increase sales or cut costs, or he would bring in a "ball-breaking guy" who would, and treat the Westminster store as a "training area." Given the historical performance of the Westminster Store, which was in line with other Denver metro AFW stores, this was simply an attempt to set Mr. Must up to fail. More importantly, as Jake Jabs acknowledged in his deposition, such an approach is completely inconsistent with

46

his business philosophy.

As to the overall sales performance of the Westminster Store, it is remarkable to note that in the only truly "apples to apples" comparison possible under the facts in this case, the store in the last year of Jack Must's leadership out performed the store under Mr. Morrison's leadership, even after he supposedly weeded out the "deadweight" and beefed up the sales staff, and imposed much needed discipline. **Exhibit 27**. While there might be other competing explanations for why that was, certainly one that the jury could adopt is that the complaints about the store's sales performance have been purposefully overblown.

With respect to the number of salespeople at the Westminster Store, there is also a very significant issue of credibility as to Mr. Zuppa's reports that it actually occurred, or was of anywhere near the significance AFW now claims. As noted previously, no such incident was made the subject of an AFW "Personnel Action" form over the last two years of Mr. Must's  tenure, although AFW management personnel now claims that it occurred on a frequent basis during that period. Defendant's only attempt to demonstrate this phenomenon is the submission of charts demonstrating that there were four salespeople on duty at the Westminster Store during the evenings of June 16 and June 30, but it has in no way linked that information up with any testimony in this case. Nor has AFW explained the significance of four people being on duty. Nor has AFW sought to explain how it is that one can tell which customers are being ignored as opposed to being "given the space" they need which is so critical to the AFW low pressure sales culture.

The lack of any contemporaneous documentation of alleged problems with the number of salespeople at the Westminster Store is even more stunning in light of the Personnel Action concerning Nolan Morrison, dated April 18, 2005. Both Mr. Morrison and Andrew Zuppa acknowledge that the staffing shortages documented in that Personnel Action were "substantially" the same phenomenon which was allegedly regarded as a basis for terminating Jack Must as Store Manager. In marked contrast, however, in Nolan Morrison's case, it shortly preceded his promotion to running the Southwest Store, and his continued meteoric rise through the AFW management ranks to the position of Store Manager at it largest store in Firestone, Colorado. What emerges from a consideration of the totality of these circumstances is that either (1) there never was any serious problem with the number of salespeople at the Westminster Store, or (2) the significance of that problem has been greatly exaggerated for purposes of this litigation. As noted, on the totality of this record, it is clear that increasing the sales force from 10 to 14 to 15 salespeople, which process included removal of "dead weight" in the sales force, actually resulted in a diminution of sales, rather than an increase!

Similarly, the incident of Jack Must's alleged belligerence in Mike Buscietta's office following the June managers' meeting has clearly been exaggerated for purposes of AFW's defense in this case. The non-functional signature capture system at the Westminster Store, which was apparently the point of departure of the meeting, is clearly primarily an information technologies department issue, rather than a store management issue, and therefore Mr. Buscietta's responsibility, not Jack Must's. Indeed, Mr.

Buscietta acknowledges a call from Jake Jabs requesting that the system be hooked up, which occurred immediately.  At the risk of sounding like a broken record, and despite Mr. Buscietta's claimed offense at Jack Must's "belligerence," this incident also was not memorialized in a Personnel Action, the recognized AFW procedure for documenting disciplinary matters.  Rather, when Human Resources Director Hayes contacted Mr. Zuppa the morning following the meeting and asked if she needed to do anything, Mr. Zuppa ominously replied, "I'll take care of it."

If possible, Dale Pepper's exchange with Jack Must on the Friday before the Fourth of July holiday in 2004 appears to be even less consequential.  Mr. Pepper acknowledges that he initiated the phone call to Jack Must, as well as all other store managers, because he knew that there might very well be confusion as to how AFW's policy regarding mandatory workdays on holidays applied in the unusual circumstance that the Fourth of July fell on a Sunday in 2004.  Lo and behold, and just as he had anticipated, one of the store managers, Jack Must, was, in fact, unclear on the application of that particular policy.  There is a conflict in the testimony as to exactly what occurred in that telephone conversation, but what is clear is that Jack Must changed plans he had made with his family, and was at work on Sunday, July 4, after Andrew Zuppa had already decided to fire him.  While Mr. Pepper claimed to have been very offended by Mr. Must's alleged insubordination, yet again this incident did not become the subject of a Personnel Action or any other documentation.  Instead, when he reported the incident to Mr. Zuppa, Zuppa repeated his mantra, "I'll take care of it."  A jury might very well

