# EXHIBIT 1

Andrew Zuppa

1

```
 1            IN THE UNITED STATES DISTRICT COURT

 2                FOR THE DISTRICT OF COLORADO

 3       Case No. 06-CV-01872-RPM-MEH

         _____

 4

         JACK MUST,

 5

                   Plaintiff,

 6       vs.

 7       AMERICAN FURNITURE WAREHOUSE CO., a Colorado

         corporation, d/b/a AMERICAN FURNITURE WAREHOUSE,

 8

                   Defendant.

 9       _____

10              DEPOSITION OF ANDREW ZUPPA

11       _____

12              PURSUANT TO NOTICE, the

13       above-entitled deposition was taken on behalf of

14       the Plaintiff at the offices of Buchanan, Jurdem &

15       Cederberg, PC, 1621 18th Street, Suite 260, Denver,

16       Colorado, on August 27, 2007, at 1:35 p.m., before

17       Jana Mackelprang, Certified Realtime Reporter,

18       Registered Professional Reporter, and Notary

19       Public.

20

21

22

23

24

25
```

38

1   A.   It's no longer there.
2   Q.   -- and County Line?
3   A.   Yeah. It's no longer there, yeah.
4   University and County Line, roughly.
5   Q.   How long did you manage that store?
6   A.   Also not long. I'm going to say three
7   months, maybe.
8   Q.   Okay. What was your next position?
9   A.   I was the store manager at the South
10  Wadsworth, Lakewood store.
11  Q.   Is that what's called the Southwest
12  store?
13  A.   Yes.
14  Q.   Store 20?
15  A.   Yes.
16  Q.   And how long were you there?
17  A.   I'm going to say six or seven months.
18  Q.   What was your next position?
19  A.   Human resource director.
20  Q.   Was this your -- and can you specify
21  for us when you became the human resources director?
22  A.   I'm going to say March of '97.
23  Q.   Okay.
24  A.   So all that needs to add up to that
25  period. You can break it up, if you want.

39

1   Q.   Well, maybe I'm confused, because you
2   gave me some dates having to do with months, and I
3   thought you said you started late '96.
4   A.   I'm going to say either that I started
5   December or January, December '96, January '97.
6   I'm sorry. I'm sorry. I'm sorry.
7   March of '98. You had asked me the question when I
8   became human resource director. If I said March of
9   '97, that was incorrect. It was March of 1998.
10  Q.   Okay. That sounds more like it.
11  A.   Let's say, roughly, 14, 15 months went
12  by during that period.
13  Q.   While you were store manager at South
14  University, what were the -- first of all, does AFW
15  have any revenue goals for its stores?
16       MR. BENSON: Object to the form. Time
17  frame?
18  Q.   (By Mr. Buchanan) Have they ever had?
19  A.   Do they have any revenue goals?
20  Q.   Yes. In other words, do you ever say,
21  This store, this month, you shall make X, and that's
22  a quota, like it was at Homestead House?
23  A.   No, not like that.
24  Q.   Given your management of the store at
25  South University when you were the store manager,

40

1   what were the average gross revenues per month at
2   that store?
3   A.   It started out, it was about a million
4   one, million two when I started, and about a million
5   six to million eight when I left.
6   Q.   What was the size of that store?
7   A.   That is tough with that store. It's
8   an old pharmacy, so there's -- there's a total
9   space, and probably a usable merchandising space,
10  which are different numbers.
11       I'm going to throw out a number that's
12  about 55,000 square feet. It could be 45; it could
13  be 55. Again, it's specifically hard to say for
14  that because it's not a furniture store.
15  Q.   Okay. University and County Line is
16  reasonably close, still reasonably close to Park
17  Meadows, isn't it?
18  A.   I don't believe the physical proximity
19  has changed between University and Park Meadows.
20  Q.   What's the distance?
21  A.   Between Park Meadows and University?
22  We're talking about the I-25 exit on C-470 compared
23  to the University exit.
24  Q.   What's your best estimate? Three or
25  four miles?

41

1   A.   Yeah, let's say four, meaning it could
2   be two and a half to seven.
3   Q.   At the South Wadsworth, Lakewood,
4   Store 20 location, what were the average gross
5   revenues per month while you were managing that
6   store?
7   A:   It would have been between a million
8   two and a million eight.
9   Q.   Again, this is based on your best
10  recollection?
11  A.   Sure.
12  Q.   And we'd have to see monthly sales
13  figures to verify that?
14  A.   That's right.
15  Q.   Okay. Had you ever worked in human
16  resources before becoming the director of the human
17  resources department?
18  A.   No.
19  Q.   Do you feel that you had adequate
20  training for that?
21  A.   No.
22  Q.   Is that a job that you requested, or
23  did Jake Jabs ask you to take it, or how did that
24  work?
25  A.   It had become vacant. The person that

11 (Pages 38 to 41)

Andrew Zuppa

42

1 had been in the job was leaving. My management
2 degree as an undergraduate, while there was no
3 specific degree, you had emphasis within management.
4 And I forget what all of them was, but human
5 resources was one. It was something that I had had
6 an interest in.
7 Q. Who had been your successor as HR
8 director?
9 A. The person before me or after me?
10 Q. I meant to say your predecessor.
11 A. Okay. Thank you. It was a person,
12 Carol Martin.
13 Q. And was Ms. Hayes your successor?
14 A. Yes.
15 Q. How long were you the HR director?
16 A. Well, job titles after that sort of
17 overlapped. I'm going to say three years.
18 Q. During the time you were HR director,
19 did you have any function as a store manager?
20 A. Did I function as a store manager?
21 No. My office was located in Thornton, which means
22 I had day-to-day interaction with the store. I
23 still was involved in furniture-related activities.
24 I may have occasionally done sales meetings. I may
25 have done them on Saturdays, at one point, every

43

1 week. So it's hard to say.
2 The stores where our administrative
3 offices are located at -- I mean, obviously, the
4 store's right there. You have opinions. So, yeah,
5 to some extent, you're involved, but you're not the
6 store manager.
7 Q. Okay. So while you were HR director,
8 your office was at the Thornton store?
9 A. Yes.
10 Q. Why did they close the South
11 University location, "they" meaning AFW?
12 A. They had a -- well, it was an awful
13 building. Still is an awful building. Actually, it
14 wasn't a building; it was a strip mall of, I'm going
15 to guess, eight spaces loosely tied together. It
16 wasn't a good facility.
17 They had purchased -- and this was
18 about the time I came aboard -- they had purchased
19 property within a development across from Park
20 Meadows, which, at that time, was, you know, very
21 hot; it was new. So they had a stand-alone store
22 which they owned; and it was an actual, you know,
23 I'd call it a furniture store. Some of these
24 buildings are retrofitted, Southwest is one I would
25 refer to as a retrofitted building.

44

1 Q. So I'm hearing a variety of reasons.
2 Was it sort of now that they had a stand-alone store
3 at Park Meadows, which is just a short distance
4 away, they decided that this particular store was
5 sort of redundant and so forth?
6 A. Let me qualify that. I wasn't with
7 the company when that decision was made. And I
8 should be careful about answering that question. I
9 wasn't part of the decision making.
10 I would say it's because they were
11 able to acquire property and own a building, which
12 seems very important to Jake. It was also set up as
13 a furniture store and not a, you know, like I said,
14 collection of strip malls tied together. It was
15 more a furniture store, and they owned the building.
16 Q. I'm confused by what you said about
17 you weren't with the company when that decision was
18 made.
19 A. Either I wasn't with the company or I
20 wasn't in a position to know why they were doing
21 that. They had already --
22 Q. Let me -- I think we're confused.
23 A. Okay.
24 Q. I'm talking about closing the store at
25 University and County Line, the one that you had

45

1 managed. You'd been with the company continuously
2 since that time?
3 A. Sure, sure.
4 Q. So you were with the company when it
5 was closed, correct?
6 A. Yes.
7 Q. But what you're telling me is that you
8 weren't involved in that decision?
9 A. No, I wasn't involved in that
10 decision.
11 Q. The Southwest store is still running,
12 correct?
13 A. Yes.
14 Q. Tell me -- we were talking about your
15 position as HR director -- did you receive any
16 special training to be the HR director?
17 A. I worked for awhile with my
18 predecessor. I felt that, you know, I completed
19 enough course work. I was reading everything at
20 that time.
21 Q. Tell me what you were reading.
22 A. Various human resource magazines,
23 everything from EEOC compliance books to workers'
24 compensation information, you know, trade journals.
25 There was the Human Resource Society, which I, you

12 (Pages 42 to 45)

Andrew Zuppa

46

1   know, requested and received information from. It
2   was largely self-study at that point.
3       Q.   Okay. Did you take any, what I will
4   call, legal training?
5       A.   Not other than what I had had in
6   college.
7       Q.   And what did that consist of?
8       A.   Legal environment of business, labor
9   management type classes, that sort of thing.
10      Q.   When we were talking earlier about
11  sexual harassment, you seemed to have a fair amount
12  of sophistication about sexual harassment, hostile
13  work environment, quid pro quo, sexual harassment,
14  that sort of thing. Have you had any training in
15  that particular area?
16      A.   Like I said, I read everything, I
17  mean, everything I could get my hands on at that
18  time. There were numerous law letters. I had a
19  subscription to everything. I mean, I was
20  absolutely determined to be up to speed and know as
21  much as anybody in my position was going to know.
22      Q.   Did you have any training in the other
23  federal statutes that you might come in contact with
24  as an HR director, specifically the Age
25  Discrimination and Employment Act?

47

1       A.   You know, things that I was focusing
2   on at that time were everything related to the 1964
3   Civil Rights Act. While I was in school, you know,
4   Americans with Disabilities was a big deal, Age
5   Discrimination Act, you know, ERISA information -- I
6   mean, this all was a big deal, you know, at the
7   time.
8       Q.   When you were at Metro State?
9       A.   No, no.
10      Q.   I'm sorry, when you were at Regis?
11      A.   No. Well, part of when I was at
12  Regis, although I didn't focus on HR stuff when I
13  was at Regis, largely.
14      Q.   I guess I'm misunderstanding. What do
15  you mean, it was a big deal?
16      A.   Well, I was taking largely -- in the
17  early '90s, I was taking HR-related classes, and ADA
18  was a big deal. But you received law bulletins, all
19  that sort of thing, you know, and age discrimination
20  was certainly a part of what we were reading about,
21  something that you were aware of.
22      Q.   Did you have training, or did you
23  educate yourself with respect to state statutes that
24  you would be involved in as HR director?
25      A.   Specific to age?

48

1       Q.   Specific to any state statute
2   involving employment.
3       A.   Well, you know, you operated a
4   business with substantial employees in the state of
5   Colorado. We also had some in Montana at that
6   point. You dealt with unemployment claims, you
7   dealt with the Colorado Civil Rights Division. I
8   mean, that was part of the job. So you were going
9   to be educated one way or the other with respect to
10  the state of Colorado.
11      Q.   And I take it that when you became HR
12  director, there were people within the department
13  who were educated in those matters as well?
14      A.   No. The department at that time was
15  one HR assistant, who largely did benefit things.
16  And I had made hires after that; but, no, it was
17  largely get up to speed; this is on you. So you
18  learned quick.
19      Q.   So who was the assistant you referred
20  to?
21      A.   Her name was Tina Wise, but she did
22  benefit stuff. I mean, you wouldn't have turned to
23  her for, say, HR-specific things. You know, we had
24  an attorney at that point, external, not in-house
25  counsel. But, again, you learned because you had to

49

1   learn. And I was absolutely committed to doing that
2   at that point.
3       Q.   Did you turn to the external attorney
4   for guidance in what you ought to be reading -- I'm
5   not going to ask for any communications -- but did
6   you treat him or her as a resource in that area?
7       A.   I would go to him for advice. I don't
8   know if it was specific to what I should be reading.
9   I had people on the outside that, you know, I had
10  worked with or had known. I'm trying to remember --
11  there was some association with the Colorado Human
12  Resource Association, where I had been requesting
13  specific information from them.
14      There was also -- there was also
15  information available from the EEOC on suggested
16  reading. It was the EEOC compliance manuals, that
17  sort of thing. I had had a complete set of the
18  Colorado Revised Statutes.
19      Q.   Okay. Did you ever have any exposure
20  to the Colorado Wage Act?
21      A.   Well, you're a business in Colorado.
22  So, to some extent, you were exposed to it every
23  day. But, yes, to answer your question, you know,
24  wage issues came up from time to time.
25      Q.   Is that something that was included

13 (Pages 46 to 49)

Andrew Zuppa

50

1   among the reading that you described, that you
2   educated yourself about the requirements of the
3   Colorado Wage Act?
4      A.   Yes,
5      Q.   When did you first -- well -- do you
6   want to take a break?
7      A.   I'm good.
8         MR. BENSON:  Would you mind?
9         MR. BUCHANAN:  No, that's fine.
10        (A recess was taken.)
11     Q.   (By Mr. Buchanan}  Mr. Zuppa, you told
12  me that you became the HR director in about March of
13  '98, and your job -- that job lasted about three
14  years?
15     A.   Yes.
16     Q.   Until roughly the spring of 2001?
17     A.   Yes.  Somewhere along the line, I was
18  also given the title of assistant general manager,
19  which meant that there was a slow transition away
20  from human resources.  As I acquired additional job
21  duties, I sort of moved out of some HR things.
22  Crystal Hayes had been hired somewhere along the
23  line.  As I sort of took on other job duties, she
24  took on more and more day-to-day job duties, until
25  she was pretty much doing everything day to day.

