# EXHIBIT 2

William Michael Buscietta

1

1    IN THE UNITED STATES DISTRICT COURT

2         FOR THE DISTRICT OF COLORADO

3    Civil Case No. 06-CV-01872-RPM-MEH

4    JACK MUST,

5    Plaintiff

6    vs.

7    AMERICAN FURNITURE WAREHOUSE CO., a Colorado

     corporation d/b/a/ AMERICAN FURNITURE WAREHOUSE,

8

9    Defendant.

10

11   _____

12        DEPOSITION OF WILLIAM MICHAEL BUSCIETTA

13   _____

14

15        PURSUANT TO NOTICE, the above-

16   entitled deposition was taken on behalf of the

17   Plaintiff at 1621 18th Street, Suite 260, Denver,

18   Colorado, on August 29, 2007, at 9:15 a.m., before

19   Dawn E.  Eastman (Calderwood), Certified Shorthand

20   Reporter, Registered Professional Reporter, and

21   Notary Public.

22

23

24

25

William Michael Buscietta

18

1   Q.   And were you in a degreed program
2   there?
3   A.   I was, hospitality and travel
4   administration.
5   Q.   Was that right after high school?
6   A.   I probably didn't go for about a year.
7   So not right after, but shortly right after.
8   Q.   I take it, the way you put it, you did
9   not get a degree?
10  A.   Yes, sir, correct, did not.
11  Q.   And any other -- well, do you have
12  some estimate as to how far -- were you halfway
13  through the program, quarter of the way through?
14  A.   Probably about a third.
15  Q.   Any other formal education beyond
16  Metro?
17  A.   No, sir.
18  Q.   Why don't you summarize -- let's start
19  this way: When did you come to work for American
20  Furniture Warehouse?
21  A.   1980.
22  Q.   Now -- so it sounds -- strike that.
23  Had you worked for another furniture
24  company before that?
25  A.   No.

19

1   Q.   Why don't you briefly summarize for me
2   your employment history. And I'm going to ask you
3   from graduation high school forward. And what I'm
4   looking for, Mr. Buscietta, I don't need a lot of
5   detail. But just companies you worked for or worked
6   for yourself, how long it lasted, what you did.
7   A.   My memory is not that well.
8   Q.   I'm trying to do it as easy as I can.
9   A.   I got married and had kids, had
10  various jobs. And I don't recall the names of the
11  companies. But I did -- the ones that I recall,
12  between high school and American, I worked for a
13  tree trimming service. I worked for a company
14  building doors. Those are the only two that I
15  remember that was in that period.
16          Right after high school, going to
17  college, I had a part-time job at Arby's and things
18  like that. I honestly don't remember the names of
19  the companies.
20  Q.   Fair enough. And you came to work for
21  AFW in 1980?
22  A.   Yes.
23  Q.   And am I understanding correctly, you
24  had virtually no experience in the furniture
25  industry?

20

1   A.   Correct.
2   Q.   What attracted you to the furniture
3   industry?
4   A.   My father worked at AFW during that
5   time.
6   Q.   What was your father's name?
7   A.   Bill.
8   Q.   And I don't mean to get into anything
9   unpleasant. Is he still employed by AFW?
10  A.   No, sir.
11  Q.   Is he still alive?
12  A.   Yes, sir.
13  Q.   So that would be Bill Buscietta?
14  A.   Yes, sir.
15  Q.   What was his position with AFW when he
16  left?
17  A.   He was, I believe, the manager of --
18  was he a manager, then? I think he was the manager
19  of one of the satellite stores, I believe.
20  Q.   Do you remember which one?
21  A.   I think it was the one on South
22  Colorado.
23  Q.   Is the South Colorado store still
24  there?
25  A.   No, it hasn't been there for a number

21

1   of years.
2   Q.   Why don't you do the same thing for
3   me, sort of chronologically -- and what I'm looking
4   for is dates, titles that you had, and basically
5   what your duties were for AFW.
6   A.   For a period of time, I don't have
7   exact dates, but I have general dates. Starting in
8   1980, I started in the warehouse and held a couple
9   of positions there -- delivery driver and then kind
10  of the general warehouse. Worked there for probably
11  between a year and two years.
12          And then I transferred into sales.
13  That was my next position. And that was only for
14  the appliance -- we sold appliances at the time. So
15  I did appliance sales.
16  Q.   Just so I'm clear, appliances are
17  refrigerators, washers, dryers?
18  A.   TV's, everything.
19  Q.   Okay.
20  A.   I'm trying to remember how long I did
21  that. Probably about a year. And then I went into
22  customer service.
23  Q.   Okay. Describe for me what -- strike
24  that. What is customer service?
25  A.   Just answering calls, solving

6 (Pages 18 to 21)

William Michael Buscietta

22

1  problems.
2     Q.   How long were you in that position?
3     A.   That wasn't -- it wasn't too long.
4  Probably less than a year.
5     Q.   Okay.
6     A.   And then from there, I took my first
7  management position. So it would have been probably
8  three or four years, I was with the company at our
9  store in Boulder. And I was the assistant manager
10 there.
11    Q.   Okay. Where was the store in Boulder?
12    A.   Right on that main street where you go
13 in across from the mall. Does that help?
14    Q.   28th?
15    A.   Yes, yes, thank you. Sorry.
16    Q.   How long were you the assistant
17 manager there?
18    A.   Probably about a year. And then I was
19 actually there when we closed that store because of
20 the lease had expired.
21    Q.   Were you still the assistant manager
22 at that time?
23    A.   Yes.
24    Q.   What was your next position?
25    A.   After that, I went back into sales at

24

1  directly after that. But I was in store management
2  from that point forward, until I was the general
3  manager. If I can just kind of give you -- at that
4  point -- I just don't remember the dates. And if
5  you need them, I can kind of give you maybe some
6  general dates on those.
7         But I went to the manager of the older
8  Aurora store, which was on Iliff and Chambers. The
9  dates are really muddied because I had a few
10 positions there. And then we opened our first large
11 store, which is the now current Aurora store. And
12 then I was the manager of that store.
13    Q.   Okay.
14    A.   Then I went from that store into being
15 the customer service manager at still the old
16 Thornton -- I guess it wouldn't be Thornton -- our
17 original location.
18    Q.   104th and I-25?
19    A.   58th and I-25.
20    Q.   On Bannock?
21    A.   Yes, sir.
22    Q.   Okay.
23    A.   And then as we built the Thornton
24 location, I went over there as their customer
25 service manager, became the sales manager.

23

1  the Thornton store.
2     Q.   Were you still selling appliances?
3     A.   No, just general furniture sales at
4  that point there.
5     Q.   And how long did you stay in that
6  position?
7     A.   It was probably less than a year, I
8  would guess. And then I went to the store on South
9  Colorado as the store manager.
10    Q.   Okay. That was your first experience
11 as a store manager?
12    A.   Yes, sir.
13    Q.   Can you give us a date for that? I
14 mean, you've been estimating times.
15    A.   It's tough.
16    Q.   Mid- to late '80s?
17    A.   I would say, yeah, mid-'80s, I would
18 guess.
19    Q.   How long were you the store manager on
20 South Colorado?
21    A.   That's kind of hard to remember, too.
22 Probably about -- boy, I don't know.
23 I'm thinking about a year, I would guess.
24    Q.   Okay.
25    A.   And I don't remember what I did

25

1         And then I'm trying to remember --
2  let's see, I've been at Thornton for three years
3  now. And I was general manager for approximately 12
4  years prior to that. I went from being sales
5  manager at the Thornton location to the general
6  manager.
7     Q.   Okay.
8     A.   So that gets you within, like, 15
9  years.
10    Q.   Let me see if you agree with me on
11 this: You indicated that you went back to being
12 store manager at Thornton in mid-June of 2004?
13    A.   Yes.
14    Q.   So does it sound right that you became
15 the general manager in about 1992; in other words,
16 12 years before?
17    A.   Well, I guess I was maybe general
18 managers for ten years. No, actually, it was 1994
19 or 1995, I was appointed general manager.
20    Q.   So you were general manager for more
21 like ten years?
22    A.   Ten years, I guess; I'm sorry. Sorry
23 about that.
24    Q.   That's all right. While you were at
25 store on Bannock, was Jack Must a salesman there?

