# EXHIBIT 3

1

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE DISTRICT OF COLORADO
3  Civil Case No. 06-CV-01872-RPM-MEH
4  JACK MUST,
5  Plaintiff
6  vs.
7  AMERICAN FURNITURE WAREHOUSE CO., a Colorado
   corporation d/b/a/ AMERICAN FURNITURE WAREHOUSE,
8
9  Defendant.
10
11 _____
12          DEPOSITION OF THOMAS K. WARD
13 _____
14
15          PURSUANT TO NOTICE, the above-
16 entitled deposition was taken on behalf of the
17 Plaintiff at 1621 18th Street, Suite 260, Denver,
18 Colorado, on August 30, 2007, at 9:05 a.m., before
19 Dawn E. Eastman (Calderwood), Certified Shorthand
20 Reporter, Registered Professional Reporter, and
21 Notary Public.
22
23
24
25

**Page 10**

```
 1  group of people from one building to another or to
 2  another location, rebuild the cubicles, whatever it
 3  took.
 4       Q.  How long were you at Ball?
 5       A.  Thirteen years.
 6       Q.  So that would take us to about...
 7       A.  About 1984, 1985.
 8       Q.  I'm going to call that good.
 9       A.  Okay.
10       Q.  And I don't mean to pry into your
11  privacy. You mentioned PTSD. Do you still receive
12  treatment for that?
13       A.  Yes, I do.
14       Q.  Can you describe, in general terms,
15  what that consists of?
16       A.  I'm being treated through the VA.
17       Q.  And does the treatment include any
18  kind of medication?
19       A.  Yes, it does.
20       Q.  Are you using that medication today?
21       A.  Yes.
22       Q.  Do you -- and my only concern about
23  that is whether it will affect your ability to
24  understand and respond to my questions truthfully.
25       A.  It'll probably help it, actually.
```

**Page 11**

```
 1       Q.  Okay.
 2       A.  Yeah. It will probably affect it in a
 3  good way. In other words, if I weren't taking the
 4  medication, I probably wouldn't be as able to
 5  understand what you are talking about.
 6       Q.  Okay, that's fine.
 7           Let's talk for a little bit about the
 8  Westminster store of AFW. Just let me tell you:
 9  It's my understanding that there was, what I'm going
10  to call the old store, in Westminster. And there's
11  now, since about the spring of 2006, the new store,
12  correct, what used to be the Homestead House?
13       A.  That's correct.
14       Q.  Are you still at the Westminster
15  store?
16       A.  Yes.
17       Q.  Have you ever, during the time you've
18  been with AFW been at any store other than either
19  the old Westminster store or the new Westminster
20  store?
21       A.  No.
22       Q.  How far are those stores from where
23  you live?
24       A.  Three miles, three and a half miles.
25       Q.  Pretty short commute?
```

**Page 12**

```
 1       A.  Very short commute.
 2       Q.  Let's talk about the old Westminster
 3  store, the one that Jack Must managed; okay?
 4       A.  (Deponent nods head.)
 5       Q.  First of all, how big is that store or
 6  was that store?
 7       A.  60,000, 65,000 square feet, roughly.
 8       Q.  And that's showroom?
 9       A.  Showroom.
10       Q.  Did it have a warehouse?
11       A.  Very small.
12       Q.  Give me the square footage on that, if
13  you could.
14       A.  I'm looking at your office. It was
15  actually very small. I would guess it to be
16  4,000 feet maybe.
17       Q.  So is it true that when you sold
18  furniture at the old Westminster store, it would
19  almost always have to come from some other
20  warehouse?
21       A.  When I first started with them, we did
22  actually bring furniture over for customers to pick
23  up. They had that option, but we stopped doing that
24  due to handling issues. But, yes, 98 percent would
25  go to Thornton to pick up their stuff.
```

**Page 13**

```
 1       Q.  Even when you were transferring it
 2  over?
 3       A.  When we were transferring it, it was
 4  probably closer to 60 percent would still go to
 5  Thornton.
 6       Q.  Am I understanding this correctly,
 7  that the warehouse was used primarily for items that
 8  had been purchased and were just being held for
 9  customers to pick up?
10       A.  And mattresses. We stocked some
11  mattresses in that warehouse.
12       Q.  But that was sort of consistent with
13  how you used the warehouse space?
14       A.  Pretty much what it was for, and for
15  staging new product that came over on the truck,
16  stage it to get ready to put on the truck.
17       Q.  All right. What were the store hours
18  of the old Westminster store?
19       A.  They changed two or three times. When
20  I first started, it was nine to nine.
21       Q.  Okay.
22       A.  Then we went from ten to ten. When we
23  went in as a satellite store, we went from ten -- we
24  went back from ten to ten, but we were closed on
25  Sunday at seven. So Sunday was ten to seven.
```

Page 18

```
 1  sales.
 2      Q.  So that would have the summer of 1999,
 3  basically?
 4      A.  Summer of 1999.
 5      Q.  How long were you in sales?
 6      A.  Until October of 2001.
 7      Q.  And what was your next position?
 8      A.  Assistant manager -- I'm sorry, the
 9  key holder position. They had a key holder position
10  for the smaller stores.
11      Q.  Meaning what?
12      A.  You would actually lock the store.
13  You would close the store three nights a week. So
14  you would do some managerial duties. And this was
15  before October of -- this was before October of
16  2001. I had that position almost a year. So it
17  would have been in -- it was in conjunction with the
18  sales job.
19      Q.  So just so I'm clear about this: You
20  would be working as a salesperson; you had some
21  managerial responsibility, and then you'd close the
22  store three nights a week?
23      A.  That's correct.
24      Q.  And they call that the key holder
25  position?
```

Page 19

```
 1      A.  Key holder position.
 2      Q.  And it's your understanding that most
 3  satellite stores had that position?
 4      A.  I think there was only two. I think
 5  it was us and one other store; I can't recall
 6  exactly. It was one of the smaller stores. Might
 7  have been Glenwood; I'm not real sure.
 8      Q.  Was this -- why was it only those two
 9  stores, if you know?
10      A.  Because they're smaller stores.
11      Q.  Sort of a way of having a third
12  manager, but not really?
13      A.  Sort of, uh-huh, uh-huh.
14      Q.  All right. Then there came a time
15  when you were designated as the assistant store
16  manager?
17      A.  That's correct. That was the 1st of
18  October of 2001. And the reason that's so clear is
19  because the facts right after 9/11.
20      Q.  Okay. All right. And at that point,
21  Jack Must was also the store manager; correct?
22      A.  No, he was the sales manager.
23      Q.  The sales manager?
24      A.  He was the assistant manager at that
25  point. Yeah, at the point that I went to the
```

