# EXHIBIT 4

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Case No. 06-CV-01872-RPM-MEH

JACK MUST,

Plaintiff

vs.

AMERICAN FURNITURE WAREHOUSE CO., a Colorado corporation d/b/a/ AMERICAN FURNITURE WAREHOUSE,

Defendant.

_____

DEPOSITION OF CRYSTAL A. HAYES

_____

PURSUANT TO NOTICE, the above-entitled deposition was taken on behalf of the Plaintiff at 1621 18th Street, Suite 260, Denver, Colorado, on August 31, 2007, at 1:05 p.m., before Dawn E. Eastman (Calderwood), Certified Shorthand Reporter, Registered Professional Reporter, and Notary Public.

Page 34

1 against their bonus?
2   A.   I believe they still had a bonus; this
3 sheet just does not reflect it. They were just
4 changing the overall weekly pay structure, trying to
5 make it easier on the managers, because it was
6 difficult to adjust from taking that draw.
7   Q.   Okay. So I guess I understand this.
8 If the manager is being paid a base salary of
9 26,000 -- and in Jack's case, getting a $400 draw
10 per week, it's going to come out to about 52,000, or
11 in that neighborhood?
12   A.   Correct.
13   Q.   Okay. So it's really not -- it's not
14 a raise?
15   A.   No.
16   Q.   Okay. It was just a different way of
17 paying it, basically?
18   A.   Right.
19   Q.   Okay. I'm with you.
20       I'll show you Exhibit 56. Again,
21 another one of these input sheets. And this appears
22 to be a change from a weekly salary of $1,000 to a
23 new salary of $1,153.85 as of June 25, 2001;
24 correct?
25   A.   Correct.

Page 35

1   Q.   And then he was also given the bonus
2 of -- what we've been calling the half bonus;
3 correct?
4   A.   Yes.
5   Q.   And, by the way, was -- I believe
6 Andrew Zuppa talked about a half and full bonus. Is
7 it your understanding that there were only the two
8 tiers?
9   A.   At that time, yes. That has changed
10 along the way, where we have a quarter bonus now.
11   Q.   When did that change?
12   A.   Late 2002.
13   Q.   So there's a quarter, half, and full
14 now?
15   A.   Yes.
16   Q.   And that's been so for about five
17 years?
18   A.   (Deponent nods head.)
19   Q.   Okay. Now, this document is actually
20 okayed by Jake Jabs; correct?
21   A.   Yes.
22   Q.   Is that Andrew Zuppa's signature under
23 "General Manager"?
24   A.   Looks like Mike Buscietta's.
25   Q.   I'm sorry, Mike Buscietta's. Okay.

Page 36

1 And then it says, "Already keyed in."
2       Do you know whose handwriting that is?
3   A.   It appears to be Carol Baggesse's.
4   Q.   I'm showing you Exhibit 57, which
5 appears to be the same document, the only difference
6 being that Carol Baggesse has signed it rather than
7 putting "Already keyed in"; correct?
8   A.   Yes.
9   Q.   Do you know why there are two
10 different documents -- not that it makes a lot of
11 difference?
12   A.   A lot of times, given that we do have
13 different locations, documents will be faxed over to
14 Carol, and then the original sent up later.
15   Q.   Okay. The 1153.85 were annualized as
16 to what?
17   A.   I believe 60,000.
18   Q.   I'm showing you now what we have
19 marked as Exhibit 58, which is another one of these
20 sheets. And it pertains to whatever it is that
21 happened on July 6, 2004?
22   A.   Yes.
23   Q.   Whatever it is that the jury concludes
24 happened at the Westminster store on July 6, 2004,
25 and, again, pertains to Jack Must; correct?

Page 37

1   A.   Yes, it does.
2   Q.   This one is filled out entirely by
3 Andrew Zuppa; correct?
4   A.   Yes.
5   Q.   And the others that we have looked
6 at -- let me ask you something; let me go backwards
7 in order.
8       Exhibit 57, who filled out the -- I'm
9 talking about -- obviously, various people signed
10 it. In terms of the information on wages, who
11 filled that out?
12   A.   It appears to be Mike Buscietta's
13 handwriting.
14   Q.   And the information on Exhibit 56, I
15 guess that's the same document. Exhibit 55, whose
16 handwriting is it?
17   A.   I would say it's Andrew Zuppa's.
18   Q.   Exhibit 54, whose handwriting?
19   A.   Andrew's.
20   Q.   Exhibit 53, whose handwriting?
21   A.   I can only say that it's Jack's,
22 without -- that's just my guess.
23   Q.   Okay. All right. You're going to be
24 the all-time, clean-up hitter here. You have been
25 sitting there listening to all my questions.

Crystal Hayes

**Page 38**

1  Q. Do you recall the testimony of these
2  various witnesses this week about these changes in
3  Jack Must's bonus amounts?
4  A. Yes.
5  Q. To my recollection, there are
6  basically two of them. And I'm showing you what
7  we've marked as Exhibit 28 and ask you to turn to
8  pages 48 and 49.
9  A. (Deponent complied.)
10  Q. And the change that was made with
11  respect to Jack Must's bonus for that quarter --
12  "that quarter" being November/December of '02, end
13  of January of '03 -- my question is: Would there be
14  any document that you can go to, at this point, to
15  figure out why it was that change was made?
16  A. Not that I'm aware of.
17  Q. And I take it that nothing is required
18  in the HR department, at least, to document why it
19  is that you're changing somebody's bonus?
20  A. No.
21  Q. Do you know whether the payroll people
22  require such a document?
23  A. I don't believe so.
24  Q. Have you, in the course of this
25  lawsuit, attempted to determine that?

