# EXHIBIT 9

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Case No. 06-CV-01872-RPM-MEH

JACK MUST,

Plaintiff

vs.

AMERICAN FURNITURE WAREHOUSE CO., a Colorado corporation d/b/a/ AMERICAN FURNITURE WAREHOUSE,

Defendant.

_____

DEPOSITION OF NOLAN P. MORRISON

_____

PURSUANT TO NOTICE, the above-entitled deposition was taken on behalf of the Plaintiff at 1621 18th Street, Suite 260, Denver, Colorado, on August 30, 2007, at 2:36 p.m., before Dawn E. Eastman (Calderwood), Certified Shorthand Reporter, Registered Professional Reporter, and Notary Public.

## Page 2

APPEARANCES:
For the Plaintiff:
  ROSS B.H. BUCHANAN, ESQ.
  Buchanan Jurdem & Cederberg PC
  1621 18th Street, Suite 260
  Denver, Colorado 80202
  (303) 297-2277
  E-mail: Rbhoolo@aol.com
For the Defendant:
  ANDREW W. VOLIN, ESQ.
  Sherman & Howard LLC
  633 17th Street, Suite 3000
  Denver, Colorado 80202
  (303) 297-2900
  E-mail: AVOLIN@SAH.COM
Also Present:
  Crystal Hayes

## Page 3

EXAMINATION INDEX
By Mr. Buchanan        Page 4

EXHIBIT INDEX
FOR IDENTIFICATION     INITIAL REFERENCE

Deposition Exhibit 46        23
  Bates Nos. AFW-MUST 0121 - 0123
  Morrison's application letter/resume

Deposition Exhibit 47        24
  Bates Nos. AFW-MUST 0119 - 0120
  Morrison's Application for Employment
  and Affidavit

Deposition Exhibit 48        24
  Bates No. AFW-MUST 0095
  5/17/2002 Personnel Action form
  re Morrison

Deposition Exhibit 49        26
  Bates No. AFW-MUST 0095
  5/2/2002 Personnel Action form
  re Morrison

Deposition Exhibit 50        26
  Bates No. AFW-MUST 0094
  4/21/2003 Personnel Action form
  Morrison

Deposition Exhibit 51        51
  Bates Nos. AFW-MUST 0540 - 0541
  AFW Termination Report and New
  Hire Report

Deposition Exhibit 52        62
  Bates Nos. AFW-MUST 0542 - 0562
  Job and Compensation computer
  screen

## Page 4

PROCEEDINGS
WHEREUPON, the following proceedings were taken pursuant to the Federal Rules of Civil Procedure.
* * * * *

NOLAN P. MORRISON,
having been first duly sworn to state the whole truth, testified as follows:

EXAMINATION
BY MR. BUCHANAN:
Q. Mr. Morrison, we met off the record. I'm Ross Buchanan. I represent Jack Must. We need to start with you telling us your full name and spelling your last name, please.
A. Nolan Paul Morrison, M-o-r-r-i-s-o-n.
Q. Okay. And what is your date of birth, sir?
A. September 7th, 1975.
Q. And your home address?
A. 872 Mockingbird Lane, Brighton, Colorado 80601.
Q. Is there a 1313 Mockingbird Lane?
A. I don't know.
Q. Mr. Morrison, have you ever had an occasion to give your deposition before?

## Page 5

A. Yes.
Q. When was that?
A. Approximately a year ago.
Q. And what was the focus of that deposition?
A. A customer claimed to have tripped and fell at our University store.
Q. At where?
A. Our university store.
Q. Which is where?
A. South University, University and C-470.
Q. Okay. This was an AFW store?
A. Correct.
Q. And what was your -- the substance of your testimony? Were you a witness, or were you managing the store? Why were you deposed?
A. I was the store manager.
Q. Okay. All right. And that was the only deposition you've ever given?
A. Correct.
Q. Do you remember who took your deposition in that case?
A. Chad Hemmat, I believe was his name.
Q. Okay. Well, having been through it

Page 14

```
 1   Q.   Okay. And have you done anything to
 2   further your education after leaving the University
 3   of Wyoming?
 4   A.   I'm attending Metro State currently.
 5   Q.   And are you in a degree program there?
 6   A.   Yes.
 7   Q.   Working towards a Bachelor's?
 8   A.   Yes.
 9   Q.   In what area?
10   A.   Management.
11   Q.   Business management?
12   A.   Yes.
13   Q.   Or do they just call it management?
14   A.   I believe it's just management.
15   Q.   Okay. Do you have a graduation date
16   or projected date?
17   A.   I'd like to be finished in about three
18   years.
19   Q.   Okay. All right. I notice you also
20   had some training as an emergency medical
21   technician; correct?
22   A.   Correct.
23   Q.   Did you ever work as an EMT?
24   A.   Yes.
25   Q.   Where did you work?
```

Page 15

```
 1   A.   I worked for AMR in Cheyenne, Wyoming.
 2   Q.   For how long?
 3   A.   I believe it was about two or three
 4   years.
 5   Q.   Was that during college or --
 6   A.   Yes.
 7   Q.   Why don't you -- let me just recite,
 8   for the record, that I see you wrote a letter to AFW
 9   indicating that you wanted to move to the Front
10   Range as soon as you had a position.
11        Do you remember that? I mean, I can
12   show it to you if you don't.
13   A.   I don't recall.
14   Q.   Okay. Did you move down here to work
15   for AFW?
16   A.   Yes.
17   Q.   Okay. And do you remember
18   approximately when that was?
19   A.   It was January of 2002.
20   Q.   Okay. Now -- and you've been working
21   for AFW ever since; correct?
22   A.   Correct.
23   Q.   So for five and a half years?
24   A.   Correct.
25   Q.   Can you list for me -- well, strike
```

