EXHIBIT 14

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                  FOR THE DISTRICT OF COLORADO
 3   Civil Case No. 06-CV-01872-RPM-MEH
 4   JACK MUST,
 5   Plaintiff
 6   vs.
 7   AMERICAN FURNITURE WAREHOUSE CO., a Colorado
     corporation d/b/a/ AMERICAN FURNITURE WAREHOUSE,
 8
 9   Defendant.
10
11   _____
12                 DEPOSITION OF JACOB JABS
13   _____
14
15           PURSUANT TO NOTICE, the above-
16   entitled deposition was taken on behalf of the
17   Plaintiff at 1621 18th Street, Suite 260, Denver,
18   Colorado, on August 29, 2007, at 2:36 p.m., before
19   Dawn E.  Eastman (Calderwood), Certified Shorthand
20   Reporter, Registered Professional Reporter, and
21   Notary Public.
22
23
24
25
```

**Page 10**

1  guess.
2      Q.   I don't even want to tell you what it
3  is a square foot in this building.
4           And, sir, am I accurate to say that
5  you kind of pride yourself on being a hands-on
6  manager for American Furniture Warehouse?
7      A.   Yes.
8      Q.   You walk your stores on a regular
9  basis?
10     A.   Yes.
11     Q.   And, in fact, as a matter of
12 introducing yourself to new employees, you have long
13 lunches with them and explain, in great detail, how
14 the company works; correct?
15     A.   Yes.
16     Q.   When you walk your stores -- first of
17 all, do you keep any sort of record of doing that?
18 Do you have a log or spiral notebook, or do you
19 dictate memos, anything like that?
20     A.   No, not really.  Tomorrow I'm going to
21 hit seven stores.  And, you know, I'm in and out of
22 them pretty quickly.  Whatever needs to be done, 30
23 minutes, 40 minutes, an hour, whatever.
24          I'll hit seven stores in one day, so
25 there's not a lot of time for, you know, noticing --

**Page 11**

1  the manager walks around with notepads and makes
2  notes.  I don't.  I may make a little note on, you
3  know, a little three-by-five card or something.
4  But, essentially, the answer is no.
5      Q.   The reason I ask is: As you probably
6  know by now, there are a handful of meetings and a
7  floor walk or two and things like that where things
8  happened of significance in this case.
9           And what I'm trying to find out is:
10 Do you personally have any record of those things
11 where you've written it down somewhere.  And it
12 sounds like the answer is no?
13     A.   No.
14     Q.   Okay.  Now, as I understand it, in
15 1998, you acquired what was left of the Rhodes
16 furniture stores; correct?
17     A.   Yes.
18     Q.   And one of those stores was up in
19 Westminster?
20     A.   Yes.
21     Q.   And there were more than that store,
22 but that was the one store that you actually put the
23 American Furniture Warehouse name on?
24     A.   Yes.
25     Q.   And that was the -- referred to as the

**Page 12**

1  Westminster store; correct?
2      A.   Yes.
3      Q.   As I understand it -- again, I'm
4  asking you to confirm this -- that fairly recently,
5  within the last couple of years, that store has
6  moved to a new location?
7      A.   Yes.
8      Q.   Fairly close, but a new location
9  nonetheless?
10     A.   Yes.
11     Q.   Okay.  And you still refer to it as
12 the Westminster store?
13     A.   Yes.
14     Q.   The managers of that store, that we
15 have heard of, are Jerry Beamer and Chris Smatla.
16 First of all, do you agree that they were managers
17 of those stores -- of that store, I should say?
18     A.   You know, we have 1,650 employees.
19 And I honestly don't remember them, for sure, if
20 they were a manager that -- I mean, it was a long
21 time ago, and there's a lot of stores, a lot of
22 people.
23     Q.   I hear you.  I guess I'm wondering:
24 When you think of the Westminster store, do you
25 think of any other managers other than those -- and,

**Page 13**

1  obviously, my client, Jack Must, was one of the
2  managers?
3      A.   Yes.
4      Q.   You remember Jack?
5      A.   Yes, I do.
6      Q.   Was a man named Brian Kurth one of the
7  managers there?
8      A.   I don't believe so.
9      Q.   Okay.  And, sir, AFW is today, as it
10 was in 1975, a family owned business; correct?
11     A.   Yes.
12     Q.   You own -- or your family owns all of
13 the stock; correct?
14     A.   Yes.
15     Q.   When did you first meet Jack Must?
16     A.   I don't remember.
17     Q.   I'll just tell you that, for your
18 information -- and, obviously, we can refer to
19 documents if we need anything more specific.  But
20 there was a point in time in the late '80s, early
21 '90s -- I'm going to say 1988 to 1992 -- when he
22 sold furniture at the Bannock store.  Okay?
23     A.   Yes.
24     Q.   Do you recall that?
25     A.   Yes.

Page 22

1  know, it's been a long time ago now. I'm pretty
2  sure it's the same thing.
3     Q.  The bottom line is, you only have one;
4  right?
5     A.  Yeah.
6     Q.  It's evolved, but it's the same
7  program?
8     A.  Yes.
9     Q.  The question on Exhibit 44 that I had
10 was it talks about "based on adjusted," and then it
11 has an asterisks, "net profits." And I don't know
12 what the asterisk means. I mean, normally I would
13 think that that was like a footnote or something
14 explaining what adjusted means.
15        Can you explain what that means in
16 that context?
17    A.  Well, a bonus is predicated on the net
18 profits of the whole company.
19    Q.  I guess my question is: What does
20 "adjusted" mean? Adjusted for what?
21    A.  I'm assuming this came from our
22 accounting department. And whatever -- you know,
23 maybe there was a lease on a building that we had to
24 pay for or something that affected that. I don't
25 know. I'd have to go to my accountants.

Page 23

1     Q.  Let me ask you this question: Your
2  name is on both of these memos; correct?
3     A.  Yes.
4     Q.  But because your name is on them does
5  not necessarily mean that you wrote them; correct?
6     A.  That's correct, yes.
7     Q.  And, in fact, in both of these
8  instances, it sounds to me like you are saying that
9  someone else wrote them; but it says that it's from
10 you?