conclude that Mr. Zuppa's uncharacteristically short and unannounced visit to the Westminster Store on Sunday, July 4, was a failed attempt to catch Mr. Must in a blatant act of insubordination in order to finally create a legitimate basis for terminating him, while simultaneously obviating the problem which its scant personnel file presents. **Exhibit 5**, Deposition Exhibit 41, "Reviews."

In summary, there are genuine issues of material fact pertaining to all of Defendant's proffered legitimate, non-discriminatory reasons for Jack Must's termination as the Westminster Store Manager.  In *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148, 120 S.Ct. 2097, 2109 (2000) the Supreme Court held that "a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."  See, also, *Ingels v. Thiokol Corporation*, 42 F.3d 616, 622 (10th Cir. 1994)("At [the summary judgment] stage, if a plaintiff advances evidence establishing a prima facia case and evidence upon which the factfinder could conclude that the defendant's alleged non-discriminatory reasons for the employment decisions are pretextual, the case should go to the factfinder [citations omitted]."  This record presents such evidence, and Defendant's motion should be denied in its entirety.

## III.   AFW'S DAMAGE CALCULATIONS ARE PURPOSEFULLY SKEWED

AFW argues that Mr. Must's claims should fail because his backpay through 2007 has been completely offset by his earnings in his new job as a car salesman.  It does so through the affidavit of Lori Tielke, Exhibits A-8 (1 of 2) at p.6,¶33 and A-8 (2 of 2) at

p.34 of 48.

In essence, Ms. Tielke makes the completely unsupported assumption that Jack Must's bonus would continue to have been cut from a full bonus to a half bonus in two of every four fiscal quarters, had he continued to be employed by AFW.  In order to maximize the impact on Mr. Must's backpay damages, Ms. Tielke has cut in half what were evidently the two largest bonuses for each calendar year.  Through this artifice, she has deducted approximately $51,912 from Plaintiff's projected earnings had he continued to be employed at AFW.

For present purposes of Defendant's Motion, it suffices to observe that Mr. Must's bonus was only reduced in two of the 19 fiscal quarters he was eligible for it (or less than 10% of the time), and AFW has not, and cannot, substantiate the reasons that was done.  Accordingly, Ms. Tielke's assumption that Mr. Must's largest bonuses would have been reduced 50% of the time is wholly without factual support or a historical basis.  In any event, there are genuine issues of material fact as to the full range of Plaintiff's damages, not just backpay, which preclude summary judgment.[2]

## CONCLUSION

Like too many summary judgment motions, Defendant's Motion is based upon its purposefully myopic view of its favorite evidence in this case.  When the record is

---

[2] At the Calendar Call held in this matter on February 29, 2008, the Court indicated that it intended to address Defendant's pending Motion for Sanctions after the trial.  For this reason, Plaintiff's counsel has not separately responded to those portions of Defendant's Motion based upon alleged spoliation of evidence in this brief.

considered as a whole, and the standard of Fed.R.Civ.P. 56 borne in mind, it is clear that there are genuine issues of material fact across the entire spectrum of the *McDonald-Douglas prima facie* case/burden shifting analytical framework, making this case wholly inappropriate for summary disposition.

Defendant's Motion must be denied in its entirety, and Jack Must given his day in court.

DATED this 21st day of March, 2008.

BUCHANAN, JURDEM & CEDERBERG, P.C.

s/ Ross Buchanan

By: _____
        Ross B.H. Buchanan, No. 12184

Eighteenth Street Atrium
1621 18th Street, Suite 260
Denver, Colorado  80202
Telephone: (303) 297-2277

ATTORNEYS FOR PLAINTIFF

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 21, 2008, I electronically filed the foregoing **PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Andrew W. Volin, Esq.
Avolin@sah.com

Gary J. Benson, Esq.
gbenson@dnvrlaw.com

s/ Nora Floyd

_____

Nora Floyd
Legal Assistant to Ross Buchanan