51

1      Q.   Do you know when you were officially
2   given the title of assistant general manager?
3      A.   I'm going to say it was '99 or 2000,
4   but, no, I can't say specifically.
5      Q.   And you were the general manager to
6   Mike Buscietta, as I understand it?
7      A.   Was the assistant manager to Mike
8   Buscietta, yes, who was the company's general
9   manager.
10     Q.   Can you peg for us when it was that
11  you were out of HR entirely?
12     A.   Well, I can't say to this day I'm out
13  of HR entirely, but I would say largely when we
14  moved into the Compark facility -- we changed
15  offices, I'm going to say, early in 2001 -- I had ·
16  been involved in some of the construction of that
17  building, and my time was starting to be used.  And
18  when we had moved into that building, I became more
19  active in advertising and marketing and far less
20  involved in HR activities.
21     Q.   Okay.  So you originally estimated for
22  me that it was a three-year job in HR, starting in
23  March of '98.  It sounds like, by March of '01, you
24  were pretty much drifting out of HR?
25     A.   Yeah.  And that's three years, so

52

1   that's about right.
2      Q.   And I guess, going back to what you
3   said, the assistant general manager title had,
4   perhaps, already been given to you by that time?
5      A.   It was '99 or 2000.
6      Q.   When did you first meet Jack Must?
7      A.   He had been a salesperson at our
8   Thornton store.  I don't know if I met him, but I
9   was maybe aware of him, I'm going to say -- you
10  know, I worked at Thornton in '98, '99, so it would
11  have been around then.  The store had a lot of
12  salespeople.  I'm going to estimate, and I'm going
13  to say it was between 60 and 80 at that time.
14     Q.   Okay, 60 to 80 salespeople at Thornton
15  alone?
16     A.   Yeah, at Thornton alone,  And, you
17  know, there was turnover, so there was more than 60
18  or 80 salespeople total, you know, in and out.
19  There was a lot.
20     Q.   Okay.  So you became aware of him at
21  that point?
22     A.   Yes.
23     Q.   And there have been statements in
24  various documents with the EEOC and so forth that
25  you played some role in promoting him into a

53

1   management trainee position.  Is that right?
2      A.   Actually, I think I played "the" role
3   in promoting him into a manager trainee role.  I
4   promoted him.  It was my decision to give him that
5   job.
6      Q.   Tell me why.
7      A.   There had become some reason -- there
8   was a lot of rapid growth during that period.  I
9   mean, crazy rapid growth, not necessarily that we
10  were expanding our operation, but the Rhodes thing
11  came along in '98, or the tail end, plus business
12  was just going up.
13         I remember in Jack's case, there was
14  some urgent need to pop somebody in.  There was a
15  schedule void, or there was -- there was a reason
16  why we needed somebody other than we just needed a
17  trainee.
18     Q.   But, I take it, you don't remember
19  specifically what it was?
20     A.   I remember an urgency for it, so I'm
21  going to say that there was a vacancy.  Just out of
22  pure -- I mean, that was a while ago, but I'm going
23  to say there was an urgency that I had to fill the
24  job.
25     Q.   And why did you focus on Jack

14 (Pages 50 to 53)

Calderwood-Mackelprang, Inc. 303.477.3500

54

1  specifically?
2      A.   Generally, what I'll do was --
3  because, you know, I wasn't, you know, personally
4  aware of a lot of salespeople. You know, I would
5  talk to some, just in passing or whatever, but you
6  would ask store managers for recommendations.
7      Q.   Did you do that in this case?
8      A.   Yes.
9      Q.   What were you told?
10     A.   I don't know that I was told anything.
11  I was given a list, I believe, of a few people. I'm
12  going to say three or four.
13     Q.   And this would be by the store manager
14  at Thornton?
15     A.   We had a sales manager at that time.
16  I'm trying to remember if we even specifically had a
17  store manager at Thornton at that time.
18     Q.   Well, actually, my specific question
19  was: You were given a list of three or four people,
20  all of whom were salespeople at the Thornton store?
21     A.   No, I can't say for sure. It could
22  have been metro-wide at that point. I mean, I would
23  have been asking metro-wide if it was a metro job
24  vacancy. And premium would have been given to
25  people with proximity to wherever the job vacancy

56

1  management trainee?
2      A.   Well, yeah, we use the term "trainee."
3  But I think -- and this is just purely out of memory
4  -- there was a vacancy. He was probably going to
5  have to cover a live schedule, which means that he
6  wasn't going to be buddied up with another manager.
7          Trainees, depending on the situation,
8  you know, kind of a -- when we have the ability to
9  have additional trainees and the luxury to have
10  people shadowing other managers, it's nice. It's
11  not always the case. It certainly wasn't always the
12  case at that period of time with rapid growth.
13          As I was trained under, let's say, a
14  live fire, I think this was a live fire trainee
15  situation.
16     Q.   So, in any event, he accepted it
17  ultimately?
18     A.   Yes.
19     Q.   And he went into a training program?
20     A.   Well --
21     Q.   Whatever that consisted of?
22     A.   Yeah. That might have included the
23  live fire training program, so, yes.
24     Q.   And was -- let me ask you this
25  question: Would, ideally, his training have

55

1  was, just because . . .
2      Q.   Proximity in terms of where they
3  lived?
4      A.   Yes.
5      Q.   So why did you focus on Jack out of
6  the three or four names that you were given?
7      A.   Well, at that time, he probably had a
8  five- or ten-minute interview.
9      Q.   Was that with you?
10     A.   Yeah. And I remember with Jack, he
11  wasn't 100 percent sold on the idea. I remember
12  that because I remember following up by calling him
13  at home and telling him I needed a decision or I
14  needed to move on.
15     Q.   What were his concerns, if you
16  remember?
17     A.   I remember he wasn't -- and -- there
18  was something to the extent of he may have not had a
19  ton of management experience or the schedule or, you
20  know, the way store managers had always been treated
21  by senior management -- I mean, these are issues
22  that I get when interviewing for the job. But I do
23  remember having to pursue Jack and kind of hold him
24  down to get an answer.
25     Q.   And this was just to become a

57

1  consisted of, as you put it, buddying up with
2  someone?
3      A.   Frankly, I don't know anymore. I
4  don't know that we've had a better success rate
5  doing that. In my case, you know, I was as live
6  fire as it got. I mean, I was involved in a very
7  hot store. Shortly after I got there, the store
8  manager had family issues that lasted almost a
9  month. So I had our second or third highest
10  productive store; I'd been with the company not a
11  long period of time; and I was picking that stuff
12  up.
13          And I would say that experience for me
14  probably leapfrogged me several years ahead of the
15  curve. And over the years, you know, I've been
16  involved in it both ways, and I don't know if I've
17  formed an opinion on which way is honestly better
18  for them.
19     Q.   Let me try the question this way --
20     A.   I'm sorry.
21     Q.   -- is it routine to buddy someone up
22  with someone else?
23     A.   I would say it's gone both ways,
24  depending on the -- it's a luxury to be able to do
25  that.

15 (Pages 54 to 57)

Andrew Zuppa

58

1    Q.   All right. How did it go in Jack
2 Must's case? You mentioned you think it was live
3 fire. Did he go straight to the Westminster store?
4    A.   I believe that he did. I don't know
5 if he spent time at Thornton with somebody or not; I
6 don't remember. Westminster was a little bit of a
7 safer bet for that, safer than what I had
8 experienced with the company.
9    Q.   And what you had experienced with the
10 company was at the University store?
11    A.   No. My assistant manager job was out
12 at Park Meadows store.
13    Q.   Why was it safer at Westminster than
14 it would have been at, say, Thornton?
15    A.   Thornton's a zoo. It is. I don't
16 know how else to explain that.
17    Q.   And tell me how that impacts -- I
18 mean, I can imagine, but I want to hear it from
19 you -- how that would impact the quality, if you
20 will, of the assistant manager -- management trainee
21 person's job.
22    A.   Can you ask it again, or . . .
23    Q.   Well, you characterized Thornton as a
24 zoo.
25    A.   Yes.

59

1    Q.   Why don't you start by telling me what
2 you mean by that.
3    A.   Particularly at that time, just so
4 much activity. I mean, the warehouse -- I mean, I
5 don't know how many employees were in that building.
6 I'm going to guess close to 400 at one point;
7 probably less now. But there was no other central
8 distribution point. We were operating, basically,
9 24 hours a day in some capacity.
10    There were huge bottlenecks occurring
11 because of overcapacity. The deliveries were all
12 having to go out there. We had more deliveries than
13 we had delivery doors, sometimes more than we had
14 delivery vehicles.
15    I mean, it was people in and out all
16 day. I don't know, I think I'm going to stick with
17 the zoo and maybe not be able to quantify it any
18 more.
19    Q.   All right. And I take it that that's
20 a more challenging environment to be a manager in,
21 in your judgment, than being at the Westminster
22 store?
23    A.   In some aspects -- I'm going to say
24 yes, if I had to completely answer it. It's
25 different, I think would be the best answer.

60

1    Q.   Are there separate challenges to
2 Westminster that you don't have at Thornton?
3    A.   Well, you don't have the HR department
4 upstairs. You don't have marketing upstairs. I'm
5 talking about that time period, not now. You didn't
6 have Mike Buscietta upstairs. You didn't have Jake
7 upstairs. You didn't have me upstairs. I mean,
8 those are both positives. So it's different being
9 out at satellite stores. Having done both, you
10 know, there's a difference.
11    Q.   And just so we're clear on terminology
12 here, a satellite store at that point in time would
13 be anything other than Thornton, correct?
14    A.   That is correct.
15    Q.   Thornton being what you might call the
16 flagship?
17    A.   Yeah. Yeah, that's true.
18    Q.   All right. The materials that were
19 submitted to the EEOC also indicate that you played
20 some role in promoting Jack to an assistant manager
21 position.
22    A.   Yeah, I think I did promote him to an
23 assistant manager position.
24    Q.   Is that because he performed well as a
25 management trainee?

61

1    A.   If I recall. I mean, you don't want
2 to leave them with a trainee title for awhile. You
3 either need to -- you know, I mean, you're not going
4 to have a manager trainee for two years. I mean, I
5 probably had the title for two months -- I mean, I
6 don't know -- if I had it at all. I'm not sure.
7    But, you know, at some point, you're
8 going through, looking at your roster, and you say,
9 Well, he's been around for a while. You know, if
10 you don't have any specific reason not to -- and at
11 that time we could find -- it was hard -- well,
12 actually, it still is -- it's hard to find managers.
13 You don't want to get rid of a manager unless, you
14 know, you have to. I mean, you want people to stay
15 in those jobs.
16    So I don't remember any specific
17 reason for why he did get the job. I probably just
18 didn't have one that he shouldn't be called up.
19 Particularly, if he was -- and I have to go back to
20 that term, "live fire" -- if they're effectively
21 doing the job, then let them have the job title.
22    If I didn't answer the question, I'll
23 start over.
24    Q.   Let me ask the question this way: One
25 of my frustrations in this case is, I have this

16 (Pages 58 to 61)

62

1 personnel file and there is nothing that I would
2 call a periodic review or a review document. Right?
3 A. That's right.
4 Q. And you know how some HR departments
5 work.
6 A. Absolutely.
7 Q. They have these printed-up documents
8 about meeting expectations, not meeting, and all
9 that sort of thing.
10 And let me just ask you the question:
11 AFW does not use such a system, correct?
12 A. No, I believe I was the one who ended
13 those. That was one of the first things that I
14 discontinued.
15 Q. Okay. So before you got there as HR
16 director, they did use such a system?
17 A. They were half-assed -- I'm sorry to
18 use that language -- they were occasionally done;
19 they were inconsistent; managers were not provided
20 with benchmarks for what "acceptable" meant. I
21 hated things like A, B, C, or 1 through 5.
22 Depending on the manager, depending on
23 where they were done, you know, there was no
24 consistent format for them. I felt the system was
25 largely just inconsistent. I didn't see any upside

63

1 to doing that. And then I had attended something or
2 read something that was strongly questioning
3 performance reviews under the way that we were doing
4 them at that time.
5 Basically, the idea is that if you
6 can't do them consistently, don't do them. So we
7 stopped doing them.
8 Q. And that was your decision?
9 A. I think I had probably suggested that
10 to either Mike or Jake at that time, with reasons
11 why I believed that. But I didn't think they were
12 being done well, and I didn't see an upside to
13 continuing doing them.
14 Q. So am I correct, then, that when I
15 asked you why Jack Must was promoted into a
16 management trainee position and into an assistant
17 manager's position, there is no document that you
18 can look at and can say, Oh, yes, now I remember, he
19 was doing this extremely well, he was doing that not
20 so well, and we provided remedial training in this,
21 that, and the other? We can't look at anything like
22 that, right?
23 A. No, that doesn't exist. I mean,
24 largely, I was in a position -- we don't have a
25 gazillion stores or -- "gazillion" meaning a lot --

64

1 store managers, not so much that, you know, the
2 evaluation didn't come down to a few members of
3 senior management who formed those opinions. In
4 Jack's case, that was me.
5 Q. Let me ask you this question: Is
6 there any document of any kind that I haven't seen
7 from the production of his personnel file that
8 records how he did in any of the positions he held
9 with AFW?
10 A. No. You were looking for an answer,
11 and I just went on and on and on. Yeah, the answer
12 would have been no.
13 Q. Who was the manager when Jack became
14 the assistant manager of the Westminster store?
15 A. I believe it was a guy named Jerry
16 Beemer, although -- no, wait a minute. I can't say
17 for sure there. I believe we inherited a guy from
18 Rhodes. His name -- he was sort of a legend in the
19 business -- Bob Russell, I'm thinking.
20 Q. And he had been a manager at Rhodes,
21 and when Rhodes was acquired by --
22 A. Yeah.
23 Q. -- AFW, he remained the manager for a
24 time?
25 A. I think so. Bob was a guy that was

65

1 sort of just known in the business. I mean it was
2 different back in those days. Everybody kind of
3 knew, you know, people, and Bob was sort of one of
4 those guys that was just, you know, a solid guy.
5 We had acquired him and a guy who's a
6 buyer for us now, Fran Coleman, who had managed the
7 Bannock Street store. I mean, these were just sort
8 of guys that were, you know, the legend guys in the
9 business. And for whatever reason, we couldn't
10 convince Bob to hang around. I think Bob was more
11 of a high-end guy. But, no, he was a solid guy, and
12 I was -- I think that was too bad.
13 Q. And then you mentioned Jerry Beemer?
14 A. Yeah.
15 Q. Was he also a Rhodes person?
16 A. He might have been. I don't know what
17 the deal was with Jerry. I'm trying to remember
18 specifically how he came about. Jerry is a pretty
19 smart guy. But then, at the same time, he had found
20 a job within the industry later, and he had split.
21 I think they had opened a Lazy Boy across the
22 street, the one that's there at 100th, I think
23 that's the job he took.
24 Q. There's eventually a guy named Chris
25 Smatla.

17 (Pages 62 to 65)

Calderwood-Mackelprang, Inc. 303.477.3500

66

1    A.   Uh-huh.
2    Q.   Was the manager at Westminster?
3    A.   Yeah, that sounds right. I think
4    Jerry bailed on me, like, really quick. He gave no
5    notice. He had taken another job, and he was gone.
6    And I think Chris was put in there for a short
7    period of time.
8    Q.   Does it sound right that Chris was the
9    manager when Jack went to work there, or do you
10   remember one way or the other?
11   A.   It doesn't seem like that was the time
12   frame. I'm not saying that it wasn't true; it just
13   doesn't seem right. It seems like Jerry might have
14   been there about that time. But it was either Jerry
15   or Chris.
16   Q.   Okay.
17   A.   You know, managers come and go.
18   Q.   Did any manager of the Westminster
19   store review Jack Must's performance as an assistant
20   manager?
21   A.   I don't remember the specific
22   conversations with Jerry. And I probably wouldn't
23   have taken Chris' advice one way or the other.
24   Q.   Okay. And the way you answered the
25   question, it sounds like, if there had been a

67

1    review, it was oral in nature?
2    A.   Yeah. One of the things that I
3    inherited was the habit of them keeping personnel
4    stuff in the store. So if that would have existed
5    in the store at that time, it was possible, you
6    know, they didn't know about it. But I doubt that
7    was the case. I doubt Chris would have bothered to,
8    one way or the other.
9    Q.   You don't have a very high opinion of
10   Chris Smatla?
11   A.   No.
12   Q.   And you never had any specific
13   information that they had any written documents,
14   personnel documents, in the store?
15   A.   No.
16   Q.   Did you ever learn anything negative
17   about Jack Must in his job as an assistant manager
18   in Westminster?
19   A.   The problem is, I wouldn't have had a
20   source for it. You know, Chris and I did not get
21   along. I did not like Chris. I didn't necessarily
22   think Jack was a very good manager. I wouldn't have
23   solicited his opinion on much.
24   Q.   So coming back to my question, did you
25   hear anything negative about Jack Must's function as

68

1    an assistant manager?
2    A.   Neither negative nor positive. Again,
3    I didn't have a source.
4    Q.   That you trusted, it sounds like?
5    A.   That I trusted or that I actually
6    would have asked at all.
7    Q.   Did you observe anything yourself
8    about Jack Must functioning as assistant manager?
9    A.   Not really. Jack would talk to me
10   occasionally, and Jack was a big fan of Jack's, and
11   that's about it.
12   Q.   Jack Must was a big fan of Jack
13   Must's; is that what you're saying?
14   A.   Yeah. So -- my information came from
15   Jack.
16   Q.   Why do you say Jack Must was a big fan
17   of Jack Must?
18   A.   You know, Jack would go out of his way
19   to say positive things about Jack. He would go out
20   of his way to say things that weren't necessarily
21   positive about Chris.
22   Q.   Okay.
23   A.   But, again, I had no other source of
24   information on that subject.
25   Q.   Okay. What do you remember him saying

69

1    that was not necessarily positive about Chris?
2    A.   He had a lot of complaints about
3    Chris' work habits, and I don't specifically
4    remember what they were. I'd always suspected Chris
5    as just kind of a -- I don't know -- I didn't like
6    Chris. For whatever reason, I didn't like him. You
7    know, sometimes you have to admit to personal bias.
8    I didn't like Chris.
9    Q.   Do you remember anything specific?
10   Did he say he comes in late, he falls asleep in the
11   back, he smokes cigarettes?
12   A.   You know, I know you talked some
13   things about merchandising, and, you know, I don't
14   remember about Chris' work habits. I was never
15   overly impressed with him, so I probably -- I didn't
16   need any help reinforcing things on Chris, although
17   I do know that Jack used to say -- you know, make
18   comments about him. But since I had largely already
19   formed my own opinion on the subject, I wasn't . . .
20   Q.   It sounds to me like you had a very
21   low opinion of Chris that was reinforced by Jack
22   Must; is that fair?
23   A.   Yeah, I think that's fair.
24   Q.   Was there anybody there that was a fan
25   of Chris Smatla's?