7 (Pages 22 to 25)

Calderwood-Mackelprang, Inc. 303.477.3500

26

1    A.   Yes.
2    Q.   How long was he at the Bannock store;
3    do you remember?
4    A.   I don't remember. I didn't really
5    deal with him.
6    Q.   And that's because you were customer
7    service?
8    A.   Yeah, and at the Boulder location,
9    too. I remember Jack being there; I don't mean like
10   recall how long he was there or when he started.
11   Q.   And just to be clear about this: You
12   had no supervisory responsibility over Jack?
13   A.   Yes, sir, I did not.
14   Q.   And so you would not have had any
15   input into any reviews and so forth, as the case may
16   be, that he would have gotten at that time?
17   A.   I would not have.
18   Q.   Okay. All right. Who was your
19   predecessor as the general manager at AFW?
20   A.   It would have been Brian Kurth.
21   Q.   K-u-r-t-h?
22   A.   Yes.
23   Q.   And do you know how long Mr. Kurth had
24   been the general manager?
25   A.   Off the top of my head, two to three

27

1    years.
2    Q.   And as I understand it, when you went
3    to the Thornton store, Andrew Zuppa became general
4    manager?
5    A.   Yes.
6    Q.   And he still is general manager?
7    A.   Yes.
8    Q.   Were you the longest serving general
9    manager of American Furniture Warehouse?
10   A.   Yes.
11   Q.   By quite a bit, sounds like?
12   A.   Yeah, I believe so.
13   Q.   During your time as general manager,
14   did AFW do any type of personnel reviews for
15   managers?
16   A.   Yes.
17   Q.   And describe for us what the process
18   consisted of while you were general manager?
19   A.   Can you clarify that?
20   Q.   Yeah. What I'm looking for is, you
21   know, some companies have these documents where they
22   talk about the job description and whether somebody
23   is meeting expectations, falling below expectations
24   needing improvement, things like that.
25        And I don't know that that was

28

1    necessarily the system at AFW, but that's what I'm
2    looking for, is you to describe for me how the
3    system worked. Was there a document that was
4    prepared? Who prepared it? Did you sit down with
5    the employees and review it? Those sorts of issues.
6    A.   Can I clarify it more?
7    Q.   Yeah.
8    A.   Do you mean an evaluation, or do you
9    mean like a review for an incident? I'm not
10   understanding what you're asking.
11   Q.   And I appreciate you making that
12   distinction. I'm talking about a more general
13   thing, where you would sit down on a regular or
14   semi-regular basis and say: We're going to review
15   this manager, and we're going to prepare a document;
16   and we're going to sit down with him or her and talk
17   about it, have him sign off on it, those sorts of
18   things.
19   A.   And you're asking if we had anything
20   in place for managers?
21   Q.   Right.
22   A.   For that, no.
23   Q.   Okay. Never, during the time you were
24   general manager?
25   A.   No.

29

1    Q.   Okay. Now, you did mention another
2    species of review, which I'm going to call a
3    personnel action type of review, where you talk
4    about specific episodes; correct?
5    A.   Yes.
6    Q.   And you did do that while you were
7    general manager?
8    A.   Yes.
9    Q.   Was that a procedure that you
10   initiated, or was it in place when you became the
11   general manager?
12   A.   It was in place from day one at
13   American Furniture.
14   Q.   By the way, day one at American
15   Furniture, as I understand it, is basically the 1975
16   time frame?
17   A.   Yes.
18   Q.   How long did your dad work for AFW,
19   all told?
20   A.   Probably about six, seven years.
21   Q.   Did he start off in 1975?
22   A.   No. About 1978, I believe.
23   Q.   So he had been there roughly a couple
24   of years by the time you came on board?
25   A.   Yes.

8 (Pages 26 to 29)

Calderwood-Mackelprang, Inc. 303.477.3500

30

1   Q.   I'll show you what we have marked as
2   Exhibit 29 to an earlier deposition in this case,
3   which is a form, the title of which says:
4   "Personnel Action;" correct?
5   A.   Yes.
6   Q.   And I just want to talk about the form
7   for a moment. I take it that these are documents
8   that -- are they, like, on a pad? Or do you have,
9   like, multiple copies of them that you can use?
10   A.   It's just saved in Word at this point,
11   a blank one in Word.
12   Q.   Right. So whenever you want to
13   prepare one, you just pull it up in Word and fill it
14   out?
15   A.   Yes.
16   Q.   Let me step back for a moment and talk
17   about those more general periodic reviews and ask
18   you to clarify something for me.
19   We deposed Andrew Zuppa a couple of
20   days ago. And Mr. Zuppa seemed to indicate that
21   there had been a procedure like that in the past,
22   but he had terminated it.
23   And, again, I'm not purporting to
24   recite his exact testimony. But my understanding
25   was that he felt they were done on a sporadic basis.

31

1   They were not very helpful and that as a result of
2   that, when he became the HR director, he terminated
3   them.
4   With that summary of what he had to
5   say about that, does that refresh your recollection
6   at all that you ever did those reviews?
7   A.   It doesn't.
8   Q.   Are you pretty sure you never did do
9   such reviews?
10   A.   Yeah. During my tenure, there were no
11   performance type of reviews for managers.
12   Q.   And if there had been, you would have
13   done them, right, because the managers reported
14   directly to you?
15   A.   Yes.
16   Q.   All right. I'm also going to
17   represent to you, Mr. Buscietta, that the exhibit in
18   front of you, Exhibit 29, is the only document
19   that's completed on this form called "Personnel
20   Action" with respect to Jack Must.
21   And my question is: Are you aware of
22   any others that were prepared by you, or anyone
23   else, pertaining to Jack Must?
24   A.   Not specifically. It's been a long
25   time. I mean, I may have reviewed Jack other times

32

1   and may not have. I don't remember specific
2   incidences -- an incident, so. . .
3   Q.   As you sit here today, if I were to
4   ask you: Were there any other incidents, other than
5   this one that's written up, you don't have a
6   specific recollection of one?
7   A.   I do not.
8   Q.   I may have some more questions about
9   that in a minute, but I wanted to step back.
10   (Deposition Exhibit 41 was marked for
11   identification.)
12   Q.   (By Mr. Buchanan) Mr. Buscietta, I'm
13   showing you what we have marked as Exhibit 41, which
14   is a two-page document that simply says: "Reviews."
15   And, first of all, do you recognize
16   this document?
17   A.   Yes.
18   Q.   Did you prepare this document?
19   A.   No.
20   Q.   Do you know who did?
21   A.   I do not.
22   Q.   Do you know when it was prepared,
23   roughly?
24   A.   That, I don't know either.
25   Q.   Was it a document that was an extant

33

1   company policy at the time you were general manager?
2   A.   It was a guideline.
3   Q.   But it existed at that time?
4   A.   Yes.
5   Q.   All right. Did it come from HR, as
6   far as you know?
7   A.   Yes.
8   Q.   And, obviously, you can read it for
9   yourself. But it talks about a review and doing
10   reviews and what's in a review and what's not in a
11   review, and all those sorts of things.
12   Is it your understanding that this was
13   the guidelines that you were to use in filling out
14   personnel actions?
15   A.   Yes, these were guidelines.
16   Q.   Okay. And these were guidelines that
17   your managers needed to be familiar with in order to
18   fill them out; correct?
19   A.   Yes.
20   Q.   And that you needed to be familiar
21   with in order to fill out any personnel actions
22   regarding managers; correct?
23   A.   Yes.
24   Q.   As general manager, did you fill out
25   personnel actions on anybody other than your store

9 (Pages 30 to 33)

62

1  out to different stores all the time. We don't have
2  any specific store.
3      Q.  Again, during that period of time, do
4  you remember hearing anything negative about him as
5  a management trainee?
6      A.  No.
7      Q.  Did you play any role in promoting him
8  to the assistant manager of the Westminster store?
9      A.  I don't know if I did specifically. I
10  don't remember saying, you know, I went over and
11  talked to him, you know, you're promoted. I think
12  it was Andrew that did that. I don't remember the
13  specifics on that.
14      Q.  Again, at the point in time that that
15  happened, had you heard anything negative about Jack
16  Must that suggested to you that that was a bad
17  decision?
18      A.  No.
19      Q.  It is my understanding that he then
20  became the manager of the Westminster store. And,
21  I'm sorry, I can't give you a date. But it was in
22  the first half of 2001, let's say.
23          Again, did you play a direct role in
24  promoting him to the store manager?
25      A.  I'd have played a direct role in all

63

1  of them. It would have either been myself or
2  Andrew, so. . .
3      Q.  Again, do you recall any of the
4  discussions or deliberations, or whatever you want
5  to call them, as a result of which Jack Must was
6  promoted to store manager?
7      A.  I do not.
8      Q.  You regarded it as a promotion from
9  assistant manager to store manager; correct?
10      A.  Yes.
11      Q.  And having answered the question the
12  way you did, I take it you don't have any negative
13  information that suggested to you that that was a
14  bad decision at that time?
15      A.  Correct.
16      Q.  Now, in terms of the reporting chain,
17  during the entire time that he was the store
18  manager, who did he report to, directly report to?
19      A.  Andrew and myself.
20      Q.  If he had gone -- if Jack had had a
21  problem and gone directly to you, you wouldn't have
22  regarded that as -- you know, to put it in the
23  vernacular -- as going over Andrew's head; correct?
24      A.  I would not.
25      Q.  As I understand it, Mr. Jabs is a very

64

1  hands-on owner. He comes to the stores; he walks
2  the stores, that sort of thing.
3          If Jack were to have taken an issue up
4  with Jake Jabs during one of those store walks, you
5  wouldn't regard that as going over either yours or
6  Andrew's head; correct?
7      A.  No.
8      Q.  There's nothing inappropriate about
9  him doing that?
10      A.  No, no.
11      Q.  Okay. Let me show you another
12  exhibit -- I'll show you what we have marked as
13  Exhibit 28 in a previous deposition. And I'll just
14  tell you that this is a set of spreadsheets
15  pertaining to bonuses paid basically during Jack
16  Must's tenure as the store manager at Westminster,
17  and it's in chronological order.
18          And the first thing I want you to do
19  is to flip to -- do you see the numbers down here at
20  the bottom of the pages?
21      A.  Uh-huh.
22      Q.  If you can, flip to page 48, please.
23      A.  (Deponent complied.)
24      Q.  And do you see Jack Must's name down
25  there, maybe two-thirds of the way down?