Page 20

```
 1  assistant, he was the manager, that's correct, if
 2  that's what you're asking me.
 3      Q.  Okay.
 4      A.  He was there previous to that doing
 5  the assistant manager's job.
 6      Q.  And I'm going to come to that, but the
 7  point is when you became assistant manager, he was
 8  managing?
 9      A.  That's correct; that's correct.
10      Q.  And did he actually hire you as the
11  assistant manager or had some input on that?
12      A.  He asked me to do the job.
13      Q.  And you accepted?
14      A.  Yes.
15      Q.  Do you know whether he had authority
16  to hire you himself, or did he have to get somebody
17  above him to approve it?
18      A.  I don't know.
19      Q.  Okay.
20      A.  I only assumed it was okay, or he
21  wouldn't have done it.
22      Q.  Okay.
23      A.  Or he couldn't have done it, I would
24  assume.
25      Q.  While you were the key holder, in the
```

Page 21

```
 1  key holder position, Jack, at least part of the
 2  time, he was the assistant manager?
 3      A.  That's correct.
 4      Q.  And then he became the manager?
 5      A.  That's right.
 6      Q.  The manager before Jack was Chris
 7  Smatla?
 8      A.  Chris Smatla, uh-huh.
 9      Q.  And the one before him was Jerry
10  Beamer?
11      A.  No. Jerry was the first one, in my
12  experience. Milan Chase was there for a short time.
13      Q.  Then who was the next manager?
14      A.  And then Chris Smalta and then Jack.
15      Q.  Okay. And then Jack was succeeded by
16  Nolan Morrison?
17      A.  That's correct.
18      Q.  And while we're on the subject, after
19  Nolan Morrison came Beth Gurecki?
20      A.  That's correct.
21      Q.  And after Beth was who?
22      A.  David Maggart.
23      Q.  And then who?
24      A.  That's it. That's where we are today.
25      Q.  He's still the store manager?
```

**Page 22**

1    A.   That's correct.
2    Q.   And that's at the new location; right?
3    A.   That's correct.
4    Q.   It's true, isn't it, that the longest
5  tenured manager of that group is, in fact, Jack
6  Must; right?
7    A.   That's true.
8    Q.   At the time that Jack was manager and
9  you became assistant manager, did somebody else
10 succeed to the key holder position?
11   A.   Yes.
12   Q.   Who was that?
13   A.   Joe Mazzuto.
14   Q.   And did he hold it the entire time
15 that Jack was the manager?
16   A.   Yes, I believe that's true. To the
17 best that I can recall, yes.
18   Q.   How many sales people did that store
19 have? Again, I'm focusing on Jack Must's tenure as
20 a manager.
21   A.   Varied anywhere from probably 12 to
22 14.
23   Q.   Okay. Was there a formula that you
24 understood for how you calculate the number of
25 salespeople you have?

**Page 23**

1    A.   The way I understood it, it had to do
2  with gross sales of the store.
3    Q.   Do you know anything more about the
4  formula other than that?
5    A.   Somewhere in the neighborhood -- they
6  wanted somewhere in the neighborhood of $90,000
7  written per salesperson, was sort of -- I'm not
8  exactly sure. That's just what I'd heard.
9    Q.   From who?
10   A.   From Jack.
11   Q.   Does -- are you sure it was 90,000?
12 Could it have been 80,000?
13   A.   Could have been.
14   Q.   There was some way of doing a formula
15 that calculated it, but you don't know for sure?
16   A.   When I started on the sales floor,
17 there was 16 salespeople. I don't know if it's
18 relevant.
19   Q.   And that was under . . .
20   A.   Jerry Beamer.
21   Q.   Jerry Beamer?
22   A.   Uh-huh.
23   Q.   And it got trimmed down to the 12 to
24 14?
25   A.   Apparently, yeah.

**Page 24**

1    Q.   Did you feel that was appropriate?
2    A.   I didn't have a feeling either way.
3    Q.   I guess what I'm asking is: Were
4  there enough customers to support 16 sales people on
5  the floor?
6    A.   I seemed to have enough. I did okay.
7    Q.   Did those people leave by natural
8  attrition, or were they fired? What do you
9  remember?
10   A.   Combination. Most people would just
11 quit and find other jobs.
12   Q.   All right. Did you feel that the 12
13 to 14 that you had was an adequate number to cover
14 the store?
15   A.   Not always.
16   Q.   Tell me why not.
17   A.   Well, there's no way to really know
18 what's going to come in when. You know, there are
19 certain patterns, obviously, that a store might
20 have. On Sundays, we were generally a little slower
21 in the evening.
22        But there's no way to know what's
23 going to happen. A store that size should probably
24 have at least four to five people at any point in
25 the evening, at least, I would think. During the

**Page 25**

1  day, you should probably have at least ten, in order
2  to adequately cover the floor.
3    Q.   So let me understand this: What you
4  said about the customer -- I'm going to call them
5  customer trends if you will, the number of people in
6  the store --
7    A.   Okay.
8    Q.   -- are you telling me that Sunday
9  evenings were reliably slow?
10   A.   Generally.
11   Q.   But the rest of the week, it was like
12 you really couldn't predict when people would come
13 in?
14   A.   No.
15   Q.   This was not one of the stores where
16 it would be reliably busy every night after people
17 would normally get off work at, say, 5:00, 5:30,
18 6:00?
19   A.   Maybe a little busier, say, between
20 four and five or between four and six. But there
21 was no way you could really know.
22   Q.   And was that true of the rest of the
23 day? In other words, some days you'd be just as
24 busy as you could possibly be in the late morning,
25 and other days would be very slow?