**Page 39**

1  A. Yes, I have.
2  Q. What have you found?
3  A. Nothing.
4  Q. Who did you talk to in the payroll
5  department?
6  A. Ms. Baggesse, who's the payroll
7  manager; Bob Schwartz, who is our company
8  controller.
9  Q. And neither one of them had an
10  explanation?
11  A. No.
12  Q. I take it the same is true of the
13  second change, which appears on pages 53 and 54?
14  A. That's correct.
15  Q. In other words, you have queried those
16  two people you referred to, Baggesse and Schwartz,
17  and neither one could tell you why?
18  A. That's correct.
19  Q. And you've not seen any document that
20  tells you why?
21  A. No.
22  Q. In talking with them, have they
23  communicated to you that, normally, there would be
24  such a document?
25  A. No, they have not.

**Page 40**

1  Q. Have you ever seen a document that
2  justifies or documents the reasons why somebody is
3  being docked?
4  A. No, I have not. Again, individuals,
5  knowing what bonuses and who's getting bonuses are
6  limited to certain people: Mr. Jabs; Bob Schwartz;
7  up until this last year, I believe Andrew Zuppa --
8  maybe two years. And then there's Carol Baggesse,
9  who would actually key in the bonuses.
10  Q. And you?
11  A. Not until recently, not until the last
12  year.
13  Q. So, obviously, everybody that gets
14  bonuses knows they get one. And the people you
15  recited know it. But the vast majority of employees
16  at AFW do not know?
17  A. Correct.
18  Q. And I guess what I'm trying to
19  understand -- flip back to page 50, for instance, if
20  you would.
21  A. (Deponent complied.)
22  Q. Do you see where it says, next to
23  Andrew Zuppa's name: Andrew asked if he could bank
24  this and not get paid."
25    And then it says, "Okay, Jake Jabs";

**Page 41**

1  right?
2  A. Correct.
3  Q. And then flip forward to 52, if you
4  would.
5  A. (Deponent complied.)
6  Q. And, again, on Andrew Zuppa's line, it
7  says, "Don't pay." And then on the right side of
8  the table, it says, "Also holding last quarter";
9  correct?
10  A. Right.
11  Q. And then, finally, with respect -- on
12  page 53, there's apparently a reference with respect
13  to Mike Buscietta, that it had something to do with
14  this GPS system:
15    And the same is true of John Hebditch.
16  And then there's a reference to Andrew Zuppa being
17  paid for, basically, three different quarters'
18  bonus; correct?
19  A. Correct.
20  Q. All of that is documented?
21  A. Yes.
22  Q. But there's nothing with respect to
23  Jack. Do you have any explanation at all for that?
24    MR. BENSON: I'm going to object to
25  the form of the question.

11 (Pages 38 to 41)

42

1   Go ahead and answer, if you can.
2   THE DEPONENT: I have no explanation.
3   Q.   (By Mr. Buchanan) Do you feel, in
4   what you've done to research that, that you've
5   exhausted all of the avenues available to you, as HR
6   director, to determine why it was that he was
7   docked?
8   A.   I do.
9   Q.   And you don't have any personal
10  knowledge, beyond what you may have heard in this
11  room and beyond what the documents do or do not
12  reflect; correct?
13  A.   I have none.
14  Q.   Okay. We've looked at the change form
15  for Jack that indicates that he was promoted to the
16  manager's job, of which his base salary would be,
17  annually, $60,000; correct?
18  A.   Yes.
19  Q.   And there is no document indicating
20  that he ever received a raise in his base salary;
21  correct?
22  A.   There was one.
23  Q.   Okay. Well, I'm sorry --
24  A.   Exhibit 57.
25  Q.   Okay. That's where he went to the

43

1   manager's position; correct?
2   A.   Okay, yes.
3   Q.   But since he went to the manager's
4   position, his base salary has never increased?
5   A.   No, I don't believe so.
6   Q.   Do you have an understanding what the
7   range of base salaries for managers was?
8   A.   Starting out at 52.
9   MR. BENSON: I'm just going to object.
10  Can we just get a time frame?
11  MR. BUCHANAN: During the time frame
12  Jack was manager. And what that is is from
13  June 25th of '01 through July 6th of '04.
14  THE DEPONENT: Normally, we don't have
15  any base. At that time, I believe anybody going
16  into -- being placed into a management position in a
17  store, it was starting at 52. And then I believe
18  the next upgrade from that, the increase would go to
19  60 as a base.
20  Q.   (By Mr. Buchanan) And were there
21  well-established grades between there and whatever
22  the top was?
23  A.   No.
24  Q.   Was there a maximum?
25  A.   No, there's no max.