Page 16

```
 1   that.
 2        You had had previous experience in the
 3   furniture industry; hadn't you?
 4   A.   Yes.
 5   Q.   Where else had you worked before
 6   coming to work for AFW?
 7   A.   Clure Brothers Furniture.
 8   Q.   And they're in Laramie?
 9   A.   Yes.
10   Q.   Is that a single store or a chain?
11   A.   It's one of two. So it's one of two.
12   Q.   It's a family-owned business?
13   A.   Yes.
14   Q.   Okay. How long did you work at Clure
15   Brothers?
16        (Reporter interruption.)
17   Q.   (By Mr. Buchanan) C-l-u-r-e?
18   A.   Right. Since I was in high school.
19   Q.   Okay. What kind of work did you do
20   for them?
21   A.   Everything. I worked in the
22   warehouse. I delivered furniture. I displayed the
23   showroom. I sold furniture. I did some management
24   with employees.
25   Q.   Okay. A little bit of everything?
```

Page 17

```
 1   A.   Yes.
 2   Q.   And when you were in high school, I'm
 3   assuming it was a part-time job; correct?
 4   A.   Yes.
 5   Q.   Was it ever a full-time job, 40 hours
 6   a week?
 7   A.   Yes.
 8   Q.   And when was that?
 9   A.   On and off over the years that I
10   worked there.
11   Q.   Okay. Were you in school the entire
12   time that you were there, either in high school or
13   in college?
14   A.   Yeah. I was in and out of college. I
15   took some semesters off.
16   Q.   Okay. All right. Any other
17   experience in the furniture business, other than
18   Clure Brothers?
19   A.   No.
20   Q.   All right. You came to work for AFW.
21   And what I would like to do now, Mr. Morrison, is to
22   summarize the positions you have held within AFW.
23   What I'm looking for is the title, if there is one,
24   the description of the job, the dates that you held
25   that, and generally what you did in that job; okay?
```

Page 34

1  mean your training or the training of someone else?
2     A.    It was kind of supposed to be my
3  training, yes.
4     Q.    What kind of jobs would you do in
5  terms of management duties?
6     A.    Oversee the sales people, sales
7  meetings, show floor display, show floor
8  maintenance, transfers, payroll. You have building
9  maintenance.
10    Q.    Okay.
11    A.    Staging.
12    Q.    All right. What is staging?
13    A.    Basically, setting up the floor,
14 moving furniture, unwrapping it, putting it --
15 deluxing, getting it ready for the floor.
16    Q.    What is deluxing?
17    A.    Putting it together, yeah.
18    Q.    And when you said the closing shift,
19 basically what that means is noon to ten or one to
20 ten?
21    A.    Yeah, one to ten.
22    Q.    During that month that you were there,
23 you mentioned sales meetings. Were there regular
24 sales meetings?
25    A.    Yes. I'd would have to say yes. We

Page 35

1  have regular sales meetings at all the stores, yes.
2     Q.    Given that you were working the
3  closing shift, they would have happened in the
4  afternoon? Or were they morning meetings that you
5  came to?
6     A.    There would have been a shift
7  beginning sale -- at the beginning of the shift,
8  there would be a sales meeting. Every shift has a
9  sales meeting.
10    Q.    So if someone is working the early
11 shift, they have a sales meeting before their shift.
12 And someone working the closing shift, as you call
13 it, there would be a sales meeting before that one,
14 as well?
15    A.    Correct.
16    Q.    And I guess I'm trying to understand:
17 Were those held during the months that you were at
18 the Westminster store --
19    A.    Yes.
20    Q.    -- sounds like the fall of '03. Were
21 they held regularly?
22    A.    Yes.
23    Q.    And who would conduct those meetings?
24    A.    The manager on duty.
25    Q.    Okay. And depending on who that was,

Page 36

1  it could be Jack Must; it could be Joe Mazzuto; it
2  could be Tom Ward; correct?
3     A.    Correct.
4     Q.    What sort of things happened during
5  the sales meetings?
6     A.    Well, we would have -- I don't know
7  what happened during those particular sales
8  meetings. So I guess if you are asking what happens
9  in a sales meeting: We review memos, possible
10 problems, ways of dealing with customers, training,
11 trying to train on new product, developing skills as
12 a salesperson, possibly take a sales test, which
13 would include various items that may have come up
14 that we would like to share that information with
15 everyone.
16    Q.    Okay. So all of those things would
17 happen during some sales meeting?
18    A.    Or a combo of some, yes.
19    Q.    Sure. Typically, how long would they
20 last?
21    A.    A half hour.
22    Q.    And were they mandatory meetings for
23 the people on that shift?
24    A.    Yes.
25    Q.    And how was the attendance at those

Page 37

1  meetings?
2     A.    I don't recall.
3     Q.    Do you ever recall believing that they
4  were poorly attended or less than all of the
5  salespeople who were going to be working that shift
6  were there?
7     A.    Well, it kind of seemed to me --
8  Westminster, the salespeople didn't really take
9  their job that seriously. I don't really recall. I
10 know that the salespeople -- I felt like the
11 salespeople really didn't respect their managers,
12 and they really didn't want to, you know, abide by
13 the company rules.
14    Q.    Now, you said they didn't respect
15 their managers? Are you referring to all four of
16 them -- I mean, all three of them?
17    A.    Yeah, yes.
18    Q.    Okay. And just to be clear about it,
19 you are talking about Jack Must, Tom Ward, and Joe
20 Mazzuto; correct?
21    A.    Correct.
22    Q.    Were you there long enough to form an
23 opinion -- and if you weren't, feel free to tell
24 me -- as to who, among those three, they respected
25 the most and who they respected the least?