11    A.  Yes.
12    Q.  Okay. Now, the program is based on
13 the consolidated profit of the company; right?
14    A.  That's correct.
15    Q.  And, obviously, there are, you know,
16 probably as many different ways to do a bonus
17 program as there are companies.
18        Why did you choose to do your bonus
19 program based on the consolidated profits rather
20 than any one of the number of other ways?
21    A.  Well, I guess I've always accepted
22 responsibility for the profits of the company. I do
23 the advertising. I do most of the buying. I sign
24 all the checks.
25        So I think I'm the one that

Page 24

1  controlled -- whether the company is successful or
2  not really is, I think, dependent on how good I buy,
3  how good I advertise. You know, I control the
4  expenses by signing the checks.
5        And I don't think -- I can't blame
6  managers, individual store managers or my delivery
7  driver manager or my, you know, warehouse manager
8  for the profit of the company. I always accepted
9  that as my responsibility, to make the company
10 profitable. And so I never try to blame it on
11 individual store managers or individual warehouse
12 managers or somebody else.
13    Q.  Okay. And, therefore, you just felt
14 that the bonus program should be based on the
15 companywide profits, you know, sort of a: We're all
16 in this together type of mentality?
17    A.  Exactly.
18    Q.  Has it ever been different? Has there
19 ever been a time when your bonuses were more
20 targeted as -- you know, I'm just thinking through
21 the possibilities -- but a flagship store like the
22 Thornton store that does a larger percentage of your
23 business, the manager of that store would get a
24 considerably larger bonus than, for instance, the
25 guy that manages the Westminster store?

Page 25

1     A.  No, we've never done that.
2     Q.  And is that, again, because of this
3  we're all in this together type of mentality?
4     A.  Yes.
5     Q.  You said something very interesting
6  about how the company -- and these are not going to
7  be your words, I'm just paraphrasing what I heard to
8  be the idea -- but the company kind of goes up and
9  down with the quality of your buying; correct?
10    A.  Yes.
11    Q.  And by that, I take it you mean all
12 aspects of buying -- buying styles that will sell,
13 buying them at costs that you can sell them for and
14 still make at least a buck on; correct?
15    A.  Yes.
16    Q.  And other aspects of buying that I
17 can't think of because I'm not a buyer. But it's
18 based on all of those factors; correct?
19    A.  Yes.
20    Q.  Is that, in your mind, the single
21 biggest driver of the revenue of the company?
22    A.  Yes.
23    Q.  And for managers, individual store
24 managers, as long as they're selling the stuff that
25 you have bought and ordered for the company really

Jacob Jabs

26

1  don't have a lot of control over whether it's going
2  to sell or not?
3     A.  That's correct.
4     Q.  Let me show you, Mr. Jabs, what we
5  have marked as Exhibit 28 to these series of
6  depositions. And I'll just tell you that this is a
7  spreadsheet documenting the payment of bonuses to
8  various management personnel at AFW basically during
9  the entire time that Jack Must was either an
10 assistant manager or manager. Okay?
11        And I've got a couple of questions
12 about just a couple of these pages. The first are
13 pages 48 and 49. Do you see down here at the bottom
14 there's a stamp?
15    A.  0031?
16    Q.  Yeah. I'm looking at the last two
17 digits, and I want you to turn to page 48?
18    A.  Okay. I see what you mean.
19    Q.  And, again, let me just get you
20 oriented here if I can. Pages 48 and 49 are what
21 appear to be kind of a rough draft and the final
22 draft of the bonuses for the quarter, which includes
23 November and December of '02 and January of '03; do
24 you see that?
25        MR. BENSON: If you don't mind me,

27

1  just the next page appears to be a clean version
2  of -- for the same period. There's handwritten
3  notes on this one, and then a cleaner version on the
4  next.
5     Q.  (By Mr. Buchanan) Right. And the
6  question I have is: Under Jack Must, there's an
7  indication that he's going from -- although he's
8  supposed to receive the full bonus, his bonus is cut
9  in half.
10        And Mike Buscietta, who was in here
11 this morning, indicates that he wrote "Mike" there
12 and he wrote the okay; and he initialed it.
13        And my question to you is: Do you
14 remember why it was that Jack Must received only the
15 half bonus as opposed to the full bonus on that
16 occasion?
17    A.  This is evidently the period of time
18 where we were having a lot of problems with Jack
19 Must just being a really poor manager, not taking
20 instructions, not, you know, staffing the store
21 properly and going home early, being lazy or
22 whatever.
23        And I'm assuming that -- you know,
24 this is, what, four years ago, five years ago --
25 whatever it was. And I remember that we took some

28

1  bonus money because we thought he was doing a lousy
2  job of running the store.
3     Q.  Now, as I understand it, you would
4  normally present these checks a month after the
5  quarter had ended; correct?
6     A.  Yes.
7     Q.  So they would be distributed in, say,
8  late February, perhaps even early March of '03;
9  correct?
10    A.  Yes.
11    Q.  Do you remember anything specific, any
12 specific episodes of misconduct on Jack's part, as
13 of that period of time?
14    A.  Well, just when I would go to the
15 stores, and I would walk into Westminster; and there
16 would be customers and not enough salesmen; jack
17 wouldn't be around. I'm trying to find out why we
18 didn't have enough -- customers would come up to me
19 and want me to wait on them, which I don't really
20 have time to wait on customers.
21        And he just -- so it got so I went
22 there more often trying to help Jack get on track.
23 And I went over a few mornings, and I'd go in for
24 the morning sales meeting and -- we would have a
25 meeting every morning, the salesmen. And Jack would

29

1  be holding the meeting, and salesmen were just
2  lollygagging around.
3         Jack just didn't seem like he could
4  take any instruction from me. He was basically
5  unsupervisable. Never, ever improved his
6  performance. He was just -- in my 52 years of
7  business, he was probably the worst manager I ever
8  saw.
9     Q.  And, yet, he served as your manager
10 there for three years?
11    A.  It sort of accumulated to where -- you
12 know, when I was personally trying to help him and
13 make him better, it was just like I was talking to
14 the wall.
15    Q.  Well, okay. I need to go back and
16 talk about some of the specifics there.