18 (Pages 66 to 69)

Calderwood-Mackelprang, Inc. 303.477.3500

70

1      A.    I don't remember. Again, I probably
2  wouldn't have cared. So I don't remember that
3  specifically.
4      Q.    You wouldn't have cared because why?
5      A.    I didn't like Chris, I didn't think
6  he was a good manager.
7      Q.    Okay. Let me ask you this: In terms
8  of the salespeople that work at various stores, who
9  hires the salespeople?
10     A.    It depends. A lot of the store
11 managers at that time, you know, were doing most of
12 it. Like today they hire their own. Some get
13 applications from other locations. Sometimes they
14 share them. Sometimes HR will hire them. It just
15 really depends. When I was a store manager, I hired
16 my own salespeople.
17     Q.    Store manager for AFW?
18     A.    Yes.
19     Q.    During the time that Jack Must was the
20 store manager in Westminster -- I'm just going to
21 recite for the record that that's roughly June
22 of '01 through July 6th of '04, basically three
23 years -- who was hiring salespeople at that time?
24     A.    For the company, or at his store?
25     Q.    Well, I guess what I'm trying to

71

1  understand is: How did salespeople come to work at
2  his store? Were they hired at Thornton and trained
3  at Thornton, and then they came to Westminster --
4      A.    Right.
5      Q.    -- or did he hire them at Westminster,
6  they came to Westminster, they were trained there,
7  they worked there?
8      A.    Both. One of your big things is you  .
9  want people from the neighborhood. I mean, you
10 don't want to have people drive, if you can help it.
11 I mean, proximity for this stuff is huge. The
12 chances that they're going to stick around if they
13 live by the store is big. So you want to put up
14 signs. And we get applications; we get all kinds of
15 applications. But people from Westminster could
16 have been turning them in at the store, turning them
17 in at Thornton, turning them in at Lakewood, for all
18 we know.
19         But as a store manager, you really do
20 want to interview the people yourselves. You want
21 to talk to them. You want to make sure it's your
22 crew, particularly if you don't have 80 people. If
23 you have -- like in a store like that or the store
24 that I had, where you have roughly 20 or 30
25 salespeople, you want to interview them yourself,

72

1  because you were the one stuck with training them,
2  and you wanted to do that. You wanted to have your
3  crew. Having your crew was a big deal.
4      Q.    Okay. So was there a program whereby
5  you would tell somebody like Jack Must, "Look, Jack,
6  hire your own people. Put 'Help Wanted' signs" --
7      A.    Yeah.
8      Q.    -- "in the front window, and you
9  interview them and you take their applications, you
10 go with it"?
11     A.    Well, specifically with Jack, yeah,
12 that's absolutely what you would have expected.
13     Q.    But my question is: Is that what you
14 told him to do?
15     A.    Yes.
16     Q.    Did you occasionally have people that
17 would be trained at, say, the flagship store and
18 then be sent to Westminster?
19     A.    Well, there was an organized program
20 of training -- it was a week or two weeks -- where
21 all new hires would end up in a sales training
22 class. And that was probably being done at -- well,
23 it was being done at Thornton at that time. But I
24 was trained at Thornton. I went to the sales class
25 there. It's just -- you know, you get a week or two

73

1  of basic instruction, where, you know, I was shown
2  how to turn a computer on, what an ottoman is, and
3  then you're sent back out to the store where you
4  were hired.
5      Q.    So, in your judgment, most of the
6  salespeople were hired at the stores, and then sent
7  to Thornton for training, and then they came back?
8      A.    Well, again, it would -- it would --
9  you know, some people, like for Jack, because, you
10 know, an application may have been turned in at
11 Thornton, they may have hired for him, or he may
12 have been taking -- as a store manager, like, in
13 Lakewood, I pretty much did all of my interviewing,
14 all my application taking, and all my hiring there.
15 Jack probably would have been in a position where he
16 may have gotten a few more people sent over from
17 Thornton because they turned in an application
18 there.
19     Q.    Just because it's closer?
20     A.    Yeah, it's -- it's up north. People
21 know it's a warehouse location, and may have turned
22 them in there. We get a lot of applications,
23 particularly when we put signs up. We're not really
24 restricted on, you know, signs in Westminster, plus
25 there's a King Soopers next door, plus there, at

19 (Pages 70 to 73)

74

1  that time, was a -- there was a health club that was
2  like the hottest, you know, health club in
3  Westminster going on there. So the place was packed
4  all the time. There was all this sort of extra
5  traffic going on there. So "help wanted" signs were
6  effective at that location at that time.
7      Q.   You promoted Jack to store manager,
8  correct?
9      A.   Yes.
10     Q.   In Westminster?
11     A.   Yes.
12     Q.   And he was to replace Chris Smatla,
13 correct?
14     A.   Yes.
15     Q.   Was Smatla terminated?
16     A.   I don't know if he was sent back into
17 sales, if he quit, if he was terminated. I don't
18 remember, but Chris wasn't having a good time at
19 that store.
20     Q.   So you don't remember which way it
21 was?
22     A.   No.
23     Q.   Okay. You didn't give Chris Smatla
24 the opportunity to become a salesperson again?
25     A.   I might have.

75

1      Q.   Do you remember one way or the other?
2      A.   No, I don't. Chris and I weren't
3  playing well, so one way or another, you know, he
4  wasn't going to manage that store. And in my head,
5  I don't honestly remember what opportunities he was
6  given.
7      Q.   Given the fact that you didn't like
8  him, which you've said repeatedly --
9      A.   Yeah.
10     Q.   -- that you'd never heard anything
11 positive about him, what was it that made you want
12 him to sell furniture in your store?
13     A.   There's a couple things. There's a
14 couple things. You have to make a decision: Is
15 this somebody that, if not in a management role, you
16 can accept their behavior? Some people get promoted
17 into a management job, and they're not good
18 managers. And in this world, not everybody has that
19 skill set, you know.
20         So you have to decide for yourself:
21 Have they reached a point where their job skills
22 just don't match the position they're in? In which
23 case, there probably is some flexibility to return
24 to the position for which they were originally
25 hired, or have they done something so egregious to

76

1  burn any potential bridges?
2          Chris wasn't a good manager, I didn't
3  think. In my opinion, he wasn't a good manager.
4  Was he dishonest with me? Was he stealing from us?
5  Was he -- you know, those are things that are far
6  different, and I just -- I don't remember with
7  Chris. I don't remember.
8      Q.   You don't remember one way or the
9  other whether he was stealing from you?
10     A.   No, that's not what I'm saying. I
11 don't remember whether he was given the opportunity
12 to go back into sales. I don't remember that
13 specifically.
14     Q.   All right. So you promoted Jack into
15 the manager's position, correct?
16     A.   Yes.
17     Q.   And does three years sound about right
18 as far as his tenure in that position?
19     A.   I'm going to say Smatla was roughly
20 2001. So, yeah, let's say roughly three years.
21     Q.   What were your reasons for promoting
22 Jack into that position as opposed to any other
23 person that might have been a candidate for it?
24     A.   I don't know that we had a ton of
25 candidates at that time. Jack had been there for a

77

1  while. Jack seemed to have an opinion on things as
2  far as, you know -- he didn't care much for Smatla.
3  I don't know, it was kind of his turn, I guess.
4      Q.   Well, I guess what I'm asking is: Did
5  you sit down and sort of weigh the pluses and
6  minuses of Jack Must and conclude that he should be
7  promoted?
8      A.   Necessity was a huge driving factor at
9  that time. The job had become vacant. While I
10 don't specifically remember the conditions for which
11 Smatla left, I do know it wasn't sort of -- you
12 know, we didn't have an indefinite amount of time to
13 fill the position. We had to fill it.
14     Q.   Let me ask you this question: Was it
15 exclusively your decision?
16     A.   With Jack at that time, I would
17 probably have to get approval, but I probably would
18 have been able to get a hand wave on Jack, that, you
19 know, absent any other information, I would have got
20 approval on that just at a very superficial level.
21     Q.   If you got approval, it would have
22 been from whom? Mike Buscietta?
23     A.   Probably Mike and Jake. I probably
24 would have laid out my recommendation. And absent
25 anybody having another opinion on it, it would have

20 (Pages 74 to 77)

78

1  gone through without a ton of consideration in that
2  situation.
3      Q.   And I take it the way you're
4  explaining it, there was no paperwork involved in
5  any of that?
6      A.   Well, he probably got a pay raise or
7  he got a – you know, he got a job title change or
8  something, if that's what you mean.
9      Q.   Well, I guess what I mean is, are
10  there forms that you submit saying, I recommend Jack
11  Must be promoted --
12     A.   No.
13     Q.   -- to this position?
14     A.   No. No. No, IBM it is not, and I
15  understand that.
16     Q.   Did you have an impression of what --
17  well, you started to talk about change in pay. As a
18  salesperson at the time that Jack Must was one, they
19  were compensating him entirely on commission sales,
20  correct?
21     A.   It still largely is that way. The
22  answer is yes, but the question kind of infers that
23  it's changed. That's pretty much the way it was.
24     Q.   Well, Glenwood Springs and Firestone
25  pay their salespeople hourly, don't they?

79

1      A.   No, Firestone pays commissions.
2  Glenwood Springs is Glenwood Springs, and there's a
3  negative 7 percent unemployment, or whatever it is
4  up there. So you deal with that store like it's on
5  an island because it's on an island.
6          Firestone, when we got the store
7  going, we -- you know, we were unsure about the
8  volume of business it was going to do, you know, so
9  we did have them on hourly for a while. They're
10  fully commissioned now.
11     Q.   Okay. Glenwood Springs is hourly?
12     A.   Yes.
13     Q.   And still is?
14     A.   Yes.
15     Q.   And has been for, what, a couple of
16  years?
17     A.   Yeah, we'll say a couple of years.
18     Q.   And then as an assistant manager, he
19  became salaried, correct?
20     A.   As a, let's say, trainee or whatever
21  position he left sales in, he would have became
22  salaried.
23     Q.   All right. And Jack's salary was
24  $60,000. Do you recall that?
25     A.   No, but that sounds about -- you're

80

1  talking about his final salary as a manager?
2      Q.   I'm talking about his salary as a
3  manager while he was at the Westminster store.
4          MR. BENSON: Object to the form. Are
5  we talking about assistant or store?
6          MR. BUCHANAN: Store manager.
7          THE DEPONENT: Okay. That sounds
8  about right. That's about the low end of what a
9  store manager would have been paid. So that's about
10  right.
11     Q.   (By Mr. Buchanan) Is there a high
12  end?
13     A.   Yeah. Most of our store managers that
14  are, you know, making full wages make about 80,000
15  in base pay; and then, you know, bonuses fluctuate
16  based on profitability, but most of them make about
17  $100,000 in compensation.
18     Q.   So the maximum at that period of time
19  was 80,000, your recollection?
20     A.   Yeah, that would have been towards the
21  high end. If one of them makes more than that --
22  it's possible.
23     Q.   Are you familiar with the fact that
24  Jack Must never received a raise in his salary?
25     A.   No, but that sounds about right.

81

1      Q.   Did you ever explain to Jack why he
2  was not getting a raise in his salary?
3      A.   I don't know if he ever asked.
4      Q.   And let's start there. He never
5  asked?
6      A.   I don't recall specifically having
7  that conversation with him.
8      Q.   And that would apply whether he asked
9  or you initiated a conversation?
10     A.   I doubt that I would have initiated a
11  compensation conversation. I just don't go out of
12  my way to bring it up that nobody got a raise. I
13  mean, I wouldn't say, Hey, jeez, it's been a long
14  time since you've had a raise.
15          I don't know if we specifically had
16  that conversation.
17     Q.   Okay. You don't remember any
18  conversation where you said, Jack, other people are
19  getting raises, you're not, and here's the reason?
20     A.   That specific comment, no.
21     Q.   You mentioned bonuses. As I surmise
22  from looking at your documents, it looks like
23  there's, sort of, two levels of bonuses for store
24  managers. There's a 20th of 1 percent and a 10th
25  of 1 percent; is that correct?

82

1    A.    It's different. It changed during the
2    period where he had been a manager. I'm not sure
3    where that had changed. Our bonus structure
4    changed, I believe, in 2001. It used to be -- well,
5    you run into some decimal errors here, so you've got
6    zeroes going the other way from the decimal point.
7    The bonus percentage used to be higher for everybody
8    than what it currently is, and it used to be
9    different. It's different now.
10        And right now, under our current
11   system, I would say that there's maybe 2 or 3
12   specific points in a bonus period. Specific
13   percentages is what I was looking for there.
14    Q.    Let me do this, just so we don't have
15   a debate about something that we don't need to have
16   a debate about --
17    A.    Right. And language here, I think, is
18   a big deal, so . . .
19    Q.    I'm going to mark as Exhibit 28 this
20   document, which I received on Friday afternoon.
21        (Exhibit 28 was marked for
22   identification.)
23    Q.    (By Mr. Buchanan) And this is a --
24   I'm just going to -- and you can take a look at
25   however many pages you want to, but this appears to

83

1    be a listing of the bonuses that were received by
2    those who were eligible to receive them during a
3    period of time when Jack Must received a bonus.
4    Okay?
5    A.    Okay.
6    Q.    And let me ask you to flip to sort of
7    the back of it and some of the last few pages. I'm
8    seeing -- let me direct your attention -- there's a
9    Bates number down here. Let's just take a look at
10   0059, as an example. And this is the period May 1
11   through July 31st, 2004.
12    A.    Okay.
13    Q.    There are -- I see bonuses of .001,
14   which would be a 10th of 1 percent, right?
15    A.    Is that a hundredth of 1 percent,
16   three over? I believe a 10th would be .01. Do we
17   need to consult somebody?
18    Q.    Well, rather than getting into a
19   debate about the math -- I'm just looking at this
20   document -- it looks like there are several people
21   that get paid .001 of something, correct?
22    A.    Yes.
23    Q.    And then there are people that get
24   paid .0005 of something?
25    A.    Yes. And I believe .0005 represents

84

1    1/2 of 1 percent, not that this matters, but I think
2    that's right.
3    Q.    And then it appears that there is a
4    separate group of people that get .00025, correct?
5    A.    Yes, which I believe represents 1/4
6    of 1 percent.
7    Q.    Is that -- and I heard what you said
8    before, that it's changed over time, but is that
9    substantially what it was during the three years
10   that Jack Must was managing the Westminster store?
11    A.    Yes.
12    Q.    Let me do it this way, Mr. Zuppa: Let
13   me ask you to look at page 43, the last two numbers
14   of the Bates designation there.
15    A.    So we're moving quite a bit.
16    Q.    From where we were, yes.
17    A.    August through October 2001.
18    Q.    Right.
19    A.    Okay.
20    Q.    Now, this would be the type of bonus
21   spreadsheet that would be produced each quarter,
22   correct?
23    A.    Yes.
24    Q.    And these are bonuses based upon what?
25   It's a percentage of what?