65

1      A.  Yes.
2      Q.  And opposite his name, originally in
3  the amount of his bonus, the amount was $6,161; and
4  it's changed, in handwriting, to 3,081. And then it
5  seems to say "Mike;" do you see that?
6      A.  Yes, yes.
7      Q.  Is that your handwriting?
8      A.  That is my handwriting.
9      Q.  And then it seems to say: Okay, and
10  then there's some initials. Are those your
11  initials?
12      A.  Over -- yes.
13      Q.  On the right-hand side?
14      A.  Yes.
15      Q.  Did this represent a reduction in
16  Jack's bonus from what I'll call the -- from the
17  full bonus to a half bonus?
18      A.  I believe so.
19      Q.  Do you recall why it was that you
20  reduced it on that occasion?
21      A.  When was this? 2003.
22      Q.  And this is pertaining to the
23  November, December of '02 and into January '03
24  quarter.
25      A.  I don't remember anything specifically

Calderwood-Mackelprang, Inc. 303.477.3500

66

1  about it. No, I don't remember anything
2  specifically about it.
3      Q.    Well -- and, again, I'm on the outside
4  looking in, and I'm trying to understand why it was
5  done. To your mind, is there any way to reconstruct
6  it at this time?
7      A.    I'm trying to think. It may have just
8  been for kind of general -- general performance. I
9  know there was a couple of occasions where Jake went
10  in, and he didn't see any salespeople on the floor
11  late in the evening.
12      I think it's more of that general
13  performance. Couple times Jake went in and didn't
14  see any salespeople. Probably based on maybe the
15  store volume a little bit. I'm not quite sure. I'm
16  sorry; I don't recall the specifics about it. I
17  don't remember one particular reason.
18      Q.    I guess what I'm asking you: When you
19  make reductions like that, are you obligated to
20  document why it is that you're doing it?
21      A.    No.
22      Q.    Other than just initialing it?
23      A.    Correct.
24      Q.    Now, you mentioned that you think Jake
25  may have gone in and seen an inadequate number of

67

1  salespeople. Have you ever seen documentation
2  pertaining to that --
3      A.    As far as what?
4      Q.    -- at about this time frame?
5      A.    What kind of documentation?
6      Q.    Any kind of documentation -- notes,
7  memos.
8      A.    I've not seen anything related to
9  that.
10      Q.    Okay. So other than just relying on
11  your memory as to why it was, as far as you know,
12  there's no way to go back and look at a document and
13  say: Here's the reason we did that?
14      A.    Correct, correct.
15      Q.    You mentioned store volume. By
16  referring to "store volume," are you talking about
17  revenues specifically?
18      A.    Not revenues, the overall store
19  volume.
20      Q.    So what does that mean? If it's not
21  revenues, what is it?
22      A.    What do you mean by "revenues"?
23      Q.    Amounts that were brought in on the
24  sale of furniture.
25      A.    Just total sales, is that what you

68

1  mean?
2      Q.    That's the way I would use revenues.
3      A.    Yeah, total sales for the store.
4      Q.    So I guess my question is: Is that
5  what you mean by "store volume"?
6      A.    Yes, yes. I'm sorry; I'm sorry.
7      Q.    That's fine. That's one of those sort
8  of misunderstandings that we can straighten out.
9  That's fine.
10      A.    Got it.
11      Q.    So the total sales that a store would
12  experience during a quarter would be at least one of
13  the factors that you might look at in terms of
14  giving someone the full amount of their bonus or
15  cutting it; correct?
16      A.    Could be.
17      Q.    Were there any sort of standards that
18  you understood? In other words, if the store's
19  volume, as you put it, were to drop 2 percent
20  relative to the last quarter, 3 percent, something
21  like that?
22      A.    There were no standards.
23      Q.    In your own mind, without there being
24  an actual standard, was there sort of a benchmark
25  that you would think: Boy, if we dropped that much,

69

1  we need to cut the manager back?
2      A.    No.
3      Q.    Is the reason that you had bonuses for
4  store managers based upon Jake Jabs' philosophy that
5  he wants to incentivize everybody in the company?
6      A.    Yes.
7      Q.    If a store experienced an
8  extraordinarily good quarter, would you occasionally
9  bump the manager's bonus? And let me ask you to
10  assume, for purposes of the question, he's already
11  at full bonus; in other words, he had the one-tenth
12  of one percent, whatever that top bonus level is.
13      A.    You're asking me for that specific
14  manager?
15      Q.    No. I'm talking as a general manager,
16  do you ever remember a situation where a manager was
17  on a full bonus program, had an extraordinarily good
18  quarter at his store, and he was given a bonus in
19  excess of that full bonus?
20      A.    Not related to his store specifically.
21      Q.    Tell me what you mean.
22      A.    The way the bonuses are based, they're
23  on an overall profit of the company, not on the
24  store. But if his store did well he would, in turn,
25  get more money anyway.

Calderwood-Mackelprang, Inc. 303.477.3500

78

1    Q.    Was that related to the same issue?
2    A.    Yes.
3    Q.    And what was Mr. Hebditch's
4  involvement with that project?
5    A.    Well, he would have been involved more
6  day-to-day than I would on it, so. . .
7    Q.    He was the more hands-on guy?
8    A.    Yeah.
9    Q.    And the warehouse manager would be in
10  charge of the delivery trucks?
11    A.    Yes, yes.
12    Q.    Now, also on pages 53 and 54, it
13  indicates that Jack Must's bonus was cut in half.
14  And on page 53, there seems to be a question here:
15  "Do we pay Jack full amount?" Correct?
16    A.    Correct.
17    Q.    Whose handwriting is that?
18    A.    Looks like mine.
19    Q.    And then there seems to be an "OK"
20  with a circle around it. Is that yours also?
21    A.    I don't think so. You can barely read
22  that.
23    Q.    Why were you asking the question: Do
24  we pay Jack the full amount?
25    A.    You know, I don't recall specifically.

79

1    Q.    By this time, he had been a store
2  manager for two and a half years; correct?
3    A.    Correct.
4    Q.    Is there any reason why he would not
5  be receiving the full amount of the bonus?
6    A.    Probably because as I stated before.
7    Q.    In other words, issues about sales
8  volume?
9    A.    General performance. Jake coming out
10  to the store and not finding enough salespeople,
11  which happened on more than one occasion. Andrew
12  had been out to the store, not enough salespeople.
13  Numerous -- you know, I'd been out to the store,
14  same thing.
15           So I'm assuming it was in those
16  general terms. But I'm assuming. I don't recall
17  specifically why we cut it. I do remember mine, but
18  I don't remember his so much.
19    Q.    So, again, your response is it could
20  have been a number of things; but you don't
21  specifically remember?
22    A.    Yes.
23    Q.    And if it had anything to do with
24  sales volume, that should be reflected in the
25  spreadsheet of sales figures; correct?

80

1    A.    I would assume.
2    Q.    If it had to do with any of the other
3  things that you categorize under performance, there
4  is no documentation of that; correct?
5    A.    I don't believe that there is.
6    Q.    Okay. Given that this was the second
7  time within a year that Jack Must had been -- that
8  his bonus had been cut, did anybody ever suggest:
9  Gee, if we really have a problem with this guy, we
10  had better get some documentation into the file?
11    A.    I don't know.
12    Q.    Did that ever occur to you?
13    A.    I can say I don't remember what I was
14  thinking at the time, or what we did.
15    Q.    And, certainly, you don't recall any
16  discussion along those lines?
17    A.    This specifically, no.
18    Q.    Do you remember -- let's take this
19  last episode first, where Jack Must's bonus was cut
20  in half for the August, September, October '03 time
21  frame.
22           Do you recall having a discussion with
23  Jack, himself, about why that occurred?
24    A.    I don't recall a discussion with him.
25    Q.    When somebody who is a bonused

81

1  employee had a cut in their bonus, typically, there
2  would be some sort of explanation; wouldn't there?
3    A.    Typically, I probably would have
4  talked to them. There was one, after a managers
5  meeting, that I talked to him. I don't remember if
6  it was regarding one of these.
7    Q.    We're coming to that. I'll tell you,
8  for purposes of our discussion, that was in June of
9  '04.
10    A.    Okay.
11    Q.    I'm asking you to reflect on these two
12  earlier occasions. Do you remember having any
13  discussion with him?
14    A.    No, then, I don't.
15    Q.    Do you remember him calling you up and
16  saying: Hey, Mike, what gives? Why am I getting
17  half the bonus?
18    A.    I don't.
19    Q.    When you give out bonus checks, is the
20  store manager given any sort of itemization to know
21  whether he's getting the full bonus or half bonus?
22    A.    No.
23    Q.    So unless he sits down with the sales
24  figures and tries to figure out what his number
25  would add up to, he might not know whether it's a

21 (Pages 78 to 81)

William Michael Buscietta

82

1 half bonus or full bonus; correct?
2 A. Correct.
3 Q. Jake told you that one time?
4 A. Yes.
5 Q. Correct? So you knew that you'd been
6 cut by a thousand?
7 A. Yes.
8 Q. I want to come back to Exhibit 29 that
9 we talked about briefly a moment ago. Actually, let
10 me give you this copy of it, so I can refer to that
11 one if I could.
12 This is a personnel action, dated July
13 5, 2002. And you signed it as the supervisor;
14 correct?
15 A. Correct.
16 Q. Do you know who prepared this
17 document?
18 A. I believe it was probably me. I'm not
19 sure.
20 Q. Is there any standard procedure that
21 the person that prepares the document is to sign it
22 as the supervisor or otherwise note that they
23 authored it?
24 A. No.
25 Q. But your best recollection is you

83

1 prepared it?
2 A. My best recollection.
3 Q. And what was this based on?
4 A. Just reading it, employees coming in
5 late. Jake had a problem with people coming in
6 late.
7 Q. Let me stop you for a second. I can
8 see what it says there. My question is: How is it
9 that you came to put this down on paper? Are these
10 things that you observed, or are they things that
11 were communicated to you?
12 A. I think part of it was me and then
13 part of it was either Jake or Andrew going out to
14 the stores.
15 Q. Let me take the paragraphs here sort
16 of one by one. Let me kind of summarize.
17 Paragraph one refers to allowing
18 employees to come in late, that causing dissension
19 and potential claims of discrimination and so forth.
20 What employees were involved?
21 A. What do you mean, "what employees were
22 involved"?
23 Q. Who had he allowed to come in late?
24 A. I assume salespeople, I believe.
25 Q. Can you give me names?