Calderwood-Mackelprang, Inc. 303.477.3500

Thomas Ward

Page 38

```
 1    A.   Jack was good at knowing, you know,
 2  what to do and how to help you out of a situation.
 3    Q.   All right. Did you regard his product
 4  knowledge as pretty good?
 5    A.   I would say it was good.
 6    Q.   And I don't know how to ask this
 7  question: Who knew more about furniture, you or
 8  him?
 9    A.   Jack.
10    Q.   Who knew more about furniture, Jack or
11  Joe Mazzuto?
12    A.   Jack.
13    Q.   Were there any salesmen, during the
14  time you were there, that knew more about furniture
15  than Jack?
16    A.   May have been early on because we did
17  inherit some professional people that had been
18  salespeople in the furniture industry for years from
19  different places -- Weberg's and Rhodes and that
20  sort of thing. That was early in my career, so I
21  really wouldn't be able to judge who knew more about
22  what at that point.
23    Q.   During the time that Jack was store
24  manager, did you feel that there was anybody there
25  that was really more knowledgeable about that
```

Page 39

```
 1  business than Jack?
 2       MR. BENSON: Object to the form. In
 3  the store?
 4    Q.   (By Mr. Buchanan) In Westminster,
 5  yeah.
 6    A.   Working as a salesperson or...
 7    Q.   In any capacity. Warehouse, janitor,
 8  anybody?
 9    A.   I would say probably not.
10    Q.   What is your understanding, based on
11  your training and your experience at American
12  Furniture Warehouse, of how they want you to sell
13  furniture?
14    A.   Well, it is low-pressure sales, for
15  sure.
16    Q.   Meaning what?
17    A.   We encourage people -- if they're not
18  sure they want it, we encourage them not to purchase
19  it.
20    Q.   Why?
21    A.   We want to make sure it's going to
22  work for them.
23    Q.   Okay.
24    A.   We want them to get the right material
25  the first time. Measure the area, their space, make
```

Page 40

```
 1  sure it's going to fit. If they're not sure it's
 2  going to fit, they probably shouldn't get it.
 3    Q.   Okay. You call it low pressure?
 4    A.   Low key, low pressure.
 5    Q.   Is that how -- in your training, is
 6  that how it's characterized over at Thornton?
 7    A.   The training I had probably may be
 8  different than the training they have now; I don't
 9  know. I can only talk about the training I had.
10    Q.   Sure.
11    A.   And at that point, it was pretty low
12  key. The training was more focused on the computer
13  issues, and the way we do business.
14    Q.   But, certainly, they talked about
15  low-pressure sales as one of the aspects of it?
16    A.   That's correct.
17    Q.   You believe that's a good sales
18  technique?
19    A.   Yes.
20    Q.   Is it better than high pressure?
21    A.   Uh-huh.
22    Q.   The answer is yes?
23    A.   Yes.
24    Q.   Tell me why.
25    A.   I believe that it gives you more
```

Page 41

```
 1  credibility with your customers.
 2    Q.   Is that important?
 3    A.   Terribly.
 4    Q.   Why?
 5    A.   They'll be back to see you if they
 6  believe in what you tell them.
 7    Q.   Now, give me some of the rules that
 8  you would follow as a salesperson, to the extent you
 9  can, other salespeople would follow, that manifest
10  this low-pressure sales approach?
11    A.   Such as sending them home to think
12  about their purchase if they're not clear if that's
13  what they want.
14    Q.   Sure.
15    A.   That's an example.
16    Q.   Anything else?
17    A.   Not sure of the color, not sure of the
18  size. Of course, we have -- I'm speaking about when
19  I was in sales. When I was in sales, we didn't have
20  the room planner that we have now, which eliminates
21  a lot of those size issues. We didn't have that
22  available.
23    Q.   In other words, you would have them
24  sit down with a room planner and say --
25    A.   Well, they do that now; we didn't have
```

## Page 42

1 that then.
2  Q.  Okay. Do you find that most of the
3 people that come in realize that: Gee, I'm not sure
4 how long my wall is; I don't know exactly --
5  A.  I find that almost 99 percent of the
6 people have no idea how big their room is.
7  Q.  So you encourage them to go home and
8 measure it and come back?
9  A.  Talk about it, sure, absolutely.
10  Q.  If they say: Gee, I really need to
11 have my husband look at this or my wife look at
12 that, you encourage them to do that?
13  A.  Absolutely.
14  Q.  What if they come in, and they tell
15 you -- you come up and say: Can I help you folks,
16 and they say, you know, we're just going to browse,
17 or we're just looking, you know, we're just kind of
18 looking around --
19  A.  Uh-huh.
20  Q.  -- what's your response to that?
21  A.  My personal response, when I was in
22 sales, I would thank them for coming in the store,
23 and hit a couple high points about American
24 Furniture like: We need two days to make
25 delivery -- couple of high points. And then I would

## Page 43

1 ask them if that helps them for now.
2  Q.  Okay.
3  A.  And give them the opportunity to back
4 up.
5  Q.  And if they say: Thank you very much,
6 what would you do?
7  A.  Thanks for coming in; anyone can help
8 you.
9  Q.  And then what would you do?
10  A.  Go on to the next customer.
11  Q.  And leave them alone?
12  A.  Sure.
13  Q.  And do you often find that people
14 would come in, you would have that sort of exchange
15 with them, and you go on to another customer and you
16 turn around, and those first folks had left?
17  A.  Uh-huh.
18  Q.  The answer is yes?
19  A.  Yes.
20  Q.  It's such an artificial thing. It's
21 just amazing. I mean, we do it all the time.
22 People do exactly what you're doing. We just need
23 to have it on the record because "uh-huh" looks a
24 lot like "huh-uh."
25     (Discussion off the record.)

## Page 44

1  Q.  (By Mr. Buchanan) Now, during the
2 time that you were at the store, did salespeople
3 wear a distinctive uniform?
4  A.  Not in the beginning, no.
5  Q.  Tell me what you didn't wear -- well,
6 strike that.
7  A.  We would wear like what he's wearing
8 (indicating).
9  Q.  In other words, you just dressed in
10 regular street clothes?
11  A.  Well, not necessarily street clothes.
12 Dress up, look nice, wear a tie.
13  Q.  Did that change at some point?
14  A.  It changed. I don't know exactly
15 when, but we went to the red shirts.
16  Q.  Do you remember when it was?
17  A.  No.
18  Q.  Was it before Jack became manager or
19 during his time as manager?
20  A.  I was still selling, I know that. I
21 was still on the floor. So it had to be probably in
22 the year 2000, maybe.
23  Q.  Was that a direction from, you know,
24 the corporate office?
25  A.  Yes.