44

1   Q.   I've seen -- and, obviously, we can
2   pull out documents if we want to -- I've seen that
3   Mike Buscietta was making $90,000 as a base salary
4   at one time.
5   Let me ask you: Have store managers
6   ever been paid a base salary of 90,000?
7   A.   No, not to my knowledge.
8   Q.   What is the highest base salary for a
9   store manager that you've ever heard of?
10  A.   I'm going off weekly. I'm sorry. I
11  believe it's 80,000.
12  Q.   Now, is there a standard time when
13  changes in base salary are made?
14  A.   We do raises -- raise sheets. And
15  they are literally sheets that go out every quarter.
16  The only individuals that would be giving raises to
17  managers at that time would have been Mike Buscietta
18  and Jake Jabs. Currently, it would be Andrew, Jake
19  Jabs, with possible input from Mike Buscietta.
20  Q.   What do the raise sheets consist of?
21  A.   It lists everybody broken out by
22  department, last pay increase, current rate of pay,
23  and a signature line.
24  Q.   And does it have an opportunity for --
25  let's focus on managers for a moment. Does it have

45

1   an opportunity for one of these gentleman that you
2   mentioned to say: I think this guy ought to be
3   increased to X? Guy or gal.
4   A.   Yes.
5   Q.   And is there -- is that something
6   that's normally a consensus? In other words, if
7   Andrew recommends it, Jake agrees?
8   MR. BENSON: Object, lack of
9   foundation.
10  THE DEPONENT: Not always.
11  Q.   (By Mr. Buchanan) But in any event --
12  well, let me ask you something: Has a manager ever
13  gotten a raise on his base salary that Jake did not
14  agree to?
15  A.   No.
16  Q.   Typically -- you say those go out
17  every quarter. You mean fiscal quarters?
18  A.   Yes.
19  Q.   Typically, do people actually receive
20  a raise every quarter?
21  A.   No.
22  Q.   How often do they typically receive
23  raises? I realize there may be some variation,
24  but ...
25  A.   Employees or managers?

**Page 46**

1  Q.  Managers.
2  A.  Rarely.
3  Q.  Tell me what you mean by that.
4  A.  Managers' pay structures, they don't
5  change unless there's been an increase of
6  responsibilities, a change of store, then it's
7  evaluated at that time.
8      Most managers are placed at a pay
9  structure where, on their bonus, you have the
10 ability, obviously, with the bonus structure, to get
11 a bigger bonus from one quarter to the next quarter.
12 So raises are really not factored in.
13 Q.  Okay. So let me understand this:
14 Once a manager becomes a manager, they're given a
15 base salary, and something pretty important needs to
16 change before that's going to be changed; correct?
17 A.  Correct.
18 Q.  And the way you adjust, if you believe
19 an adjustment should occur, is through the bonus?
20 A.  Yes.
21 Q.  So the $60,000 that Jack was paid as a
22 manager at the Westminster store, there would have
23 to be something fairly dramatic happen in order for
24 that to increase; correct?
25 A.  Correct.

**Page 47**

1  Q.  Like changing to another store?
2  A.  Yes.
3  Q.  Or changing responsibility in some
4  dramatic way?
5  A.  Maybe into corporate, yes.
6  Q.  And are you aware of anybody who has
7  ever run the Westminster store who has been paid
8  more than $60,000 as a base salary?
9  A.  I would be guessing. I'd have to have
10 the raise sheets in front of me.
11 Q.  But as you sit here, you are not aware
12 of anyone?
13 A.  No.
14 Q.  To your understanding -- and, again,
15 I'm not asking you to speculate -- but to your
16 understanding, is there, given that the Westminster
17 store is one of the very smallest stores, and
18 obviously, the Thornton store is many multiples of
19 its size, is there any sort of an understanding that
20 the Westminster store manager is always going to
21 start off at 60 and stay there?
22     MR. BENSON:  And I'm only objecting to
23 the form. We're talking about the old Westminster
24 store? Because there's two different sized
25 stores and --

**Page 48**

1  Q.  (By Mr. Benson) Good point. I am
2  talking about old Westminster store.
3  A.  I don't think it's an understanding.
4  Again, what Jack was paid was not uncommon to the
5  same pay rate of our similar stores for other
6  managers.
7  Q.  All right. And it also wasn't
8  uncommon for him to have worked there for three
9  years as a manager and not get a raise in base
10 salary?
11 A.  It's not uncommon, no.
12 Q.  And it's certainly not a reflection,
13 in and of itself, of his performance; correct?
14 A.  No, it's not.
15     MR. BENSON:  We've been going almost
16 an hour. Do you want to take a break?
17     MR. BUCHANAN:  I don't mind.
18     (A recess was taken.)
19 Q.  (By Mr. Buchanan) Ms. Hayes, I wanted
20 to come back to something you said. I asked you
21 about raises, and you said that managers were rarely
22 raised. And I take it that's distinguished from
23 nonmanagement?
24 A.  Correct.
25 Q.  And I don't need much detail about

**Page 49**

1  this, but give me some idea of how often your
2  average AFW employee, at least, is considered for a
3  raise?
4  A.  This is just a guesstimate. I would
5  say they were probably given raises twice a year, a
6  quarter each -- quarter, 25 cents.
7  Q.  Oh, 25 cents each. So, typically, if
8  raises are given, they're pretty much across the
9  board?
10 A.  No, on average.
11 Q.  On average. All right.
12     Does AFW retain the records from
13 Jack's first stint as a salesperson at the Bannock
14 store from 1988 to 1992?
15 A.  No, we don't.
16 Q.  You've looked for them?
17 A.  I have.
18 Q.  And you can't find them?
19 A.  No.
20 Q.  Just, if you would, for the record,
21 summarize what you did to look for those records.
22 A.  Well, once we moved into our corporate
23 building at E-470 and Peoria, Compark, all the
24 records from the main location, which was Thornton,
25 at that time, were moved to Compark; everything was