Page 42

1  Q. Okay. You mean currently?
2  A. Currently, yeah -- even back then.
3  Q. Okay. Well, let me ask you this:
4  When did you -- when were you notified that you were
5  either being considered or had been selected to be
6  the store manager at Westminster?
7  A. As I recall, it was around the
8  beginning of the week. I think it was a Monday
9  around the July 4th holiday.
10 Q. Of 2004?
11 A. Yes.
12 Q. And tell me what you remember about
13 that?
14 A. Mike Buscietta came to me and asked me
15 if I would be interested in moving up into a store
16 manager position.
17 Q. Where were you when he asked you that?
18 A. Where was I?
19 Q. Physically, where were you located
20 when you had that discussion?
21 A. On the sales floor at the Thornton
22 store in the vignette.
23 Q. Okay. And what do you recall saying?
24 A. What do I recall I said?
25 Q. What was your response?

Page 43

1  A. Absolutely.
2  Q. Okay. And did you know which store he
3  was talking about?
4  A. Huh-uh, no, I did not.
5  Q. Okay. And did you then have any
6  contact with Andrew Zuppa about that?
7  A. I remember something later that day or
8  possibly the next day, yes.
9  Q. What do you remember?
10 A. The gist of the conversation was, you
11 know, if I was ready to kind of take on that
12 challenge, number one. And that, number two, he
13 would be coming to see me about -- he would be
14 coming to talk to me. I don't really recall the
15 whole -- it's usually a fairly short, precise
16 conversation.
17 Q. That sounds like a phone conversation?
18 A. Yes, I believe it was.
19 Q. And did Andrew Zuppa come to see you
20 in person?
21 A. Yes.
22 Q. What do you recall about that?
23 A. It was, I believe, like on a Thursday.
24 And he had come to the store to see how I was doing.
25 Q. And you were at Westminster by this

Page 44

1  time?
2  A. Yes. I had assumed the role as the
3  store manager. And he was -- he had come by to tell
4  me what things he would like to see go on at that
5  store.
6  Q. Let me stop you for a moment. You
7  told me about when Mr. Buscietta approached you on
8  the sales floor at Thornton. How soon after that
9  conversation did you go to Westminster?
10 A. I believe -- and this is a little
11 hazy -- but Wednesday.
12 Q. So you think there was, like, a day in
13 between, or maybe it was the next day?
14 A. I believe it was Wednesday.
15 Q. Okay. I'm having trouble there
16 because I don't know which day the discussion was
17 on. Was that on a Monday?
18 A. I believe it was, like, a Monday,
19 correct, yes.
20 Q. So two days later you were at the
21 Westminster store?
22 A. Yes.
23 Q. Okay. And then pick it up from there.
24 You mentioned Zuppa came to see you at the
25 Westminster store?

Page 45

1  A. Yes.
2  Q. What do you remember -- when was that?
3  A. Shortly after. I believe it was the
4  next morning, like Thursday morning.
5  Q. Okay. And what do you recall about
6  that discussion?
7  A. Andrew wanted me to make some changes
8  at the store, and we talked about that.
9  Q. What changes did he want you to make?
10 A. Well, he wanted more sales staff
11 there -- or at least he wanted better coverage on
12 the floor. There was a big problem about helping
13 customers.
14 Q. Okay. And what was the nature of the
15 problem?
16 A. There were no salespeople either
17 available or on the shift, so not enough people to
18 take care of the customer load that we had.
19 Q. Okay. What other changes?
20 A. We talked about display on the floor,
21 you know, maybe making the store a little bit nicer
22 and more organized. And possibly we talked about
23 some of the other employees -- for instance, the
24 warehouse staff, the design staff, and the front
25 office staff.

46

1 Q. But you don't remember anything
2 specific about that?
3 A. I do not.
4 Q. Okay. As a result of that
5 conversation -- well, strike that.
6 Prior to Andrew Zuppa coming in on
7 that Thursday, had you decided, as the store
8 manager, that you were going to make some changes?
9 A. Absolutely.
10 Q. And what had you decided to do?
11 A. Well, I was going to do a couple of
12 things. Either train and improve the current staff
13 that was there, hire more sales staff for better
14 coverage, change schedules that were more conducive
15 to the customer load.
16 And I was going to try to reverse the
17 lackadaisical -- sorry for the term -- the
18 lackadaisical free-for-all that was going on there.
19 Q. That gives me some sort of general
20 categories. Had you actually fired anybody by the
21 time Andrew Zuppa got there?
22 A. No, I don't believe so.
23 Q. Had you hired anybody else?
24 A. I don't believe so.
25 Q. Had you taken any steps to hire anyone

47

1 else, including putting a sign on the front window,
2 calling up Thornton and saying: Do you have any
3 trainees you could send me, anything like that?
4 A. I don't recall exactly, but I'm sure
5 that's one thing that I would have done, trying to
6 get applicants.
7 Q. Were there already some applicants
8 there when you got there, in terms of, you know,
9 resumes that had been submitted, applications that
10 had been submitted, that sort of thing?
11 A. I don't recall.
12 Q. Okay. Did -- you mentioned that --
13 did Andrew Zuppa give you any direction as to who,
14 specifically, ought to be terminated?
15 A. No.
16 Q. Okay. Did he give you any direction
17 as to what he was looking for? Did he say, you
18 know: We want this type of employee, but we don't
19 want that employee?
20 A. I don't remember him saying that. I
21 believe what he was -- his main thing was having
22 enough coverage on the floor and having the
23 salespeople actually be out on the sales floor
24 available for customers.
25 Q. Okay. Following that conversation,