17        We got into this discussion by me
18 asking you why his bonus was cut, and I was trying
19 to understand if there was some specific episode.
20        And it sounds to me, from your answer,
21 like it was really just an accumulation of a number
22 of things that you feel were out of place?
23    A.  That's right.
24    Q.  Did you make any attempt, Mr. Jabs,
25 to -- and I know it probably -- this irritates you,

**30**

1  and, frankly, I can understand why it would irritate
2  you, but you have to answer the question. Did you
3  make any effort to document these things with Jack?
4  Sit down and say: Look, Jack, here's the list of
5  things you are doing wrong, and we need some
6  improvement on. Here's a remedial plan; I want you
7  to meet these goals; you need to meet them. And if
8  you don't meet them, you will be out of here? Did
9  you ever do that?
10     A.  Not in writing. Basically, the way
11  the systems works is, you know, if his performance
12  didn't improve, I would go to his supervisor. I
13  don't believe in really disciplining people myself.
14  I mean, I don't think that's my -- as the owner of
15  the store, I need to wear the white hat, I guess you
16  might say.
17     So, basically -- I didn't personally
18  review people or do what you were saying. I went to
19  the supervisor and said: Hey, you know, this guy is
20  not doing his job; and you need to step in and try
21  to make him do his job.
22     Q.  And so during the time that Jack was a
23  manager of the store, you would have gone to Mike
24  Buscietta and/or Andrew Zuppa and said those things;
25  correct?

**31**

1     A.  Yeah, whoever the supervisor was.
2     Q.  And it would have been one of those
3  two fellows; right?
4     A.  I believe so. Again, I'd have to get
5  the records. With 1,650 employees and times, you
6  know what I mean.
7     Q.  Sure.
8     A.  Generally, if they were his
9  supervisor, the answer would be yes.
10    Q.  Again, I'm not trying to be picky
11  here; I'm just trying to understand. There was
12  never a person between Jack Must, as manager of
13  Westminster, and either Andrew Zuppa or Mike
14  Buscietta as general manager; correct?
15    A.  No.
16    Q.  There was never any other reporting
17  level between them?
18    A.  No.
19    Q.  You don't believe in vice presidents
20  at all?
21    A.  Yeah, I have no vice presidents.
22    Q.  Do you remember when this episode we
23  have been talking about, which is the subject of
24  pages 48 and 49 when his bonus was cut in half, do
25  you remember communicating specifically with Jack

**32**

1  about that?
2     A.  I don't remember that, no.
3     Q.  Would you normally do that?
4     A.  Probably not. There again, I think
5  it, you know, would go through the supervisor. I'd
6  let the supervisor handle that.
7     Q.  Okay. And if the supervisor didn't
8  handle that and didn't say anything specific to him,
9  would Jack have any way of knowing that his bonus
10  was half of what it would normally be?
11    A.  Theoretically, that could be correct,
12  I guess.
13    Q.  Okay. You don't enclose a note with
14  it saying: Jack, we have cut your bonus this much;
15  and here are the reasons why? Anything like that?
16    A.  No. I think Jack knew why his bonus
17  was cut in half.
18    Q.  And that's what I'm trying to
19  understand. What are you relying on when you say
20  that?
21    A.  From my personal visits to the store
22  and, you know, telling him to shape up, a lot of
23  verbal -- I think what you are kind of relating to
24  is I think, on a lower level, you do written
25  reviews. That's basically the way the company

**33**

1  works. If you are a dock guy, and you screw up, you
2  get it in writing.
3     But when you get to be a manager, you
4  don't really -- you know, you tell a manager
5  verbally. And you really assume that that's all you
6  need to do. To sit down and reduce it to writing is
7  probably: You're fired. You know, that's when the
8  writing starts.
9     I think pretty much, in our company,
10  if the thing's in writing, that means pretty much
11  you're -- it's the end of the road. I can't
12  remember the last time I reviewed a manager, for
13  example, in writing.
14    Q.  Let me ask you to flip forward in the
15  exhibit to pages 53 and 54.
16    A.  (Deponent complied.)
17    Q.  And, again, I have a question here.
18  I'm looking at Jack Must's line, which is the third
19  one where there is handwriting. And it says that
20  his bonus is basically cut in half. And the
21  sentence is: "Do we pay Jack full amount." And
22  then there's an okay with what appear to be initials
23  above that.
24    Are those your initials there, or can
25  you tell?

## Page 34

1    A.  Yes.
2    Q.  Do you know why you cut his bonus on
3  that occasion?
4    A.  You know, I would say it was a long
5  time ago; and I don't specifically remember, you
6  know, what the situation here was. I don't --
7    Q.  And I guess what I'm trying to
8  understand, Mr. Jabs, is we looked at two episodes
9  where the bonuses were cut. But there were several
10 others where they weren't cut. And I'm wondering:
11 Had you decided -- well, strike that.
12         Can you help me at all understand why
13 it is that he was cut in some quarters but not
14 others?
15   A.  Well, I -- you know, this is back in,
16 what, '02 or '03? I would say that if his bonuses
17 were cut, it related to performance. He wasn't
18 doing a good job, and the manager would be saying we
19 shouldn't be paying Jack his whole bonus.
20   Q.  Would that mean that as of
21 November of -- well, the November or December of '03
22 and the end of January '04 quarter, it would have
23 been Mike Buscietta saying that he shouldn't get his
24 full bonus because he wasn't doing his job?
25   A.  Yeah. If he was his supervisor, yes.

## Page 35

1    Q.  And, again, you're not remembering
2  anything specific; you are just relying on that's
3  the way it would normally happen?
4    A.  Yes.
5    Q.  Do you want to have high-pressure
6  salespeople at American Furniture Warehouse?
7    A.  I think we are famous for low selling,
8  low pressure. We have an excellent reputation of
9  being a no-pressure store.
10   Q.  Okay. And your salesmen, for the most
11 part, are on commission; correct?
12   A.  Yes.
13   Q.  If they don't sell furniture, they
14 don't get paid?
15   A.  That's correct.
16   Q.  And, nevertheless, you have always
17 emphasized that you don't want any high-pressure
18 sales; correct?