85

1    A.    Consolidated profitability, which is
2    the term up on top, you'll see next to "Bonus
3    Percentage." You've got "Employee," "Bonus
4    Description," "Bonus Percentage," and the
5    abbreviation for the word "Consolidated
6    Profitability."
7    Q.    Okay. And then there are three
8    numbers under there, correct, and a total?
9    A.    Yes.
10    Q.    Those would represent the three months
11   of August, September, October '01?
12    A.    On this sheet, they're not necessarily
13   defined, but it's possible that's what they meant.
14   I think, later, some of these are better described,
15   I think. But, yeah, I believe that what --
16    Q.    Why don't you flip to the next page,
17   44, and that --
18    A.    Yeah, okay. Okay.
19    Q.    And then there's a total there,
20   correct?
21    A.    Yeah.
22    Q.    And that's -- as you say, it's a
23   consolidated profit, in other words, company-wide?
24    A.    Yes.
25    Q.    All right. And I note here on page

22 (Pages 82 to 85)

Andrew Zuppa

86

1  43, pertaining to the monthly bonus from August to
2  October of '01, Jack Must's percentage is changed to
3  .0010, effective, it looks like, 10/9/01, correct?
4      A.    Uh-huh.
5      Q.    The answer is yes?
6      A.    Yes. Sorry.
7      Q.    And you were the person that decided
8  to do that?
9      A.    Yeah, it looks that way, yes.
10     Q.    Do you know what "2196" means?
11     A.    It could be his employee number.
12     Q.    I think his employee number is 3014,
13  or something like that.
14     A.    Oh, okay. Hold on a second. I'm
15  thinking -- and I'm going to guess here -- that he
16  may have entered management or changed jobs to like
17  store manager somewhere within that period. I don't
18  know. So they used a prorated formula for that.
19     Q.    All right.
20     A.    So let me just say that I think what
21  it means is that, if he would have been a store
22  manager, and this would have been in effect the
23  entire time, he would have had the bonus that looks
24  more like the 3544 number.
25     Q.    I see what you're saying.

87

1      A.    Instead, he ended up somewhere in
2  between, 2196.
3      Q.    That's a prorated number --
4      A.    Yeah, I believe what it says is this
5  effective date was October 9th of 2001, which
6  occurred -- actually, I'm going to stick with my
7  answer there. I'm not -- okay. He's saying that's
8  an effective date. I'm guessing it's some sort of
9  prorated raise that occurred within the bonus
10  period.
11     Q.    Okay. So then -- and I'm just going
12  to flip forward here -- page 44, the next page --
13     A.    Hold on on this, because at the same
14  time, during that same period, it looks like Tom
15  went through something similar to that, that he was
16  probably added to it. So I think that's probably a
17  decent answer.
18     Q.    Tom Ward?
19     A.    Tom Ward, who was also at that store,
20  which also -- it looks like something happened
21  timing-wise during the period.
22     Q.    Okay. Then flipping forward to
23  page 44, again, Jack Must's line indicates that he
24  is at the .001 level?
25     A.    Uh-huh.

88

1      Q.    What should we call that? A 10th of
2  1 percent?
3      A.    Let's just call it a -- let's just
4  call it full, and call the 5 half.
5      Q.    Okay, that's fine. He's the full
6  bonus at that point, correct?
7      A.    Okay, yes.
8      Q.    And that's for the quarter November,
9  December, January of '01, into '02, correct?
10     A.    Yes.
11     Q.    And by the way, is that how you've
12  always done your quarters for purposes of bonuses?
13     A.    They're fiscal quarters.
14     Q.    Okay. Your company is run on July to
15  June?
16     A.    Fiscal year ends the end of March.
17  Quarter 4 is January, February, March, fiscal
18  quarter.
19     Q.    Okay. So these don't coincide with
20  fiscal quarters?
21     A.    Yes -- well, sorry, no.
22     Q.    They're slightly different?
23     A.    Yeah. The January -- they're usually
24  paid out -- a month will transpire. So if this one
25  ends the end of January, financials are done through

89

1  the month of February, and they're paid in March.
2  So they're paid the first -- sorry, the last month
3  of each fiscal quarter, I guess would be the way to
4  describe it.
5          No, that is -- yeah. March --
6  sorry -- March -- no, because they're paid in March,
7  which is the last month of the fiscal quarter.
8  They're paid in March, June, September, December,
9  last month of the fiscal quarter, which I think is
10  correct. And if I completely blew that, it's
11  probably irrelevant.
12     Q.    All right. Proceeding on here,
13  page 45, Jack Must remains at the full bonus,
14  correct?
15     A.    I'm sorry, we're on page 45?
16     Q.    Yes, page 45. And this is for the
17  February, March, April quarter of 2002.
18     A.    Um-hum. Yeah, he's still at, we'll
19  say, full bonus.
20     Q.    And then the next quarter after that,
21  May, June, July of '02, still at full bonus,
22  correct?
23     A.    On 46?
24     Q.    Yes.
25     A.    Yeah, it looks that way.

23 (Pages 86 to 89)

90

1    Q.    Okay. And then on 47, which is for
2  the August, September, October '02 quarter, he's
3  still at full bonus, correct?
4    A.    Yes.
5    Q.    Then for the November, December,
6  January '03 quarter, the document seems to indicate
7  he's at full bonus, but then there's a slash mark
8  through it and a number that appears to be the half
9  bonus number --
10   A.    Um-hum.
11   Q.    – 3081?
12   A.    Yeah.
13   Q.    And then an initial out on the side?
14   A.    Yeah.
15   Q.    Whose initials are those, do you know?
16   A.    It looks like Mike's is the top one
17 and Jake's below it. Mike Buscietta the top one,
18 and Jake Jabs below it.
19   Q.    Do you know anything about why Jack's
20 bonus was cut back in the November, December,
21 January '03 time frame?
22   A.    I don't specifically remember.
23 Looking at it, it looks like he upset Mike in some
24 sort of way.
25   Q.    Tell me why you can surmise that.

91

1    A.    It looks like Mike's name is directly
2  on the line. It looks like Mike probably wrote that
3  number in, and Jake okayed it. But I can't say for
4  sure, so I probably shouldn't be commenting on it.
5    Q.    And I guess what I'm wondering is,
6  what – do you know what the substance of the
7  problem was?
8    A.    I don't recall that specific incident.
9    Q.    Then continuing on, page 49, we're now
10 looking at the November, December of '02, into
11 January of '03 quarter. And I'm sorry, that appears
12 to be duplicative of the one we just looked at.
13   A.    This looks like this was a revised
14 copy of it to include notes, is what I'm guessing.
15   Q.    I think you're right. And it does
16 include the half bonus for Jack, correct?
17   A.    The number looks like the commented
18 portion of the one we just looked at.
19   Q.    Even though the --
20   A.    The number, yeah, the bonus percentage
21 does not correspond with what he's being paid. It
22 corresponds to the notes that look like they were
23 handwritten in.
24   Q.    Then on page 50 is the February,
25 March, April quarter of '03. Jack is now listed at

92

1  full bonus, and it appears that he did receive a
2  full bonus, correct?
3    A.    Yes, that's what it looks like.
4    Q.    Next, page 52, is the May, June, July
5  of '03 quarter. And Jack Must is listed as
6  receiving the full bonus, and the numbers indicate
7  he did receive a full bonus, correct?
8    A.    Yeah, that's what it looks like.
9    Q.    Page 53 is for the August, September,
10 October '03 bonus period, or quarter. And it
11 indicates -- it's printed that he's receiving the
12 full bonus, but it appears, in fact, he received the
13 half bonus, correct?
14   A.    Yeah, it looks like there were three
15 manual comments made on these.
16   Q.    And the one opposite Jack's name
17 appears to be a question: "Do we pay Jack full
18 amount?"
19   A.    Yeah.
20   Q.    And then it appears to be "Okay" with
21 an initial. Whose initial is that?
22   A.    That looks like Jake's initial. It
23 looks like Mike's handwriting, the question.
24   Q.    Okay. Do you remember anything about
25 that? This is for the October '03 -- pardon me,

93

1  August through October '03 quarter. When would
2  these bonuses actually have been paid?
3    A.    Skip a month. This one would have
4  been paid December.
5    Q.    Okay. Now, there's a note down at the
6  bottom that seems to say 11/28/03?
7    A.    Yeah. When I say December, I mean the
8  checks were probably issued, say, effective
9  December 1st. The decision on this sheet probably
10 came out the end of November, which I guess would be
11 consistent with all of this.
12   Q.    Okay. Do you know why there was any
13 question about what amount Jack was to be paid on
14 that particular quarter?
15   A.    No. It seemed to be something
16 pertaining to Jake and Mike. I don't specifically
17 remember the time period.
18   Q.    Then the next page, 54, again it
19 appears to be sort of a redraft of the August,
20 September, October '03 quarter, and it indicates
21 that Jack's bonus was cut by Jake, correct?
22   A.    Yeah. It looks like this includes the
23 notes, and this was a revised -- printed a copy of
24 the one similar to what we talked about before.
25   Q.    Right. Do you know why Jake cut Mike

24 (Pages 90 to 93)

94

1 Buscietta's bonus that quarter?
2    A.   Yeah, that I do remember.
3    Q.   Why was that?
4    A.   There's also a note next to John
5 Hebditch.
6    Q.   Yes.
7    A.   We had purchased a GPS positioning
8 system that quarter, I believe. And I'm speaking
9 out of memory, but I tend to remember that there was
10 some issue regarding the purchase of an expensive
11 tracking system that either wasn't being monitored
12 or didn't work effectively. I wasn't involved with
13 that, but there was something to that extent, if I
14 remember right.
15    Q.   Why was it purchased?
16    A.   What do you mean?
17    Q.   Well, what purpose does a GPS system
18 function -- or have for AFW?
19    A.   Well, when you have 200 trucks, you
20 like to know where they are. So this helps keep
21 track of them.
22    Q.   This was a system installed on all the
23 delivery trucks?
24    A.   Delivery or over-the-road trucks -- I
25 don't remember which -- or both, at that period of

95

1 time.
2    Q.   And it didn't work so well?
3    A.   Well, I don't know if it didn't work
4 so well or there was some issue regarding it. I
5 just know what is in my head. And then looking back
6 on the page before, it seems to reference GPS,
7 which kind of matches my memory. And it could have
8 just taken a longer time to be installed. I don't
9 remember the specifics there, but Jake seems to be
10 commenting, as I remember, that, you know, there was
11 some issue with it at that point that he wasn't
12 happy with.
13    Q.   Do you know what it was that raised
14 the question, apparently, in Mike Buscietta's mind,
15 as to whether AFW was to pay Jack the full amount of
16 his bonus?
17    A.   I don't remember the specific issue.
18 What I surmise from this is Jake had some issue.
19 Mike asked, Do you want me to go ahead with this?
20 And Jake said, Pay half. That's what it looks like
21 by reading it. Do I have specific memory of it?
22 No.
23    Q.   Flipping forward to 55, this is now
24 the November, December of '03, into January of '04,
25 quarter. Jack Must is listed as receiving the full

96

1 bonus, and it appears he did, in fact, receive the
2 full bonus, correct?
3    A.   Yeah, that's what it looks like.
4    Q.   Okay. The next page, page 56, to the
5 untrained eye, I don't see anything that pertains to
6 Jack Must on there. Is there anything that you see?
7    A.   No. This looks -- actually this looks
8 like an income statement for our antique store,
9 which I'm not real sure why this was included.
10    Q.   Okay. Flipping forward to page 57,
11 then, this concerns the quarter of February, March,
12 April '04, and indicates that Jack Must is listed as
13 receiving the full bonus. And, in fact, he did
14 receive the full bonus, correct?
15    A.   Yeah, that's what it looks like.
16    Q.   Now, this was the quarter, was it not,
17 that you had a meeting with Mike Buscietta and Jack
18 Must in Mike Buscietta's office, at the managers'
19 meeting, where these bonus checks were presented?
20    A.   See, this quarter ended April. Skip
21 May, June -- are you referring to the signature
22 capture thing?
23    Q.   Well, I believe that was one of the
24 topics that was discussed in Mike Buscietta's
25 office, if that helps.

97

1    A.   Well, that was sort of the topic I
2 remember being discussed in Mike Buscietta's office.
3 So if we're talking about that, it seems about
4 right.
5    Q.   So this would have been the bonus
6 check that was -- that Mr. Buscietta asked Mr. Must
7 to come into his office and talk about?
8    A.   Yeah. Let's assume that date is
9 roughly the first part of June of 2004. Is that
10 what we're --
11    Q.   Yeah.
12    A.   Yeah, that sounds about right.
13    Q.   And then, finally -- well, let me ask
14 you about page 58 again. I don't see anything that
15 pertains to Jack Must specifically on that page. Is
16 that --
17    A.   Again, we have an income statement, an
18 unaudited income statement from our antique store,
19 which I don't think is going to be helpful. To
20 answer your question, no.
21    Q.   The American Classic Market is an
22 antique store?
23    A.   Yes.
24    Q.   Then, finally, page 59, this is the --
25 well, it appears to be the quarter May, June, and

25 (Pages 94 to 97)

98

1  July of 2004, correct?
2      A.   Uh-huh.
3      Q.   The answer is yes?
4      A.   The answer is yes.
5      Q.   And, again, it indicates that Jack
6  Must was to receive the full bonus, but he received
7  zero, and it says, "Term 7/05/04," correct?
8      A.   Yes.
9      Q.   "Term" means terminated, correct?
10     A.   Yes.  His date of employment
11 terminated, I believe, is what the reference is to.
12     Q.   Did you write that?
13     A.   No.
14     Q.   Who did, do you know?
15     A.   That would have been our controller,
16 Bob Schwartz.  I didn't prepare this document.
17     Q.   But you don't know who --
18         THE DEPONENT:  Bob Schwartz,
19 S-c-h-w-a-r-t-z.
20     Q   (By Mr. Buchanan)  So if I ask you why
21 it is that Mr. Schwartz entered "Term 7/05/04," you
22 don't really know, correct?
23     A.   I don't.  I'm guessing it's what he
24 viewed his date of termination to be.  Or, you know,
25 he must have thought it was his date of termination.