84

1 A. I cannot.
2 Q. Do you know why they were late?
3 A. I do not.
4 Q. Do you know if Jack had actually
5 disciplined any of those employees?
6 A. I don't know that, either.
7 Q. Do you know whether any employee who
8 was late had called in ahead of time?
9 A. I don't know that, either.
10 Q. Did you ever solicit Jack Must's
11 thoughts about that issue?
12 A. I don't recall.
13 Q. Did you – if his explanation is that
14 there was one employee who was running late and had
15 called in, and it just happened to be at a time when
16 Jake Jabs was physically in the store, and he
17 allowed her to come in and start her shift late,
18 would you have any criticism of that?
19 A. I don't understand what you're asking.
20 Q. Let me ask you this: When an employee
21 is running late and calls in, is there a standard
22 policy? Are you to tell the employee: Don't come
23 in today?
24 A. No.
25 Q. You want them to come in and get

85

1 started as soon as they can get there; right?
2 A. In most cases.
3 Q. Those things happen; correct?
4 A. Yes.
5 Q. People have to commute to the store;
6 they get stuck in traffic, have kids to drop off,
7 all those things happen; correct?
8 A. Correct.
9 Q. They've happened to you?
10 A. Not too much, but they have.
11 Q. Some?
12 A. Some.
13 Q. If we wanted to know -- we'll strike
14 that.
15 Do you have any information as to the
16 time frame that was involved here? In other words,
17 are these things that had been recently observed?
18 And I'm focusing on the first paragraph, people
19 coming in late.
20 A. I would assume that it had been fairly
21 recent.
22 Q. And you could establish who was
23 involved if you were to look at, among other things,
24 time cards; couldn't you?
25 A. Again, "who was involved"?

22 (Pages 82 to 85)

86

1   Q.   In other words, which employees were
2   late, how late they were?
3   A.   Probably.
4   Q.   Then it says: "It is also apparent
5   that you are not holding the required daily Sales
6   Meeting at the mandated time of 9:45 a.m."
7        First of all, where is it stated in
8   the policies of AFW that you are to have a daily
9   sales meeting at 9:45?
10   A.   I think we have something in our sales
11   consultant that says we hold meetings at -- I don't
12   know if it's 9:45, but we hold a meeting everyday.
13   Q.   Are those meetings necessary?
14   A.   Yes.
15   Q.   Everyday?
16   A.   Yes.
17   Q.   What sort of things are discussed at
18   the daily sales meetings?
19   A.   Everything.
20   Q.   Tell me what you mean by that?
21   A.   Everything. Mainly, they're more
22   geared towards our business, You know, it can be
23   either -- we normally do, like, a sales test. It
24   can be questions regarding product knowledge.
25   Questions regarding policies, what's in upcoming

87

1   ads. It could be a million different things that
2   the tests are related to and/or our meetings.
3   Q.   The phraseology is something that I'm
4   interested in. It says here: "It is also apparent
5   that you are not holding these meetings."
6        Do you know anything about why that
7   was apparent to you?
8   A.   Because he didn't hold the meetings.
9   Q.   But based on what? Did employees
10   complain that he wasn't doing it? Did you come
11   there at 9:45, and no sales meeting was going on?
12   Do you remember what --
13   A.   I'm not sure. I think Jake was there
14   that morning. It was either myself, Jake, or
15   Andrew. But no meeting was held, so. . .
16   Q.   Okay. And you're referring to one
17   instance when no meeting was held?
18   A.   At this one.
19   Q.   It also refers to cleaning needing to
20   be done prior to the store opening.
21   A.   Uh-huh.
22   Q.   Were there complaints -- strike that.
23        Again, where did that information come
24   from, to the best of your recollection?
25   A.   The store was dirty. It was either

88

1   me, Jake, or Andrew that had been there at this one.
2   Q.   Tell me what you mean by "dirty." I
3   assume we are not talking about dirt on the floor?
4   A.   That's exactly what we're talking
5   about.
6   Q.   Again, this is something that one of
7   the three of you observed? And you don't know who,
8   and you can't give me any more specifics about it?
9   A.   Correct.
10   Q.   Would that normally be something that
11   would get documented in the managers' personnel
12   file, if the store was dirty?
13   A.   I don't know if it would normally get
14   put in there. I'm not sure what you mean by that.
15        (Deposition Exhibit 42 was marked for
16   identification.)
17   Q.   (By Mr. Buchanan) I'll show you what
18   we have marked as Exhibit 42 to your deposition.
19   I'm showing you what we have marked as Exhibit 42,
20   Mr. Buscietta. What is this document?
21   A.   "Satellite Store Checklist."
22   Q.   Is this a document that you are
23   familiar with?
24   A.   Yes.
25   Q.   Who prepares these documents?

89

1   A.   Various people.
2   Q.   This one at the top says it's done on
3   12/6. And it lists the "Main Store Person" as Pete.
4   Who is Pete?
5   A.   Pete Parker.
6   Q.   Pete Parker was a buyer?
7   A.   Yes.
8   Q.   And does this reflect a time when he
9   was physically at the store to inspect?
10   A.   Yes.
11   Q.   And how often would Pete Parker go to
12   the stores to inspect?
13   A.   I'm not sure. We didn't have any
14   schedule, per se.
15   Q.   In other words, they would be sort of
16   surprise visits; wouldn't they?
17   A.   Could be.
18   Q.   The purpose is to show up without much
19   notice and see how things really are rather than
20   somebody putting their best foot forward; correct?
21   A.   Could be.
22   Q.   I want you to refer to the second page
23   of this document. Again, this is completed by Pete.
24   It's done on 12/6. We don't have a date -- at least
25   not on this document.

23 (Pages 86 to 89)

90

1       And Item No. 2 is: "Housekeeping
2  (Inside/Out)." And it says "Good"; correct?
3       A.   It says "Okay." Are we looking at the
4  same thing?
5       Q.   No. 2 on the second page.
6       A.   I'm sorry, yes, I was looking at No.
7  1.
8       Q.   It says "Good"; correct?
9       A.   Correct.
10      Q.   That would certainly be a place, if
11  the store was dirty, you would expect it to be
12  notated; correct?
13      A.   Correct.
14      Q.   Let me ask you about some of the items
15  on the first page. There's a line labeled "VIN"
16  number, and then a whole bunch of spaces to be
17  filled in. What is the VIN number?
18      A.   Vignette number.
19      Q.   Vignette number, okay. Not vehicle
20  identification number?
21      A.   No, no, no.
22      Q.   Tell me what "Raise kill on Powell
23  armoire to $59" means.
24      A.   That means that Jack would have had it
25  priced wrong.

91

1       Q.   What does "kill" mean?
2       A.   It's what we refer to as a kill tag,
3  something that's been marked down or a closeout. It
4  can be various things. We do it for mark-downs,
5  closeouts to match competition; something's moving
6  slower than normal. The kill tags are used for
7  various reasons.
8       Q.   These are all things, I take it,
9  listed on the first page that Mr. Parker felt needed
10  to be done; correct?
11      A.   Correct.
12      Q.   I don't have to ask you about each
13  one. But are these -- in reviewing them, are there
14  any of them that appear to be just things that you
15  would expect to be done just automatically, that
16  everybody knows that you are to, quote, Raise kill
17  on Powell armoire to $59, for instance?
18      A.   Can you ask me that again?
19      Q.   I guess what I'm trying to understand
20  is, is Pete just giving Jack instructions to do
21  these various things? Or should Jack have known to
22  do these various things before Pete got there?
23      A.   He should have known to do these
24  things.
25      Q.   How would he know that?

92

1       A.   Are you asking me about one
2  specifically, or all of these?
3       Q.   Let's focus on that first one, "Raise
4  kill on Powell armoire to $59," how would he know
5  he's supposed to do that?
6       A.   It would be in our system as $59.
7       Q.   And could the price have changed since
8  it was last tagged?
9       A.   Very much so.
10      Q.   Because prices change all the time;
11  right?
12      A.   Not all the time but frequently.
13      Q.   How is he to know when the prices
14  change?
15      A.   There's reports for store managers to
16  run.
17      Q.   On how often a basis?
18      A.   Daily.
19      Q.   Okay. Let me pick out another item.
20  The fifth one down says: "Move South Shore maple
21  baby furniture to kid's area. Show with crib."
22       Is that something that might be or
23  would be put in the daily managers' reports that you
24  referred to?
25      A.   Well, we need to back up. The one I

93

1  referred to, you only inquired about pricing.
2       Q.   My first question was. But my
3  question now, on the fifth item down, about moving
4  the South Shore maple baby furniture, my question
5  is: Is that something that would be noted on these
6  reports that go to managers? Or is that simply
7  something that Pete suggested he do?
8       A.   Probably something Pete suggested, on
9  that particular one.
10      Q.   How about the next one down, it says:
11  "Add Wow sign to Mission futon frame -- Wow $89";
12  correct?
13      A.   Correct.
14      Q.   What's a "Wow" sign?
15      A.   It's a larger sign.
16      Q.   Designed to, what, attract attention?
17      A.   Correct.
18      Q.   Again, is that something that the
19  managers should have known ahead of time, or was
20  that something that Pete decided: Why don't you do
21  this?
22      A.   That one he probably should have
23  known. We've used those quite a bit throughout the
24  store and still do.
25      Q.   Right. But why put it on that

24 (Pages 90 to 93)

98
1    down -- but more competition.
2       Q.   Well, "soft sales" means you're not
3    generating as much revenue as at some indefinite
4    time in the past?
5       A.   I would guess.
6       Q.   I guess my question is: Knowing Jake
7    Jabs as you do, is that the way he would use the
8    term?
9       A.   I believe so.
10      Q.   And then he also says: "More
11   competition (there have been several new stores
12   opened in town)...."
13          Reflecting at this point in time, July
14   2002, five years ago, basically, who were the new
15   stores in town at that time?
16      A.   Well, I think like -- probably the
17   ones down around I-25 and Broadway, like Furniture
18   Row. Those couple places over there.
19      Q.   Do you remember, as you sit here
20   reflecting on it, the summer of 2002, or
21   thereabouts, was a time when there were a whole
22   bunch of new furniture retailers in town?
23      A.   I don't remember it specifically, no.
24      Q.   Now, this letter is dated July 11,
25   2002?