## Page 45

1  Q.  And did the salesmen dress in that
2 distinctive manner?
3  A.  Yes.
4  Q.  Red shirts?
5  A.  Red polos or long-sleeve shirts or
6 cardigan sweaters or something.
7  Q.  They had to be in red?
8  A.  Yeah.
9  Q.  And the idea was that anybody in red
10 could help you?
11  A.  That's correct.
12  Q.  Do you know why that change was made?
13  A.  I think it was to make salespeople
14 more identifiable, easier for customers to know who
15 the salespeople were.
16  Q.  Do you think it worked?
17  A.  In that respect.
18  Q.  Was there a downside to it?
19  A.  Yeah, I think so.
20  Q.  What was the downside?
21  A.  Kind of like a Kmart guy or something,
22 your Ace Hardware man. There was a downside, was
23 just the scuttlebutt. But I think it was more just
24 somebody's thinking that somebody is telling you you
25 have to wear red. You know how the reaction is,

**Page 50**

1  during those times?
2     A.   Not very often.
3     Q.   Would you observe him doing the
4  interaction that you talked about: Greeting
5  customers, making sure they got a salesperson, that
6  sort of thing?
7     A.   I can't honestly say. I don't have
8  any specific recollection of that. I'm sure it must
9  have happened; it almost has to.
10    Q.   That's part of the job; right? If
11 you're shorthanded on the floor for whatever
12 reason --
13    A.   Oh, absolutely.
14    Q.   -- the manager goes out and sort of
15 pinch hits for whoever is not there?
16    A.   We do that today. It's a daily thing.
17    Q.   All right. When you came to work at
18 Westminster in the warehouse, was Jack already there
19 as an assistant manager?
20    A.   No, wait a minute. Let me think.
21 Jerry Beamer -- no, he wasn't.
22    Q.   Who was Jerry Beamer's assistant?
23    A.   George Dorman -- George Dorman was
24 there, but I think he was the sales manager. The
25 assistant manager was there just a short time. He's

**Page 51**

1  actually managing the Stickley store in Westminster
2  now.
3        Do you recall (indicating Mr. Benson)?
4        MR. BENSON: Nobody else is allowed to
5  answer.
6        THE DEPONENT: I'm sorry. What the
7  heck was his name?
8        MR. BENSON: If you can't remember,
9  you can't remember.
10    Q.   (By Mr. Buchanan) It wasn't Milan
11 Chase?
12    A.   No, sir.
13    Q.   Okay.
14    A.   I can't remember. It was nobody I
15 mentioned earlier. He was the assistant manager at
16 that time, and he went to Pueblo. And that's when
17 Jack came up.
18    Q.   All right. You were actually at the
19 Westminster store before Jack became the assistant
20 manager?
21    A.   I was there.
22    Q.   That's when you met him for the first
23 time?
24    A.   That's correct.
25    Q.   When you became a salesperson, did

**Page 52**

1  Jack -- and I take it when you asked Mr. Beamer if
2  you could go into sales, you went to Thornton for
3  training?
4     A.   Right.
5     Q.   When you came back, did Jack play a
6  role at any point in training you to do sales?
7     A.   Not at that point. It was still the
8  other three.
9     Q.   When he came on, did he help you --
10    A.   He came on as a sales manager -- I'm
11 sorry.
12       MR. BENSON: You just need to let him
13 finish his question.
14       THE DEPONENT: He came on as the sales
15 manager, and then he helped all the salespeople.
16    Q.   (By Mr. Buchanan) Let me understand
17 this: You believe he once held a position called
18 sales manager?
19    A.   Yes.
20    Q.   And that's different from assistant
21 manager?
22    A.   Yes.
23    Q.   While he was sales manager, he was
24 helping the other salespeople?
25    A.   That's correct, if they had a

**Page 53**

1  question.
2     Q.   Was he, himself, working as a
3  salesman, also?
4     A.   No.
5     Q.   And then at some point, he went from
6  seals manager to assistant manager?
7     A.   That's correct.
8     Q.   To your knowledge, during the time
9  that Jack was the manager of the store, were there
10 regular sales meetings?
11    A.   There were sales meetings everyday.
12    Q.   Tell me when those occurred.
13    A.   In the morning.
14    Q.   And what would they consist of? Let
15 me ask you this, before you answer that question:
16 When you say "in the morning," before the store
17 opened --
18    A.   That's correct.
19    Q.   -- at what time?
20    A.   Usually 9:30.
21    Q.   And what would happen at those
22 meetings, what sort of information --
23    A.   I'm trying to think when we started
24 doing the daily quiz. I don't really recall exactly
25 when that started. The buyers will send us a little

Page 54

1  daily quiz that we do everyday with the salespeople,
2  just reiterating different things.
3      And I don't remember exactly when that
4  started. On Saturday there was always a test -- on
5  Saturday. We always had that on Saturday and Sunday
6  when we had the big meetings when everyone was
7  there.
8      Q.  Let me ask you this: When you say
9  "everyone was there," you are talking about the
10  Westminster store?
11      A.  Salespeople.
12      Q.  And they would be the salespeople at
13  Westminster?
14      A.  That's correct.
15      Q.  So however many you had -- 12, 14 --
16  they'd all be there Saturday morning?
17      A.  Saturday morning they would have a
18  meeting in the morning and a meeting in the
19  afternoon for the closing shift.
20      Q.  So you had two meetings on Saturday?
21      A.  Right.
22      Q.  Would you have two meetings during
23  Sundays?
24      A.  Two during the week.
25      Q.  We're getting a little confused here.