**Page 54**

1    A.   No.
2    Q.   Do you recall that portion of Andrew
3    Zuppa's testimony earlier this week regarding
4    performance reviews and the format that I've seen in
5    other cases, where there's a standard form that
6    says: Here are the expectations of this particular
7    job description; and this person either meets them,
8    exceeds them, needs improvement, or whatever?
9    A.   I've seen them at other employers,
10   yes.
11   Q.   Do you recall him saying that his
12   recollection was, when he became the HR director,
13   those forms were being used; but they were being
14   used sporadically and inconsistently, and he decided
15   to get rid of them?
16   A.   I do recall him saying that.
17   Q.   Do you believe that's accurate?
18        MR. BENSON: Object, lack of
19   foundation.
20        THE DEPONENT: I can only assume.
21   Q    (By Mr. Buchanan) Well, I guess,
22   here's my question --
23        MR. BENSON: She wasn't at the company
24   then.
25   Q    (By Mr. Buchanan) Fair enough. And

**Page 55**

1    what I'm going to ask you is this: I realize that
2    you came after he started out as the HR director.
3    But are there personnel files that you've seen of
4    AFW employees that do, in fact, have that type of
5    performance review in them?
6    A.   I've seen files from years ago that
7    did have those type of performance type evaluations.
8    Q.   And I take it you've never seen one on
9    Jack Must?
10   A.   No.
11   Q.   Can you give us a time frame for when
12   you believe these sorts of documents were used?
13   A.   Again, this would be assumption. I
14   would say early '70s.
15   Q.   Oh, wow, that long ago?
16   A.   Yeah.
17   Q.   And no more recent than that?
18   A.   Nothing comes to mind, no.
19   Q.   See, that seems inconsistent with
20   Zuppa's testimony, because he seems to say that they
21   were being used up until the time he became HR
22   director, which was whenever that was, but it was
23   certainly long after the early '70s.
24   A.   I'm assuming. I know I've seen some,
25   but it was a very long-term employee.

**Page 56**

1    Q.   Let me ask you a few questions about
2    some financial documents that we've been looking at
3    this week. I want to show you Exhibit 32, which is
4    a spreadsheet of sales figures for the various AFW
5    stores over a period of time.
6         First of all, do you have any role in
7    producing those types of documents?
8    A.   No, I don't.
9    Q.   Do you see those documents on a
10   regular basis?
11   A.   I do.
12   Q.   In what connection do you see them?
13   A.   They're e-mailed every morning.
14   Q.   Okay. So they're available to you, as
15   an AFW employee, every morning?
16   A.   As a manager. They're e-mailed to
17   managers every morning.
18   Q.   And managers would certainly include
19   store managers?
20   A.   I can't say if they get it or not. I
21   know corporate does.
22   Q.   And you're in corporate?
23   A.   Yes.
24   Q.   So you can literally look at those
25   every morning?

**Page 57**

1    A.   Yes.
2    Q.   And what time of morning are they
3    available?
4    A.   Before I get there.
5    Q.   And they're current as of the last
6    day's business?
7    A.   Yes.
8    Q.   So if I come in on --
9         MR. BENSON: He can't come in.
10        MR. BUCHANAN: Yeah, right, object to
11   the form.
12   Q.   (By Mr. Buchanan) If you were to come
13   in September 1st, tomorrow morning, into your
14   office, you could access a program that would show
15   you what the sales figures were through August 31st?
16   A.   Correct.
17   Q.   And once -- and then if you were to
18   come in on Sunday, on the 2nd, you could access
19   figures as of September 1?
20   A.   I don't believe so because it is done
21   by the accounting department. So I don't believe it
22   would be there on Sundays. I would get Sunday's on
23   Monday.
24   Q.   Okay. So accounting doesn't come in
25   on Sunday?

Page 58

```
1    A.   No.
2    Q.   But they do come in on Saturday?
3    A.   No. So I would not get the weekend --
4    I would get both Saturday's and Sunday's on Monday.
5    Q.   Okay. Fair enough. And then can you
6    download them?
7    A.   Download them?
8    Q.   Yeah.
9    A.   Meaning?
10   Q.   Print a copy of it.
11   A.   Yes, I can.
12   Q.   Now, let me ask you about Exhibit 34.
13   And these documents were probably not in front of
14   you when there were questions being asked, but I
15   asked at least one or two witnesses this week: Why
16   are the numbers that are reflected on Exhibit 34
17   different from the numbers that are reflected on
18   Exhibit 32? And I haven't heard anybody tell me why
19   that is. Are you able to?
20   A.   I can give it a shot. This is written
21   sales.
22   Q.   "This" being 32?
23   A.   "This" being 32.
24   Q.   Okay.
25   A.   And I can only assume that this
```

Page 59

```
1    (indicating) is actual sales.
2    Q.   Meaning 34 takes out cancellations,
3    returns, even exchanges?
4    A.   Correct. Orders canceled.
5    Q.   Of course, even exchanges don't cost
6    anything, but returns do, obviously?
7    A.   Yes, they do. Canceled invoices,
8    voided invoices.
9    Q.   Have you ever seen financial -- or
10   spreadsheets in the form of Exhibit 34?
11   A.   You mean up until this week?
12   Q.   Yeah.
13   A.   No.
14   Q.   I'll just represent to you -- let me
15   see it before I misstate that.
16        Yeah. I'll represent to you those are
17   documents that were submitted with AFW's submission
18   to the EEOC. Did you participate in putting those
19   documents together?
20   A.   No. Lori Tielke, who is, as you
21   referred to her, the nuts and bolts of the
22   operation, I can go to her and request specific
23   information that I need. And she is probably the
24   responsible party of this.
25   Q.   I take it that the document that you
```