48

1 what did you do to fulfill that directive from
2 Mr. Zuppa?
3 A. The first thing I did is started
4 training that sales staff and holding them
5 responsible for the time on the floor, their breaks,
6 trained them on how you be more effective and
7 efficient on the floor.
8 I remember trying to get a lot of
9 interviews to try and get the people that I wanted
10 there that I thought would be conducive to that
11 store and that would be a good, you know, addition
12 to our team.
13 Q. Interviewing, you are talking about,
14 applicants?
15 A. Correct.
16 Q. Okay. What else?
17 A. Those were my two main focuses, to get
18 more people on the floor and to train the current
19 salespeople to be better.
20 Q. Let's talk about training for a
21 moment. How did you do that?
22 A. Well, in the sales meetings, we can
23 talk about more appropriate ways to work, how to be
24 more efficient, more effective, get feedback, manage
25 the floor, get out and be with those salespeople,

49

1 see what they're doing and see what they can improve
2 on, try to motivate them.
3 Q. Okay. Were the sales meetings -- I
4 mean, before you got there, you indicated that at
5 least in the fall of '03 when you were there, there
6 were regular sales meetings. So those were
7 continued, I take it?
8 A. Absolutely.
9 Q. And did you sort of shift the focus
10 more to training than what it had been previously?
11 A. Yes.
12 Q. Okay. And did you mostly just -- how
13 did you do that? Did you pick out a subject a day?
14 Or did you, you know, ask, for instance, Tom Ward to
15 talk about a particular subject or take case studies
16 where, you know, somebody had screwed up on a ticket
17 or something like that and illustrate it? How did
18 you do it?
19 A. Those would be there. I think one of
20 the main things that I looked at was talking about
21 my observations and talking about my successes in
22 sales.
23 Q. At Thornton?
24 A. Correct.
25 Q. Did you find that the staff that you

Page 50

1 inherited was receptive to that?
2    A.   Some of them, yes.
3    Q.   Okay. And some of them not?
4    A.   Yes.
5    Q.   Okay. Did you eventually -- well, you
6 mentioned you wanted to get more people on the
7 floor. And I realize -- well, you've indicated that
8 you interviewed people. Did you hire some
9 additional people?
10   A.   Yes.
11   Q.   Do you remember how many you hired?
12   A.   I do not.
13       MR. BUCHANAN: Okay. Why don't -- now
14 might be a good time. Why don't we take a break.
15 I'm going to make a copy of the two documents that
16 you identified for me earlier, and that may help us
17 with some numbers, at least. Okay?
18       THE DEPONENT: Okay.
19       (A recess was taken.)
20       (Deposition Exhibits 51 and 52 were
21 marked for identification.)
22   Q.   (By Mr. Buchanan) All right.
23 Mr. Morrison, we were talking about some changes or
24 intended changes that you wanted to make in,
25 primarily, the sales force at the Westminster store

Page 51

1 when you first got there; correct?
2    A.   Yes.
3    Q.   And did Andrew Zuppa also tell you
4 that he wanted changes made in the warehouse or with
5 the -- I forget what the other -- the front office,
6 and those sorts of things, as well?
7    A.   I don't recall him specifically
8 pointing out a group. But it was overall that the
9 attitude and the way of life there, so to speak,
10 kind of needed to change.
11   Q.   All right. Let me show you what we
12 have marked as Exhibit 51, which is a two-page
13 document. The first page is entitled "Termination
14 Report," and the second page is entitled "New Hire
15 Report."
16       And my understanding -- well, you
17 indicated earlier that this was a document that you
18 looked at that sort of refreshed your recollection
19 as to who was hired and who was fired; correct?
20   A.   I did say that. But all this really
21 is showing me is letting me remember that there were
22 some changes being made.
23   Q.   Okay. And I guess -- let me
24 understand. Under "Name," I assume if we saw the
25 unredacted document, there would be a full name

Page 52

1 there; correct? In other words, at the top, it
2 says: Mi, Ci, Es, Fi, those are the first two
3 letters of last names; is that your understanding?
4    A.   Yes.
5    Q.   Okay. And each of these is an
6 employee at 08, meaning the Westminster store, under
7 the heading "Division" there?
8    A.   Right, yes.
9    Q.   Now, it looks to me like there were,
10 during the period for which the computer had been
11 queried -- basically, the 1st of June through the
12 end of August -- there were six salespeople who were
13 terminated -- whose employment was terminated for
14 whatever reason. It lists four resignations, one
15 job abandonment, and one actual firing; correct?
16   A.   Yes, that's how I read it.
17   Q.   So you actually only fired one person;
18 correct?
19   A.   Yes, per this, yes.
20   Q.   And it's listed that you did that on
21 July 12, 2004, or that that's the date that's listed
22 there; correct?
23   A.   Uh-huh. Yes, that is the date, yes.
24   Q.   And it looks like the last name starts
25 with N-e. Do you know who that was?

Page 53

1    A.   I don't recall.
2    Q.   Could it have been Scott Newel?
3    A.   Possibly.
4    Q.   Did you know a sales associate named
5 Scott Newel at Westminster?
6    A.   I don't particularly recall that.
7    Q.   Okay.
8    A.   I can't put a name with a face.
9    Q.   Now, you didn't -- obviously, there's
10 only one listed as discharged. These others are
11 resignations. Do you remember people resigning,
12 coming in and saying: I quit?
13   A.   Yes.
14   Q.   Okay. Do you remember who did that?
15   A.   Not particularly, no.
16   Q.   Do you remember a woman named Linda
17 Zippery quitting?
18   A.   Vaguely, yes.
19   Q.   Do you remember that her daughter
20 married David Duval, the golfer?
21   A.   Yeah, I guess I kind of recall that,
22 yes.
23   Q.   And that was a resignation, correct?
24   A.   I would believe so, yes.
25   Q.   Didn't have anything to do with her

14 (Pages 50 to 53)

Page 58

1   A.   I don't understand the question.
2   Q.   Well, you indicated that Andrew
3   Zuppa's focus was there was not enough coverage on
4   the floor, that you needed to get people to cover
5   the floor; correct?
6   A.   Correct.
7   Q.   And one of the things that you did,
8   not only thing, but one of the things was hired some
9   more people; correct?
10  A.   Yes.
11  Q.   And the first person you hired, it
12  looks like, was on July 27th, 2004; correct?
13  A.   Yes.
14  Q.   And then you hired another on
15  August 3rd, another on August 10th, another on
16  August 24th -- actually, it looks like two on
17  August 24th; correct?
18  A.   Yes.
19  Q.   Okay. So you made a total, as I
20  understand it, of five hires during that time?
21  A.   That's what it shows, yes.
22  Q.   And that was to replace six people in
23  sales who had either been -- either resigned,
24  abandoned their job, or had been discharged;
25  correct?