19   A.  That's correct.
20   Q.  And in your judgement, that cuts down
21 on even exchanges; doesn't it?
22   A.  Yes.
23   Q.  And it cuts down on returns?
24   A.  Yes.
25   Q.  Any other benefits to it, as far as

## Page 36

1  you are concerned?
2    A.  Well, it allows the customer a
3  pleasant shopping experience. That's what I have
4  always preached to my people, is I think that
5  customers have to have a pleasant shopping
6  experience.
7         Once they have that and the salesman
8  is able to build a rapport with the customer and a
9  relationship with the customer, that the customer
10 comes back in the store and, hopefully, asks for the
11 same salesman, if he's done a good job.
12        I just don't believe high-pressure
13 selling is acceptable. It's a culture I think that
14 we have at American. The salesmen learn that it's
15 the way it should be done. And the bottom line is
16 they will make much more money selling low pressure.
17 In fact, high-pressure salesmen don't normally last
18 long at American.
19   Q.  Okay. It sounds like you regard it as
20 a matter of experience and maturity in salesmen,
21 that they're not high pressure?
22   A.  That's right.
23   Q.  Now, it's true, isn't it, that many
24 people come into your stores and a salesman will
25 approach them. And in the first few sentences, they

## Page 37

1  basically say: Look, we're just looking; we're
2  fine. Correct?
3    A.  Absolutely.
4    Q.  And what do you expect a salesman to
5  do under that set of circumstances?
6    A.  Leave them alone. We don't ask them
7  to follow the customer. We ask them to leave them
8  alone; let them look. They need to be available.
9  Seems like people today are -- they're different
10 types of customers, of course.
11        A lot of customers are in a hurry.
12 The salesman should be visible. We make them all
13 wear red shirts so that, you know, when a customer
14 walks around the store, they can see a red shirt,
15 which means that's a salesman. They should be maybe
16 cleaning their area, straightening pillows, but be
17 available so that when a customer does want
18 information about a sofa or fabric or a mattress,
19 the salesman is there ready to help them.
20   Q.  Okay. But it is not necessarily a bad
21 thing in your stores for customers to be wandering
22 around the aisles looking at furniture, but there's
23 no salesman in the immediate vicinity?
24   A.  No, that's not a bad thing.
25   Q.  In fact, that happens quite a bit?

**Page 38**

1  A. Yes.
2  Q. And it sounds like that's part of the
3  positive buying experience. They don't have a
4  salesman nipping at their heels all the time to make
5  decisions and trying to rush into things?
6  A. That's correct.
7  Q. All right. And this has been a
8  philosophy you've had for many years; correct?
9  A. Forever.
10  Q. Certainly since you've been running
11  American Furniture Warehouse?
12  A. Forever.
13  Q. And you would expect Andrew Zuppa to
14  be familiar with that; wouldn't you?
15  A. Uh-huh.
16     MR. BENSON: You have to answer yes or
17  no.
18     THE DEPONENT: I'm sorry. Yes.
19  Q. (By Mr. Buchanan) Has Andrew Zuppa
20  ever used the phrase: "Can I help you salesmen" in
21  your presence?
22  A. Not that I remember.
23  Q. Do you know what that phrase means in
24  his use of it?
25     MR. BENSON: Object to the form. No

**Page 39**

1  establishment has been made.
2  Q. (By Mr. Buchanan) Let me ask the
3  question this way: Has he talked about aggressive
4  salespeople with you?
5  A. Has Andrew talked about aggressive
6  salespeople with me?
7  Q. Yes.
8  A. Not that I recall.
9  Q. Have you ever had to tell Andrew
10  Zuppa: Look, I don't want aggressive salespeople; I
11  want experienced salespeople; I want people who will
12  be available, and who will give customers their
13  space? Have you ever had that discussion?
14  A. Well, we've talked about that at a lot
15  of managers meetings, employee lunches, things like
16  that. As an individual conversation with Andrew, I
17  don't recall that.
18  Q. To your way of thinking -- just so we
19  are on the same page of music here -- to your way of
20  thinking, an aggressive salesperson is probably not
21  a very good salesperson?
22  A. That's correct.
23  Q. Mr. Jabs, I'm going to show you what
24  we have marked as Exhibits 29 and 30 to some earlier
25  depositions in this case. You can take a moment to

**Page 40**

1  review those, and then I'll have a few questions
2  about them.
3  A. Do you want to do them individually or
4  together?
5  Q. We can probably do it that way. I'll
6  start with 29, if you've read that.
7  A. Yeah.
8  Q. Do you remember the circumstance
9  referred to in the -- well, strike that.
10     Were you in the Westminster store one
11  day when an employee came in late?
12  A. Yes.
13  Q. And do you remember any of the
14  circumstances of that? Do you remember who the
15  employee was?
16  A. No.
17  Q. Okay. And was that the -- one of the
18  episodes that you were referring to in the first
19  paragraph there? Strike that; let me be clear about
20  that.
21     I realize you didn't author this
22  document. Okay?
23  A. Right.
24  Q. But I'm wondering whether you had any
25  role in asking that it be prepared?

**Page 41**

1  A. I don't remember that. I can't
2  remember.
3  Q. Okay. Let's talk about that episode I
4  just referred to where an employee came in late.
5  What do you remember about that?
6  A. Well, I think it happened more than
7  once. The meetings were supposed to -- the salesmen
8  are supposed to come in 30 minutes early, which on
9  the weekdays, it should be around 9:30.
10     So I go to the store at about a
11  quarter 'til, and the salesman are straggling in;
12  and there's no meeting. And I don't know if my --
13  if Mike and Andrew did it off of my complaining to
14  Mike or he did it on his own. I think Andrew and
15  Mike were also going to the store and more or less
16  verifying that. I know Andrew did for sure, and I
17  believe Mike did.
18     So it was just that this is what was
19  happening. And what we saw with Jack was no really
20  improvement on that.
21  Q. Do you know whether Jack was
22  disciplining his salespeople for coming in late?
23  And by "disciplining," I mean preparing these
24  personnel actions?
25  A. I don't know that.

Jacob Jabs

**Page 46**

1  testing.