99

1  You'll see this, because if you go down to -- like
2  there's another one, Roger Tomasek, it would have
3  been the same thing; that's the date he believes
4  this guy would have left the company.
5      Q.   Roger Tomasek was the sales manager at
6  Compark?
7      A.   Yeah.  And you'll see the term there
8  "term."  So that's when Roger would have quit.
9  You'll also see the term "Effective Date" that
10 something started.  You know, that's basically . . .
11     Q.   How would we determine on those -- and
12 I forget the number, but it seems to me there were
13 two times when Jack's bonus was supposed to be the
14 full bonus, but it was reduced to a half bonus.  How
15 would we determine why that happened?
16     A.   You know, I would like to think there
17 would be a notation in his file, but with Mike and
18 Jake, it's possible that that didn't happen.
19     Q.   Have you seen any notation in
20 preparation for this deposition?
21     A.   I didn't review Jack's personnel file,
22 so I don't know.
23     Q.   What is manager's insurance?
24     A.   I don't know.  I would like to think
25 it's the insurance we purchase to protect us from

100

1  our managers, but I don't think that's correct.
2         Obvious sarcasm.  I don't know.
3      Q.   You've got to be careful.
4      A.   I know.
5         MR. BENSON:  Along those lines, do you
6  mind if we take a quick break?
7         MR. BUCHANAN:  Okay.
8         (A recess was taken.)
9      Q.   (By Mr. Buchanan)  Mr. Zuppa, before
10 the break, I think I'd asked you about manager's
11 insurance.  There's a reference to Jack going on
12 manager's insurance.  And let me just see if I can
13 fast forward this.  It's my understanding that you
14 pay for health insurance for a manager differently
15 than you do for any other employee at AFW.  Is that
16 true?
17     A.   What time period are we talking about?
18     Q.   Well, it would be during the period of
19 time that Jack was a manager.
20     A.   It was different at one point, like
21 the bonus changed, our health insurance changed
22 significantly, too.  There used to be, you know, an
23 insurance provider, and HMO was different.  And, you
24 know, that -- such as the nature of managed
25 healthcare, a lot of things changed during that

101

1  period.
2         There used to be a time where some
3  managers did have their entire, you know, health
4  insurance paid for, but this is going back a ways.
5  Specifically what year that changed, I don't
6  necessarily recall, but it did change.
7      Q.   Do you recall that, for a manager, AFW
8  essentially paid their entire premium?
9         MR. BENSON:  Object to the form.
10 Again, the time frame seems to be critical.
11     Q.   (By Mr. Buchanan)  Well, again, when
12 Jack Must was a manager.
13     A.   Once upon a time, we paid 10 -- an
14 employee could pay 10 bucks, and we would cover for
15 them to get their insurance paid for some plans.  I
16 mean, once upon a time, a lot of things were
17 different.
18         At a time -- yeah, there was a time,
19 probably within the framework when he first became a
20 manager that we did pay, you know, a percentage of a
21 manager's health insurance -- or paid all of it.
22     Q.   And let me ask you this, let me ask
23 the question this way:  Is it different now?
24     A.   Everything's different now.
25     Q.   Do they pay less than all for a

110

1  to have to take a physical, or, you know, go to each
2  employee and say, Geez, tell me about your health,
3  tell me about your age, tell me about your
4  demographics, I mean, we bought group insurance.
5      Q.    Fair enough.  But did your analysis
6  involve some itemization of who's actually using
7  this insurance and to what extent?  In other words,
8  do older workers use -- were they using the
9  insurance?  Were they causing the higher cost of
10 health insurance compared to younger workers?
11     A.    I don't know that we ever broke it out
12 that way or if that was the direction we were going.
13 That was not the significant driving force of what
14 was going on.  We did not manage claims.  Nobody
15 managed claims.  That was the huge -- we had no case
16 management.  That was the issue.  That was the
17 elephant in the elevator on healthcare with American
18 Furniture Warehouse.
19          And that information specifically, I
20 know that I wouldn't have been in agreement with
21 that.  I mean, you know, it's -- that was just
22 not -- that wasn't a factor we were using.
23     Q.    Were there any other programs
24 presented to you other than Kaiser's?
25     A.    Yeah.  You know, the market isn't as

112

1  reads -- it was typed by Mike.  I can tell that.
2      Q.    Why?
3      A.    Font, styles, the way you talk.  I
4  mean, it's not something -- you write in the same
5  fonts; you have a certain tone in whatever.  This is
6  Mike.
7      Q.    Let me handle it this way, then:  Did
8  you observe any of the circumstances that gave rise
9  to this complaint about him?
10     A.    I don't recall.  This was 2002.
11     Q.    Your signature appears on the line
12 labeled "Witness."  Does that mean you witnessed --
13     A.    I witnessed --
14     Q.    -- the signature, or you --
15     A.    I witnessed --
16     Q.    -- actually saw these things happen?
17     A.    I -- I --
18          MR. BENSON:  Go ahead.  You just
19 jumped on each other.
20          THE DEPONENT:  Yeah, sorry about that.
21 That's on me.
22          It would have meant that I witnessed
23 this review.  There's also a portion scribbled out
24 there that could have been based on what I said.
25 But, no, it does not mean that I witnessed the

111

1  big as it used to be.  I mean, there's been
2  consolidation.  There's not ultimate choices
3  anymore.  So you would look at typically three or
4  four other choices that would vary in terms of, you
5  know, co-pays, what's covered, how cases are
6  administered, where do you start picking up
7  insurance?  You know, it's all those sort of
8  factors, and you make the best decisions that you
9  can make, you know, looking at spreadsheets.
10          And, ultimately, you're going to turn
11 to your broker and say, What do you think?
12          (Exhibits 29 and 30 were marked for
13 identification.)
14     Q.    (By Mr. Buchanan)  Mr. Zuppa, I'm
15 going to show you what we've marked as Exhibits 29
16 and 30.  And I want to ask you about the
17 circumstance that gave rise to these.
18          Apparently, in July of 2002, there was
19 a writeup which you signed as a witness.  It's dated
20 July 6, 2002 -- this is Exhibit 29 -- having to do
21 with employees coming in late at the Westminster
22 store.  Obviously, it was written up with respect to
23 Jack Must.  Do you remember any of the circumstances
24 of why this issue came up at that time?
25     A.    Specifically, I don't remember.  It

113

1  activity; just that I witnessed the fact that he was
2  being reviewed.
3      Q.    (By Mr. Buchanan)  Okay.  Now, what
4  did it consist of?  Was there a time when Jack was
5  physically present and he was presented this piece
6  of paper and said, Please read it and sign it?  What
7  do you remember?
8      A.    I don't remember.  They were all
9  signed the same day.  Given the date of it, it could
10 have happened at a manager meeting; I don't know.
11 It looks like we all signed it at the same time, but
12 I can't say specifically on this.  It was too long
13 ago.
14     Q.    Do you know who initiated this?
15 You've said Mike Buscietta typed it.  Does that mean
16 he would have initiated it?
17     A.    It would have meant that he or Jake
18 initiated this.  Jake was out in the stores more,
19 but it could have been either Mike initiating it or
20 Jake telling him to do it.  I'm saying that because
21 if it would have came from me, I most likely would
22 have done this myself.
23     Q.    Let me ask you about Exhibit 30, which
24 is a letter purportedly from Jake Jabs to Jack Must.
25 If you want to review that briefly, I will give you

29 (Pages 110 to 113)

**114**

1 some questions.
2 A. Yeah, this I did type.
3 Q. You typed it?
4 A. Yeah.
5 Q. Okay. Now, this is six days following
6 the 2002 writeup, correct?
7 A. Right.
8 Q. So you authored this for Jake's --
9 A. Yeah.
10 Q. -- signature, correct?
11 A. Yes.
12 Q. Do you remember why you did that?
13 A. I believe the line -- not corporate,
14 not Mike, not Fran, not Andrew. I believe,
15 following this writeup, either Fran or Mike or
16 myself had been in the store, had heard tones like:
17 Well, you know, you guys have got to go do this
18 stuff, referring to Jack talking to salespeople
19 about, you know, the review and telling them to do
20 things, and him using the term, Well, you know,
21 corporate wants you to do this. You have to do it
22 because, you know, the senior management is making
23 you do it. And the tone behind it is that managers
24 need to represent the company, and don't use, you
25 know, us as a scapegoat.

**115**

1        And if I remember right, that had
2 occurred in the interim between the review -- and
3 Jack had gone back and badly handled it, and that
4 had been, you know, conveyed back to either Fran or
5 Jake or myself. It, apparently, had been back to
6 Jake, because while it's me writing it, it's, you
7 know, Jake's -- this is me writing for Jake.
8        Q. You didn't witness any of this either,
9 correct?
10 A. No, I didn't.
11 Q. And you can't tell me any more
12 specifically about where the actual observation came
13 from?
14 A. No. This was 2002.
15 Q. Right. And we have asked for the
16 original of this document, preferably a signed
17 version of it, and we've been told there is none or
18 it can't be located. Do you have any idea where the
19 original of this document would be?
20 A. This looks like Jack would have faxed
21 it back. So the original would be a faxed copy, and
22 Jack would have retained the original.
23 Q. Do you know if there's an original
24 with Jake Jabs' signature on it?
25 A. No. Jake may not have actually signed

**116**

1 this. If I authored it and sent it over to Jack to
2 sign it, he may not have signed it.
3        Q. Well, let me tell you that throughout
4 his personnel file, Jack Must's personnel file, Jake
5 Jabs initials or signs a huge number of documents,
6 everything from pay raises to vacation requests,
7 leave requests -- everything else. And, yet, here's
8 a letter to one of his store managers, being very
9 critical of his performance, and it's not signed.
10 A. Well let me tell you, after 11 years
11 of writing for Jake, and stuff, I keep a digital
12 signature of Jake's. Sometimes, if I'm sending out
13 a fax, I may not have used it. All I can tell you
14 is, unless Jack is disputing having ever signed
15 this, this was originated by Jake. It's Jake's
16 wording, written by me. By the way, I did most of
17 the correspondence for Jake, whether it's personnel
18 or, you know, writing letters to a politician or
19 writing an article for a trade magazine. When you
20 work with somebody in that capacity since 1998 -- I
21 helped author his book. You know, I've helped him
22 with numerous articles. This is Jake's tone,
23 written by me, faxed over for Jack to sign, probably
24 faxed back. That's it.
25        Q. Can you say of your own knowledge that

**117**

1 Jake Jabs ever saw Exhibit 30 and approved its
2 wording and so forth?
3        A. I would say the content is Jake's,
4 yes. To answer your question, I cannot say with
5 certainty that he read the final product. Can I
6 absolutely say that he initiated this, that it's the
7 context and tone? Yes, and I can say that because I
8 have authored pretty much everything he's written
9 for a decade.
10        Q. While we're on the topic, what was
11 your role in writing his book? You're talking about
12 American Tiger?
13 A. Yes.
14 Q. What was your role in that?
15 A. I was given somewhere between nine and
16 14 days to get him a final product. I went out and
17 found an author. I sat at her house. I watched her
18 clean things up. I read through the blueprints. I
19 omitted many spelling errors, numerous grammatical
20 errors, inflated the content so that you could get a
21 binder on it so that it looked like an actual book
22 instead of a pamphlet. I added pictures, and I
23 delivered to him 14 to 21 days later a completed
24 book at high point, as asked.
25        Q. So when it says it's by Jake Jabs, in

30 (Pages 114 to 117)

Calderwood-Mackelprang, Inc. 303.477.3500

122

1  managers because you rely on them. I can't be out
2  in the stores as much as I honestly want. You rely
3  on those people. There's only, let's say, 10 or 11
4  people that are in these positions, so there's no
5  excuse, in my opinion, to not have a direct
6  relationship with them.
7       So I go out to the stores, and I'm
8  already aware of what Jake's opinion is, that
9  there's not enough salespeople, and this has been
10  going on for a while. And I'm looking at Jack and I
11  would ask him things like: Jack, where are your
12  salespeople? We just walked the store. That's an
13  easy store because it's not big, you can pretty much
14  see stem to stem, you can walk around it pretty
15  quickly. And I'm watching customers, and I'm
16  watching couples, and I've worked in furniture for a
17  very long time, and I've worked in retail a very
18  long time, and you're witnessing things. And you're
19  specifically pointing out: Jack, those people
20  should be with a salesperson right now. Where are
21  they?
22       Oh, I've got four people in the store.
23  Well, we just walked the store. I'm looking at one
24  over there. Where are the other people? Sometimes
25  there's one person; sometimes there's two. But

123

1  it's 5 o'clock now. When people come into furniture
2  stores as couples to make buying decisions, they do
3  that generally after work. It's not the middle of
4  the day. So between 5, 7, 8 o'clock, not only do
5  you have customers in the store, you have buying
6  customers in the store. Both decision-makers are
7  there. You don't have to worry about the husband is
8  there alone or the wife is there alone. Now you've
9  got couples in there; your decision-makers are
10  there. And I would observe these people, and I
11  would take Jack over and show him. Or customers
12  would ask us for help while we were walking around
13  looking at merchandising or other things, and I
14  would point that out to Jack.
15       Q.   Let me stop you and ask you something.
16  You're referring to some specific episodes that
17  happened between June 14th, 2004, when you became
18  general manager, and when you terminated him on July
19  6th, 2004, correct?
20       A.   Sure.
21       Q.   How many episodes are we talking
22  about?
23       A.   I'm going to say four occasions during
24  that period.
25       Q.   And did you -- I know there's a memo

124

1  in here, which I'm going to show you in a moment.
2  It's dated July 2004. Do you have any more specific
3  information about what you saw on what particular
4  occasions and in what circumstances than that
5  written document?
6       A.   No. I mean, I had specific
7  conversations with Jack when I was out in the stores
8  during that period.
9       Q.   One of which he recorded?
10       A.   Yes, yes.
11       Q.   And you've seen a transcript of it?
12       A.   Yes.
13       Q.   Have you listened to the recording
14  itself?
15       A.   No, I looked at the transcript.
16       Q.   Does the transcript remind you of the
17  conversation itself?
18       A.   Yeah, it wasn't unlike previous
19  conversations. That one was starting to express
20  growing frustrations on the same issues.
21            (Exhibit 31 was marked for
22  identification.)
23       Q.   (By Mr. Buchanan)  I'm showing you
24  what we've marked as Exhibit 31, which, as I
25  understand it, is a transcript of a conversation

125

1  that you had with Jack Must and Tom Ward at the
2  Westminster store on June 16th, 2004. Is that the
3  transcript that you reviewed?
4       A.   As far as I know, it is.
5       Q.   And this was a conversation that
6  occurred, as I understand it, back in the warehouse
7  area of the Westminster store?
8       A.   I don't know. It appears to be a
9  portion of a conversation. Where it occurred in the
10  store and whether or not it was that exact date, I
11  don't know. It's not inconsistent with
12  conversations Jack and I were having at that period.
13  It is an incomplete conversation. It picks up
14  somewhere in the middle. It ends before this
15  conversation ends.
16       Q.   Is there any portion of that
17  transcript that, reading through it, it struck you
18  as just downright inaccurate, can't be right, must
19  have been recorded wrong?
20       A.   No. I didn't have a huge problem with
21  the transcript. I mean, I was becoming frustrated
22  with Jack, and that's obvious. When you have the
23  same conversation over and over and you're not
24  getting anywhere. And having experienced Jack, I'm
25  sure you're familiar.