99
1       A.   Correct.
2       Q.   And we earlier looked at a personnel
3    action, which is dated July 6, 2002. Do you believe
4    these pertained to the same episodes of observation
5    that are reflected in the personnel action?
6       A.   I'm not sure.
7       Q.   My question is: Given that they were
8    five days apart, would that suggest that there
9    wasn't any new information; this was just we wanted
10   to get a letter from Jake into Jack's file?
11      A.   I don't know if there would have been
12   any new information or not for this one.
13      Q.   Is it unusual -- strike that. Is it
14   unusual, in any way, for Jake Jabs to actually write
15   a letter to one of his store managers?
16      A.   No, it's not unusual.
17      Q.   Happens with some frequency?
18      A.   Not frequent, but it happens.
19      Q.   When you were a store manager, did you
20   ever receive such a letter?
21      A.   I'm sure I did.
22      Q.   Okay.
23      A.   I'm sure I did.
24      Q.   When you say it that way, it sounds
25   like it may have happened more than once?

100
1       A.   Possibly. It's a 27-year career, so
2    it's possible.
3       Q.   Let me ask about the back order
4    report. If a salesperson makes a sale and then, for
5    whatever reason, that sale is canceled -- customer
6    returns the furniture; there's an even exchange --
7    what happens to the revenue from that?
8       A.   As far as?
9       Q.   Well, do you return all the money to
10   the customer?
11      A.   Yes, in most cases.
12      Q.   And do you pay commissions on sales as
13   written or sales as delivered?
14      A.   As delivered.
15      Q.   So when -- so, basically, a
16   salesperson would be incentivized to work the back
17   order report because they don't get a commission on
18   it unless and until it's delivered?
19      A.   Yes.
20      Q.   And, normally, it's Jake's philosophy,
21   isn't it, if you incentivize employees, they'll find
22   their own way; and they'll get things done?
23      A.   I don't know if that's his
24   philosophy -- his philosophy as far as incentivizing
25   is so that people do more work.

101
1       Q.   Tell me what you mean by that?
2       A.   Well, for instance, a delivery driver,
3    if he's on commission, he does more deliveries than
4    a guy that would be paid hourly.
5       Q.   But in this particular instance, a
6    salesperson who is on a commission, which is not
7    paid unless or until the furniture is delivered and
8    kept by the customer, would be incentivized to work
9    their back order report; wouldn't they?
10      A.   In theory.
11      Q.   Okay. And that's the reason that you
12   make the commissions payable when the furniture is
13   delivered, so that the salesmen will follow through;
14   correct?
15      A.   Part of it, correct.
16      Q.   Is there any other reason?
17      A.   Just in general -- we just don't pay
18   on written, in general, because then they're going
19   to write everything they possibly can.
20      Q.   And it gets messy if sales don't get
21   completed and everything else?
22      A.   (Deponent nods head.)
23      Q.   The answer is yes?
24      A.   Yes.
25      Q.   Okay. Now, there's also a reference

26 (Pages 98 to 101)

William Michael Buscietta

102

1  in here – and I'm looking at the third paragraph of
2  Exhibit 30. It says: "We need to upgrade our
3  stores and our staff. It's a window if opportunity"
4  -- I assume he means "of opportunity" -- "to upgrade
5  all our staff with all the layoffs happening,
6  especially in the sales department."
7         And I'm a little confused by that.
8  Does the author of this letter, whether it's
9  Mr. Jabs or someone else, mean to say that there
10 were a lot of layoffs happening at American
11 Furniture Warehouse?
12        MR. VOLIN: Objection, foundation.
13        THE DEPONENT: I don't know; I don't
14 know.
15     Q.    (By Mr. Buchanan) Were there, to your
16 recollection -- based on -- again, reflecting on the
17 summer five years ago, were there lots of layoffs
18 happening in the furniture retail industry?
19     A.    If I had to guess, I would guess it
20 was in general, the economy in general, all
21 businesses here in Colorado – I'm assuming.
22     Q.    And if that's the correct
23 understanding, would Jake, or whoever the author of
24 this letter is, be saying that this is an
25 opportunity to snatch up some good employees who

103

1  have been laid off elsewhere?
2     A.    I believe so.
3     Q.    Okay. Did you have any -- between the
4  times -- the July 2002 time frame, when Exhibits 29
5  and 30 were prepared -- did you have any other
6  occasions to have verbal counseling or warnings to
7  Jack Must?
8         MR. VOLIN: Can you read that question
9  back?
10        (The record was read back by the
11 reporter as requested.)
12     Q.    (By Mr. Buchanan) I'll withdraw that;
13 it's a bad question.
14        Between July 2002, when Exhibits 29
15 and 30 were prepared, and when he was terminated in
16 July of 2004, did you have occasion to have any
17 verbal counseling or warning sessions with Jack
18 Must?
19        MR. VOLIN: Object to the form.
20 Assumes facts not in evidence.
21        MR. BUCHANAN: I understand the
22 objection. It's to form only; right? The form is
23 noted.
24        MR. VOLIN: Well, it's more than form,
25 Counsel. What you're saying is he was terminated,

104

1  which is the subject of some dispute. So why don't
2  you say his separation from the company?
3         MR. BUCHANAN: You're not entitled to
4  coach your witness. And you know very well you're
5  not supposed to. I used a word that he understands,
6  and he didn't have any difficulty understanding it.
7  And your objection is to form, and that's it. You
8  need to make that objection.
9         MR. VOLIN: I made that objection, and
10 I don't need to be made quiet. Because you're
11 assuming facts -- evidence he has not testified to.
12 So it's not just a form objection. It's called a
13 trick question, which makes lawyers look bad,
14 Counsel.
15        MR. BUCHANAN: No, it isn't. It's a
16 legitimate question, and you're not supposed to
17 coach the witness.
18        MR. VOLIN: It brings disrespect to
19 our industry when you do that. You shouldn't do
20 that. You, of all people, should know better than
21 to do that.
22        MR. BUCHANAN: I think our soliloquy
23 on that is adequately established.
24     Q.    (By Mr. Buchanan) Between July of
25 2002 and July of 2004, did you have any sessions

105

1  where there was verbal counseling or warnings with
2  Jack Must?
3     A.    I don't recall.
4     Q.    Now, you mentioned earlier – just to
5  be fair about this, you mentioned earlier you do
6  recall a meeting, after a managers meeting, with
7  Jack Must; correct?
8     A.    Correct.
9     Q.    Which we're going to talk about here
10 in a minute. And I'm wondering if other than that
11 meeting, do you remember any other time where you
12 gave verbal counselings or warnings to Jack Must?
13     A.    I don't recall specifically.
14     Q.    Do you have any vague recollection?
15     A.    Well, I would have talked to him quite
16 frequently. Could any conversation I had with him
17 be construed as counseling if I was at his store?
18 So that could be open to a weekly, monthly basis
19 that I would talk to him. I mean, I wouldn't,
20 certainly, leave him alone for that two-year period.
21     Q.    Fair enough. But my specific question
22 is: Do you remember, as you sit here today, any
23 time you came up and said: Jack, this isn't going
24 well; you need to improve on this? Or I need to see
25 improvement on this, or however you would put it?

Calderwood-Mackelprang, Inc. 303.477.3500

106

1    A.    You are asking specifically if I had
2    conversations that he needed to improve and nothing
3    else?
4    Q.    Well, let's start there. Between July
5    of 2002 and July of 2004.
6    A.    I don't recall.
7    Q.    Do you recall any interaction with
8    Jack where you were trying, subtlely or otherwise,
9    to suggest: Jack, you need to change this; you need
10    to do this?
11    A.    I don't recall specifics. As I stated
12    before, I would visit the stores frequently. But,
13    you know -- again, that's ten stores in the Metro
14    area. So, you know, you can figure the math as far
15    as getting around to them all the time.
16         But I think it's too general of a
17    question. I don't feel comfortable answering that.
18    I could do these (indicating) on a Saturday if I did
19    a Saturday's sales meeting, but --
20    Q.    So we're clear: When you point out
21    "these" (indicating), you're talking about the
22    satellite store checklist?
23    A.    Yes.
24    Q.    If you did that, it would be in his
25    personnel file?