Page 55

1      A.  The reason I'm getting confused is
2  because we now do a daily little sales test where we
3  didn't always do that. We always had the weekend,
4  but I don't recall when we started the daily.
5      Q.  Okay. But at some point during the
6  time Jack managed, this daily test or semi-daily
7  test started?
8      A.  Are you asking me if Jack was the
9  manager when that started?
10      Q.  Yes.
11      A.  I don't really remember when that
12  started.
13      Q.  You mentioned that you did have daily
14  meetings?
15      A.  Correct.
16      Q.  At 9:30?
17      A.  Right.
18      Q.  And on the days when you opened, you
19  would run those meetings; correct?
20      A.  That's correct.
21      Q.  And other than the quizzes that the
22  buyers would send you, what else would occur during
23  those meetings?
24      A.  We would just talk about issues, make
25  sure that the floor was clean and straight. That

Page 56

1  was a big priority, keeping the floor clean.
2      Q.  And if it wasn't, I take it people had
3  to go clean their area?
4      A.  Take care of it, that's right.
5      Q.  Each salesman was assigned a certain
6  area?
7      A.  That's correct.
8      Q.  And did you feel that the Westminster
9  store was a reasonably clean and neat store?
10      A.  Reasonably.
11      Q.  Did you feel that salesmen generally
12  did their job of cleaning up their areas?
13      A.  Oh, I don't know. Some did; some
14  didn't. Some were more reluctant.
15      Q.  In general, I mean, you guys asked or
16  instructed them to do it and they did it, perhaps
17  reluctantly or --
18      A.  If it wasn't clean, we had to instruct
19  them to take care of that.
20      Q.  Did you think that you and Jack were
21  negligent in that area, or did you feel you did your
22  best?
23      A.  I don't think we were negligent.
24      Q.  Now, were there times where the -- you
25  know, the meeting was supposed to start at 9:30, and

Page 57

1  there was literally nothing to talk about?
2      A.  There was never nothing to talk about.
3  There was always something -- new product,
4  cleanliness of the store, new product, customer
5  issues, delivery problems.
6      Q.  And those meetings occurred everyday?
7      A.  Everyday.
8      Q.  Now, Jake Jabs was in here yesterday
9  afternoon. And he said that -- and I'm paraphrasing
10  my recollection of what he said -- but, in essence,
11  he said that he was there some mornings and salesmen
12  would straggle in; and there was no meeting. And he
13  thought that was inadequate.
14      Now, does that mesh with your
15  experience?
16      A.  Well, it seemed to me we had meetings;
17  we talked about stuff. And, there again, the
18  structure of the written test that we would have
19  everyday, I'm not really sure when that started. So
20  that would be something more of a concrete thing
21  that we did.
22      Q.  But even without the quizzes or the
23  tests, you'd have these meetings; correct?
24      A.  We would discuss things going on, new
25  product, show them the new product, that kind of

130
1   was doing.
2       Q.  Do you think that was an appropriate
3   action on his part?
4       A.  For -- on whose part?
5       Q.  On Jack's part. In other words, he
6   hears a complaint from Mike. He goes to you, and
7   hears your side of it and decides not to write it
8   up; is that right?
9       A.  Mike tells Jack to write me up, and
10  Jack does not write me up? Do I feel that was
11  appropriate?
12      Q.  Yes.
13      A.  No, he should have written me up
14  because he was told to do so.
15      Q.  But he didn't?
16      A.  No.
17      Q.  Jack -- well, was there a time when
18  somebody -- and this "somebody" may have been you,
19  given what you testified to here before -- where
20  Jack was criticized for not sending somebody out on
21  a ride in a delivery truck. And the reason was that
22  this somebody suffered from PTSD?
23      A.  That was me.
24      Q.  What do you remember about that
25  episode?

131
1       A.  I explained to them -- see, I don't
2   know how far back I need to go on this, but I do
3   have PTSD, along with some physical wounds that I
4   suffered in Vietnam. I do get paid a disability
5   from the government. It's not like something I made
6   up.
7           I do have an issue with being closed
8   in, not in control, being in a truck, being in
9   traffic. You know, I'm letting things out here that
10  I don't think are anybody's business, but I'm doing
11  it anyway.
12      Q.  Let me be clear with you, and I
13  understand that. First of all, I didn't know it was
14  you. I had heard from Jack that there was this
15  episode, and he got criticized for not writing
16  somebody up for it. And because the other side in
17  this case is claiming that they terminated Jack for
18  performance reasons --
19          MR. BENSON: Object to the form.
20      Q.  (By Mr. Buchanan) -- I am duty-bound
21  to ask all the questions about that.
22          The fact that it incidentally intrudes
23  upon your privacy, I apologize for. But,
24  nevertheless, I need to know the information. Now,
25  I'm not asking that you to tell more than you feel

132
1   comfortable. And, frankly, I think I've heard
2   enough about the issue.
3           Based on your condition of PTSD, you
4   didn't want to go on the delivery truck ride;
5   correct.
6       A.  You can state "didn't want to," but
7   you can also state that it's not really possible.
8       Q.  And you communicated that to Jack?
9       A.  I did.
10      Q.  And Jack said: Fine, I'm not going to
11  require you to do it?
12      A.  What he did is he referred me to Mike.
13      Q.  And what happened then?
14      A.  And I told Mike, and he communicated
15  with Mike and called and let me know -- Mike
16  apparently told Jack to tell me that I didn't have
17  to do that, but I did have to come down and spend
18  the day at the receiving dock.
19      Q.  Okay.
20      A.  And I don't recall -- if there was
21  supposed to be a write-up for that, I was not told
22  that.
23      Q.  And you never received a write-up for
24  it?
25      A.  No. And I was not told there should

133
1   have been. The only one I know about is the
2   newspaper issue.
3       Q.  Do you know whether Jack received a
4   write-up?
5       A.  I don't.
6       Q.  At any point in your career at AFW,
7   have you been offered the position of being store
8   manager at Westminster?
9       A.  No.
10      Q.  Do you want that job?
11      A.  No.
12      Q.  Why not?
13      A.  That's a tough one. That's a tough
14  question. I'm not sure I can answer that. It all
15  gets back to -- believe it or not, it all gets back
16  to the PTSD thing.
17      Q.  Tell me why.
18      A.  Because I'm more closed in; I don't
19  have the freedom. I don't know if you understand
20  this condition at all.
21      Q.  I have a pretty good understanding of
22  it because I represent people that have it, so I
23  have a good understanding.
24      A.  Okay. It makes it so I personally --
25  I need an out whatever I'm doing. It doesn't matter

34 (Pages 130 to 133)