Page 60

```
1    would get on your e-mail every morning --
2    A.   Is direct sales.
3    Q.   -- in the form of Exhibit 32,
4    obviously does not reflect this type of information
5    on Exhibit 34. And I forget how you characterized
6    that: Delivered sales or . . .
7    A.   Actual.
8    Q.   Actual sales, okay, because those
9    things have not occurred yet?
10   A.   Right.
11   Q.   Okay. All right. While we're on the
12   subject, I'll show you Exhibit 33, which is a table
13   showing basically three divisions, pre-Jack Must,
14   Jack Must period, and post-Jack Must; correct?
15   A.   Correct.
16   Q.   How was that document prepared?
17   A.   Again, I would refer to Lori Tielke on
18   any such report.
19   Q.   You didn't play any role in it?
20   A.   No.
21   Q.   You didn't play any role in
22   communicating what you wanted -- or what somebody
23   wanted reflected?
24   A.   What's needed? I very well could
25   have.
```

Page 61

```
1    Q.   Does that remind you who requested
2    this document?
3    A.   There's been so much information
4    requested, no, I could not tell you.
5    Q.   Is Lori Tielke still employed at AFW?
6    A.   Yes, she is.
7    Q.   Is she in the accounting department?
8    A.   Assistant controller.
9    Q.   Assistant to Mr. Schwartz?
10   A.   Yes.
11   Q.   Would she be the person that would be
12   most knowledgeable about these last three documents
13   we have talked about, the sales figures?
14   A.   I would say yes.
15        (Deposition Exhibit 59 was marked for
16   identification.)
17   Q.   (By Mr. Buchanan) Showing you what we
18   have marked as Exhibit 59 to your deposition.
19   Again, it's another spreadsheet that has been
20   prepared, using at least some of the format of the
21   previous one, this one listing pre-Jack Must and
22   Jack Must period.
23        Do you know who prepared this
24   document?
25   A.   I know Lori Tielke did prepare this
```

Crystal Hayes

70

1  alone. Retaining employees. Keeping the managers
2  up-to-date on new laws. It's a continuous, ongoing
3  training.
4    Q.   Okay. Let's talk about Exhibit 41,
5  which is this document pertaining to reviews. Do
6  you know who authored that?
7    A.   I don't. I have revised this form,
8  though it's a very similar. Obviously, cleaned it
9  up quite a bit, attached a sample to it.
10    Q.   Attached a sample of . . .
11    A.   Of a review.
12    Q.   Of a review? Okay. And that may very
13  well be in the -- these look like these came from
14  the EEOC personnel file, but I think I know the one
15  where you say: John Smith did this or that?
16    A.   (Deponent nodded.)
17    Q.   Now, you say you don't know the
18  original author, but you've updated it?
19    A.   Yes.
20    Q.   Do you know where it came from? Was
21  it drafted internally from AFW, or did it come from
22  some other business?
23    A.   No, it's an AFW internal document.
24    Q.   The reason I ask that is there's no,
25  you know, letterhead or other indication, at least

71

1  in the text that I have seen, that really indicates
2  it's AFW specific. But you think it was drafted at
3  AFW?
4    A.   Yes. And the reason why I would state
5  that is that most of the times you hear companies
6  talk about reviews, they would use it in the same
7  manner that you would use a review, as a positive
8  thing. Reviews, for us, are usually negative or
9  educational.
10    Q.   And, in fact, you actually state that
11  in the very first line. You say: "A review (or
12  write-up personnel action form) is a formal notice
13  to an employee that his/her performance conduct is
14  below established company standards." Correct?
15    A.   Correct.
16    Q.   And you don't -- as a general matter
17  at AFW, you don't give commendations?
18    A.   Correct.
19    Q.   In other words, you don't have, you
20  know, like, an "atta boy" form where you, you know,
21  you talk about how --
22    A.   There are no pats on the back.
23    Q.   There are no pats on the back. So
24  Jack Must's personnel file is not unusual in the
25  sense that there's no indication that he did

72

1  something particularly well on a particular
2  occasion?
3    A.   Correct.
4    Q.   Why is that? Why are there no pats on
5  the back at AFW?
6    A.   Mr. Jabs is a true believer of paying
7  his employees for the work that they do. They're
8  there to get a paycheck. He does pay very well.
9  There's no need to.
10    Q.   Okay. Now, when you say that you have
11  revised this, can you summarize for us, in any way,
12  what your revisions consisted of?
13    A.   I can't. Again, it was just really
14  cleaning it up, the verbiage, making it prettier.
15    Q.   Okay. Well, it is pretty.
16        Now, it's true, isn't it, that this
17  document is intended, really, for managers and
18  managers exclusively?
19    A.   Correct. Or department managers,
20  anybody that's in a position to give a review.
21    Q.   Let me be sure I understand who they
22  are. That's the CEO, the general manager, the
23  assistant general manager, when there was such a
24  thing, the store managers and department managers?
25    A.   Correct.