Page 59

1   A.   That's what this shows. I don't
2   really recall -- I don't really recall how many we
3   replaced or not. I do remember hiring and some
4   leaving, yes.
5   Q.   And do you agree --
6   A.   This definitely shows that, yes.
7   Q.   And would you agree that there's a net
8   loss of one sales person as a result of that?
9   A.   Yes.
10  Q.   Do you recall the total number of
11  salespeople that you had there at that store at that
12  time?
13  A.   I do not recall. I could guess, but I
14  don't have a good -- I don't have a good --
15  Q.   I don't want you to guess. But if you
16  could estimate, that would be great.
17  A.   I believe when I started there there
18  was around 11 or 12.
19  Q.   Okay. And let's say after the first
20  couple of months, did you still have 11 or 12, just
21  a different mix of them?
22  A.   I remember -- I remember my number
23  being 14 to 15 -- at least that was a goal. For
24  some reason, I'm remembering around 10 when I first
25  got there. I don't know why.

Page 60

1   Q.   Let me ask you this question: Were
2   you given any guidelines as to how many additional
3   people you could hire?
4   A.   They had a certain goal that they
5   wanted to have at that store, yes.
6   Q.   Was it a numerical goal; in other
7   words, 15 salespeople, or what?
8   A.   Yes. I don't remember the exact
9   number, but yes. They would have said: We should
10  be around this number.
11  Q.   Okay. And do you have an
12  understanding as to how they reached the conclusion
13  that you needed that number?
14  A.   Well, a couple of things. Just by
15  numbers, you could take the total that the store
16  sells, divide that by approximately 80 to 90,000;
17  and that would give you a number of salespeople.
18       You know, in general, some of the
19  stores need more people or, you know, due to size
20  and things like that. So, I mean, there's some
21  other factors that go into that.
22  Q.   Okay. But the formula that you
23  recited is the standard formula that AFW uses?
24  A.   Yes.
25  Q.   In other words, you take gross

Page 61

1   revenues per month, divide by 80 or 90,000, and that
2   gives you the number of salespeople you need;
3   correct?
4   A.   Correct.
5   Q.   And the theory there is that if a
6   salesman sells $80,000 per month and makes, on
7   average, 5 percent commission, that that's a livable
8   wage for a salesperson; correct?
9   A.   Correct.
10  Q.   And that's the basic computation you
11  go through, and then you adjust it depending upon
12  other factors?
13  A.   Yes. For instance, you might have one
14  or two extra to cover times where people would take
15  vacation or if they were to call in sick.
16  Q.   In your experience managing stores for
17  AFW, did you find that it was normally true that a
18  smaller store would need, you know, more than the
19  formula would give them simply because you had to
20  cover, you know, the store being open basically 12
21  hours a day, seven days a week?
22  A.   Yes.
23  Q.   Okay. And that was easier to adjust
24  at a store like Thornton where you have, as you
25  said, 60 to 90 salespeople; correct?

**Page 62**

1  A.  I would say it's about the same. I
2  mean, you are still using the same numbers, same
3  amount percentagewise.
4  Q.  Okay. I'm going to show you what we
5  have marked as Exhibit 52. First of all, is this a
6  document that you've seen before?
7  A.  No, I have not seen this before.
8  Q.  Is this one that you're -- a format
9  that you are familiar with?
10  A.  Yes, this is payroll that we use.
11  Q.  Okay. I'm trying to match it up here
12  with Exhibit 51. Would this first page of
13  Exhibit 52, where it says "Job and Compensation" and
14  then it says "Le," is it your understanding that
15  would match up with "Le" on the termination report?
16       MR. VOLIN:  Objection, foundation.
17       THE DEPONENT:  I don't understand what
18  you are talking about.
19  Q.  (By Mr. Buchanan)  See where it says
20  L-e here (indicating)?
21  A.  Yes.
22  Q.  Indicating the first two letters of a
23  name?
24  A.  Oh, yes.
25  Q.  Do you agree that when you look at

**Page 63**

1  this on the screen, the person's name is typically
2  right there?
3  A.  Yes.
4  Q.  And does that match up to this L-e
5  right here on Exhibit 51?
6  A.  They're both L-e's.
7  Q.  Fair enough. But I guess what I'm
8  trying to understand is: It your understanding that
9  the front page of Exhibit 52 would pertain to the
10  same employee that the fifth line of Exhibit 51
11  pertains to?
12  A.  Yes, it would appear that way, yeah.
13  Q.  Okay. And then help me with some
14  other entries here. Under -- let's just look at the
15  first page of Exhibit 52, pertaining to this
16  employee, "Le."
17       Down where it says "Start" and "End,"
18  the second line down there where it says 1/19/04 and
19  then 6/11/04, is that your understanding of when
20  they worked there?
21       MR. VOLIN:  Objection, foundation.
22       THE DEPONENT:  That possibly could be.
23  Q.  (By Mr. Buchanan)  And then would
24  6/12/04 be the date they were terminated?
25       MR. VOLIN:  Objection, foundation.