2  So the only point I'm making right now
3  is there's a lot more tests on bedding than there
4  would normally would be. So the tests are about
5  things that everybody should know about, new
6  products, changes.
7  Q. Do you find that salesmen are sort of
8  resistant to having a meeting every single day?
9  A. There are probably some, but I don't
10  know. I think if you're in the company very long,
11  you'd probably make the decision that: Hey, this
12  company's the reason that we're growing. And right
13  now, our business is up pretty damn good. And
14  everybody else complains how slow business is, and
15  maybe we know what we're doing.
16  The smartest salesman will say, you
17  know: I'm there for the meetings, and I need to
18  know what's going on, if he wants to be, you know, a
19  good writer.
20  Q. These two documents, Exhibits 29 and
21  30, are dated within six days of each other. The
22  first is July 5th, and then there's a letter of
23  July 11th.
24  And my question is: Do you believe
25  this was sort of two parts of the same personnel

**Page 47**

1  action that you were writing the letter on, that
2  went out over your signature, as sort of
3  reemphasizing what was already in the personnel
4  action?
5  A. I remember this one here (indicating)
6  as definitely being my language. I'm trying to make
7  it real clear that -- what the responsibilities are.
8  And so there wouldn't be any mistake, I guess, you
9  know, in my mind, that if you do a good job on this,
10  you don't land up in lawsuits. Instead of sitting
11  here today wasting our time, maybe this spelled it
12  out then.
13  Q. Okay. When you -- the answer you just
14  gave referring to "this" was Exhibit 30, the letter
15  dated July 11, 2002?
16  A. Yes.
17  Q. Do you believe you drafted this
18  document?
19  A. Yes, yes.
20  Q. If Andrew Zuppa says he drafted it,
21  would he have been mistaken?
22  A. Well, he might have -- basically, I
23  dictate letters to people, everybody from my
24  secretary to managers. Probably Andrew wrote it,
25  drafted it, but I dictated it. And he drafted it or

**Page 48**

1  wrote it, I guess.
2  Q. He actually transcribed your
3  dictation?
4  A. Probably typed it up, yeah.
5  Q. Okay. There's a reference in the
6  third paragraph to "these times of soft sales."
7  Do you recall July of 2002 being a
8  particularly soft time in the sales cycle?
9  A. I couldn't remember then. There's
10  cycles in business. Like right now, there's a
11  downturn in business with all the foreclosing on
12  houses. And for me to remember exactly what was
13  going on in that period of time, there was some kind
14  of, you know, recession or down period.
15  Q. When you say "soft sales," you mean
16  sales are down; revenues are down?
17  A. Yeah.
18  Q. And then you talk about more
19  competition: "There has been several new stores
20  opened in town."
21  Do you know who you were referring to
22  specifically there?
23  A. No, not offhand.
24  Q. Okay. And then continuing in that
25  same line, it says, "We need to upgrade our stores

**Page 49**

1  and our staff. It's a window of opportunity to
2  upgrade all our staff with all the layoffs
3  happening, especially in the sales department."
4  Can you explain what was meant by
5  that?
6  A. Well, I just spoke to homebuilders
7  last Wednesday. They wanted me to speak because of
8  slow business and share my idea on how to make
9  business better for them.
10  Q. If you've got the solution to that
11  one, I know some other people who will want to talk
12  to you about it.
13  A. One of the things I say is there's
14  opportunities in slow times. Like right now, I
15  think there's opportunities. I bought American in
16  1975, a big recession. I stole it, really. You
17  know, 80,000 cash; it was on the books for a million
18  and half bucks. It was an opportunity.
19  I started my music store -- I bought a
20  music store, half interest, 1,500 bucks in a big
21  recession. I've figured out that I've been through
22  seven recessions in my 52 years in business. And
23  there's opportunity in recessions, particularly in
24  real estate. There's opportunity in real estate;
25  that's for sure. And that's what builders are in,

Page 66

1 A. Probably mostly customer service. We
2 have 40 people in customer service now. Then we
3 probably had 30, or whatever it was, you know. We
4 believe in listening to complaints from customers.
5 You can correct a complaint if you know what -- if
6 you're doing something wrong, somebody will normally
7 tell you, a customer.
8    So it was probably not really from
9 salespeople because -- none of my salespeople handle
10 any customer complaints, none. All the customer
11 complaints go directly to customer service, and they
12 handle it.
13    And the reason for that is they're
14 trained. They're trained how to handle them. They
15 have the authority to do same day exchanges, give a
16 customer's money back, whatever it takes to try to
17 satisfy the customer.
18    So every week when I -- like tomorrow
19 when I'm visiting all my stores, I will go up to
20 customer service and spend some time with Rob Naish,
21 our manager. And we'll go over the problems --
22 because they're the ones that hear the problems;
23 customer service does.
24    So most of the time these come from
25 there, but they also come from managers and

Page 67

1 customers. If I'm walking around the store or
2 getting into my car, a customer will grab me and say
3 something.
4 Q. One more thing?
5 A. Yeah.
6 Q. What you say here is: "No Quotas for
7 the Store or Sales Consultants." Correct?
8 A. That's correct.
9 Q. In other words, you are not looking
10 for a particular revenue target from any particular
11 store?
12 A. I've never had a goal for this
13 company. I've never had a goal for the salesmen.
14 I've never had a goal for myself. I've never, ever
15 planned on more than one store or ten stores.
16 Never, ever had goals. Never had quotas or goals.
17 Q. In fact, you are fond of saying,
18 aren't you, Mr. Jabs, that you are not in the
19 furniture business for the money; you're in it for
20 the adventure?
21 A. That's right.
22 Q. You are in it because you're doing
23 what you like to do?
24 A. That's right.
25 Q. That's an attitude or a philosophy of

Page 68

1 doing business that you want your company to absorb?
2 A. That's right.
3 Q. And so by saying there are no quotas
4 for the stores, the store manager should understand
5 that: I'm not looking for any particular revenue
6 target for you guys?
7 A. That's right.
8 Q. Basically: Do your best?
9 A. Or profits. I never, ever say: You
10 need to make so much money. I never play one store
11 against the other on sales contests or profit or
12 nothing. I just basically, once a month, get a
13 financial statement. If we're making money, doing
14 okay, that's good enough for me.