130

1  out of that store. Jack should have been moving up
2  through the company. He should have moved on a long
3  time ago. I mean, he's basically in a position
4  where I'm defending his job, when he should have
5  moved on from there. This is not a hard store to
6  run. It's an easy store to run. He has been given
7  specific instruction that is not hard to achieve,
8  and he's either ignoring it or he's just not doing
9  it. He either doesn't care or can't do it.
10     Q.   What do you mean by, "He should have
11  moved on long ago"?
12     A.   He should have been in a bigger store.
13  He should have had more responsibility. He should
14  have been managing more people.
15     Q.   And, yet, you tell me that Jake Jabs
16  had this horrible opinion of him. How would he do
17  that? What opportunity would he have --
18     A.   He had all the opportunity in the
19  world. He had all the opportunity during the period
20  he was there to change people's impressions, to step
21  up, to improve his relationship with Jake, to follow
22  simple instruction, to work on his relationship with
23  Mike Buscietta, which is important when you work in
24  management. You need to get along with senior
25  management; you absolutely do. I have to. I don't

131

1  have that choice. All managers have to do that.
2  You need to maintain a respectful -- it does matter
3  what your bosses -- this is not a janitor job. This
4  is a manager job. You are in charge of human
5  beings. You are in charge of careers. You are in
6  charge of a business that most companies would be a
7  stand-alone company by itself. You're in charge of
8  all those things. So all of these things matter.
9  And he had opportunity more than anybody I know to
10  remedy all those situations during those years, and
11  he didn't. People's opinions didn't change of him.
12     Q.   Okay.
13     A.   Sorry.
14     Q.   I'm just asking for specifics. And if
15  you can give me specifics, that's what I want.
16     A.   Okay. Did I do okay, or do you want
17  something else?
18     Q.   If you've told me everything you know.
19     A.   No, I've got something else for you.
20  I don't remember a single contribution that he made,
21  a single idea that we implemented, a single thing
22  that he brought to the table during that period of
23  time.
24     Q.   During the three years he was
25  managing?

132

1     A.   Yeah, yeah. If he did, I don't know
2  what it was. You know, contribution is a big deal.
3  So you've got this guy who's not progressing, who's
4  not moving along. Forget the downside, what's your
5  upside? What's your upside? What does he bring?
6     Q.   You referred to bringing in a
7  ball-breaking guy to come in and run it. What did
8  you mean by that?
9     A.   Somebody that's effective. I should
10  have used the word "effective." I used
11  "ball-breaking." I believe the term is hyphenated.
12  It was colorful and it was frustrating, and the word
13  I should have used was "effective," but I used that
14  term, meaning just get this done. You've been told
15  what to do. Just do it. Please do it.
16     Q.   And "this" in that sentence, the
17  primary focus seems to be: Have enough salespeople
18  in here when there are customers in the store?
19     A.   Why wouldn't you have just had them
20  lined up like a basketball zone defense? If this is
21  all they wanted, meaning senior management, why
22  wouldn't you just go out and do it? Why would you
23  continue to have these conversations with me, who I
24  will assure you is the last person on the plant you
25  want to have tell you a second time to do something,

133

1  so unaccustomed to it, so -- I mean, why wouldn't
2  you just do that? Why would you allow people to
3  keep talking about that, over and over again?
4     Q.   Okay. Did you -- I'm looking at
5  page 4 now, lines 12 and 13. You talk about -- 11
6  through 13 -- you say, "I think we need to do a
7  better job of flushing out dead weight and getting
8  some more aggressive help."
9           Now, did you have the opinion that
10  some of his salespeople were not up to snuff, were
11  not very good?
12     A.   Well, I had the opinion that you would
13  ask him, "How many salespeople do you have here
14  tonight?" He would say, "Four." But there would
15  clearly be one or two in the store.
16           You've got two possibilities: Either
17  Jack is letting them leave during critical times or
18  they're walking out, hitting the McDonald's over
19  there or smoking somewhere outside, you know -- so
20  if you want to give Jack the benefit of the doubt --
21  and I really did for a long, long time; I absolutely
22  wanted to give Jack the benefit of the doubt -- but
23  if you give him the benefit of the doubt, it means
24  that you have people just wandering out the doors
25  and walking around as they will, and they're not

34 (Pages 130 to 133)

Andrew Zuppa

134

1 doing a good job at being responsive to you.
2    Q.    Let me ask you something. You had the
3 authority to fire people, didn't you?
4    A.    Oh, absolutely.
5    Q.    Did you ever fire any of his
6 salespeople?
7    A.    No, I wouldn't have had the – I would
8 have had anecdotal experiences with them
9 individually.
10    Q.    So what?
11    A.    Well, that's a fine company.
12    Q.    You've just stated that when you were
13 in there, you would see -- giving Jack the benefit
14 of the doubt, these people are just walking out on
15 him -- did you ever see anybody do that?
16    A.    No. I didn't see hardly anybody at
17 all. That was the problem.
18    Q.    At one point, you referenced seeing
19 three people smoking out front. Do you remember
20 that?
21    A.    At one point -- I don't know.
22    Q.    Did you fire them?
23    A.    No, I didn't fire them.
24    Q.    Why not?
25    A.    Why would I fire somebody else's

135

1 employees?
2    Q.    Well, they're AFW employees, aren't
3 they? And you're the general manager of AFW.
4    A.    This is the way that it works: I talk
5 to the store manager. They fix the problem. I
6 don't go around firing salespeople and whatever. I
7 talk to the manager. Jake talks to me; maybe he
8 talks to the store manager. I talk to the store
9 manager. They fix the problem.
10         Back to this memo here before, where
11 it talks about the company -- no, let me finish; you
12 asked the question, I'm going to finish it, because
13 this is relevant, and it's specific to your question
14 – and specific to your question is: I don't want
15 the company blanketed for every decision we make.
16 You run your store; you run it like a business. If
17 I say, "This is how it works," this is how it works.
18 You deal with it.
19         And if you're going to walk up and see
20 somebody at a specific moment in time, I don't know
21 if this is the best employee in the world, I don't
22 know if I caught you at the worst moment -- and,
23 wow, what a fascinating company this is -- I'm going
24 to fire you based on an anecdotal experience that I
25 have when I'm there. I don't know if you're Mother

136

1 Teresa or somebody that's not that. That's why you
2 have store managers. That's why you pay them these
3 dollars.
4    Q.    So, in other words, you felt it was
5 his job to fire whoever he felt it was appropriate
6 to fire and not yours?
7    A.    I was making available to him any
8 tools that he needed to fix the problem. If I'm
9 wrong about what I'm observing, fine, fix it your
10 way; do whatever you want. I'm giving Jack as much
11 ammunition to fix the problem, and as much leeway,
12 as I possibly can. I'm giving him ultimate
13 decision-making to -- you want to keep them, Jack,
14 you keep them. You want to get rid of them, you get
15 rid of them, but you fix this problem. It's on you;
16 it's not on me. We've got 330 salespeople; it's not
17 my job. I've got 11 store managers; they're my job,
18 and I take that very, very seriously.
19    Q.    One of the things you say, on page 4
20 of this transcript, is, "We're doing less business
21 in this store now than the day we opened the son of
22 a bitch."
23    A.    Yeah, that sounds true.
24    Q.    Is that true?
25    A.    Yeah, that sounds true, yeah, and that

137

1 sounds like something I would say.
2    Q.    Based on what?
3    A.    Based on what? I'm sorry, I don't
4 understand what --
5    Q.    Well, how do you know that you were
6 doing less business than the day you opened the son
7 of a bitch?
8    A.    On literacy. I can read a sales
9 report.
10    Q.    And that's my question. Had you
11 actually studied sales reports?
12    A.    Yeah, once or twice along the way,
13 sarcastic, meaning every morning.
14    Q.    My question is: Can you please
15 quantify for me how much less business you claim
16 this store was doing at this point in time,
17 June 16th, 2004, than it had before?
18    A.    Our sales were not up at that store.
19 Our sales were down at that store from our initial
20 full year. That is true.
21    Q.    The initial full year was what?
22    A.    1999.
23    Q.    And so you made more money in that
24 store --
25    A.    That's not what I said. I was talking

35 (Pages 134 to 137)

178

1    any –
2        A.   We never looked at that specific
3    subject because it wasn't in the top two or three
4    major points in the argument. We did not assume
5    that we had. We did not look into it.
6        Q.   Do you recall a time shortly after
7    this – well, let me ask you -- you've talked about
8    the signature capture incident or issue – were
9    there any other issues discussed at that meeting?
10       A.   We were discussing personal
11   responsibility, ability to take responsibility for
12   your business and your specific job functions,
13   raising your voice to the company's general manager.
14   And then, at the end, Jack flips out: We had a good
15   May. And then we had to have that conversation. So
16   that was sort of a –
17       Q.   Okay. You disagreed that they had a
18   good May?
19       A.   We were talking about personal
20   responsibility. We were talking about basic job
21   function.
22       Q.   Let me stop you. Did you disagree
23   that they'd had a good May?
24       A.   Yes.
25       Q.   Why?

179

1        A.   The numbers weren't outstanding. They
2    were roughly similar to months that we'd had -- May
3    is a good month for us. Those numbers weren't
4    extraordinary. That, I would say, would have been a
5    bad month in what my opinion of the business should
6    have been.
7            But largely past that, it was just not
8    the issue. The central theme with Jack, if I had to
9    put something next to his name, would be: I don't
10   get it. I don't get it. Jack Must: I don't get
11   it. I can't stay on point. I can't address what's
12   in front of me.
13           Again, I don't have to tell you about
14   that. You know that. Now, here we were again on
15   this same subject.
16       Q.   You agree that the store earned,
17   according to these documents, in May of 2004,
18   $1,021,856, correct?
19       A.   I don't know. Again, I'm unfamiliar
20   with that. I just prefer going back to this, if
21   it's okay.
22       Q.   That's okay. It's my understanding
23   that this is the digest of that information.
24       A.   Well, you can work it out with them as
25   to what that is.

180

1            MR. BENSON: Page 65. I'll speed up
2    the process.
3        Q.   (By Mr. Buchanan) You acknowledge
4    that's what they made in May of '04?
5        A.   That's what they sold.
6        Q.   Meaning that's the gross revenues?
7        A.   Yeah, sales.
8        Q.   I would love to continue the
9    conversation a little further on that issue, but I
10   need to move along.
11           (Exhibit 36 was marked for
12   identification.)
13       Q.   (By Mr. Buchanan) I'm showing you
14   what we've marked as Exhibit 36 to your deposition,
15   Mr. Zuppa. This is a three-page document. Is this
16   your handwriting?
17       A.   Yes.
18       Q.   And this document is dated July 2004,
19   correct?
20       A.   Uh-huh.
21       Q.   The answer is yes?
22       A.   Yes. I'm sorry. Yes.
23       Q.   Do you recall the actual day that you
24   wrote this out?
25       A.   I'm guessing it was -- I had a final

181

1    conversation with Jack where we discussed his moving
2    back into sales. He had made a couple of specific
3    comments to me, so I decided I should probably sit
4    down while things were fresh in my head and try to
5    briefly recap this. It was not meant as a complete
6    accounting. It was me jotting down notes that I
7    assumed some day I may need again based on what Jack
8    had said to me.
9        Q.   So this was actually prepared after
10   you terminated Jack?
11       A.   Yes, it was the --
12           MR. BENSON: Object to form, Counsel.
13   I apologize. You'd mentioned that earlier. You're
14   characterizing this as a termination, and there's a
15   dispute with that.
16       Q.   (By Mr. Buchanan) You didn't have a
17   problem with my calling it a termination, did you?
18       A.   I never caught it. I never caught it.
19   Just for the record, I offered Jack a chance to
20   transfer back into sales. He declined.
21       Q.   But you terminated him as a store
22   manager, didn't you?
23           MR. BENSON: Object to form.
24           THE DEPONENT: I don't think that
25   characterization, as a term that you would use in

182

1  the sense of employment, is accurate.
2      Q.   (By Mr. Buchanan)  You didn't fire him
3  as a store manager?
4      A.   Let's be clear what we're talking
5  about, so we don't have to get into the syntax
6  things.
7      Q.   Let me ask you a direct question:  Did
8  you fire Jack Must as a store manager?
9      A.   Let me answer it as direct as I'm
10 going to be able to.
11         I offered him a transfer back into
12 sales, a position for which he was originally hired.
13 He was no longer going to be the store manager
14 there.
15     Q.   Does that mean he was terminated as
16 the store manager?
17     A.   I don't think I can define that any
18 better than what I did.  Rather than using a word
19 that has an innocuous meaning at this point, I
20 attempted to clearly define the specifics of what I
21 did.  I can't do better than that.  And if you ask
22 me 50 times, I'm not going to be able to answer the
23 question --
24     Q.   Let me ask you the question this way:
25 Whatever happened on July 6th, 2004, with respect to

183

1  Jack Must's employment, if he had come in the next
2  day, sat down at the manager's desk and started
3  doing manager's stuff, would you have been concerned
4  about that?
5      A.   I would have been concerned that he
6  was insane because we had discussed the point that
7  he wasn't going to do that anymore, that his option
8  was to go back into sales,
9      Q.   And did you intend, when you had your
10 conversation with him on July 6th, 2004, that he
11 would become a salesperson?
12     A.   Did I think that's what he would do?
13     Q.   Yes.
14     A.   Yes.
15     Q.   Where?
16     A.   Anywhere other than that store.
17     Q.   Not in Westminster?
18     A.   Other than that, anywhere else.
19     Q.   Did you tell him that?
20     A.   Yes.
21     Q.   What did you say about that?
22     A.   I told him that he had the option to
23 return back into sales.  His immediate answer was:
24 I don't think I can afford that.  I'm not going to
25 do that.  I will see you in court.

184

1      Q.   Did you then feel that the matter was
2  resolved, that that was all that needed to be said
3  about it?
4      A.   No, I took one more shot at him.
5      Q.   Tell me what you mean by "one more
6  shot at him."
7      A.   I said, "Jack, you can go back into
8  sales.  You can go with that.  I'll help you work
9  with schedules; I'll help you work with whatever you
10 want.  I want you to take some time to think about
11 it."
12         "No, I can't do that.  I can't afford
13 that."  That was the end of it.
14     Q.   Did you give him any specifics about
15 where, when, what position he'd have?
16     A.   I was attempting to.  In fact, I had
17 told him, I'm happy to work with you on schedules.
18 I said, You can't work in sales here.  If you want
19 to go to Thornton, if he wanted to ask me any amount
20 of questions on the subject that he wanted to, I
21 would have been prepared to do that.  I was also
22 prepared to give him a period of time to think it
23 over, but that was not an option given to me.
24     Q.   The next day, when he didn't show up
25 at work, did you call him up and say, "Jack, where

185

1  are you?  We want you as a salesperson."
2      A.   The next day, the last thing he said
3  to me was repeating the phrase, I'll see you in
4  court.  The first time, I might have let that go,
5  but the second time, I guess I knew where he was
6  going.
7      Q.   So you didn't call him up --
8      A.   No, I'll see you in court pretty much
9  says everything.
10     Q.   In other words -- well, strike that.
11         Coming back to Exhibit 36, was it
12 right after that that you sat down and wrote this
13 down?
14     A.   I believe it was the next morning.
15     Q.   I want to make sure I understand some
16 things.  We've talked about a great deal of what's
17 in here already, so I don't want to overdo this.
18 When you say that you'd been leaving FC early does
19 that mean Fort Collins early?
20     A.   Yeah, I'd been leaving Fort Collins,
21     Q.   Why would you be in Fort Collins?
22     A.   Because as I did tours of stores, I
23 wanted to work around Denver traffic.  So I tried to
24 be out of the metro area and up in Fort Collins.
25 That gave me the option later to largely miss

47 (Pages 182 to 185)

Andrew Zuppa

186

1  southbound traffic, because you were above it,
2  north, take the Northwest Parkway, which you're the
3  only car on it and can drive backwards at 100 miles
4  an hour, if you have to. I had a toll pass for
5  that.
6          So you take that over to Wadsworth,
7  and you can shoot over, and it was a good route to
8  take. That way I could hit Southwest as my last
9  store, Store 20, South Wadsworth, Lakewood, and then
10 I could be finished and could go home at 8 o'clock
11 or whenever.
12        Q.   Now, it says, "Jack won't stay after 5
13 to 6 p.m., even when I called to say I was coming.
14        A.   Yeah.
15        Q.   You mean you called and said to Jack,
16 "Please wait for me," and he'd leave?
17        A.   I would have to start doing that
18 because if I came any time after that, he wouldn't
19 be there. So as much as possible, I would try to
20 tell somebody: Go ahead and give him a call, let
21 him know I'm coming.
22        Q.   And when you did that, did he stay?
23        A.   Not always. Sometimes I missed him.
24 In fairness, I was not always there by 5:30 or 6;
25 sometimes I was there at 6:30 or 7. But he was not