107

1    A.    They don't go in personnel files.
2    Q.    Where do they go?
3    A.    They get taken care of and then thrown
4    away. They are left to the store manager.
5    Q.    How did this one get in his personnel
6    file? "This one," being Exhibit 42.
7    A.    No clue.
8    Q.    At the top, it says: "Put in Jack
9    Must file," with the initial D.
10    A.    Looks like a box, I guess. I don't
11    know why it would be in his file. Normally, they
12    don't go into files.
13    Q.    Do you know whose writing that is?
14    A.    Not off the top of my head.
15    Q.    Apparently, it was completed by Pete
16    Parker. Can you identify that handwriting as Pete
17    Parker's?
18    A.    No, I don't recognize Pete's. And
19    he's been gone for a while.
20    Q.    Okay. You mentioned that you would
21    visit the stores frequently. Did you have a regular
22    schedule?
23    A.    No.
24    Q.    Give me however you can characterize
25    it, Mr. Buscietta. Was it a weekly thing, monthly

108

1    thing?
2    A.    Average it for all the stores?
3    Q.    However you feel comfortable.
4    A.    I would say probably monthly.
5    Q.    And when you did that, did you, as of
6    either a matter of personal habit or were you
7    required to document what you had seen?
8    A.    No.
9    Q.    Were you required to report to Jake
10    what you had seen?
11    A.    No.
12    Q.    Given the time frame we're talking
13    about -- and the end of the time frame was July of
14    2004 -- is there anything that you can go back to
15    and say: I was there on this date; here's what I
16    observed; here's what I said to Jack; here's what he
17    said to me, anything like that?
18    A.    No, nothing I can go back to.
19    Q.    Let's talk about the meeting that you
20    had with Jack in your office following the June
21    managers meeting. Okay?
22    A.    (Deponent nods head.)
23    Q.    Did you have a monthly managers
24    meetings?
25    A.    Yes.

109

1    Q.    And am I correct that at the monthly
2    managers meeting, in the month following the end of
3    a fiscal quarter for bonus purposes, you would
4    distribute bonus checks?
5    A.    Yes.
6    Q.    And do you recall how it is that you
7    and Jack came to have a meeting after the sales or,
8    pardon me, after the managers meeting?
9    A.    I don't know if that might have been
10    related to some of the bonus. I believe it was over
11    a signature capture or something. I don't remember
12    the specifics. But I do remember, in general, what
13    they were.
14    Q.    Well, let me --
15    A.    I can't tell you word for word what
16    was said.
17    Q.    Okay. Did you initiate the meeting or
18    did Jack?
19    A.    That, I don't know.
20    Q.    It was in your office?
21    A.    Yes.
22    Q.    The managers meeting, itself, was
23    elsewhere; correct?
24    A.    Yes.
25    Q.    In a larger conference room somewhere?

28 (Pages 106 to 109)

110

1    A.    Yes.
2    Q.    As you reflect on that meeting,
3    Mr. Buscietta, do you have any recollection of why
4    it is that that meeting occurred in your office and
5    didn't occur where the larger managers meeting had
6    been?
7    A.    I don't understand the reason behind
8    that. If it was to address something with an
9    individual, it wouldn't be with a group, then.
10    Q.    In other words, you wanted some
11    privacy?
12    A.    I would guess. I don't remember who
13    initiated it, so. . .
14    Q.    What do you remember about that
15    meeting?
16    A.    The only thing that I really remember
17    that sticks out about it was how belligerent Jack
18    was.
19    Q.    Tell me what you mean.
20    A.    Raising his voice. I don't know if I
21    could say he was condescending. But I guess, as the
22    general manager or even as a manager, if I have an
23    employee come to me now and they raise their voice,
24    you don't -- you hope that they respect you a little
25    bit more. But he was very belligerent in that

111

1    meeting, and that's what sticks out the most.
2    Q.    Okay.
3    A.    Because I didn't have managers do
4    anything like that in the past.
5    Q.    Let me understand. When you
6    characterize him as "belligerent," tell me what you
7    mean specifically?
8    A.    Raising his voice.
9    Q.    Okay.
10    A.    Talking over me, not listening.
11    Q.    Okay. Was there anybody in this
12    meeting, other than you and Jack?
13    A.    I believe Andrew -- I don't know if he
14    was there from the start, but I remember Andrew
15    being there.
16    Q.    Did Andrew speak to Jack?
17    A.    He probably did, I would guess.
18    Q.    Did you raise your voice?
19    A.    I don't remember.
20    Q.    Did Andrew raise his voice?
21    A.    I don't remember that, either.
22    Q.    Was Andrew condescending?
23    A.    Don't remember that, either.
24    Q.    Do you have an opinion whether Andrew
25    can, from time to time, be condescending?

112

1    A.    He hasn't been with me.
2    Q.    Can he be with store managers?
3    A.    I don't think so.
4    Q.    The subject -- at least one of the
5    subjects was signature caps?
6    A.    I believe so, right.
7    Q.    I think I understand that system.
8    That's where someone picks up a piece of furniture
9    at the warehouse and signs for it. And it goes
10    immediately into your computer system and locks out
11    the invoice, correct?
12    A.    Yes, correct.
13    Q.    And this was a new system that AFW had
14    had put into its stores?
15    A.    It was fairly new. Could have been
16    there a while.
17    Q.    What was the issue on signature caps?
18    A.    What was the issue?
19    Q.    When you talked to Jack.
20    A.    That his had not been working.
21    Q.    And why had it not been working, to
22    your understanding?
23    A.    Why it was not working? I don't know
24    why it wasn't working. I know that it wasn't
25    working.

113

1    Q.    Okay. Why was that an issue that you
2    wanted to talk to him about? Was it his bailiwick
3    to make it work, or someone else's job?
4    A.    It was his.
5    Q.    Why do you say that?
6    A.    Can I refer to this paragraph here
7    that Jake writes?
8    Q.    Sure.
9    A.    "I am a believer that the Store
10    Manager is responsible for all of this." And that's
11    always been Jake's philosophy.
12    Q.    And you're referring to Exhibit 30?
13    A.    Correct.
14    Q.    And would you understand that "all of
15    this" would refer to what he was referring to above?
16    A.    It refers to everything in your store,
17    is what that refers to.
18    Q.    All right. And because it's a
19    signature capture system and it's in his store, he's
20    responsible for it?
21    A.    Yes.
22    Q.    Who was responsible for hooking up the
23    signature caps?
24    A.    In the initial phase?
25    Q.    Yes.

114

1   A.   Most likely be the IT department.
2   Q.   Where are they located?
3   A.   They're both at Thornton and the
4   Compark location.
5   Q.   And to your knowledge, as of July of
6   2004, what was involved in getting these signature
7   cap systems up and running, from an IT standpoint?
8   A.   I don't know, from an IT standpoint,
9   what it would take.
10   Q.   And I take it you wouldn't expect a
11   store manager to know, from an IT standpoint, what
12   it would take?
13   A.   I didn't say that earlier.  I just
14   said he was responsible for ensuring that it was
15   working, not that he was responsible for the IT
16   portion of it.
17   Q.   Fair enough.  Did you gain an
18   understanding, during that meeting, that the IT
19   folks had either never been out to hook it up or had
20   only just very recently been out to hook it up?
21   A.   That part, I didn't understand that.
22   I don't remember that part of that.
23   Q.   He had, by far, the smallest warehouse
24   in the AFW constellation; didn't he?
25   A.   Probably.  It would be close.

116

1   was, this meeting -- I'm just going to tell you this
2   meeting happened on June 2nd or 3rd, '04.  Was it
3   within the last six months or. . .
4   A.   As I recall, we had them for quite a
5   while.  Because I think Jack was not working for
6   quite sometime, as I recall -- 60, 90 days,
7   something like that.  So we had them for quite a
8   while.
9   Q.   Did you have an understanding it had
10   been working at one time, and it stopped?
11   A.   I believe -- I do, yeah, or should
12   have been working.
13   Q.   All right.  IT reports to you, or did
14   at that time?
15   A.   Yes.
16   Q.   Did they report to you the progress of
17   getting these signature capture functions up and
18   running?
19   A.   I don't recall if they specifically
20   did.
21   Q.   Who was the head of IT at that time?
22   A.   It would have been Brian Frantz.
23   Q.   F-r-a-n-t-z?
24   A.   Correct.
25   Q.   Do you remember, one way or the other,

115

1   Glenwood, Southwest is probably about the same.
2   Q.   10,000 feet?
3   A.   I guess, yeah.
4   Q.   Does it stand to reason that the
5   signature caps in that store would be a lower
6   priority than they would be, for instance, at the
7   Thornton mega store?
8   A.   No.
9   Q.   They're not?
10   A.   No.
11   Q.   Even though the mega store handles
12   many multiples the amount of furniture coming in and
13   out of its warehouse?
14   A.   Not any less, but as important.
15   Q.   Do you know what importance the IT
16   people put on it; in other words, where they focused
17   their priorities on that?
18   A.   They do a lot of things.  I don't know
19   where they would have focused them at that time.
20   I'm not sure what you're asking in that question.
21   Q.   Let me ask it this way:  Do you know
22   when the signature caps began being installed?
23   A.   I don't remember the exact date, no.
24   I don't remember.
25   Q.   Can you tell us, relative to when it

117

1   whether there were any particular issues that caused
2   Jack's system to either not get hooked up at all or
3   stop functioning once it had been hooked up?
4   A.   I don't.
5   Q.   Do you recall anything about his
6   explanation for that?
7   A.   I don't.
8   Q.   Do you remember saying to Jack words
9   to the effect:  Can you give me one reason or a
10   reason why I should give you this bonus check?
11   A.   I don't remember saying that
12   specifically.  If I had the bonus check and if it
13   was at that time, possibly.
14   Q.   You hadn't given it to him yet;
15   correct?
16   A.   I would guess.  I don't remember that
17   part of the conversation specifically.  So the thing
18   that sticks out, again, was Jack.  Everything before
19   and after that doesn't stick out as much as his
20   behavior.
21   Q.   Whatever you said about the bonus
22   check preceded, as you said, him getting
23   belligerent; didn't it?
24   A.   I don't remember that.
25   Q.   Was the only issue that this meeting,

30 (Pages 114 to 117)

William Michael Buscietta

| | 118 | | 120 |
|---|---|---|---|

**118**

1  as far as you were concerned, was to be about was
2  the signature capture?
3    A.  I believe so.
4    Q.  Were other issues discussed?
5    A.  I don't recall.
6    Q.  Do you remember Andrew Zuppa saying
7  words to the effect: If we had to live off your
8  store, we'd starve?
9    A.  I don't remember Andrew saying that
10  either.
11    Q.  Do you remember him saying something
12  to that effect?
13    A.  No.
14    Q.  Are you denying that he said it?
15    A.  I don't know whether he said it or
16  didn't say it.
17    Q.  Do you recall there being some
18  discussion about the sales volume at the Westminster
19  store?
20    A.  I don't recall that part of that,
21  either.
22    Q.  Is there anything else that happened
23  during that meeting that sticks out in your mind
24  now, other than what we have already talked about?
25    A.  No.