Thomas Ward

134

1  if I'm sitting in this room or if I'm driving down
2  the street or if I'm in a job. I need a buffer; I
3  need an out.
4      Q.  Okay. Fair enough. Were you there
5  the day that Jack was handed seven checks and asked
6  to turn over his keys, clean out his desk? Were you
7  there that day?
8      A.  I was there that day.
9      Q.  Were you part of the conversation
10 where that occurred?
11     A.  No.
12     Q.  What do you remember about that, that
13 day?
14     A.  I remember Andrew coming to the store.
15 I remember him and Jack walking off. And I remember
16 Jack coming back and getting his keys and saying
17 good luck and walking out the door.
18     Q.  That was basically it?
19     A.  Extent of the conversation.
20     Q.  He didn't say anything other than
21 "good luck"?
22     A.  No.
23     Q.  And where was Andrew when he was
24 cleaning out his desk?
25     A.  He just got his keys and a couple of

135

1  things. He didn't actually clean much out. I guess
2  he got a few personal things. Andrew was off in
3  another part of the store.
4      Q.  And Jack didn't tell you what had
5  happened?
6      A.  No. But I could pretty much tell what
7  was going on.
8      Q.  Fair enough. But he didn't say
9  anything?
10     A.  He just said good luck.
11     Q.  Have you ever seen him since?
12     A.  Uh-huh.
13     Q.  When did you see him?
14     A.  I go to a Karaoke bar twice a week
15 that I've gone to for three or four years. And
16 there's been a couple of occasions where he's
17 actually come in there, as well.
18     Q.  Does he sing?
19     A.  Not very well.
20         (Discussion off the record.)
21     Q.  (By Mr. Buchanan) So you've seen him
22 in that context?
23     A.  Yes.
24     Q.  Following him picking up his keys and
25 leaving, did you talk to Andrew?

136

1      A.  Yeah.
2      Q.  What do you recall Andrew saying?
3      A.  He just said: I need to talk to you.
4  And I said: I'll bet you do.
5      Q.  What did he say?
6      A.  He said: Not like that, you know, not
7  like that. In other words, you just fired Jack; he
8  wants to talk to me, but not like that. See, I was
9  under the impression that we both were going to be
10 fired because Jack kept telling me that we were both
11 going to be fired. And he kept telling my wife that
12 we were going to be fired; he kept telling anybody
13 that would listen that we were going to be fired.
14     Q.  Jack did?
15     A.  Uh-huh.
16         MR. BENSON: Is that a yes?
17         THE DEPONENT: Yes.
18     Q.  (By Mr. Buchanan) So what happened?
19 What did Andrew say?
20     A.  He just said that we were moving in
21 another direction, and he's got somebody coming over
22 to run the store. And he wanted me to help them out
23 wherever I could. And I said: Sure, do whatever
24 you need to do. And it turned out it was Nolan.
25     Q.  But he did say: I have someone else

137

1  coming over?
2      A.  That's right.
3      Q.  And that was the very same day, within
4  minutes, sounds like, of firing Jack?
5      A.  Ten minutes, probably.
6      Q.  All right. Jack never came back the
7  next day to manage the store; did he?
8      A.  No, I don't think so. I don't even
9  remember if I was off the next day. All I know is I
10 haven't seen him in the store.
11     Q.  When you say that Jack had been saying
12 to you that you were both going to be fired and
13 saying that to your wife and so forth, tell me in
14 what context would he say that? I mean, was
15 that --
16     A.  Just in conversation.
17     Q.  And how long had he been saying that?
18     A.  A month maybe. I don't know exactly.
19     Q.  Did you ever ask him: Why do you
20 think they're going to fire me as opposed to you,
21 Jack?
22     A.  No.
23     Q.  Did he ever indicate why he thought
24 that was going to happen?
25     A.  To both of us, you mean?

35 (Pages 134 to 137)

Calderwood-Mackelprang, Inc. 303.477.3500

**Page 138**

1    Q.   Yes.
2    A.   No. I think he knew, in his heart,
3    that things were not going well; and he wasn't doing
4    what they expected him to do. And he didn't give it
5    the effort to fix it.
6         I know I never once heard him say to
7    Andrew: Well, Andrew, what do I need to do to make
8    this better, buddy.
9    Q.   You never heard him say that?
10   A.   What do I need to do? I mean, you
11   know.
12   Q.   Do you remember him saying, during
13   that tape-recorded conversation: What do you
14   suggest; how can we improve?
15   A.   I remember him saying something about
16   what can you do to help me, but not what can I do to
17   help you.
18   Q.   Okay.
19   A.   John Kennedy said it best.
20   Q.   Okay. All right. You used the word,
21   in an answer a minute ago, that Jack was fired. Is
22   there any doubt in your mind that Jack was fired
23   that day that you just recited about?
24        MR. BENSON: Object to form. Lack of
25   foundation.

**Page 139**

1         THE DEPONENT: Well, I know he left
2    the building. I'm pretty sure he was offered
3    another job. I'm pretty sure he was offered a sales
4    job.
5    Q.   (By Mr. Buchanan) When you say you're
6    pretty sure about that, how did you become pretty
7    sure about that?
8    A.   Because that's the practice that
9    they've done with other managers that have left.
10   They've offered them a sales job.
11   Q.   Do you have any other information,
12   other than they have done it in the past?
13   A.   That's how they do it. They offer you
14   another position.
15   Q.   And certainly Jack never said to you
16   that they offered him a sales position; correct?
17   A.   I don't think he did.
18   Q.   Okay.
19   A.   He only said, like, two words on the
20   way out: Good luck, and waved. And I don't
21   remember him saying anything about that.
22   Q.   All right. Had you ever known Nolan
23   Morrison before he came to manage the store?
24   A.   Yeah, he was at our store filling in
25   while somebody was on vacation. I can't remember

**Page 140**

1    when that was. I can't tell you when that was, but
2    it was probably a few months prior to that. I don't
3    know when, exactly; but that was my only dealing
4    with Nolan up to that point.
5    Q.   In what capacity did he fill in?
6    A.   Filling in as a manager. Must have
7    been Jack that was on vacation. Somebody was on
8    vacation. I'm not sure who. It could have been
9    Joe.
10   Q.   Do you remember how long he was there?
11   A.   A week.
12   Q.   Okay. That would have been your only
13   exposure before he came over as the new manager?
14   A.   Yes.
15   Q.   So I'm clear: After Jack said good
16   luck and left and Andrew was talking to you, Andrew
17   didn't offer you the job of store manager; correct?
18   A.   No.
19   Q.   Okay. Let me ask you this: Was Nolan
20   there -- I guess you said you didn't know whether
21   you were working the next day; correct?
22   A.   Was Nolan there the next day, is that
23   what you're asking me?
24   Q.   Yes.
25   A.   I'm sure he was.