73

1    Q.   Is that correct?
2    A.   Yes.
3    Q.   And this particular one has Jack
4  Must's name at the top of it. He initialed the
5  first page, and he signed the second page; correct?
6    A.   Yes.
7    Q.   So it's something that you require a
8  manager to sign; correct?
9    A.   Yes.
10    Q.   And this particular one is signed
11  6/4/03, which was approximately a year before he
12  was -- he left the company. Is there a reason why
13  he did it on that date? Did you ask him to sign,
14  like, a new version on that date?
15    A.   Again, we'll go through this twice a
16  year. I would be pretty positive that 6/4/03
17  probably was a managers meeting.
18        At that time, when we do go over this
19  information, again, we're going over the harassment
20  policies, the dos and don'ts of the managers,
21  obviously, the appropriate way to give a review --
22  you know, to always have somebody in there with you.
23  Again, it's more educational than just going over
24  the operations of the store.
25    Q.   You mentioned that one of the things

Page 78

```
 1    Q.   Do the discharge guidelines consist of
 2  anything other than that?
 3    A.   I don't believe so.
 4    Q.   In other words, it's just the
 5  procedure, that --
 6    A.   It's a procedure.
 7    Q.   -- these three people need to sign
 8  off?
 9         MR. BENSON:  Object to the form.  I
10  think it misstates the quote.
11         THE DEPONENT:  No, I --
12         MR. BENSON:  Hang on.  It says "or,"
13  not "and."
14    Q    (By Mr. Buchanan) Does it include
15  anything other than the three people who could be
16  asked to sign off on it?
17    A.   Does it include anything other than?
18    Q.   Yeah.  In other words, is there
19  anything more to these discharge guidelines that are
20  referred to here, other than one of these three
21  people -- at least one of these three people needs
22  to sign off?
23    A.   Again, this is a form from three or
24  four years ago.  So I'm trying to visualize the
25  guidelines.
```

Page 79

```
 1  I don't think so.
 2    Q.   Let me ask you this:  When you say you
 3  are trying to visualize the guidelines, there's a
 4  document --
 5    A.   Yes, there is.
 6    Q.   -- called "Discharge Guidelines"?
 7    A.   I know I have a copy.
 8    Q.   It's not in the personnel manual?
 9    A.   No, it's not.
10    Q.   How long a document is it?
11    A.   A one-page document.
12    Q.   Is it a document that's been revised
13  from time to time?
14    A.   I believe I revised that once.  I
15  revised this form, too.
16    Q.   "This form," being Exhibit 41?
17    A.   Yes.
18    Q.   Have you revised that form since
19  June 4, or thereabouts, of '03?
20    A.   Yes.  The reason why I can state that
21  is all my forms now actually will have a revision
22  date at the bottom and the AFW logo on the top.
23    Q.   Do you know when the last time that
24  you revised the discharge guidelines was?
25    A.   Not off the top of my head.
```

Page 80

```
 1    Q.   Have you archived the previous
 2  editions of the discharge guidelines?
 3    A.   I'm sure I have a copy, yes.
 4    Q.   If I were to ask your attorneys to
 5  produce a copy of the discharge guidelines that were
 6  in existence and applied to July 6, 2004, you could
 7  give us a copy of those?
 8    A.   I believe so.
 9    Q.   Who has these discharge guidelines?
10    A.   Specifically?
11    Q.   Well, no.  Let me ask:  What
12  categories of employees have the discharge
13  guidelines?
14    A.   Managers.
15    Q.   Basically, the same people who do
16  reviews and do hiring and firing?
17    A.   Correct.
18    Q.   Were the discharge guidelines in
19  existence when you came to AFW?
20    A.   I believe so, yes.  It was always
21  given out with this form (indicating).
22    Q.   With the "Reviews" form?
23    A.   (Deponent nods head.)
24    Q.   This particular review form is signed
25  by Jack Must as of June 4, 2003.  Were the discharge
```

Page 81

```
 1  guidelines signed by managers?
 2    A.   I don't believe we required them to
 3  sign those.  It was just their handout to take with
 4  them.
 5    Q.   Okay.  Is there a reason you did not
 6  require them to sign that?
 7    A.   Again, it was their information, for
 8  them to the keep.
 9    Q.   And I take it you expected them to act
10  upon the discharge guidelines -- to act in
11  accordance with the discharge guidelines?
12    A.   In accordance, yes.
13    Q.   And just to be clear about this:  The
14  discharge guidelines pertained to discharging any
15  employee; correct?
16    A.   Again, it would have to -- depends on
17  the incident, what the violation was.
18    Q.   Fair enough.  But, I mean, I assume
19  that the guidelines, themselves, addressed that, if
20  it was a huge --
21    A.   Yes, they do.
22    Q.   You know, if someone comes in and
23  slaps Jake Jabs, they're going to be terminated?
24    A.   Right.  I believe the guidelines do
25  outline that in there.
```

Crystal Hayes

Page 82

1    MR. BENSON: Not specifically a slap,
2 Counsel.
3    MR. BUCHANAN: I can't wait to see
4 these.
5    Q.  (By Mr. Buchanan) Do you -- in your
6 HR department, you receive all personnel actions;
7 right?
8    A.  They come through me, yes.
9    Q.  What happens to them in your office?
10   A.  I review them, and then they go to the
11 file room to be filed in the employee's files.
12   Q.  Do they get filed anywhere else?
13   A.  No.
14   Q.  Are they one-part forms?
15   A.  Yes.
16   Q.  There are no carbon copies?
17   A.  No carbon copies. Occasionally,
18 there's an attachment to it. If somebody, just an
19 example, neglected to put comments in a back order,
20 they would make a copy of that invoice and attach it
21 to it.
22   Q.  Like: Here's what I'm talking about,
23 or: Here's the exhibit that illustrates that?
24   A.  Yes.
25   Q.  Do you keep, in the HR department, the