**Page 64**

1  Q.  (By Mr. Buchanan)  If you know? I
2  mean, if you're --
3  A.  I don't know.
4  Q.  I don't need you to guess. I just
5  want you to explain it to me because I've never seen
6  this screen.
7  A.  I've actually never used this
8  particular screen in the software.
9  Q.  Okay. Now, obviously, we have been
10  provided, in Exhibit 51, with a certain period of
11  time up through the end of August of '04.
12       Do you believe you did additional
13  hiring and firings, and were there additional
14  employees that resigned after August 31st of '04 and
15  until you left the Westminster store?
16  A.  I don't recall any numbers. But, yes,
17  that would have happened. I was fairly consistent in
18  hiring there. I recall that I hired the whole time
19  that I was there.
20  Q.  Okay. And would the hires be
21  primarily in the sales area? That's a poor
22  question, so let me ask the question this way: You
23  have to hire warehousemen, front office people,
24  salespeople all separately; right?
25  A.  Yes.

**Page 65**

1  Q.  But the bulk of the staff are
2  salespeople, right, in terms of just numbers?
3  A.  Yes, the sales staff would have the
4  most numbers.
5  Q.  Okay. Would it stand to reason that
6  most of your hires, then, would be salespeople?
7  A.  Yes.
8  Q.  Okay. Do you have any estimate of the
9  total number of people you hired from July of 2006,
10  when you took over the Westminster store, until you
11  left the Westminster store?
12       MR. VOLIN:  Objection to the form.
13  Q.  (By Mr. Buchanan)  I think you
14  previously estimated that was a period of about nine
15  months; right?
16  A.  I don't even have an estimate.
17  Q.  Was the objective to keep the sales
18  staff at about 14 to 15 people?
19  A.  Yes.
20  Q.  And when did you get up to that level,
21  the 14 or 15? The reason I ask is you told me you
22  think you inherited about 10 or 11. And we've
23  already established that in the first -- you know,
24  by the end of August, there was actually a net
25  decrease of one person in sales.

### Page 66

1    So you wouldn't -- that would bring it
2  to 9 or 10. And I'm wondering: When did you get up
3  to 14 and 15?
4        MR. VOLIN: Objection to form.
5  Mischaracterizes his testimony and what the exhibit
6  shows.
7    Q.   (By Mr. Buchanan) Did I
8  mischaracterize anything?
9    A.   I don't recall. I don't recall how
10  many numbers. It would be very hard for me to tell
11  you how many numbers.
12    Q.   Do you think you ever got up to 14 or
13  15?
14    A.   Yes.
15    Q.   Okay. And let me just ask the
16  question straight up: Do you remember when that
17  happened?
18    A.   I don't recall.
19    Q.   Okay. Did you feel that you had done
20  all that you could to satisfy Andrew Zuppa that
21  there were enough salespeople to cover the floor?
22    A.   I believe that it was an ongoing
23  effort. And that coverage on the floor, with those
24  salespeople that were there and the new sales hires,
25  I believe that it got a lot -- it got better, yes.

### Page 67

1    Q.   Okay. Did it ever get satisfied to
2  Andrew Zuppa's satisfaction, to your knowledge?
3    A.   I don't know if he was satisfied. I
4  didn't have a conversation with him about that. So
5  I would assume that it was taken care of in his
6  eyes.
7    Q.   You say you didn't have a conversation
8  with him. What would be your interaction with
9  Andrew Zuppa while you were the store manager at
10  Westminster? Did you have a regular time that you
11  would talk to him?
12    A.   No. The only time I would talk to him
13  was if there was something that he needed to talk to
14  me about.
15    Q.   Okay. And that would typically be
16  over the phone?
17    A.   Not necessarily. He would come out to
18  the store also. Both.
19    Q.   All right. Do you recall him
20  remaining critical of the coverage that you had on
21  the store?
22    A.   About the only thing I truly remember
23  him commenting on is that they were not getting as
24  many complaints about people not being helped, and
25  that he appreciated that.

### Page 68

1    Q.   And when you say "not as many
2  complaints," where had he been getting complaints
3  about that?
4        MR. VOLIN: Object to form and
5  foundation.
6    Q.   (By Mr. Buchanan) If you know?
7        THE DEPONENT: People e-mail in and
8  write in in letter and e-mail form.
9    Q.   (By Mr. Buchanan) Have you ever seen
10  any such letters or e-mails?
11    A.   Over the years, I've seen a couple,
12  yes.
13    Q.   And a couple pertaining to the
14  Westminster store?
15    A.   Yeah, I believe some were at the
16  Westminster store.
17    Q.   Okay. Have you seen any of those in
18  preparation for your testimony today?
19    A.   No.
20    Q.   Okay. Is "a couple" your best
21  estimate as to how many you've seen?
22    A.   Yes.
23    Q.   Okay. Did Andrew Zuppa give you any
24  other indication as to how you were doing, other
25  than this number of complaints apparently reducing?

### Page 69

1    A.   I don't recall.
2    Q.   Let me show you Exhibit 38, which is
3  another "Personnel Action" form prepared, as I
4  understand it, by Andrew Zuppa. And it's dated
5  April 20, 2005.
6        And it pertains to -- I'm just going
7  to paraphrase -- I'll quote it. It says: "Nolan's
8  store did not have enough staff to adequately run
9  the building."
10        Do you remember what that referred to?
11    A.   Yes. This was -- this was a night I
12  wasn't there. And from my understanding, someone
13  had called in sick, and there -- two people had
14  taken lunch at the same time, so there was limited
15  sales staff on the floor.
16    Q.   You weren't there, so one of the other
17  managers, either the assistant manager or the
18  turnkey, were there that night?
19    A.   Correct.
20    Q.   And the assistant manager would have
21  been Tom Ward?
22    A.   I believe this night it was the person
23  who replaced Joe Mazzuto. And his name was Jon
24  Smarr.
25    Q.   S-m-a-r-r?