15 Q. Okay. So if Andrew Zuppa was
16 literally simultaneously communicating to Jack Must
17 that he needed to get the revenues of that store up
18 or there needed to be a change, that would not be
19 consistent with your philosophy; would it?
20 A. That's correct.
21 Q. That would be inconsistent with your
22 philosophy?
23 A. That's correct.
24 Q. And, in fact, you feel that Jack
25 didn't really have control over the numbers of that

Page 69

1 store?
2 A. That's correct.
3 Q. Anymore than any other store manager?
4 A. That's right.
5 Q. Do you recall receiving a complaint
6 from Rich Dawson, who was then the manager of the
7 Southwest store, that Andrew Zuppa had been putting
8 what he regarded as inappropriate pressure on him to
9 get his numbers up?
10 A. I don't recall that.
11 Q. Help me with something that isn't
12 self-evident to me because I'm not a business guy.
13    What is it about the more
14 low-pressure, low-key sales approach that you
15 believe eliminates even exchanges or returns?
16 A. Well, the customer should make an
17 informed decision on what they like -- the color,
18 style, size that fits. And the customer should make
19 that decision. And then I think the customer
20 accepts responsibility for their decision.
21    If a customer feels that a salesman is
22 guiding them -- and this is the trouble with high
23 pressure; this is what happens. The salesman is
24 guiding a customer to a different product or guiding
25 them to -- like a lot of times, they have spiffs on

|   | 70 |
|---|---|
| 1 | certain items so, you know, if you buy this -- if |
| 2 | you sell a $600 sofa versus a $300 sofa, they get |
| 3 | more commission and, meanwhile, the customer can't |
| 4 | afford a $600 sofa; they can only afford a $300 |
| 5 | sofa. So then you're going to get it back. |
| 6 | So the concept is: Let the customer |
| 7 | make the decision and be responsible so that they |
| 8 | feel responsible that they made the decision on that |
| 9 | product. And you agree on the price and the |
| 10 | delivery and everything else. And the odds of |
| 11 | getting that back go way down. |
| 12 | Q. Okay. That makes sense. And you also |
| 13 | indicate that it'll get rid of hostile customers. |
| 14 | And I take it that, basically, you'll get rid of the |
| 15 | people that are angry because of the buying |
| 16 | experience that they had from a high-pressure |
| 17 | salesman? |
| 18 | A. Right. |
| 19 | Q. Okay. I take it that what you just |
| 20 | said is, at least in part, why you put so many |
| 21 | information tags on your furniture? |
| 22 | A. That's correct. |
| 23 | Q. Is to educate the customer about it so |
| 24 | that they can make an informed decision? |
| 25 | A. That's correct. |

|   | 71 |
|---|---|
| 1 | Q. I'm interested in No. 2 here. In the |
| 2 | first bullet item you say: "If an Anti-American |
| 3 | Furniture customer is in the store saying things |
| 4 | like why don't you sell solid wood" -- and then you |
| 5 | go on to say: You have my permission to, you know, |
| 6 | tell them to shop elsewhere. And a lot of your |
| 7 | information tags address that very issue; don't |
| 8 | they? |
| 9 | A. Yes. |
| 10 | Q. That in a dry climate like Colorado, |
| 11 | solid wood is going to check and crack? |
| 12 | A. Crack, yeah. It'll dry out and crack. |
| 13 | Q. And at least in that respect, veneer |
| 14 | furniture is advantageous because it doesn't crack; |
| 15 | is that correct? |
| 16 | A. Right. |
| 17 | Q. Okay. |
| 18 | MR. BENSON: Let the record reflect |
| 19 | that counsel knows more about furniture than he's |
| 20 | letting on. |
| 21 | MR. BUCHANAN: Took all the wood shop |
| 22 | classes. |
| 23 | THE DEPONENT: Must have read my book, |
| 24 | maybe. |
| 25 | Q. (By Mr. Buchanan) I want to come back |

|   | 72 |
|---|---|
| 1 | to what you told me. You indicated that it was your |
| 2 | decision to offer Jack a position on the sales |
| 3 | floor? |
| 4 | A. Yes. |
| 5 | Q. But you did that in response to Andrew |
| 6 | Zuppa coming to tell you that he was going to |
| 7 | terminate him; correct? |
| 8 | A. Yes. |
| 9 | Q. He had made the decision he was going |
| 10 | to terminate him? |
| 11 | MR. BENSON: Object to the form. |
| 12 | Answer if you can. |
| 13 | THE DEPONENT: Yes, I think it was |
| 14 | probably a little bit of a joint, I guess. You |
| 15 | know, it was a while back. But I think the |
| 16 | consensus between upper management, if you will, was |
| 17 | that it was time for Jack to move on. |
| 18 | Q. (By Mr. Buchanan) But the impetus for |
| 19 | the sales position came from you, not from Andrew? |
| 20 | A. Yes. I've always really believed in |
| 21 | that, I guess. You know, in other words, obviously, |
| 22 | he was okay when he was a salesman; or he wouldn't |
| 23 | have been -- if he was okay as a salesman, I was |
| 24 | going to give him the opportunity to go back. A lot |
| 25 | of salesmen do pretty good. I don't know what Jack |

|   | 73 |
|---|---|
| 1 | did. I don't have -- I don't track salesmen or how |
| 2 | much they sell. But I assume he did okay in the |
| 3 | sales force. |
| 4 | So it was an opportunity for him, |
| 5 | instead of having to find a new job, to go back and |
| 6 | have a job. |
| 7 | Q. Do you have a standard formula at AFW |
| 8 | to determine how many salesmen a store should have? |
| 9 | A. We have a -- I want to call it a |
| 10 | guideline. If a store is doing, let's say, |
| 11 | $2 million a month, they should have X amount of |
| 12 | salesmen. If they're doing 4 million a month, they |
| 13 | should have X amount of salesmen. |
| 14 | Q. And let me just ask you to assume -- |
| 15 | and you probably know this perfectly well -- that |
| 16 | the Westminster store, in those days, was doing, you |
| 17 | know, somewhere between 850 in a relatively slow |
| 18 | month to a million maybe, you know, snuggling up to |
| 19 | a million one in a month. |
| 20 | A. That sounds correct. |
| 21 | Q. How many salesmen would you expect in |
| 22 | that store? |
| 23 | A. Normally, we divide that by 90,000. |
| 24 | So that would be nine, ten salesmen, I guess, in |
| 25 | that area. |

Page 74

```
1   Q.  Why do you use 90,000?
2   A.  Well, just as a -- that would be a
3   compensation for -- you know, if a salesman is
4   selling 90,000, and they make 4 percent -- and, of
5   course, they make 6 percent on bedding, and -- so
6   things like that.