187

1  waiting for me, and then I was there with Tom.
2        Q.   And you had an understanding, didn't
3  you, that he was working from whenever they opened
4  in the morning, or before they opened, until 6, and
5  that it was Tom or Joe Buzzuto (phonetic) that was
6  closing the store?
7        A.   Yeah, except if I was coming, in which
8  case I so didn't care. I didn't. I mean, I tried
9  to work my schedule to be there as close to 6 as I
10 could. I mean, I was willing to interrupt my day.
11 But at the end of the day -- you know, it's not a
12 bank; these are not banker's hours. This is part of
13 what you sign on for. And, trust me, if my boss was
14 coming, I would absolutely be there, if it
15 was 10 o'clock at night.
16        Again, I don't get it. I never will.
17        Q.   It says here that you found one
18 salesperson here on one night and two on another
19 night, correct?
20        A.   Yes.
21        Q.   Can you specify which nights those
22 were?
23        A.   Previous visits. I don't know.
24        Q.   Is there any way to reconstruct it?
25 Do you keep any records --

188

1        A.   No, I didn't. Some of the buyers keep
2  sheets or would have them for a short period, but I
3  didn't fill them out. I didn't keep -- I didn't
4  keep notes. That's why I sat down with this. And I
5  only did it after Jack surprised me with the fact he
6  wasn't returning to a sales position.
7        Q.   That actually surprised you?
8        A.   Yeah, it did. Yeah, it did.
9        Q.   It was Jack's perception that he would
10 make about half as much as he was making in a sales
11 position.
12        A.   Yeah, I didn't get that. Jack was a
13 low-paid manager. Him making that kind of money in
14 sales should have absolutely been achievable.
15        Q.   Let's assume that that's his
16 perception. Do you believe that it's reasonable for
17 somebody not to take a job at half the pay that
18 they've been receiving?
19        A.   I don't think it's reasonable for him
20 to have assumed that he would have done that.
21 Particularly given his experience with the company,
22 he should have known that was not the case.
23        Q.   Could you live on half the money
24 you're making now?
25        A.   I could have lived on what I made in

189

1  sales, which I'm guessing would have been roughly
2  what Jack made, which shouldn't have been that much
3  different than what he was making as a store
4  manager. What he was making as a store manager was
5  absolutely achievable for someone with Jack's
6  experience.
7        Q.   Are you married?
8        A.   Yes, I am.
9        Q.   Do you have children?
10        A.   No, I don't.
11        Q.   And so with respect to any particular
12 night where you claim there was one salesperson on
13 one night and two on another night, you can't say
14 when they were?
15        A.   Well, a couple of things: I'm not
16 claiming that. That's what happened. And
17 specifically, no. I was there trying to salvage
18 Jack as a manager. If I honestly was more concerned
19 about trying to fire him or get rid of him, yes, I
20 probably would have done a better job of notating
21 things. But I assumed, like I always assume with
22 our managers, that again when I brought stuff to
23 their attention, that they would just resolve it.
24 And if Jack would have been half as interested in
25 wanting to resolve these issues rather than opening

48 (Pages 186 to 189)

190

1  up tape recorders, he probably would have still been
2  there.
3        So it was my intention to try to
4  salvage this relationship, not take it south. If
5  that had been, given my HR background, given my
6  management and given my surprise as to which
7  direction he was honestly going, I would have had
8  that documented. But, you know what? Am I bad? I
9  didn't.
10       Q.    Mr. Zuppa, let me ask you very
11  directly: Is there any way to reconstruct what two
12  nights you're referring to when you make those
13  statements in this document, Exhibit 36?
14       A.    I don't know. Are there additional
15  tape recordings? Other than that, I don't have an
16  answer. I guess I would have to say no.
17       Q.    Then my question is: Did all
18  salespeople punch a clock at Westminster in those
19  days?
20       A.    I'm sure -- there is a timekeeping
21  record. They are commissioned people. And whether
22  or not they're on the clock and whether or not
23  they're actually in the store are very separate
24  issues. For instance, you can look around the
25  store. They wear red. If you walk the store, you

191

1  can see the store. So whether they're punched in or
2  whether they're actually in the store at that time,
3  very, very different issues, very different, and a
4  large part of what the ultimate problem is.
5        Q.    One of the things you discussed with
6  Jack in the middle of June, the conversation that
7  was recorded, was whether they could go from wearing
8  the red shirts to, I'll call them, street clothes,
9  shirts and ties. Do you know whether they ever did
10  that?
11       A.    Shirts and ties?
12       Q.    Yes.
13       A.    I don't think it would have been an
14  option for them. When we talk about shirts and
15  ties, that still assumes they're going to put a vest
16  over it.
17       Q.    A vest which is a distinctive color?
18       A.    Bright red, blood bright red.
19       Q.    What you're telling me is that the
20  salespeople that you would expect to see in the
21  store would either be wearing a red shirt or a red
22  vest?
23       A.    Absolutely, as a condition of
24  employment.
25       Q.    You mentioned that he complained to

192

1  Dale about having to work on July 4th. Did he, in
2  fact, work on July 4th?
3        A.    Yeah, I believe that he did.
4        Q.    And he also worked on July 5th, didn't
5  he?
6        A.    The way the specific days fell, he
7  would have been expected, most likely -- if July 4th
8  was on a Sunday --
9        Q.    And I believe that's correct.
10       A.    If July 4th fell on a Sunday, he would
11  have been expected to work Sunday and Monday.
12       Q.    And he did that, right?
13       A.    Yeah, as far as I know.
14       Q.    Did Dale Pepper go out to see if he
15  was there?
16       A.    No, I believe I was around one of
17  those two days. I was out at the stores. I was
18  trying to remember, it was either the 4th or the
19  5th. I believe Jack was there. I didn't believe
20  that he wasn't.
21       Q.    Was that the purpose of going out
22  there?
23       A.    No, on the holidays, I go out to the
24  stores. There's nobody I can do business with;
25  normal people are off work at those times. When you

193

1  work in retail, this is when you work. I can't do
2  business with anybody -- I can't be on the phone, so
3  I might as well be out in the stores. You're not
4  necessarily looking for managers. You're just
5  making sure that things look like they're running.
6        Q.    So despite whatever complaints he had
7  about working on the 4th, in point of fact he did
8  work on the 4th?
9        A.    Yes, he worked the mandatory days that
10  he was required to work as a condition of his
11  employment. He did the very basic that was required
12  of him on those days.
13       Q.    It says here that "Tom complained" --
14  I'm looking at Exhibit 36 again -- it says, "Tom
15  complained that Jack is negative figures/influence
16  on store. Talking negative about
17  Company/me/Mike/Dale. Hurting store." Correct?
18       A.    Yeah, right.
19       Q.    Tom is Tom Ward?
20       A.    Tom Ward.
21       Q.    And when did he say these things to
22  you?
23       A.    On some of the nights that I would go
24  out that I missed Jack, I was there with Tom, and
25  Tom would bring these subjects up, that Jack would

198

1    Dale's side of, that he had told me about --
2        Q.   Just so we're clear about this, this
3    is the phone conversation where he's calling up and
4    talking about working on the 4th?
5        A.   Yes.
6             Given the fact that, in one way or
7    another, he had basically told Dale, you know: I
8    will work if I decide to work; if I don't, I won't.
9    So if I show up, it's purely my deal. What I had
10   witnessed with Jack and Mike directly, specifically,
11   I was wondering: Is this a guy that's going to work
12   with me? Do I have any reasonable expectation that
13   if I tell him to do something that's important, it's
14   going to be important to him and it's going to get
15   done?
16            Throw that on top of what was going on
17   with the salespeople thing, where, honestly, as a
18   store manager, I would have just had them lined up
19   as ducks, if that's what it would have came down to
20   -- why wouldn't you? Why would you care? Was he
21   trying to prove a point? Did he not get it, or did
22   he just not care? Quite frankly, either way, who
23   cares at that point? I certainly didn't. I had ten
24   other guys to deal with who created none of these
25   issues for me.

199

1        Q.   Salespeople have to be supervised,
2    don't they?
3        A.   Oh, absolutely.
4        Q.   Let's talk about the meeting you had
5    with him on July 6th.
6        A.   Okay.
7        Q.   As I understand it, you came in the
8    store approximately 5:40 that evening, correct?
9        A.   I don't know.
10       Q.   He was still there?
11       A.   Well, obviously, he was still there.
12       Q.   Tell us what happened.
13       A.   July 6th being the conversation we had
14   about him moving back into sales?
15       Q.   If you choose to put it that way, yes.
16       A.   Well, how would you put it?
17       Q.   I'd put it as a termination.
18       A.   So let me get this straight. If I ask
19   you to go back into the job that you were originally
20   hired for, but you still had your employment, at the
21   end of the year, somebody still gave you a tax
22   document, and you still got a check every week, you
23   would regard that as being terminated?
24       Q.   You bet. Being terminated from being
25   the store manager, you bet.

200

1            Now that that debate is over, can you
2    answer my question? What happened that night?
3        A.   I will agree that that debate is over,
4    as long as we understand that if this was brought up
5    in previous questions from you, I simply didn't
6    catch the distinction. I didn't catch it. I
7    assumed we were talking about the same thing, given
8    that --
9        Q.   Jack didn't catch the distinction
10   either. Let me assure you of that.
11            Now, let me ask you this question:
12   What happened on the night that you came in to talk
13   to him?
14       A.   I think Jack fully understood what was
15   going on. Jack was fully prepared for that
16   conversation, far more than I was, by the way. So
17   Jack understood. He knew.
18       Q.   He knew what?
19       A.   He knew that he had the option to go
20   back into sales. He knew he had that option.
21       Q.   I'm just asking you to walk me through
22   the facts. Tell me what you remember happening.
23   You walk in the store. You establish contact with
24   Jack. What happens?
25       A.   "Jack, let's go upstairs and talk. We

201

1    need to talk."
2            We go upstairs. There's a mezzanine
3    upstairs. It doesn't run the full length of the
4    store, you know; it's a mezzanine. Anyway, there's
5    a quiet area. There's no way for customers or --
6    there's no back office at that point. This is the
7    most secluded place in the store. You can see if
8    somebody is walking by. You can see that nobody is
9    behind you. We go up there and talk.
10       Q.   Let me ask you something. Why did you
11   want to be in a secluded area?
12       A.   Because we needed to have a
13   conversation that was between me and him and not his
14   subordinate staff or customers.
15       Q.   Then what happened?
16       A.   "Jack, we're going in a different
17   direction. We're going to have to put a different
18   store manager in here. Listen, you have the
19   opportunity to go back into sales. That's what
20   we're doing right now."
21            That's about the extent of the initial
22   part of the conversation. I was not there to debate
23   it. We had been down that road. We were absolutely
24   not going to keep him as a store manager. We had
25   finally reached that decision. So he was being

51 (Pages 198 to 201)

Andrew Zuppa

**202**

1 informed of what was happening and what his options
2 were.
3    Q.    Who made the decision that he was not
4 going to be kept as a store manager?
5    A.    Ultimately I did. Ultimately I did.
6    Q.    Did Jake Jabs have any input in that?
7    A.    He was not well respected by Jake.
8    Q.    But my --
9    A.    Well, I'm trying to explain it. You
10 asked a question. I'm going to have to explain it.
11 If you're looking for a yes/no answer -- this is the
12 best way I can explain it. If you want a yes/no
13 answer, rephrase the question.
14    Q.    Did you ask Jake Jabs anything to the
15 effect, "Jake, I'm getting ready to fire Jack Must;
16 is that okay"?
17    A.    Well, given, once again for the 50th
18 expletive time -- see, you say you don't want to
19 have this conversation, yet you keep bringing it
20 back there like I'm a fricking idiot. So what
21 question is it that you want to have?
22         No, I never asked Jake if we were
23 firing Jack, because we were moving him back into
24 sales, and we were very clear on it. And, damn it,
25 Jack was very, very clear on it. So what question

**203**

1 is it that you want to ask? Do you want to move off
2 that subject and move on to where you want to go, or
3 do you want to have this conversation, because I can
4 have this one all night?
5    Q.    Why don't you listen to my question.
6    A.    I did.
7    Q.    Did you ever ask Jake Jabs, "Jake, I
8 am going to make it so that Jack Must is not going
9 to be the store manager at Westminster anymore and
10 move him into sales; is that okay"?
11    A.    Yes, I did have that conversation.
12    Q.    And when did that occur?
13    A.    The day of or previous to that. I
14 don't remember whether it was specifically that day
15 or if it would have been -- I'm trying to think. I
16 think it was either July 5th or July 6th. I don't
17 remember which. But store manager decisions,
18 absolutely, they're all going to have to be vetted
19 by Jake.
20    Q.    And where did that conversation take
21 place?
22    A.    His office.
23    Q.    And this would have been, if our
24 recollection is correct, this would have been a
25 Monday?

**204**

1         MR. BENSON:  Object to the form. I
2 thought he just said Monday or Tuesday.
3    Q.    (By Mr. Buchanan)  Okay. Is that your
4 best recollection?
5    A.    It was the day of or the day before I
6 talked to Jack.
7    Q.    I apologize, you did say that.
8         Then bring me back. You're upstairs.
9 You're in a secluded area. You've said these
10 things. What is Jack's reaction?
11    A.    He fires back immediately: "No, I
12 can't afford that. I'll see you in court."
13    Q.    Then what else happens?
14    A.    I pause. I was surprised. Jack was
15 ready for that question. He fired back immediately.
16 He had already considered it. He said something
17 like, you know: "I can't live on $40,000 a year."
18 But this was continuous. I'd finish a sentence,
19 boom, right back.
20         You've had enough conversations with
21 people in your life to understand, when you have
22 these life-moving conversations, if somebody had
23 pondered it. He had. I was caught off guard. I
24 paused for a second. I said, "Jack, you can get the
25 schedule that you want. You know, you have the

**205**

1 option to go back in sales, and if you want to take
2 some time to think about it, it's okay."
3         "No, I can't afford the pay cut. I
4 can't do that."
5         "You want to think about it?"
6         "No." That's it. I asked him to give
7 me his keys. He stepped up. He turned his back to
8 me, said again, "I'll see you in court."
9         I said, "Yeah, I heard that." Then
10 that was the last thing I said to him.
11    Q.    Did you give him some checks?
12    A.    Yes.
13    Q.    And you gave him basically seven
14 checks, correct?
15    A.    I gave him a lot of checks.
16         (Exhibit 37 was marked for
17 identification.)
18    Q.    (By Mr. Buchanan)  I'm handing you
19 what we've marked as Exhibit 37. And you can look
20 through this, if you'd like, but I'm looking here on
21 the first three pages. These seem to be weekly
22 paychecks, correct?
23    A.    The first one, 15, has a handwritten:
24 Week ending 7-4. It says salary pay, 40 hours.
25    Q.    You believe that to be accurate. Is

52 (Pages 202 to 205)

206

1  there any reason that's inaccurate?
2      A.  Pay period ending 7-4. It looks like
3  approximately what his weekly salary would have been
4  for 40 hours.
5      Q.  Do you know whose writing it is that
6  says, Week ending 7-4?
7      A.  It looks like it's Carol Baggesse's,
8  our payroll manager.
9      Q.  There's paychecks in the identical
10  amount for week ended 7/11 and 7/18, correct?
11      A.  Yeah, it looks like it.
12      Q.  Then you have four checks with some
13  increment of vacation pay, correct?
14      A.  Yeah, one for 40 hours of vacation,
15  another one for 40 hours of vacation, another one
16  for 40 hours of vacation, sick pay for five and
17  vacation of two. So what I'm assuming is he had 80,
18  120 -- 122 hours of payable vacation and five hours
19  of sick pay over whatever hours we pay on sick pay,
20  which I believe is 160. That may or may not be
21  correct. There was five hours of sick time paid for
22  some reason.
23      Q.  You had ordered these checks, correct?
24      A.  Yes.
25      Q.  And you had them with you at the time?