**120**

1    A.  I don't remember him being there.
2    Q.  His office was in the same location;
3  correct?
4    A.  It is, correct.
5    Q.  This was at the Englewood location at
6  the Compark store?
7    A.  Correct.
8    Q.  You eventually did give him his bonus;
9  correct?
10    A.  I believe so.
11    Q.  Do you recall it was in the full
12  amount?
13    A.  I don't recall.
14    Q.  Did you have a discussion with Andrew
15  Zuppa after that meeting?
16    A.  I believe that I did.
17    Q.  What do you remember about that
18  discussion?
19    A.  I think, because of Jack being
20  belligerent, I wanted to fire him.
21    Q.  You wanted to fire him?
22    A.  I wanted to fire him.
23    Q.  What did you say?
24    A.  That I wanted to fire him.
25    Q.  And what did Andrew respond?

**119**

1    Q.  This was a meeting at the end of the
2  day; correct?
3    A.  I don't know if it was quite the end
4  of the day. I'm not sure. Our meetings can end
5  anywhere from two to six.
6    Q.  I mean, the managers meetings are in
7  the afternoon?
8    A.  Mornings into the early afternoons.
9    Q.  So they last that long?
10    A.  Yes.
11    Q.  But it was a meeting after that
12  managers meeting?
13    A.  Yes, sir.
14    Q.  So it stands to reason it was probably
15  afternoon?
16    A.  Yes, yes, I'm sorry. I misunderstood.
17    Q.  I didn't ask the question that way the
18  first time. I was under the impression it was at
19  five o'clock?
20    A.  Two or three, it could have possibly
21  been.
22    Q.  Did anyone drift into this discussion,
23  other than Andrew?
24    A.  I don't remember.
25    Q.  Was Jake in on it?

**121**

1    A.  Andrew's response was -- I think
2  Andrew said something to the effect: He's my
3  responsibility; let me work with him.
4    Q.  Did you direct Andrew Zuppa to fire
5  him?
6    A.  No.
7    Q.  Was the basis for the firing the
8  belligerence?
9        MR. VOLIN:  Object to form.
10        THE DEPONENT:  I'm not sure. It
11  wasn't involved with anything, other than that, with
12  Jack.
13    Q.  (By Mr. Buchanan)  My question is:
14  Your feelings that afternoon when you said you
15  wanted to fire him, was the basis the belligerence?
16    A.  Yes.
17    Q.  You felt disrespected?
18    A.  Yes.
19    Q.  And you communicated that to him, I
20  assume?
21    A.  To Jack or Andrew?
22    Q.  To Jack.
23    A.  I would assume.
24    Q.  Do you remember anything else about
25  the discussion?

31 (Pages 118 to 121)

Calderwood-Mackelprang, Inc. 303.477.3500

William Michael Buscletta

122

1    A.   No, I don't; I don't.
2    Q.   Okay.  Do you recall a time, shortly
3    after that, where you got a call from Jake while he
4    was walking the floor at the Westminster store?
5        A.   Not specifically.  But as I stated
6    earlier, there were numerous occasions when Jake was
7    out there, and there weren't enough salespeople,
8    whatever the case may be; and I got calls.
9        Q.   Do you remember a time when you got a
10   call and Jake was walking the floor with Jack, and
11   the subject was signature caps?
12       A.   I do believe.
13       Q.   What do you remember about that phone
14   call?
15       A.   I don't remember the phone call.  I
16   remember Jake being out there and saying it wasn't
17   working.
18       Q.   Do you remember him taking the
19   position that this is a systems department issue,
20   not Jack's issue?
21       A.   No, I don't remember him taking that
22   position.
23       Q.   Why was he calling you?
24       A.   Again, I was the general manager.
25       Q.   Fair enough.  But if this is Jack's

123

1    responsibility and it's Jake's philosophy that the
2    store manager is responsible for everything, why is
3    he going to call you?
4        A.   Because Jack didn't have it fixed; it
5    wasn't working.
6        Q.   So?
7        A.   And he should have.
8        Q.   So?
9        A.   Obviously, Jack couldn't do it; so he
10   was calling me.
11       Q.   So he wanted you to do something to
12   fix the signature caps?
13       A.   Yes, I would guess.  That would be the
14   basis of the call.
15       Q.   Did you do something?
16       A.   I'm assuming I did, yes.
17       Q.   You don't remember?
18       A. ·  I don't remember specifically, but I
19   probably had someone out that day to fix it.
20       Q.   Did you talk to Brian Frantz about
21   this at any point?
22       A.   I don't remember if I talked to Brian
23   specifically about it.  I don't recall.
24       Q.   How would you normally communicate
25   about something like that?  Would you call someone

124

1    on the phone or write a memo?
2        A.   Usually call.
3        Q.   Do you have e-mail?
4        A.   Yes.      . .
5        Q.   Would you e-mail him?
6        A.   Would I e-mail Brian?
7        Q.   Yeah.
8        A.   I don't remember.  That probably would
9    have been a call.  That was urgent at that point.
10       Q.   Are you an e-mail type of guy?
11       A.   Sometimes.  Just as equally a phone
12   guy, still.
13       Q.   So you tend -- if there's an urgency
14   to it and it's going to be a longer discussion, you
15   tend to want to have a phone call?
16       A.   Yes.
17       Q.   How long did the phone call from Jake
18   last on that occasion?
19       A.   I don't have a clue; I don't have a
20   clue.
21       Q.   Were there any other subjects brought
22   up other than signature caps?  .
23       A.   I don't recall that either.  I just
24   remember signature caps really sticks out.
25       Q.   Do you recall calling Jack after that,

125

1    Jack Must?
2        A.   I don't recall, but I imagine I would
3    have.
4        Q.   Why?
5        A.   To ask why it wasn't working.  I'm
6    speculating.  I don't remember talking to Jake.  I
7    don't want to speculate about my conversation with
8    Jack.
9            I remember Jake calling and signature
10   caps ended up being a big deal that day just because
11   it wasn't working.  But that's about all I remember.
12           I don't remember calling Brian.  I
13   don't remember calling Jack.  I'm assuming Jake
14   called me so that I would take care of it.
15       Q.   Okay.  What I'm trying to understand
16   about the signature caps is this:  Did you feel that
17   Jack Must, himself, or somebody that worked for
18   him -- an assistant manager, a warehouseman, a
19   salesman, or anyone else there at the Westminster
20   store -- should be able to go into the signature
21   caps and get them working?
22       A.   Let's say Jack has a truck, which they
23   did; and the truck was broke down and needed engine
24   work, would I expect him to fix the truck?  Maybe,
25   possibly, if he knew how to.  But I would expect

32 (Pages 122 to 125)

126

1  Jack to call somebody to get it fixed.
2      Q.   But you didn't expect Jack, himself,
3  to go in there and figure out, from a computer
4  standpoint, what was wrong with the signature cap
5  and fix it himself?
6      A.   Not from a software standpoint,
7  certainly hardware. If your computer goes out, you
8  unplug it and plug it back in as the first line of
9  defense, those types of things, yes. Software, no.
10     Q.   Obviously, if it is more than that,
11 you would expect him to go to people who know how to
12 do such things?
13     A.   If it were a hardware issue, if we
14 were doing it throughout the stores, then they would
15 be working on them. And his would have been either
16 not plugged into the terminal or something like
17 that. It could just as easily be hardware and those
18 types of issues as it could be software issues.
19     Q.   Did you ever get a report back from
20 whomever, Brian Frantz, anybody in his department,
21 Jack, anyone else, about what the problem had been?
22     A.   No, I don't recall.
23     Q.   Would they normally do that?
24     A.   Not normally.
25     Q.   Does the IT department prepare work

127

1  orders, or anything, that documents what they're
2  doing and why they're doing it?
3      A.   No, not really. They do a lot of
4  things by phone. We have their extensions, and they
5  call the guys. And, you know, a lot of the IT
6  problems, you try to get fixed pretty quick. You
7  can't rely on work orders going through a system.
8      Q.   Was part of the reason -- strike that.
9  When did you meet Nolan Morrison?
10     A.   I don't remember the exact date I met
11 him. He was a salesperson at the Thornton location
12 originally, I believe.
13     Q.   Did you play a role in promoting
14 Mr. Morrison from sales to his next position?
15     A.   Which was his next position?
16     Q.   That's a good question. I assume
17 assistant manager, but I don't know that.
18     A.   If it was prior to when I was general
19 manager, yes, I would have.
20     Q.   Do you remember anything about that?
21     A.   Huh-uh.
22     Q.   The answer is no?
23     A.   The answer is no. I'm sorry.
24     Q.   Do you remember having input into
25 promoting Nolan Morrison into his position as store