**Page 141**

1    Q.   Okay.
2    A.   But I couldn't even tell you if I was
3    off the next day; I don't remember.
4    Q.   What do you remember -- how old is
5    Nolan Morrison, by the way?
6         MR. BENSON: Object, lack of
7    foundation.
8         THE DEPONENT: Oh, 28, 30; I don't
9    know -- 50.
10   Q.   (By Mr. Buchanan) So 28 to 30 is your
11   estimate?
12   A.   Yes, I don't know.
13   Q.   Your answer is yes?
14   A.   Yes.
15   Q.   Do you know much about his career with
16   AFW?
17   A.   You are talking about at that point?
18   Q.   Up to that point, other than the week
19   he spent in management there?
20   A.   No.
21   Q.   When he got there, do you think he was
22   knowledgeable about how to run a furniture store?
23   A.   Yeah, yes.
24   Q.   Did you feel you had to train him?
25   A.   To run the store?

```
                                                    150
 1        THE DEPONENT: I guess you could call
 2   it fired, but I think he resigned.
 3        (Discussion off the record.)
 4   Q.   (By Mr. Buchanan) Now, you mentioned
 5   warehouse people. Did Nolan fire some warehousemen?
 6   A.   Fired one guy.
 7   Q.   Who was that?
 8   A.   Oh, man. Jason...
 9   Q.   Jason somebody?
10   A.   Yeah. Jason DeLeon.
11   Q.   How about those two -- I forget what
12   you called them, the guys in the shouting match with
13   Jack.
14   A.   Jesse De Havilland?
15   Q.   Yeah.
16   A.   Jesse quit. Jerry went to Thornton,
17   but has since quit, I think. And Jesse actually
18   quit.
19   Q.   Okay. How long was Nolan Morrison
20   there?
21   A.   A year -- not quite a year.
22   Q.   Do you recall he left there to go down
23   to the Southwest store to replace Richard Dawson?
24   A.   I think he went to Southwest. Yes, I
25   do remember him going to Southwest. I'm not sure
```

```
                                                    151
 1   why, but that's where he went.
 2   Q.   You've told me about Nolan Morrison's
 3   management style. I think you put it that he was
 4   more aggressive, requiring more follow-up, more
 5   accountability?
 6   A.   Yes.
 7   Q.   Do you think that made a difference in
 8   the store?
 9   A.   Sure.
10   Q.   Tell me how.
11   A.   I think it ran a tighter ship, so to
12   speak. I think things got done in a more orderly
13   fashion. I think salespeople took more notice of
14   what they were doing and not doing.
15   Q.   Anything else?
16   A.   From a personal standpoint, I liked it
17   better.
18   Q.   Why?
19   A.   I felt more comfortable.
20   Q.   Did it make any difference in the
21   revenues, as far as you could tell?
22   A.   I have no idea.
23        MR. BENSON: Object, lack of
24   foundation.
25        THE DEPONENT: Yeah, I have no idea.
```

```
                                                    152
 1   Q.   (By Mr. Buchanan) If I were to tell
 2   you that as between the last year that Jack managed
 3   and the year, or thereabouts, that Nolan managed,
 4   there was $30,000 in gross revenue -- a difference
 5   of $30,000, would that surprise you?
 6   A.   Which way? Actually, it wouldn't
 7   surprise me either way. It doesn't matter which
 8   way.
 9   Q.   I mean, that works out to about two or
10   $3,000 a month?
11   A.   One sofa per hour, maybe.
12   Q.   How much is a sofa, so I can check
13   your math?
14   A.   Starts at about 249 and goes from
15   there.
16   Q.   That's not --
17   A.   That's not --
18   Q.   That's not a swing in gross revenues
19   that impresses you very much?
20   A.   One way or the other.
21   Q.   Okay. When Nolan Morrison left, were
22   you offered the job of being store manager?
23   A.   No.
24   Q.   Again, did you still have the same
25   feeling about it, that you wouldn't want it?
```

```
                                                    153
 1   A.   You bet.
 2   Q.   And did Beth Gurecki take over?
 3   A.   Yes.
 4   Q.   How long did Beth last?
 5   A.   Until we moved.
 6   Q.   Until you moved to the new location?
 7   A.   So it would be approximately a year, I
 8   would guess, something like that.
 9   Q.   And how did she do?
10   A.   In comparison to?
11   Q.   Nolan, Jack, or any other...
12   A.   Well, she inherited a better situation
13   than what Nolan stepped into. Things were better.
14   Q.   So how did she do?
15   A.   The warehouse people were better. She
16   did okay.
17   Q.   Where is she now?
18   A.   Compark, I think I heard.
19   Q.   Okay. Now, you mentioned she stayed
20   until you moved. When you moved, did a new store
21   manager take over?
22   A.   Uh-huh.
23   Q.   Who was that?
24   A.   David Maggart.
25   Q.   And he's still the store manager?
```

**Page 154**

1  A. Uh-huh.
2  Q. And you've been an assistant manager
3  to all of those people?
4  A. Uh-huh.
5  MR. BENSON: Is that a yes?
6  THE DEPONENT: I had to train them
7  all.
8  MR. BENSON: Is that a yes?
9  THE DEPONENT: Yes. I'm sorry.
10 Q. (By Mr. Buchanan) And you've -- let
11 me ask you this question: The Homestead House
12 facility, what's the square footage of that
13 facility?
14 A. About 100,000 to 110,000, I'm not sure
15 exactly.
16 Q. That's the showroom?
17 A. The showroom.
18 Q. And how big is the warehouse?
19 A. It's exactly the same size. It's one
20 on top of another.
21 Q. Is the showroom on the ground floor?
22 A. Upstairs, top floor.
23 Q. And I've understood that you are not
24 using the whole warehouse?
25 A. That's correct.