Page 83

1 personnel actions by the person who has generated
2 them, as opposed to the person they're about?
3    A.  Can you rephrase that, please?
4    Q.  Sure. Well, let me ask you
5 specifically: If I were to ask you for all
6 personnel actions that Jack Must prepared, would you
7 have any way of doing that, other than going to each
8 of the employees that he supervised at one time or
9 another?
10   A.  No, you would have to pull each
11 individual file.
12   Q.  Is there any index that you could look
13 at? In other words, do you keep any sort of log
14 that would tell you where to look?
15   A.  No.
16   Q.  Do you recall ever having any
17 criticism, yourself, as HR director or as -- in your
18 previous positions in the HR department, of Jack
19 Must's preparation of personnel actions?
20   A.  Nothing comes to mind, but I will get
21 two dozen reviews a day.
22   Q.  Okay. I guess my question is: Did it
23 ever come to your attention, or did you ever
24 determine on your own that Jack doesn't file
25 personnel actions at all?

Page 84

1    A.  I could not answer that.
2    Q.  And I take it if I were to ask about
3 any other particular issue, like he never fills them
4 out completely, he doesn't support them adequately,
5 or whatever else, you couldn't answer that question,
6 either?
7    A.  No. Normally, when I get reviews, I
8 will read the content to make sure that there's
9 nothing in there that needs to be addressed. Rarely
10 will I -- I mean, I'm going through them so fast,
11 again, if it was just a standard review, minor
12 violation, I won't address it; and it gets filed.
13         (Deposition Exhibit 60 was marked for
14 identification.)
15   Q.  (By Mr. Buchanan) Okay. I'm showing
16 you what we've marked as Exhibit 60, and I'll just
17 tell you that -- or just ask you to sort of notice
18 that these are apparently computer screens
19 pertaining to Jack Must; correct?
20   A.  Correct.
21   Q.  And these are payroll computer
22 screens?
23   A.  Yes.
24   Q.  Are these screens that you have access
25 to?

Page 85

1    A.  I do.
2    Q.  And I have, obviously, pulled them out
3 of his personnel file. And I'm wondering if you can
4 tell me why -- do you see where it says, "Length of
5 Service"?
6    A.  Yes.
7    Q.  And you see on the first page where
8 the value is, if I'm reading that correctly, 0504?
9    A.  Yes.
10   Q.  And then on the second page, the value
11 is 0510?
12   A.  Yes.
13   Q.  And then on the third page, the value
14 is 0511?
15   A.  Okay.
16   Q.  Can you tell me what that means?
17   A.  I thought I knew these. No, I cannot.
18   Q.  Can you, in looking at the first
19 page -- well, actually, I think I may have just
20 answered my question.
21        The first page indicates that it was
22 printed on November 11th, '03. Do you see that, in
23 the lower right-hand corner?
24   A.  Yes.
25   Q.  The second page indicates that it was

22 (Pages 82 to 85)

Calderwood-Mackelprang, Inc.  303.477.3500

**Page 94**

1  Q. In AFW's response to the EEOC, you are
2  listed as one of the people – one of the four
3  people that have information pertaining to Jack Must
4  speaking negatively about AFW.
5  A. (Deponent nods head.)
6  Q. What is your information in that
7  regard?
8  A. I can refer back to the managers
9  meeting that was talking about the signature
10 capture.
11 Q. And are you talking about the managers
12 meeting where Jack had the meeting with Mike
13 Buscietta?
14 A. Yes.
15 Q. What do you know about that?
16 A. About the meeting with Mike Buscietta?
17 Q. Yes.
18 A. Again, I found out after the fact that
19 there was a conversation that took place in
20 Mr. Buscietta's office at Compark. I had a
21 conversation, I believe it was the day after, with
22 Mike Buscietta because the meeting, I believe,
23 happened after our managers meeting that day.
24      I had talked to Mike, because I used
25 to talk to Mike on a daily basis. He had told me

**Page 95**

1  about the meeting; he was pretty upset. Apparently,
2  Jack was disrespectful to him in some manner.
3  Q. Okay. What else?
4  A. Nothing else.
5  Q. And just to be clear about this: Your
6  entire information about what happened in Mike
7  Buscietta's office comes from Mike Buscietta?
8  A. Yeah, it came from Mike. After
9  speaking with Mike and him telling me about the
10 meeting, I did call Mr. Zuppa, asked him: What
11 happened, you know, is everything okay? Do you need
12 me to do anything?
13 Q. Why did you ask him those questions?
14 A. Because I felt it was my position.
15 Q. Had Mike -- in your conversation with
16 Mike, had he indicated that he wanted to fire Jack
17 Must?
18 A. No. Again, it was just a general
19 conversation about the content of the meeting.
20 Q. What did Andrew Zuppa respond to you?
21 A. No, that he was going to take care of
22 it, that I had enough on my plate.
23 Q. Did he say anything other than: I'm
24 going to take care of it?
25 A. No, but it was a very -- I mean, it

**Page 96**

1  was just a very brief conversation about that.
2  Q. So it sounds like this was a telephone
3  conversation?
4  A. Yeah.
5  Q. And this was the only subject of that
6  conversation?
7  A. Yeah.
8  Q. Anything else that would be, in your
9  mind, responsive to AFW's statement that you are one
10 of the people that knows about Jack Must speaking
11 negatively about the company?
12 A. I think that would be it.
13 Q. So far I haven't heard anything
14 negative about the company. I've heard about Mike
15 Buscietta having an argument with Jack Must.
16      MR. BENSON: Object to the form of the
17 question.
18      THE DEPONENT: Again, being
19 disrespectful to a general manager is pretty
20 negative.
21 Q (By Mr. Buchanan) Well, it may be a
22 negative action. What I'm looking for is a negative
23 statement about the company, as distinct from Mike
24 Buscietta.
25 A. That would be it.