Nolan Morrison

```
                                                    70
 1    A.   Correct.
 2    Q.   Do you remember Andrew Zuppa talking
 3  to you about this?
 4    A.   Yes.
 5    Q.   What do you remember him saying?
 6    A.   He was frustrated with me because
 7  everything had been going so well, and that he was
 8  fairly certain that he wouldn't have to be talking
 9  to me again about this.
10    Q.   And about five days later, you went
11  down to the Southwest store; correct?
12    A.   Correct.
13    Q.   Okay. So you were only there a few
14  more days beyond this anyway; correct?
15    A.   Yes.
16    Q.   Was this the only time -- strike that.
17         Had he ever talked to you at all about
18  having an inadequate number of sales -- and, by the
19  way, I just want to be clear about this.
20         Was it your understanding that there
21  were an inadequate number of salespeople
22  specifically on the night that he was talking about?
23    A.   That was my understanding, yes.
24    Q.   The reason I ask is he says "did not
25  have enough staff." He's not talking about front
```

```
                                                    71
 1  office staff or warehouse staff; correct? He's
 2  talking about salespeople; correct?
 3    A.   This was actually a night where the
 4  front office person, she wasn't as fast as an
 5  average cashier would be. So we had a line at the
 6  front office, which is number -- which was part of
 7  that right there.
 8         That's, I think, what frustrated Jake.
 9  And, two, it was because Jake had to help a customer
10  move a mirror to the front of the store. And that's
11  basically why this happened.
12    Q.   Okay. And this was when Jake was
13  there that he observed these things?
14    A.   Correct.
15    Q.   But Andrew -- the conversation you
16  recited was with Andrew; correct?
17    A.   Yes.
18    Q.   About his frustration because things
19  had been going well; correct?
20    A.   Yes.
21    Q.   Okay. Your next duty station, as I
22  understand your testimony, was the Southwest store;
23  correct?
24    A.   Yes.
25    Q.   And you went down there to replace
```

```
                                                    72
 1  Richard Dawson after he was fired; correct?
 2    A.   I was sent there to replace Richard.
 3  I don't know if he was fired or not.
 4    Q.   Okay. What were you told?
 5    A.   I wasn't told.
 6    Q.   I guess what I want to know is: How
 7  did you know you were to go to the Southwest store?
 8    A.   Andrew called me and told me he needed
 9  me to report there and take over that store as the
10  floor manager.
11    Q.   Okay. And how soon after that were
12  you down at the Southwest store?
13    A.   After the phone conversation?
14    Q.   Yes.
15    A.   Forty minutes probably.
16    Q.   So you -- literally the same day?
17    A.   Yeah, yes.
18    Q.   And what was your understanding as to
19  how recently Mr. Dawson had departed, for whatever
20  reason?
21    A.   I didn't have an idea. I was told to
22  go there, show up, and get my keys and start my
23  duty.
24    Q.   Okay. Did you ever meet Richard
25  Dawson?
```

```
                                                    73
 1    A.   Yes.
 2    Q.   In what context?
 3    A.   At managers meetings.
 4    Q.   Prior to him being terminated?
 5    A.   Prior to him leaving or whatever. I
 6  honestly don't know.
 7    Q.   Let's not fight about whether he was
 8  terminated. You had met him before that, but you
 9  hadn't worked with him, it sounds like?
10    A.   I never worked with him directly, no.
11    Q.   You stayed at the Southwest store five
12  months, and then you went to the University store to
13  be the store manager; correct?
14    A.   Yes.
15    Q.   Why did you -- well, again, were you
16  asked by Andrew Zuppa to go to the University store?
17    A.   Yes.
18    Q.   Who did you replace there?
19    A.   No one. It was actually we were going
20  to open it.
21    Q.   So that was a brand-new store?
22    A.   For us, yes.
23    Q.   Okay. Had they -- had AFW inherited
24  it or acquired it from someone else?
25    A.   Yeah, we had bought that from
```

19 (Pages 70 to 73)

Page 74

1  Homestead House.
2  Q. Okay. Do you remember approximately
3  when that was?
4  A. The end of 2005.
5  Q. Okay. Do you know how many stores AFW
6  acquired from Homestead House?
7  A. Yes.
8  Q. How many?
9  A. Three.
10  Q. And how many did they maintain as AFW
11  stores?
12  A. Two.
13  Q. And University is one of them, and the
14  new Westminster store is the other?
15  A. Yes.
16  Q. And they closed down a third?
17  A. Yes.
18  Q. You were at University for three to
19  four months, and then became a store manager at
20  Compark; correct?
21  A. Yes.
22  Q. Were you the store manager, or were
23  there more than one?
24  A. There was basically two of us.
25  Q. Okay. And who was the other one?

Page 75

1  A. Russ Olson.
2  Q. Who did you replace?
3  A. I don't believe I replaced anyone, I
4  don't believe. I was there to make some changes to
5  that store, particularly in the display department,
6  some staging and display. And, again, kind of
7  overall -- overall maintenance and detail, things
8  like that.
9  Q. Was there a manager there named
10  Tomasek at one time at Compark?
11  A. I believe there was Roger Tomasek,
12  yes.
13  Q. And he was not terminated or didn't
14  leave the company, for whatever reason, at or about
15  the time you came to become a manager?
16  A. I don't know; I don't recall.
17  Q. In any event, you were not told that
18  you were replacing Mr. Tomasek?
19  A. No.
20  Q. Again, was this a promotion that
21  Andrew Zuppa communicated to you?
22  A. Yes.
23  Q. Okay. And I believe you indicated
24  that was from January to August of 2006, correct,
25  that job?