7       But if they want to make -- you want
8   them to make a decent living, the salesmen.
9   Q.  I'm not following you. You are saying
10  the salesman will make $90,000?
11  A.  No, that would be 90,000 in sales.
12  Q.  In sales, okay.
13  A.  So say they average 5 percent, that
14  would give them 45,000 a year.
15  Q.  Okay. So 90,000 a month in sales?
16  A.  Yeah.
17  Q.  Okay. I was missing that increment.
18      (Discussion off the record.)
19  Q.  (By Mr. Buchanan) On $90,000, if a
20  guy sells 90,000 in furniture and it's all delivered
21  and nothing is returned, 90,000 in revenue, the
22  salesperson will make $3,600 in a month?
23  A.  Well, they make more. They probably
24  average about 5 percent because there's more
25  commission on some things. Like bedding, which is
```

Page 75

```
1   part of their thing; they make 6 percent on that.
2   They average probably about 5 percent. So 5 percent
3   would be 45,000.
4   Q.  Okay. Now, you have indicated that
5   you don't have a quota. 90,000 is not a quota; it's
6   simply a number that you use to calculate?
7   A.  It's a guideline. It changes a little
8   bit. Like Pueblo, which is a lower income market,
9   you know, might be a little bit different. I've
10  just been a believer that a salesman needs to make a
11  decent living, or they don't stay with you.
12  Q.  Okay. And as far as you are
13  concerned, 45,000 is a decent living?
14  A.  Right.
15  Q.  And is that about where your salesmen
16  average?
17  A.  It varies a lot. I mean, this is
18  what, four years ago, I guess. Things have changed
19  in places and so forth. In other words, you always
20  some formula. When Jack worked for Weberg's, when
21  business got slow, they hired more salesmen thinking
22  that they would boost their sales.
23      See, I've always thought that was a
24  stupid thing because all you do is lose all of your
25  salesmen. When business got slow, I blame it on me,
```

Page 76

```
1   not on the salesmen. I wasn't drawing the traffic
2   to the store or buying right. I never blamed the
3   salesmen for slow sales. In fact, a lot of
4   companies in this business blame salesmen for slow
5   sales. I've never done that.
6   Q.  Okay. So if Jack Must -- if we take
7   whatever number the Westminster store was making per
8   year and divide that number by 90,000, we should get
9   basically the number of salesmen that he needed?
10  A.  Yeah. And I'm thinking, back then, it
11  was probably 80,000. I think we have raised it
12  because of inflation. And that was four years ago,
13  so I'd have to check. It seems to me that, back
14  then, it was more like 80,000.
15  Q.  And have I done the formula correctly?
16  In other words, take gross revenues divided by
17  80,000, and that will give you the number of
18  salesmen that you need?
19  A.  That's correct.
20  Q.  Did you have any input in the decision
21  as to who was going to replace Jack Must as the
22  manager of the Westminster store?
23  A.  Not really, no.
24  Q.  Did you know Nolan Morrison at that
25  time?
```

Page 77

```
1   A.  Yes, sir.
2   Q.  And how did you know him?
3   A.  I believe he was a manager trainee.
4   I'm guessing now; I'm not sure. I think he was a
5   manager trainee.
6   Q.  Okay. And did he -- had you had
7   interaction with him before? Did you have an
8   opinion about him as a manager?
9   A.  Not really.
10  Q.  Okay. Whose decision was it to make
11  him the replacement for Jack Must?
12  A.  Probably was between Andrew and Mike.
13  Q.  Okay. Did you sign off on that
14  decision?
15  A.  I don't know what "sign off" means.
16  Q.  I meant to say sign off. If I said --
17  A.  Approved?
18  Q.  Approved, whatever.
19  A.  I'm not sure. Did Jack Must -- did
20  Nolan become manager after Jack? I don't know that
21  for sure.
22  Q.  That's my understanding.
23  A.  Okay. I don't know that for sure.
24  I'd have to check. If Nolan did become the manager
25  after Jack, I probably approved that, yes.
```

20 (Pages 74 to 77)

Jacob Jabs

Page 86

1  ensure that we had enough people to take care of the
2  customers.
3      Q.  So did you have to pay hourly
4  somewhere near $25 an hour?
5      A.  Uh-huh. It varies per salesman. But,
6  yes, we paid some as high as that, yeah.
7      Q.  Did that have the effect of -- or do
8  you know whether that had the effect of tracking --
9  attracting relatively younger workers compared to
10 older workers?
11     A.  There again -- one thing about the
12 furniture business is I think older people sometimes
13 do better than the younger people. They're more
14 experienced and more mature.
15         But I've never tracked older versus
16 younger. It never was a problem in the furniture
17 business, whether they were younger or older.
18     Q.  When you say you've never tracked it,
19 you've never studied the issue?
20     A.  Never seemed to be a problem. You
21 know, I think the first time we ever heard anything
22 about firing older people is this lawsuit. I've
23 never even heard of that before. First time I ever
24 heard of it.
25     Q.  Did hearing about it with this lawsuit

Page 87

1  cause you to look into the matter and see if it's
2  true?
3      A.  You know, I think this lawsuit is so
4  bogus it's unbelievable. I think I pay attention to
5  things that are a problem. If I felt this lawsuit
6  had some justification, at 49 years old for a
7  manager, I mean, you know, we've got a lot of
8  managers -- I'm 76 years old, by the way. And so I
9  look at 49 as young.
10     Q.  Sure. But you also own all the stock
11 of the company; don't you?