207

1      A.  Right.
2      Q.  So you were anticipating what his
3  response was going to be, weren't you?
4          MR. BENSON: Object to the form.
5          THE DEPONENT: As far as what?
6      Q.  (By Mr. Buchanan) As far as what
7  you've recited he said.
8      A.  As far as what?
9      Q.  As far as not wanting to return to
10  sales because he couldn't live on $40,000.
11      A.  No.
12      Q.  No?
13      A.  Absolutely not.
14      Q.  Why did you have these checks
15  prepared?
16      A.  Well, because it's his manager's pay.
17      Q.  So what?
18      A.  So what? Well, I could have -- so
19  what what?
20      Q.  For the week ended July 4th, when is
21  his paycheck due?
22      A.  The end of the week. I don't know.
23      Q.  Several days after July 4th, correct?
24      A.  Right.
25      Q.  And you're handing these to him on

208

1  July 6th?
2      A.  Yeah.
3      Q.  And then there's a week ended
4  July 11th?
5      A.  Yes.
6      Q.  That check isn't due for several days
7  after July 11th, correct?
8      A.  Well, yeah.
9      Q.  There's a week ended July 18th. That
10  check isn't due for several days after July 18th,
11  correct?
12      A.  Well, yeah, and he didn't even work in
13  that period.
14      Q.  But you understand from the Colorado
15  Wage Act, don't you, that when somebody resigns, you
16  don't have to pay them the day they resign? You pay
17  them whatever you owe them on their regular payday;
18  isn't that correct?
19      A.  What does that have to do with it?
20      Q.  You understand that, right?
21      A.  Well, we're not hurting for cash.
22      Q.  Do you understand that?
23      A.  Yes, and I don't understand its
24  relevancy to this at all.
25      Q.  Do you also understand that under the

209

1  Colorado Wage Act, when you fire someone, that you
2  have to pay them what they have coming that day?
3      A.  Oh, wow, I see where you're going.
4      Q.  Do you understand that?
5      A.  I understand that this is completely
6  the wrong way to go with this. This is not what
7  happened.
8      Q.  My question is: Do you understand
9  that requirement of the Colorado Wage Act, that when
10  you fire somebody, terminate them, you have to pay
11  them what they have coming immediately?
12      A.  Yeah, Jack was not being fired -- to
13  answer your question, yes. And as he was not being
14  fired, I didn't consider it within the context of
15  this. And that's not why these multiple checks were
16  given to him. Multiple checks were given to him so
17  he could have his vacation pay at manager rate, in
18  which he accrued it. He also would have a week to
19  either build up his backorder or take a week off in
20  between going into sales and not be screwed out of
21  his manager pay and pay that 7.14 an hour, or
22  whatever it was, that a salesperson's pay would be.
23      Yeah, this was being a good guy. This
24  was acting like a normal human being.
25      Q.  You replaced Jack Must with Nolan

53 (Pages 206 to 209)

210

1 Morrison, correct?
2        MR. BENSON: Object to the form.
3        THE DEPONENT: Nolan was the next
4 manager there, yeah.
5    Q.    (By Mr. Buchanan) And it was your
6 decision to replace him, was it not?
7    A.    To replace who?
8    Q.    To replace Jack with Nolan.
9    A.    We had to replace him with somebody,
10 and I approved the decision on Nolan, yes.
11   Q.    Was somebody else involved in that
12 decision?
13   A.    Yes, Jake was involved in that; Mike
14 Buscietta was involved in that.
15   Q.    And you prepared some paperwork
16 pertaining to that, correct?
17   A.    Paperwork?
18   Q.    Yes.
19   A.    Well, he was being transferred into a
20 different position, so I probably would have done
21 this.
22        {Exhibits 39 and 40 were marked for
23 identification.}
24   Q.    (By Mr. Buchanan) I'm showing you
25 what we've marked as Exhibit 40, which is a

211

1 personnel master file input --
2        MR. BENSON: I think we're to 39.
3        MR. BUCHANAN: I've skipped one.
4        THE DEPONENT: I think the checks were
5 39.
6        MR. BUCHANAN: The checks are 37. And
7 I have just marked the document that I've just
8 handed him as 40. I've skipped one. I'll get to
9 it.
10       MR. BENSON: Sorry, I didn't mean to
11 create a stir.
12   Q.    (By Mr. Buchanan) This is a document
13 that was prepared by whom, do you know?
14   A.    It looks like my handwriting. It is
15 my signature. It looks like my handwriting.
16   Q.    And it's in the same pen that you
17 wrote your signature, correct?
18   A.    Yeah, it looks like my handwriting.
19   Q.    And the other signatures are who?
20   A.    That's a payroll entry. That's Carol
21 Baggesse's, who would have entered it into the
22 system.
23   Q.    And you indicate that Nolan Morrison's
24 compensation is to be changed from 1058 per pay
25 period to 1153.85, plus a half bonus as of July 5,

212

1 2004, correct?
2    A.    Yeah.
3    Q.    The day before you had your
4 conversation with Jack?
5    A.    No. The 5 refers to a pay period.
6    Q.    The effective date July 5, '04?
7    A.    Yeah.
8    Q.    What date did you sign this?
9    A.    It looks like the date that this was
10 entered was the 6th. So that would have been
11 consistent, basically.
12   Q.    And the new position as manager of
13 Store 8, which is the Westminster store, correct?
14   A.    Yes. The reason the effective date on
15 pay is so I didn't have to fractionate a week's pay.
16 I'm guessing the 5th was a Monday, which was the
17 start of a pay period, which I think is correct. So
18 that's why the two dates are different.
19   Q.    But it's your handwriting that says
20 the 5th, correct?
21   A.    Yeah.
22   Q.    In fact, it looks like it was the 7th
23 initially, and then you changed it?
24   A.    Yeah, it looks like I changed it to
25 correspond with the pay period, that's correct.

213

1        (Exhibit 38 was marked for
2 identification.)
3    Q.    (By Mr. Buchanan) I want to show you
4 Exhibit 38 to your deposition, which is a personnel
5 action pertaining to Nolan Morrison, dated
6 4/18/2005. And it pertains to not having enough
7 staff to adequately run the building, correct?
8    A.    Yeah.
9    Q.    What specifically do you remember
10 about what you meant -- first of all, is this
11 something you prepared?
12   A.    It doesn't look like it. The font is
13 different. Again, it's not my -- whatever. It
14 looks like it was either prepared by HR or by
15 probably Jake's assistant. Either way. Or else I
16 had somebody else type it.
17   Q.    You're listed as the supervisor and
18 you signed it, correct?
19   A.    Yeah, I signed it, and I was the one
20 who presented it to Nolan.
21   Q.    Was this a complaint that you had
22 about him?
23   A.    I believe so. I believe it was a
24 complaint either from Jake or Fran Coleman. They
25 were out at his store, had observed the fact that

54 (Pages 210 to 213)

214

1  they didn't think it was staffed properly at the
2  time that they were out there, and I presented this.
3      Q.   Do you recall what it was about the
4  staffing that they felt was inappropriate?
5      A.   I believe the issue was largely the
6  same, that they had, during a store visit, observed
7  customers walking around, didn't feel that the
8  staffing with the current amount of employees that
9  were in the store at that time.
10     Q.   Substantially the same problem that
11 you felt was quite a problem with Jack?
12     A.   Yeah, substantially.
13     Q.   Did Nolan get fired for this?
14     A.   No. He was told about it one time.
15     Q.   How long did Nolan stay the manager of
16 the Westminster store?
17     A.   I don't recall. He was replaced later
18 on. He had moved on later. So I don't remember the
19 specific time frame. I'm guessing it was probably
20 maybe three months after this; I don't know.
21     Q.   What happened was he went up to -- he
22 went down to the southwest store to replace Rich
23 Dawson, correct?
24     A.   Yeah, that sounds right.
25     Q.   Then he went from the Southwest store

215

1  up to the Firestone store, correct?
2      A.   No, he went to South University, when
3  we opened that.
4      Q.   And then he went to Firestone?
5      A.   He may have come over to Compark in
6  between. I don't remember. Or he may have been at
7  Compark before he was at University, or he may not
8  have been there at all, but he was moving quite a
9  bit.
10     Q.   Just so I'm clear about this, he went
11 Westminster, Southwest, to South University, to
12 Compark?
13     A.   Or the opposite. I remember him being
14 briefly at Compark, for some reason. I believe he
15 was there. The exact sequence, I don't remember,
16 but it was something similar to what you described.
17     Q.   And it sounds like his longest duty
18 station was at the Westminster store?
19     A.   Specifically, I don't know.
20     Q.   He's been at five locations in three
21 years?
22     A.   Well, he's been at -- he was working,
23 prior to his management job, at Thornton. He worked
24 at Westminster. He worked at Southwest. I know he
25 worked at University, and I know he worked at

216

1  Firestone. So I'm going to say, including Thornton,
2  it was either five or six.
3      Q.   I'm showing you Exhibit 39 to your
4  deposition. This is titled "The Affidavit of Andrew
5  Zuppa." Is this a document that you yourself
6  prepared?
7      A.   No.
8      Q.   Who prepared it?
9      A.   I'm not sure.
10     Q.   Do you know where the information for
11 its preparation came from?
12     A.   It probably would have came from
13 conversations with me.
14     Q.   And it was presented to you to sign?
15     A.   Yes.
16     Q.   And you signed it?
17     A.   Yes.
18     Q.   Are you completely satisfied that
19 everything in here is true and accurate to the best
20 of your understanding?
21     A.   I was completely satisfied at the time
22 that I signed it that it was true and accurate.
23     Q.   And are you still completely
24 satisfied?
25     A.   I haven't reread it. I don't know.

217

1  Do you want me to reread it?
2      Q.   Why don't you do that.
3          I'm asking if there's anything in it
4  that you want to change at this point because it's
5  inaccurate or for whatever reason.
6      A.   Specific phrasing, I don't know about,
7  but content-wise, I think it's pretty consistent
8  with what we just talked about.
9      Q.   So you're comfortable that it's
10 accurate and complete?
11     A.   Maybe not complete. I would say it's
12 accurate. You have basically a page and a half of
13 text. I think we expanded on a lot of the things in
14 here, just from what we talked about. I would say
15 it's accurate. Whether or not it's complete or not,
16 I would probably say, you know, I had more than a
17 page and a half to talk about, and we did.
18         MR. BUCHANAN: Those are all the
19 questions I have.
20         MR. BENSON: Should we take a minute?
21         MR. BUCHANAN: Okay.
22         (A recess was taken.)
23         MR. BENSON: We're finished.
24         (WHEREUPON, the deposition was
25 concluded at 6:20 p.m.)

55 (Pages 214 to 217)

Andrew Zuppa

218

```
1        I have read the foregoing
2    transcript of my testimony and have indicated the
3    same by my signature.
4
5
6
                    ANDREW ZUPPA
7
8    STATE OF COLORADO
9    CITY AND COUNTY OF DENVER
10        Subscribed and sworn to before me by
11   ANDREW ZUPPA, on this _____, 2007.
12        My commission expires:_____.
13
14
15
16   _____
               Notary Public
17
18   _____
                 Address
19
20
21   Reporter:  JM
22
23
24
25
```

220

```
1    CALDERWOOD-MACKELPRANG, INC.
     4410 Zuni Street
2    Denver, Colorado 80211
     (303) 477-3500
3
4    September 14, 2007
5    GARY J. BENSON, ESQ.
     Dwoodin Chambers & Williams PC
6    3900 East Mexico Avenue, Suite 1300
     Denver, Colorado 80210
7
     Re: Must v. American Furniture Warehouse
8
     Deposition of: ANDREW ZUPPA
9
     The deposition in the above-entitled matter is ready
10   for reading and signing.  Please attend to this
     matter by complying with ALL blanks checked below.
11
         _____ arranging with us at the number listed below
12       to read and sign the deposition in our
         office.
13
         XXX  having deponent read your copy and sign
14       amendment sheets, if any (original signature
         page enclosed.)
15
         _____ reading enclosed deposition, signing
16       signature page and correction sheets if any.
17
18   XXX  within 30 days of the date of this letter.
19
         _____ by_____due to trial/hearing date of
20
21   Please be sure that the signature page and amendment
     sheets, if any, are signed before a notary public
22   and returned to our office.  If this matter has not
     been taken care of within said period of time, the
23   deposition will be filed unsigned pursuant to the
     Rules of Civil Procedure.
24   JANA MACKELPRANG, CRR, CSR, RPR
25   cc: Counsel of Record
```

219

```
1           CERTIFICATE
2    STATE OF COLORADO    )
                          )ss.
3    CITY AND COUNTY OF DENVER )
4        I, Jana Mackelprang, Certified Realtime
     Reporter, Registered Professional Reporter, and
5    Notary Public for the State of Colorado, do hereby
     certify that previous to the commencement of the
6    examination, the said ANDREW ZUPPA was duly sworn by
     me to testify the truth in relation to the matters
7    in controversy between the said parties.
         I further certify that said deposition
8    was taken in shorthand by me and was reduced to
     typewritten form by computer-aided transcription,
9    that the foregoing is a true transcript of the
     questions asked, testimony given, and proceedings
10   had.
         I further certify that I am not an
11   attorney nor counsel nor in any way connected with
     any attorney or counsel for any of the parties to
12   said action or otherwise interested in its event.
         IN WITNESS WHEREOF, I hereunto affix my
13   hand and notarial seal this 14th day of September,
     2007.  My commission expires January 24, 2008.
14
15
16
     _____
17   Jana Mackelprang
     CSR, RPR  Notary Public
     Calderwood-Mackelprang, Inc.
18
19
20
21
22
23
24
25
```

221

```
1    CALDERWOOD-MACKELPRANG, INC.
     4410 Zuni Street
2    Denver, Colorado 80211
     (303) 477-3500
3
4    ROSS B.H. BUCHANAN, ESQ.
     Buchanan, Jurdem & Cederberg, PC
5    1621 18th Street, Suite 260
     Denver, Colorado 80202
6
     Re: Must v. American Furniture Warehouse
7
     Dear Mr. Buchanan:
8
     Enclosed is the deposition of: ANDREW ZUPPA
9
         _____ Previously filed.  Forwarding signature page
10       and amendment sheets.
11       _____ Signed, no changes.
12       _____ Signed, with changes, copy enclosed.
13       _____ Unsigned, notice duly given _____
         pursuant to the Rules of Civil Procedure.
14
         _____ Not signed, notice duly given _____
15       since trial is set for _____.
16       _____ No signature required.
17       _____ Signature waived.
18       _____ To be signed in court.
19       _____ Signature pages/amendment sheets to be
         returned to court on date of trial.
20
21       _____ Mailed by Certified Mail No._____.
22       _____ Hand-delivered on approximately _____.
23   JANA MACKELPRANG, CRR, CSR, RPR
24   cc: Counsel of Record
25
```

56 (Pages 218 to 221)