128

1  manager of the Westminster store?
2      A.   I didn't have input. You need to
3  probably word that differently. I didn't have
4  input; I was asked an opinion. How's that?
5      Q.   By whom?
6      A.   By Andrew.
7      Q.   What were you asked?
8      A.   Did I have anybody that he thought
9  could manage the Westminster store.
10     Q.   And what did you say?
11     A.   I said Nolan.
12     Q.   You were the one that suggested Nolan?
13     A.   I'm the one that suggested Nolan, yes.
14     Q.   When was that?
15     A.   I'm not sure, not sure. I don't know.
16 I remember him asking me, but I don't know -- I
17 think it was the day that it happened; but I'm not
18 sure, though.
19     Q.   The day what happened? I'm sorry.
20     A.   That Jack quit.
21     Q.   Okay. The day he was handed a bunch
22 of checks?
23     A.   I don't know about that. I wasn't
24 there. I heard that he quit.
25     Q.   So he asked your opinion as of that

129

1  day, and you told him Nolan Morrison?
2      A.   Yes.
3      Q.   Based on what?
4      A.   Based on Nolan's probably one of the
5  few people there that's as good as I am. Not that
6  I'm that great, but. . .
7      Q.   Good at what?
8      A.   At running stores, working at American
9  Furniture.
10     Q.   To my understanding, he had never run
11 a store before that; correct?
12     A.   I don't believe that he had. I don't
13 know what his prior career was; I couldn't tell you.
14     Q.   I'm sorry I keep interrupting you. By
15 that time, you had become the store manager in
16 Thornton; correct?
17     A.   Correct.
18     Q.   Did Andrew Zuppa ask you your opinion
19 when you were the store manager?
20     A.   I don't understand.
21     Q.   Well, several things happened in the
22 same time frame.
23     A.   Okay.
24     Q.   And I'll show you a memo here if you
25 need it. There was a memo that went out June 14,

33 (Pages 126 to 129)

Calderwood-Mackelprang, Inc. 303.477.3500

130

1  2004, that said you had gone from being the general
2  manager to managing Thornton.
3      A.   Correct.
4      Q.   And as I understand it, that meant you
5  moved from the corporate offices in Englewood up to
6  Thornton; correct?
7      A.   Correct.
8      Q.   And you went from being the general
9  manager to the manager of one of the stores?
10     A.   Correct.
11     Q.   Would you characterize that as a
12 demotion?
13     A.   No.
14     Q.   Without giving me any numbers -- I'm
15 not going to ask you numbers -- did your
16 compensation remain the same?
17     A.   Yes.
18     Q.   Who made that decision?
19     A.   Jake, I believe.
20     Q.   Did Jake explain why he made that
21 decision?
22     A.   Said he wanted to make a change.
23     Q.   I guess you kind of assumed that?
24     A.   I did.
25     Q.   Was there a basis for it or reason?

131

1      A.   He didn't say, didn't say.
2      Q.   How long a conversation was this?
3      A.   It was very short, very short.
4      Q.   You had been his general manager for
5  ten years?
6      A.   Uh-huh.
7      Q.   Answer is yes?
8      A.   The answer is yes.
9      Q.   Did you feel you were owed an
10 explanation?
11     A.   No.
12     Q.   Did you have any forewarning that this
13 was going to occur?
14     A.   No.
15     Q.   Where did it happen?
16     A.   Where did Jake tell me?
17     Q.   Yes.
18     A.   In his office.
19     Q.   I asked if you had any forewarning.
20 Did you have any inkling that's what he wanted to
21 talk to you about?
22     A.   No, huh-uh.
23     Q.   I want to make a change, and that was
24 it?
25     A.   That was it.

132

1      Q.   He didn't say: I want to make a
2  change because Andrew is better at this than you
3  are; you're better at this than Andrew is, anything
4  like that?
5      A.   No.
6      Q.   Was anyone else present for that
7  meeting, other than you and Jake?
8      A.   No, just Jake and I.
9      Q.   Now, was it after that meeting with
10 Jake that you were asked by Andrew your opinion as
11 to someone else who could manage the Westminster
12 store?
13     A.   Well, it would have to have been after
14 that, correct?
15     Q.   Well, that's what I'm asking.
16     A.   I thought we just talked about that,
17 though.
18     Q.   Let me understand. Had you known
19 Nolan Morrison before you went up to Thornton?
20     A.   Yes.
21     Q.   Had you known his capabilities and
22 qualifications and everything before you went up to
23 Thornton?
24     A.   Yeah, I think so.
25     Q.   Is there any reason why you couldn't

133

1  have offered the opinion that you did to Andrew
2  Zuppa before you went up to Thornton?
3          MR. VOLIN:  Object to the form.
4          THE DEPONENT:  When I was still
5  general manager?
6      Q.   (By Mr. Buchanan)  Yes.
7      A.   Would I have recommended Nolan as a
8  store manager, if the occasion would have arose, for
9  a store manager?
10     Q.   Yes?
11     A.   Most likely.
12     Q.   You knew enough about him to make that
13 recommendation before you went to Thornton?
14     A.   Yeah, probably, probably.
15     Q.   What was Nolan's position at Thornton
16 before he went to Westminster?
17     A.   He was one of the sales managers or
18 assistant manager; it could be either/or. They
19 intertwine quite a bit. At larger stores, they do
20 because of the sheer number of salespeople.
21     Q.   Let me be clear about this: Assistant
22 managers and sales managers, at least at the larger
23 stores, are essentially the same level?
24     A.   Essentially.
25     Q.   Did you have any input into the actual

34 (Pages 130 to 133)

William Michael Buscietta

134

1    decision – I've heard what you said after the
2    meeting in your office. Did you have any input into
3    the actual decision to terminate Jack Must as the
4    store manager at Westminster?
5            MR. VOLIN: Object to the form.
6            THE DEPONENT: No.
7       Q.   (By Mr. Buchanan) Did Mr. Zuppa
8    consult you on that issue?
9       A.   No.
10      Q.   The first time you heard that there
11   was an issue about it was when he asked: Do you
12   have anybody that could become the manager over at
13   Westminster?
14      A.   Correct.
15      Q.   You gave your address at the outset as
16   Highlands Ranch. Is that where you were living in
17   the summer of 2004?
18      A.   Let's see, I've been there four years.
19   I'm not sure. It would be close. I think I've been
20   there four years at my place, so we would be five
21   years away right now.
22      Q.   Well, 2004 --
23      A.   So, yes, I would have been living
24   there. I'm sorry. I'm terrible at math.
25      Q.   Going to Thornton would have been a

135

1    significantly larger commute for you; correct?
2       A.   Yes.
3       Q.   Did you have any contact with Jack
4    Must after July 6, 2004?
5       A.   I don't believe so.
6       Q.   You never had a phone call from him,
7    had a conversation with him on the street, anything?
8       A.   I don't think so.
9       Q.   As the store manager at Thornton, you
10   now report to Andrew Zuppa; correct?
11      A.   Correct.
12           MR. BUCHANAN: Those are all the
13   questions I have. Thank you, sir.
14           THE DEPONENT: Thank you. Thank you.
15           MR. VOLIN: Let's take a quick break
16   and see if we have any.
17           (A recess was taken.)
18           MR. VOLIN: I've got no questions for
19   the witness.
20           (WHEREUPON, the deposition was
21   concluded at 12:12 p.m.)
22
23
24
25

136

1            I have read the foregoing
2    transcript of my testimony and have indicated the
3    same by my signature.
4
5
6
     _____
              WILLIAM MICHAEL SUSCIETTA
7
8    STATE OF COLORADO
9    CITY AND COUNTY OF DENVER
10          Subscribed and sworn to before me by
11   WILLIAM MICHAEL BUSCIETTA on this
12   _____,2007.
13          My commission expires:_____.
14
15
16
17
     _____
              Notary Public
18
19
     _____
              Address
20
21
22   Reporter: DEE
     Trial/Hearing Date: Unknown
23
24
25

137

1              CERTIFICATE
2   STATE OF COLORADO      )
                           )ss.
3   CITY AND COUNTY OF DENVER )
4
5        I, Dawn E. Eastman (Calderwood),
    Certified Shorthand Reporter, Registered
6   Professional Reporter, and Notary Public for the
    State of Colorado, do hereby certify that previous
7   to the commencement of the examination, the said
    WILLIAM MICHAEL BUSCIETTA was duly sworn by me to
8   testify the truth in relation to the matters in
    controversy between the said parties.
9        I further certify that said deposition
    was taken in shorthand by me and was reduced to
10  typewritten form by computer-aided transcription.
    that the foregoing is a true transcript of the
11  questions asked, testimony given, and proceedings
    had.
12       I further certify that I am not an
    attorney nor counsel nor in any way connected with
13  any attorney or counsel for any of the parties to
    said action or otherwise interested in its event.
14       IN WITNESS WHEREOF, I hereunto affix my
    hand and notarial seal this 28th day of September,
15  2007. My commission expires September 20, 2010
16
17
18
     _____
19            Dawn E. Eastman (Calderwood)
              CSR, RPR, Notary Public
              Calderwood-Mackelprang, Inc.
20
21
22
23
24
25

35 (Pages 134 to 137)