**Page 155**

1  Q. Why is that?
2  A. I don't know.
3  Q. Do you know what percentage is being
4  used?
5  A. I could guess -- 10 to 15 percent
6  maybe.
7  Q. But, obviously, you have a lot more
8  capacity if, for whatever reason, AFW decided to
9  store more inventory there?
10 A. That's correct.
11 Q. When that store opened, was there a
12 grand opening?
13 A. Yes.
14 Q. Was it successful?
15 A. I think so.
16 Q. Are you aware that the month of that
17 opening, there were $2 million in revenue?
18 A. Yes.
19 Q. Has the store ever had 2 million again
20 in any given month?
21 MR. BENSON: Objection, lack of
22 foundation. Go ahead and answer if you can.
23 THE DEPONENT: I don't know.
24 Q. (By Mr. Buchanan) Let me ask you
25 this: Are gross revenues something that you look

**Page 156**

1  at?
2  A. Not very often.
3  Q. Is it your understanding that that's
4  important to the company?
5  A. Absolutely.
6  Q. But it's not something that you focus
7  on personally?
8  A. It's not something that I can do much
9  about.
10 Q. Why not?
11 A. Well, I'm not the operations manager;
12 I don't set the prices; I don't set the sales. I
13 just pretty much take care of the store, keep it
14 clean, keep it running, keep people working.
15 Q. You don't buy the product?
16 A. I do buy product, as a matter of fact.
17 Q. You don't buy the product that gets
18 sold in the store?
19 A. I don't buy it; I'm not a buyer.
20 Q. You're not a buyer.
21 A. That's right. I don't work on margins
22 and all that stuff.
23 Q. How many salesmen are at the Homestead
24 store?
25 A. Right now?

**Page 157**

1  Q. Yeah.
2  A. Eighteen.
3  Q. Is that kind of like the largest
4  number there's ever been?
5  A. No, I think we had 20 at one point,
6  maybe 21.
7  Q. What is the range?
8  A. The range is anywhere from probably 18
9  to 20, at least from what I know now. That does
10 change from time to time.
11 Q. And those are all salesmen?
12 A. Salespeople, that's correct.
13 Q. What's the management structure?
14 There's a store manager; you're the assistant
15 manager?
16 A. Jon Smarr.
17 Q. Jon Smarr is an assistant manager?
18 A. Sales manager.
19 Q. Okay. Are there any other managers,
20 other than you three?
21 A. Huh-uh.
22 Q. The answer is no?
23 A. No, I'm sorry.
24 MR. BUCHANAN: Those are all the
25 questions I have, Mr. Ward. Thank you for coming

40 (Pages 154 to 157)

Calderwood-Mackelprang, Inc. 303.477.3500

**Page 158**

1  in.
2       MR. BENSON: I have no questions for
3  the witness. And I'll handle signature for the
4  witness.
5       (WHEREUPON, the deposition was
6  concluded at 12:25 p.m.)

**Page 159**

1       I have read the foregoing
2  transcript of my testimony and have indicated the
3  same by my signature.

7  _____
       THOMAS K. WARD

8  STATE OF COLORADO
9  CITY AND COUNTY OF DENVER
10      Subscribed and sworn to before me by
11 THOMAS K. WARD on this _____, 2007.
12      My commission expires: _____

       _____
             Notary Public

       _____
             Address

21 Reporter: DEE
   Trial/Hearing Date: Unknown

**Page 160**

1                 CERTIFICATE
2  STATE OF COLORADO  )
                      )ss.
3  CITY AND COUNTY OF DENVER )

5       I, Dawn E. Eastman (Calderwood),
   Certified Shorthand Reporter, Registered
6  Professional Reporter, and Notary Public for the
   State of Colorado, do hereby certify that previous
7  to the commencement of the examination, the said
   THOMAS K. WARD was duly sworn by me to testify the
8  truth in relation to the matters in controversy
   between the said parties.
9       I further certify that said deposition
   was taken in shorthand by me and was reduced to
10 typewritten form by computer-aided transcription,
   that the foregoing is a true transcript of the
11 questions asked, testimony given, and proceedings
   had.
12      I further certify that I am not an
   attorney nor counsel nor in any way connected with
13 any attorney or counsel for any of the parties to
   said action or otherwise interested in its event.
14      IN WITNESS WHEREOF, I hereunto affix my
   hand and notarial seal this 30th day of September,
15 2007. My commission expires September 20, 2010.

19    _____
      Dawn E. Eastman (Calderwood)
      CSR, RPR, Notary Public
      Calderwood-Mackelprang, Inc.

**Page 161**

1  CALDERWOOD-MACKELPRANG, INC.
   4410 Zuni Street
2  Denver, Colorado 80211
   (303) 477-3500

4  September 30, 2007

6  GARY J. BENSON, ESQ.
   Dworkin Chambers & Williams PC
   3900 East Mexico Avenue, Suite 1300
7  Denver, Colorado 80210
8  Re: Must v. American Furniture Warehouse
9  Deposition of: THOMAS K. WARD
10 The deposition in the above-entitled matter is ready
   for reading and signing. Please attend to this
11 matter by complying with ALL blanks checked below:
12 _____ arranging with us at the number listed below
       to read and sign the deposition in our
13     office
14 _____ having deponent read your copy and sign
       amendment sheets, if any (original signature
15     page enclosed.)
16 XXX  reading enclosed deposition, signing
       signature page and correction sheets if any.
17     within 30 days of the date of this letter or
    _____ by _____ due to trial/hearing date of
18  _____

19 Please be sure that the signature page and amendment
   sheets, if any, are signed before a Notary public
20 and returned to our office. If this matter has not
   been taken care of within said period of time, the
21 deposition will be filed unsigned pursuant to the
   Rules of Civil Procedure.

23 DAWN E. EASTMAN (CALDERWOOD), CSR, RPR

   cc: Counsel of Record

# Amendment to Deposition

Case Number <u>06-CV-01872-RPM-MEH</u>

The deponent, <u>Thomas Kwaed</u>, wishes to make the following changes in the testimony originally given:

| Page | Line | Should Read | Reason |
|------|------|-------------|--------|
| 133  | 9    | yes         | Recalled |

Subscribed and sworn to before me <u>Danielle R. Price</u>
this <u>19th</u> day of <u>October</u>, 20 <u>07</u>.

_____
Signature of Deponent

My commission expires:
<u>March 28, 2010</u>

_____
Notary Public Signature

**DANIELLE R. PRICE**
**NOTARY PUBLIC**
**STATE OF COLORADO**
My Commission Expires 03/28/2010

Address: <u>8800 Wadsworth Blvd.</u>
<u>Westminster, CO 80021</u>