**Page 97**

1  Q. You don't have any information that he
2  was saying something negative about AFW itself?
3  A. No.
4  Q. All right. We're getting very close
5  here. I just have a few things that I need you to
6  clear up for me, if you can:
7       I'm showing you what we have marked as
8  Exhibit 51. This is a document that was produced to
9  us last week and is a "Termination Report," as I
10 understand it, a spreadsheet showing -- well, the
11 first page shows people terminated. The second
12 sheet shows people hired in Store No. 8, which is
13 the Westminster store; correct?
14 A. Correct.
15 Q. During a particular date range;
16 correct?
17 A. Yes.
18 Q. Now, this is one of, perhaps, 15
19 different iterations of what, I assume, is the HR
20 database that have been produced in this case?
21 A. Yes.
22 Q. Are you the person that makes the
23 query to the computer to set these up?
24 A. Oh, good Lord, no.
25 Q. Who is the?

Page 130

```
 1              CERTIFICATE
 2   STATE OF COLORADO    )
                          )ss.
 3   CITY AND COUNTY OF DENVER )
 4
 5         I, Dawn E. Eastman (Calderwood),
     Certified Shorthand Reporter, Registered
 6   Professional Reporter, and Notary Public for the
     State of Colorado, do hereby certify that previous
 7   to the commencement of the examination, the said Was
     CRYSTAL A. HAYES duly sworn by me to testify the
 8   truth in relation to the matters in controversy
     between the said parties.
 9         I further certify that said deposition
     was taken in shorthand by me and was reduced to
10   typewritten form by computer-aided transcription,
     that the foregoing is a true transcript of the
11   questions asked, testimony given, and proceedings
     had.
12         I further certify that I am not an
     attorney nor counsel nor in any way connected with
13   any attorney or counsel for any of the parties to
     said action or otherwise interested in its event.
14         IN WITNESS WHEREOF, I hereunto affix my
     hand and notarial seal this 30th day of September,
15   2007. My commission expires September 20, 2010.
16
17
18         _____
           Dawn E. Eastman (Calderwood)
19         CSR, RPR, Notary Public
           Calderwood-Mackelprang, Inc.
20
21
22
23
24
25
```

Page 131

```
 1   CALDERWOOD-MACKELPRANG, INC.
     4410 Zuni Street
 2   Denver, Colorado  80211
     (303) 477-3500
 3
 4   September 30, 2007
 5
     GARY J. BENSON, ESQ.
 6   Dworkin Chambers & Williams PC
     3500 East Mexico Avenue, Suite 1300
 7   Denver, Colorado  80210
 8   Re: Must v. American Furniture Warehouse
 9   Deposition of: CRYSTAL A. HAYES
10   The deposition in the above-entitled matter is ready
     for reading and signing. Please attend to this
11   matter by complying with ALL blanks checked below:
12   _____ arranging with us at the number listed below
           to read and sign the deposition in our
13         office.
14   _____ having deponent read your copy and sign
           amendment sheets, if any (original signature
15         page enclosed.)
16   XXX   reading enclosed deposition, signing
           signature page and correction sheets if any,
17         within 30 days of the date of this letter or
     _____ by _____ due to trial/hearing date of
18   _____
19   Please be sure that the signature page and amendment
     sheets, if any, are signed before a Notary public
20   and returned to our office. If this matter has not
     been taken care of within said period of time, the
21   deposition will be filed unsigned pursuant to the
     Rules of Civil Procedure.
22
     DAWN E. EASTMAN (CALDERWOOD), CSR, RPR
23
     cc: Counsel of Record
24
25
```

Page 132

```
 1   CALDERWOOD-MACKELPRANG, INC.
     4410 Zuni Street
 2   Denver, Colorado  80211
     (303) 477-3500
 3
 4
     ROSS B.H. BUCHANAN, ESQ.
 5   Buchanan Jurdem & Cedesberg PC
     1621 18th Street, Suite 260
 6   Denver, Colorado  80202
 7   Re: Must v. American Furniture Warehouse
 8   Dear Mr. Buchanan:
 9   Enclosed is deposition of: CRYSTAL A. HAYES
10   _____ Previously filed. Forwarding signature page
           and amendment sheets.
11
12   _____ Signed, no changes.
13   _____ Signed, with changes, copy enclosed.
14   _____ Unsigned, notice duly given _____
           pursuant to the Rules of Civil Procedure.
15
     _____ Not signed, notice duly given _____
16   since trial is set for _____
17   _____ No signature required.
18   _____ Signature waived.
19   _____ To be signed in court.
20   _____ Signature pages/amendment sheets to be
           returned to court on date of trial.
21
     _____ Mailed by Certified Mail No._____
22
     _____ Hand-delivered on approximately _____
23
24   DAWN E. EASTMAN (CALDERWOOD) CSR, RPR
25   cc: Counsel of Record
```