Page 76

1  A. Yeah, as I recall, yes.
2  Q. And then you went up to Glenwood
3  Springs for about five weeks?
4  A. Yes.
5  Q. Were you the store manager there?
6  A. Yes.
7  Q. Who did you replace there?
8  A. Ed Berry.
9  Q. And where did Mr. Berry go?
10  A. He left the company.
11  Q. Do you know if he was fired or left
12  voluntarily?
13  A. I do not know.
14  Q. How do you spell the last name?
15  A. Berry, B-e-r-r-y.
16  Q. So that would have been about this
17  time last year?
18  A. Yes.
19  Q. Okay. And then you went to the
20  Firestone store about when?
21  A. I believe it was the beginning of
22  October.
23  Q. When had that store opened?
24  A. It was not open at that time. We were
25  opening it.

Page 77

1  Q. Okay. When was the grand opening of
2  that store?
3  A. November 6th.
4  Q. All right. And were you the store
5  manager, or were there more than one?
6  A. No, just me.
7  Q. Okay. And how big a store is the
8  Firestone store? What's the square footage?
9  A. Approximately 530,000 square feet
10  total. The showroom is 178,000.
11  Q. What's the remainder of the 530?
12  A. Warehouse.
13  Q. Wow, big warehouse; right?
14  A. Yeah, yes.
15  Q. 350,000 feet or more -- something like
16  that -- 450,000.
17  A. About 350.
18  Q. Okay. I want to understand, Firestone
19  is kind of an unusual store, isn't it? There's a
20  self-service aspect to it?
21  A. Yes, it's a new concept store.
22  Q. Tell me how the self-service works?
23  A. It is kind of set up so that instead
24  of little items that a customer would have to wait
25  to get from the warehouse, they can put on a cart

86

1  I have read the foregoing
2  transcript of my testimony and have indicated the
3  same by my signature.
4
5
6  _____
   NOLAN P. MORRISON
7
8  STATE OF COLORADO
9  CITY AND COUNTY OF DENVER
10      Subscribed and sworn to before me by
11  NOLAN P. MORRISON on this _____, 2007.
12      My commission expires: _____.
13
14
15
16  _____
            Notary Public
17
18  _____
             Address
19
20
21  Reporter: DEE
    Trial/Hearing Date: Unknown
22
23
24
25

87

          CERTIFICATE
STATE OF COLORADO  )
                   )ss.
CITY AND COUNTY OF DENVER )

    I, Dawn E. Eastman (Calderwood),
Certified Shorthand Reporter, Registered
Professional Reporter, and Notary Public for the
State of Colorado, do hereby certify that previous
to the commencement of the examination, the said
NOLAN P. MORRISON was duly sworn by me to testify
the truth in relation to the matters in controversy
between the said parties.
    I further certify that said deposition
was taken in shorthand by me and was reduced to
typewritten form by computer-aided transcription;
that the foregoing is a true transcript of the
questions asked, testimony given, and proceedings
had.
    I further certify that I am not an
attorney nor counsel nor in any way connected with
any attorney or counsel for any of the parties to
said action or otherwise interested in its event.
    IN WITNESS WHEREOF, I hereunto affix my
hand and notarial seal this 30th day of September,
2007. My commission expires September 20, 2010.


_____
Dawn E. Eastman (Calderwood)
CSR, RPR, Notary Public
Calderwood-Mackelprang, Inc.

88

CALDERWOOD-MACKELPRANG, INC.
4410 Zuni Street
Denver, Colorado 80211
(303) 477-3500

September 30, 2007

GARY J. BENSON, ESQ.
Dworkin Chambers & Williams PC
3900 East Mexico Avenue, Suite 1300
Denver, Colorado 80210
Re: Must v. American Furniture Warehouse
Deposition of: NOLAN P. MORRISON
The deposition in the above-entitled matter is ready
for reading and signing. Please attend to this
matter by complying with ALL blanks checked below:
____ arranging with us at the number listed below
     to read and sign the deposition in our
     office.
____ having deponent read your copy and sign
     amendment sheets, if any (original signature
     page enclosed.)
XXX  reading enclosed deposition, signing
     signature page and correction sheets if any,
     within 30 days of the date of this letter or
____ by _____, due to trial/hearing date of
     _____
Please be sure that the signature page and amendment
sheets, if any, are signed before a Notary public
and returned to our office. If this matter has not
been taken care of within said period of time, the
deposition will be filed unsigned pursuant to the
Rules of Civil Procedure.

DAWN E. EASTMAN (CALDERWOOD), CSR, RPR

cc: Counsel of Record

89

CALDERWOOD-MACKELPRANG, INC.
4410 Zuni Street
Denver, Colorado 80211
(303) 477-3500


ROSS B.H. BUCHANAN, ESQ.
Buchanan Jurdem & Cederberg PC
1621 18th Street, Suite 260
Denver, Colorado 80202
Re: Must v. American Furniture Warehouse
Dear Mr. Buchanan:
Enclosed is deposition of: NOLAN P. MORRISON
____ Previously filed. Forwarding signature page
     and amendment sheets.
____ Signed, no changes.
____ Signed, with changes, copy enclosed.
____ Unsigned, notice duly given _____
     pursuant to the Rules of Civil Procedure.

____ Not signed, notice duly given _____
     since trial is set for _____.
____ No signature required.
____ Signature waived.
____ To be signed in court.
____ Signature pages/amendment sheets to be
     returned to court on date of trial.

____ Mailed by Certified Mail No. _____

____ Hand-delivered on approximately _____


DAWN E. EASTMAN (CALDERWOOD) CSR, RPR
cc: Counsel of Record

23 (Pages 86 to 89)