12     A.  I'm just saying that I think older --
13 I don't believe it's a problem in this business,
14 age, you know. We have a lot of older salesmen and
15 a lot of older managers. We have some younger ones,
16 too. I think we tend to shift to a little older
17 degree in the furniture business because there's
18 more mature, more experience, more savvy.
19         So this lawsuit will not change my --
20 I will not start keeping track of ages because I
21 think it's a 100 percent bogus lawsuit.
22     Q.  Okay. You have pretty strong feelings
23 about the civil justice system; don't you?
24     A.  Civil justice system?
25     Q.  Yes. As distinct from the criminal

Page 88

1  justice system?
2      A.  I guess I don't understand the
3  question.
4      Q.  Well, you have a pretty strong feeling
5  that lawsuits -- you've personally been, or your
6  company has been sued a number of times for sexual
7  harassment; have they not?
8      A.  No.
9      Q.  Was the Coleman suit a sexual
10 harassment suit?
11     A.  No, it wasn't.
12     Q.  There were no allegations of sexual
13 harassment?
14     A.  No, it was age -- age and -- there was
15 some kind of discrimination, I remember. Again, a
16 real bogus lawsuit. It was thrown out in a summary
17 judgment. And she had to pay some of the court
18 costs and attorney fees because it was such a bogus
19 lawsuit.
20     Q.  My question is: In the Coleman case,
21 involving Beverly Coleman, were there allegations of
22 sexual harassment?
23     A.  I don't believe so. I don't remember
24 that.
25     Q.  So if Mr. Buscietta has testified that

Page 89

1  he gave a deposition in that case, and there were
2  allegations of sexual harassment directed against
3  you, personally, that's --
4          MR. BENSON: Hang on. I object to the
5  form. I think that it mischaracterizes the
6  testimony. I do not believe that's what
7  Mr. Buscietta testified to.
8          MR. BUCHANAN: Well, I guess the
9  transcript will indicate what he testified to.
10     Q.  (By Mr. Buchanan) But my question is:
11 That's incorrect, as far as you were concerned?
12     A.  There was no sexual harassment in the
13 Beverly Coleman case. There was none.
14     Q.  (By Mr. Buchanan) Well, that's a
15 slightly different question. I asked about an
16 allegation of sexual harassment. Was she claiming
17 that she was sexually harassed?
18     A.  You know, I'd have -- you'd have to
19 ask my attorneys or somebody else. I'm not -- let's
20 put it this way: I'm not aware of a sexual
21 harassment. I don't know who she was claiming was
22 sexually harassing her.
23     Q.  There was a sexual harassment that
24 rose up in Fort Collins; was there not?
25     A.  Yes.

23 (Pages 86 to 89)

Calderwood-Mackelprang, Inc. 303.477.3500

Jacob Jabs

98

1  and then we'll be done. Those are all the questions
2  I have, Mr. Jabs.
3      MR. BENSON: I have no questions for
4  the witness. We didn't do this yesterday or today,
5  but I'll handle signature at my office for all the
6  witnesses.
7      (WHEREUPON, the deposition was
8  concluded at 4:40 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

100

1           CERTIFICATE
2  STATE OF COLORADO   )
                       )ss.
3  CITY AND COUNTY OF DENVER )
4
5      I, Dawn E. Eastman (Calderwood),
   Certified Shorthand Reporter, Registered
6  Professional Reporter, and Notary Public for the
   State of Colorado, do hereby certify that previous
7  to the commencement of the examination, the said
   JACOB JABS was duly sworn by me to testify the truth
8  in relation to the matters in controversy between
   the said parties.
9      I further certify that said deposition
   was taken in shorthand by me and was reduced to
10 typewritten form by computer-aided transcription,
   that the foregoing is a true transcript of the
11 questions asked, testimony given, and proceedings
   had.
12     I further certify that I am not an
   attorney nor counsel nor in any way connected with
13 any attorney or counsel for any of the parties to
   said action or otherwise interested in its event.
14     IN WITNESS WHEREOF, I hereunto affix my
   hand and notarial seal this 28th day of September,
15 2007. My commission expires September 20, 2010.
16
17
18
          _____
          Dawn E. Eastman (Calderwood)
19        CSR, RPR, Notary Public
          Calderwood-Mackelprang, Inc.
20
21
22
23
24
25

99

1      I have read the foregoing
2  transcript of my testimony and have indicated the
3  same by my signature.
4
5
6      _____
          JACOB JABS
7
8  STATE OF COLORADO
9  CITY AND COUNTY OF DENVER
10     Subscribed and sworn to before me by
11 JACOB JABS, on this _____, 2007.
12     My commission expires:_____
13
14
15
16     _____
          Notary Public
17
18     _____
          Address
19
20
21 Reporter: DEE
   Trial/Hearing Date: Unknown
22
23
24
25

101

1  CALDERWOOD-MACKELPRANG, INC.
   4410 Zuni Street
2  Denver, Colorado 80211
   (303) 477-3500
3
4  September 28, 2007
5
   GARY J. BENSON, ESQ.
6  Dworkin Chambers & Williams PC
   3900 East Mexico Avenue, Suite 1300
7  Denver, Colorado 80210
8  Re: Must v. American Furniture Warehouse
9  Deposition of: JACOB JABS
10 The deposition in the above-entitled matter is ready
   for reading and signing. Please attend to this
11 matter by complying with ALL blanks checked below:
12 _____ arranging with us at the number listed below
          to read and sign the deposition in our
13        office
14 _____ having deponent read your copy and sign
          amendment sheets, if any (original signature
15        page enclosed.)
16 XXX   reading enclosed deposition, signing
          signature page and correction sheets if any,
17        within 30 days of the date of this letter or
   _____ by_____ due to trial/hearing date of
18 _____
19 Please be sure that the signature page and amendment
   sheets, if any, are signed before a Notary public
20 and returned to our office. If this matter has not
   been taken care of within said period of time, the
21 deposition will be filed unsigned pursuant to the
   Rules of Civil Procedure.
22
   DAWN E. EASTMAN (CALDERWOOD), CSR, RPR
23
   cc: Counsel of Record
24
25

26 (Pages 98 to 101)