# EXHIBIT 18

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 06-cv-01872-RPM-MEH

---

DEPOSITION OF JACK MUST
Tuesday, May 8, 2007

---

JACK MUST,

Plaintiff,

vs.

AMERICAN FURNITURE WAREHOUSE CO., a Colorado corporation, d/b/a AMERICAN FURNITURE WAREHOUSE,

Defendant.

---

APPEARANCES:

| | |
|---|---|
| For Plaintiff: | Buchanan, Jurdem & Cederberg, P.C. |
| | By Ross B.H. Buchanan, Esq. |
| | 1621 18th Street, Suite 260 |
| | Denver, Colorado 80202 |
| | 303.297.2277 |
| For Defendant: | Sherman & Howard L.L.C. |
| | By Andrew W. Volin, Esq. |
| | 633 17th Street, Suite 3000 |
| | Denver, Colorado 80202 |
| | 303.297.2900 |
| | Dworkin Chambers Williams York |
| |   Benson & Evans, P.C. |
| | By Gary J. Benson, Esq. |
| | 3900 E. Mexico Avenue, Suite 1300 |
| | Denver, Colorado 80210 |
| | 303.584.0990 |
| Also Present: | Andrew Zuppa |

Page 26
1  Q  And that management reserved their right to
2  use their best judgment in how to run the stores;
3  correct?
4  A  Yes.
5  Q  Section 2 there, Equal Employment, do you
6  see that section?
7  A  Yes.
8  Q  You understood that AFW had a no
9  discrimination policy; right?
10  A  Yes.
11  Q  And you understood that that policy also
12  prohibited age discrimination?
13  A  Yes.
14  Q  Referring you to page 4 of the manual,
15  section 6, General Conduct, that reinforces the
16  importance of customer service; correct?
17  A  Yes.
18  Q  And the AFW policy was to treat every
19  customer as the most important person to walk through
20  the doors; right?
21  A  Yes.
22  Q  And you understood that every effort had to
23  be made to serve the customers to their satisfaction;
24  right?
25  A  Yes.

Page 27
1  Q  You understood that it was important for
2  Mr. Jabs that each customer have -- be greeted by a
3  sales representative and be treated well by that
4  sales representative?
5  A  Yes.
6  Q  Referring you actually back to section 2 on
7  page 2, the Equal Employment provisions. Did you
8  ever have any training as a store manager on
9  discrimination and harassment?
10  A  No.
11  Q  You never attended any training sessions on
12  preventing harassment or discrimination in the
13  stores?
14  A  Harassment but not discrimination.
15  Q  What kind of harassment training do you
16  recall?
17  A  In manager meetings we talked about sexual
18  harassment in meetings.
19  Q  And you understood that if there were
20  issues of unlawful discrimination or harassment, you
21  could bring those concerns to Crystal Hayes in human
22  resources; correct?
23  A  Yes.
24  Q  And you also understood you could bring
25  those concerns to Mr. Jabs; correct?

Page 28
1  A  Yes.
2  Q  Did you ever bring any concerns of
3  discrimination or harassment to Ms. Hayes?
4  A  No.
5  Q  Did you ever bring any concerns of
6  discrimination or harassment to Mr. Jabs?
7  A  Yes.
8  Q  When was that?
9  A  On a floor walk I had mentioned to Jake
10  that I was being harassed by Andrew about the numbers
11  in the store.
12  Q  Is that something that's in your ledger?
13  A  Yes.
14  Q  So that's something that happened in June
15  of 2004?
16  A  Yes.
17  Q  Prior to June of 2004, did you ever
18  complain to Mr. Jabs of any harassment or
19  discrimination?
20  A  No.
21  Q  Going to page 6 of the manual, section 10,
22  you see that refers to Holidays?
23  A  Yes.
24  Q  And you understood that certain holidays
25  were work days for managers; right?

Page 29
1  A  Yes.
2  Q  And you understood that there were
3  mandatory work days sometimes before and after the
4  holiday as well, on the day before and the day after
5  the holiday as well; correct?
6  A  No.
7  Q  You never understood that?
8  A  No. Because, if I can speak here, I'll
9  tell you. Before Andrew became the assistant general
10  manager, the store managers only had to work the
11  Monday of the holiday, not the Sunday.
12  Q  If a major holiday fell on a Monday,
13  managers would not have to work the Sunday before; is
14  that your testimony?
15  A  Yes.
16  Q  But then when Mr. Zuppa became the
17  assistant general manager that policy changed?
18  A  Yes, it did.
19  Q  And do you recall getting anything in
20  writing about the change of that policy?
21  A  No. Just verbally.
22  Q  When you just said just now that the policy
23  changed when he became the assistant general manager,
24  do you mean when he became the general manager?
25  A  No.

8 (Pages 26 to 29)

HULAC COURT REPORTING, LLC
(303) 331-0131, (303) 331-9898 FAX

**Page 46**

1    A    No.
2    Q    As part of your promotion in June 2001 to
3  the store manager position, your weekly salary was
4  changed to 1153.85 per week; correct?
5    A    Yes.
6    Q    And that works out to about $60,000 a year;
7  correct?
8    A    Yes.
9    Q    And that was your weekly compensation the
10 entire time you served as the store manager of
11 Westminster; correct?
12   A    Yes.
13        (Deposition Exhibit 8 was marked.)
14   Q    (BY MR. VOLIN) Mr. Must, I'm handing you
15 what's marked as Exhibit 8 and numbered at the bottom
16 as 132. This is a form from your personnel file
17 showing that as of June 25, 2001 your weekly salary
18 was changed from $1,000 to 1153.85 and that you were
19 still on the bonus factor of .0005. Do you see that?
20   A    Yes.
21   Q    Does that refresh your recollection that at
22 the time you were made the store manager, although
23 your weekly salary was increased, your bonus amount
24 was kept the same; correct?
25   A    Yes.

**Page 47**

1    Q    Do you recall the circumstances of your
2  promotion to store manager in June 2001?
3    A    Can you repeat that?
4    Q    What do you remember about the
5  circumstances of your promotion to the store manager
6  position at Westminster in June 2001?
7    A    As I recall, Chris Smatla was the store
8  manager at the time, and they had been coming in the
9  store, corporate, and they didn't like the way the
10 store looked. There was tables that were wrong with
11 the furniture. They just weren't happy with what he
12 was doing with the store, and that's why they moved
13 me in there.
14   Q    Do you know if Mr. -- what was his last
15 name?
16   A    Smalta.
17   Q    How do you spell that?
18   A    S-m-a-t-t-a (sic).
19   Q    Do you know if Mr. Smatla had been warned
20 before he was replaced as store manager?
21   A    I have no -- I would not know that.
22   Q    Do you know if he was fired as a store
23 manager?
24   A    I recall that he was.
25   Q    How would you evaluate your performance as

**Page 48**

1  the assistant store manager from February of '01
2  through June of '01 to when you were promoted as
3  store manager?
4    A    Exceptionary.
5    Q    Exceptionary, is that a word?
6    A    Exceptional. I'm sorry.
7    Q    Why would you consider your performance
8  exceptional?
9    A    Because I basically had to pick up and
10 clean up everything he messed up, and that's what I
11 did.
12   Q    So in your position as assistant store
13 manager, you thought that Mr. Smatla was not doing a
14 good job as the store manager?
15   A    I noticed things, yes.
16   Q    Did you report to corporate management your
17 concerns about Mr. Smatla's performance?
18   A    We had had discussions.
19   Q    Who did you have discussions with?
20   A    I talked to Mike Buscietta. He had
21 mentioned to me.
22   Q    Did you tell Mr. Buscietta that you thought
23 there were concerns with Mr. Smatla's performance as
24 store manager?
25   A    I think that's their job to do, but I could

**Page 49**

1  see he was getting in some trouble there.
2    Q    Did you tell Mr. Buscietta that you thought
3  there were problems with the way Mr. Smatla was
4  running the store?
5    A    Yes.
6    Q    And you thought it was Mr. Buscietta's job
7  to make the changes that may have been necessary?
8    A    Yes.
9    Q    Do you know who made the decision to
10 promote you to the store manager at Westminster?
11   A    Andrew and Mike.
12   Q    And were you told why the decision was made
13 to promote you?
14   A    Because they wanted the store cleaned up.
15 They wanted it running right, and they wanted it
16 looking good.
17   Q    Earlier you testified that the store
18 manager was somebody else, Jerry Beemer, I think you
19 said?
20   A    When I first got there, yes.
21   Q    But at some point you recall Mr. Beemer
22 left and Mr. Smalta became store manager?
23   A    Yes.
24   Q    Did he come from a different store to
25 become store manager?

Page 86

1  Q  What happened was that Jake Jabs was at
2  your store in May of 2004, and the subject of the
3  signature capture system came up and you told him
4  that it was there, but it hadn't been working for
5  four or five months; correct?
6  A  That's correct.
7  Q  And then after that Mr. Jabs contacted
8  Mr. Buscietta and then the problem is fixed?
9  A  Yeah. And he called Mike on his cell phone
10 and told Mike that it's not Jack's responsibility,
11 it's your responsibility to get the system up and
12 running, yes.
13 Q  And that's a conversation that happened in
14 May of 2004?
15 A  Yes.
16 Q  Had you -- before your conversation with
17 Mr. Jabs where you told him that the system hadn't
18 been working for four or five months, had you
19 reported to Mr. Buscietta this problem with the
20 system?
21     MR. BUCHANAN: Object to the form.
22 A  I don't recall.
23 Q  (BY MR. VOLIN) Had you reported to anyone
24 in corporate management that the system hadn't been
25 working?

Page 87

1  A  I recall store visits prior to that that I
2  probably did mention something to somebody.
3  Q  You don't remember one way or the other for
4  sure?
5  A  I don't recall for sure.
6  Q  So is it possible that the first time
7  corporate management, meaning Mr. Buscietta,
8  Mr. Zuppa, Mr. Jabs, the first time they could have
9  found out that your system wasn't working is when you
10 had this conversation with Mr. Jabs in your store in
11 May of 2004?
12 A  It's possible.
13 Q  Let me talk to you a little bit about the
14 store sales in May 2004. May is typically a bigger
15 sales month than January through April; correct?
16 A  Yes.
17 Q  And that's because May has got holidays and
18 the weather is better, both of which helps sales;
19 right?
20 A  Yes.
21 Q  You recall how the sales for the
22 Westminster store in May of 2004 compared to the
23 sales in May of 2003?
24 A  As far as my recollection, our store was
25 down $28,000, I believe.

Page 88

1  Q  Do you have any explanation for any factors
2  that would have accounted for less sales in May of
3  2004 than May of 2003?
4  A  I don't know why, but there were other
5  stores that were down more than my store, that I know
6  of.
7  Q  In early June 2004 there was a monthly
8  managers meeting at the corporate headquarters;
9  correct?
10 A  Yes.
11 Q  And one of the topics that came up at that
12 meeting was making sure that store managers kept
13 corporate informed about problems at their store so
14 that things could be fixed; right?
15 A  At times, yes.
16 Q  That was one of the things that came up at
17 this June managers meeting; right?
18 A  I don't recall that.
19 Q  Well, this issue about the signature
20 capture system at your store not working for four or
21 five months, do you recall that that came up at all
22 in the June managers meeting?
23 A  It didn't come up to me in the meeting. It
24 came up after the meeting.
25 Q  Right. But you don't recall in the meeting

Page 89

1  any discussion about making sure corporate is
2  informed about problems in the stores?
3  A  I don't recall that at all.
4  Q  So it could have happened, but you don't
5  remember one way or the other?
6  A  I don't recall that.
7  Q  Do you recall any of the topics that came
8  up at the June managers meeting?
9  A  They talk about a lot of things, and it
10 drags on for a long time, and I did take notes, but I
11 don't have them with me so... There's a lot of
12 things talked about.
13 Q  Do you have notes of managers meetings or
14 other events that took place --
15 A  I did --
16 Q  -- during your employment at AFW?
17 A  I did take notes at the meetings. I don't
18 have them now this far past, but I did -- we all took
19 notes.
20 Q  Well, do you have any records or notes
21 about your employment at AFW other than what you've
22 provided to your lawyer in this case?
23 A  No. No, sir.
24 Q  And at some point after your employment
25 with AFW ended, did you destroy all the other records

23 (Pages 86 to 89)

Page 90

1  that you had?
2     A   Yes.
3     Q   And do you recall when that destruction
4  took place?
5     A   I don't recall the exact date but shortly
6  after.
7     Q   Was it before you filed your charge of
8  discrimination?
9     A   Yes.
10    Q   Was it before you had retained Mr. Buchanan
11 to be your lawyer?
12    A   Yes.
13    Q   And why did you destroy all those records
14 about your employment?
15    A   Because I didn't think I needed any of that
16 stuff.
17    Q   At the time that you left your employment
18 with AFW, one of the last things you said to
19 Mr. Zuppa in your meeting with him is, I'll see you
20 in court; right?
21    A   Yes.
22    Q   So even at the time of your separation with
23 employment with AFW, you intended to take the company
24 to court; right?
25    A   Yes.

Page 91

1     Q   But you still destroyed documents about
2  your employment; right?
3     A   That basically -- those meetings was my
4  personal notes that I didn't feel were necessary for
5  me to keep.
6     Q   What else did you destroy after the
7  termination of your employment with AFW other than
8  your notes of managers meetings? What other
9  documents were there?
10    A   Nothing.
11    Q   And how many managers meeting notes had you
12 kept?
13    A   Some of them I'd keep for a month and
14 destroy them. Some probably two months' worth of
15 stuff. I didn't keep years' worth of stuff.
16    Q   Do you recall how many pages of notes you
17 destroyed --
18    A   I don't --
19    Q   -- after you left your employment with AFW?
20    A   I don't.
21    Q   At that June -- at that June 2004 managers
22 meeting one of the things that happened was
23 Mr. Buscietta distributed the quarterly bonus checks;
24 correct?
25    A   Yes.

Page 92

1     Q   And when he got to you, he didn't give you
2  your check, he told you to meet him in his office
3  after the meeting; correct?
4     A   Yes.
5     Q   Do you recall anything else that happened
6  during the meeting, the managers meeting itself
7  before your meeting with Mr. Buscietta in his office?
8     A   No.
9     Q   You made notes about that meeting in his
10 office?
11    A   On my ledger, yes.
12    Q   If that's what you want to call.
13    A   Yes, I sure did.
14       (Deposition Exhibit 15 was marked.)
15    Q   (BY MR. VOLIN) Mr. Must, I've handed you
16 what's been marked as Exhibit 15, and it's numbered
17 at the bottom as pages 22 through 29. These appear
18 to be handwritten notes by you with various dates.
19 Is this what you referred to earlier in your
20 testimony as your ledger?
21    A   Yes.
22    Q   And do you have any other handwritten notes
23 of events during your employment with AFW other than
24 the notes that are Exhibit 15?
25    A   No.

Page 93

1     Q   Because everything else you destroyed?
2     A   Yes.
3     Q   Did you start taking these notes on June
4  2nd, 2004?
5     A   Yes.
6     Q   And when was the first time that you -- you
7  made these notes? Was it the afternoon of June 2,
8  2004 or was it the next day?
9     A   This would be when I got back from the
10 managers meeting the afternoon, early evening.
11    Q   So in the evening of June 2, 2004, you made
12 the first page and a half of notes that are
13 Exhibit 15?
14    A   Yes.
15    Q   Had you made notes before of your
16 interactions with Mr. Zuppa or Mr. Buscietta or
17 Mr. Jabs?
18    A   No.
19    Q   So this was the first time that you had
20 made notes like this?
21    A   Yes.
22    Q   Did you put in these notes of -- about the
23 meeting on June 2, 2004 everything that you felt was
24 significant?
25    A   Yes.

**Page 94**

1  Q  Have you read these over to refresh your
2  recollection about that meeting with Mr. Buscietta on
3  June 2, 2004?
4  A  Yes.
5  Q  And did reading this help refresh your
6  recollection?
7  A  It's exactly what happened.
8  Q  Do you recall anything else that happened
9  other than what's in the notes?
10  A  No.
11  Q  Did you tape record that meeting in
12  Mr. Buscietta's office on June 2, 2004?
13  A  No.
14  Q  Do you recall that during the meeting in
15  Mr. Buscietta's office the door was open?
16  A  Yes.
17  Q  And that his office was in a row of offices
18  and then there were also cubicles around his office?
19  A  I don't recall but.
20  Q  Do you remember that Mr. Zuppa came in
21  during the meeting with Mr. Buscietta?
22  A  He came in right when we got there, yes.
23  Q  It was your recollection that he came in at
24  the start of the meeting or that he came in soon
25  after it began or which?

**Page 95**

1  A  From what I recall, he came in with us.
2  Q  So the meeting began with the three of you
3  together?
4  A  Yes.
5  Q  Do you know if anyone else heard what was
6  said in that meeting besides the three of you? You
7  testified that the door was open.
8  A  Well, they left the door open. I don't
9  know. I don't know who was out there or who heard
10  what.
11  Q  But it took place at about 3:30 in the
12  afternoon?
13  A  Yeah. It was after the meeting, yes.
14  Q  And Mr. Buscietta said he didn't think you
15  should get a bonus check at all for that quarter;
16  correct?
17  A  Yes.
18  Q  One of the things he complained to you
19  about was the problem with the signature capture
20  system not working?
21  A  Yes.
22  Q  And he told you that you should have been
23  dealing with the problem, rather than using it as an
24  excuse?
25  A  I don't recall exactly what he said but...

**Page 96**

1  Q  He told you you should have dealt with the
2  problem rather than letting it sit there for four or
3  five months was the essence of what he said; right?
4  A  He might have.
5  Q  And you took the position that it wasn't
6  your responsibility; correct?
7  A  Ultimately it was probably his
8  responsibility since he's in charge of systems.
9  Q  At that meeting with him, you took the
10  position that it wasn't your responsibility to make
11  sure the systems in your store were working?
12  A  It wasn't fully my responsibility.
13  Q  I'm not asking you if it was fully your
14  responsibility or not. I'm asking you what you said
15  during the meeting with Mr. Buscietta?
16  A  I don't recall exactly what I said to him.
17  Q  Mr. Zuppa told you you shouldn't be patting
18  yourself on the back about your May sales figures;
19  right?
20  A  Yes.
21  Q  And you told him the store was going to do
22  what it was going to do?
23  A  Yes.
24  Q  You took the position that it wasn't your
25  responsibility if the store sales decreased?

**Page 97**

1  A  I ultimately take the responsibility for
2  increase, decrease, anything.
3  Q  So is it your responsibility if the store
4  performance -- sales performance decreases?
5  A  To some extent, yes.
6  Q  You knew at that meeting that both
7  Mr. Buscietta and Mr. Zuppa felt that your
8  performance was unacceptable; correct?
9  A  With their attitudes there, yes.
10  Q  And you felt that your job was in
11  jeopardy --
12  A  Yes.
13  Q  -- at that meeting? Referring you to the
14  second page of these notes, it says, After about 15
15  minutes of defending myself from this harassment by
16  these two general managers. Do you see that?
17  A  Yep.
18  Q  What do you mean by defending yourself for
19  15 minutes? What do you recall that you said?
20  A  Basically defending myself of my job and my
21  position and why I should get my bonus check and how
22  hard I worked for the company and how dedicated I
23  was. I just couldn't understand why I was getting
24  put through this.
25  Q  You didn't understand why they felt that

25 (Pages 94 to 97)

Page 98

1  your performance was so bad that your bonus should be
2  eliminated?
3      A   That's correct.
4      Q   Do you recall raising your voice to
5  Mr. Buscietta in that meeting?
6      A   I might have.
7      Q   Do you recall shouting at him?
8      A   I don't believe I shouted at them, but they
9  were pretty loud themselves.
10     Q   Had you raised your voice to Mr. Buscietta
11 before?
12     A   I don't recall. I don't believe I did.
13     Q   So this was the first time you'd raised
14 your voice with Mr. Buscietta as far as you can
15 recall?
16     A   As far as I can recall, yes.
17     Q   Were you aware of any of Mr. Buscietta's
18 other subordinates that were raising their voices
19 with him?
20     A   I wouldn't know that.
21     Q   Would you have raised your voice like that
22 if you had been talking to Mr. Jabs?
23     A   When they're trying to take my money away
24 for no reason, I might have.
25     Q   Do you know what Mr. Buscietta's reaction

Page 99

1  was to your behavior in his office?
2      A   I don't know.
3      Q   Do you know what Mr. Zuppa's reaction was
4  to your behavior in Mr. Buscietta's office?
5      A   Don't know.
6      Q   Well, Mr. Zuppa talked to you later about
7  his impressions about what happened in that office,
8  didn't he?
9      A   Yes.
10     Q   And didn't he say that you're lucky you
11 weren't fired or words to that effect?
12     A   I was just defending myself and trying to
13 get paid for what I deserved.
14     Q   Didn't Mr. Zuppa tell you that it was his
15 impression that you were lucky you weren't fired?
16     A   And ultimately that's what he did, yes.
17     Q   Did you talk to anyone after that meeting
18 in Mr. Buscietta's office about what had happened?
19     A   Yes.
20     Q   Who did you talk to?
21     A   I talked to my wife, number one.
22     Q   Anyone else?
23     A   I don't recall.
24     Q   Did you talk to anyone at the store?
25     A   I don't recall.

Page 100

1      Q   Prior to that meeting in Mr. Buscietta's
2  office on June 2, 2004, had you gotten along okay
3  with Mr. Buscietta?
4      A   For the most part, yes.
5      Q   And prior to that meeting had you gotten
6  along with Mr. Zuppa?
7      A   At times.
8      Q   That's a different answer than with respect
9  to Mr. Buscietta. So explain what the difference
10 is.
11     A   Like I told you before, when Andrew -- when
12 I first became a store manager, Andrew was very
13 supportive of me, compliment me on the store because
14 the store did look great. I was doing my job, and he
15 pretty much let me alone for a while until around the
16 end of my employment, somewhere in between there
17 so...
18     Q   Earlier you testified that sometime during
19 or after your first year as store manager Mr. Zuppa
20 became increasingly negative to you. Do you recall
21 that testimony?
22     A   He got more negative as time went on, yes.
23     Q   And because of that negativity, did you
24 feel like he wasn't getting along with you or you
25 weren't getting along with him?

Page 101

1      A   I wouldn't say I wasn't getting along with
2  him, but I couldn't understand why he had such an
3  attitude about our store and why he was so negative
4  about the store and myself.
5      Q   As of June of 2004 do you recall who the
6  other store managers were?
7      A   Jerry Beemer.
8      Q   Where was Jerry Beemer store manager in
9  June of '04?
10     A   Oh, June of '04, I'm sorry. You're talking
11 about other store managers?
12     Q   Let me stop.
13     A   Okay.
14     Q   When you say Jerry Beemer, that's somebody
15 who was a prior store manager at Westminster.
16     A   Okay.
17     Q   I'm talking June of '04 at the same time
18 that you have this meeting with Mr. Buscietta after
19 the multi managers meeting, at that time period do
20 you recall who the other store managers were?
21     A   Some of them, yes.
22     Q   Do you recall in Fort Collins Mr. Tucci was
23 the manager?
24     A   Yes.
25     Q   Do you recall what his age was?

Page 110

1    Q    And you understood that Mr. Buscietta went
2  from being the general manager to becoming the
3  Thornton store manager?
4    A    Yes.
5    Q    Did you talk to either Mr. Zuppa or
6  Mr. Pepper or Mr. Buscietta about these changes?
7    A    No.
8    Q    Did you think of Mr. Buscietta's move from
9  general manager to Thornton manager as a demotion?
10   A    Could be.
11   Q    Did you regard it as a demotion for
12 Mr. Buscietta?
13   A    I didn't really think of it that way, but
14 I'm sure it could be.
15   Q    Were you aware of any management employees
16 being demoted at AFW while you worked there?
17   A    I'd say probably yes.
18   Q    Do you recall any specific people that you
19 remember being demoted?
20   A    I know Chris Smatla was demoted when
21 he -- I think he went to sales at Compark from what I
22 remember.
23   Q    After being the store manager at
24 Westminster, he was demoted to sales at Compark, you
25 think?

Page 111

1    A    As far as I know. I don't think he lasted
2  very long, but I kind of recall him going there.
3    Q    Do you recall anyone else that was demoted
4  from a management job?
5    A    I can't recall.
6    Q    Are you aware of whether any employees at
7  AFW who have been demoted who were ever repromoted?
8    A    I wouldn't probably know that.
9    Q    Are you aware of any AFW employees that
10 were in management jobs being moved into sales jobs
11 besides Mr. Smalta?
12   A    Not that I know of that I can recall.
13   Q    In June of 2004 you recall that Mr. Jabs
14 also made store visits?
15   A    Yes.
16   Q    And do you recall that when Mr. Jabs
17 visited in June of 2004 you complained to him about
18 Mr. Buscietta?
19   A    No.
20   Q    Do you recall complaining to Mr. Jabs about
21 Mr. Zuppa?
22   A    Yes.
23   Q    And do you recall what you said to Mr. Jabs
24 about Mr. Zuppa?
25   A    I think I told Jake that Andrew has been

Page 112

1  harassing me about the numbers in the store.
2    Q    Do you think you actually used the term
3  harassment when you spoke with Mr. Jabs?
4    A    I believe I did.
5    Q    And do you recall what his response was?
6    A    He said, Jack, Andrew shouldn't be hassling
7  you or harassing you about the numbers because you
8  have no control over them.
9    Q    And do you believe you have no control over
10 the numbers as the store manager?
11   A    I wouldn't say I have no control, but I
12 don't have a lot of control. I have -- I mean,
13 obviously I want the store to do as well as anybody
14 else did at that time. As long as I ran my store and
15 had my salespeople working out there and taking care
16 of the customers, I believe the store would do what
17 the store's going to do.
18   Q    Did you believe after your meeting with
19 Mr. Buscietta and Mr. Zuppa in Mr. Buscietta's office
20 on June 2, 2004, that that -- their complaints to you
21 had been motivated by your age?
22   A    At that time I wouldn't say it was that. I
23 just knew that -- I knew that Andrew was out to get
24 me.
25   Q    You felt as of June of '04 he was out to

Page 113

1  get you?
2    A    I'd say a little before that.
3    Q    When did you first get the impression that
4  Mr. Zuppa was out to get you? Would it have been May
5  of '04?
6    A    Probably. After this for sure.
7    Q    When you say "this," you mean after his
8  promotion to --
9    A    Right.
10   Q    -- general manager?
11   A    Then I knew for sure. But I had feelings
12 before that that something was going to -- was going
13 on. I can't recall the exact date of when I felt
14 that, but I felt it.
15   Q    And that's because he was always negative
16 in his store visits?
17   A    Andrew didn't like that store. He called
18 it, you know, somewhere off planet earth and they'd
19 all starve if they had to live on it. A lot of
20 negative statements.
21   Q    Referring you to your notes, Exhibit 15,
22 the bottom of page 24 references an event on Friday,
23 June 4th. Do you see that?
24   A    Yes.
25   Q    After you complained to Mr. Jabs about

29 (Pages 110 to 113)

HULAC COURT REPORTING, LLC
(303) 331-0131, (303) 331-9898 FAX

Page 134

1  Q  You did tell him that you didn't want to
2  work both Sunday and Monday; right?
3  A  Yes.
4  Q  And you told him that you would work Monday
5  but you didn't want to work Sunday?
6  A  I told him I didn't want to, but if I had
7  to, I would, yes.
8  Q  And Mr. Pepper told you that you had to
9  work Sunday as well, didn't he?
10 A  That's not correct.
11 Q  What's not correct?
12 A  Mr. Pepper told me, Jack, if you don't want
13 to work Sunday, don't work Sunday.  That's what he
14 told me.
15 Q  Well, why don't you tell me what you recall
16 of the conversation from start to finish in the order
17 in which it went?
18 A  From what I recall, I told him that I
19 didn't agree with it.  I said, If I have to work
20 Sunday, Monday, I will, but I don't agree with it.  I
21 don't think it's fair to the store manager.
22    Dale said, That's the new policy; that's
23 what it is.  If you don't want to work Sunday, Jack,
24 you don't have to.
25    And the first thing I have thought was I

Page 135

1  was being set up.
2  Q  Have you now told me all you recall about
3  your conversation?
4  A  Yes.
5  Q  There was nothing else said?
6  A  Not that I recall.
7  Q  Didn't Mr. Pepper tell you that you should
8  work Sunday as well and that you said, We'll see, and
9  that he then said, We'll see?
10 A  No.
11 Q  Are you sure that it didn't go that way?
12 A  I sure am.
13 Q  Did you make any notes about that
14 conversation?
15 A  No.
16 Q  Could you -- that was a phone call; right?
17 A  Yes.
18 Q  Could you tell if Mr. Pepper was unhappy
19 with your reaction to his request that you work both
20 days?
21 A  I couldn't tell.
22 Q  Do you know if Mr. Pepper also talked to
23 the other store managers and told them that they had
24 to work Sunday and Monday?
25 A  I don't know if he did for sure, but I

Page 136

1  would assume he did.
2  Q  After your phone call with Mr. Pepper, did
3  you send to him a schedule, a work schedule?
4  A  I might have.
5     (Deposition Exhibit 18 was marked.)
6  Q  (BY MR. VOLIN)  I'm handing you what's been
7  marked as Exhibit 18.  It's a page numbered 14 at the
8  bottom.  Appears to me to be some sort of fax.  Do
9  you know what this is?
10 A  Looking at it now, I kind of recall that
11 they wanted to schedule what the managers were going
12 to work those three days.
13 Q  Did you fill this in or did somebody else
14 fill in the schedule?
15 A  I wrote that out.
16 Q  And then did you fax it to Mr. Pepper or
17 did somebody else?
18 A  I did, I'm sure.
19 Q  There's a fax line at the top?
20 A  Uh-huh.
21 Q  Dated July 2, 2004, Friday, do you see
22 that?
23 A  Yes.
24 Q  Do you think that's when you sent it to
25 Mr. Pepper?

Page 137

1  A  I don't recall but -- I don't recall when I
2  sent it to him.  I probably sent it to him as soon as
3  I made it up.
4  Q  It would have been after your phone call
5  with him?
6  A  I would assume it was, yeah.  I would think
7  it was.  I don't recall exactly.
8  Q  Do you know if Mr. Pepper was upset at all
9  with how his conversation with you went?
10 A  Like I said, I don't recall.  But I do know
11 what he said to me.
12 Q  Did you talk to Mr. Pepper on Sunday?
13 A  No.
14 Q  You don't remember talking to him?
15 A  No.
16 Q  Is it possible you called him and told him
17 you were at the store?
18 A  I don't -- I don't believe I called him.
19 Q  The way your conversation with him ended
20 was it unclear whether or not you were going to work
21 on Sunday?
22 A  I knew I was going to work on Sunday.  I
23 don't think he knew.
24 Q  Right.  So do you think that it's possible
25 on Sunday you would have called him to tell him, Hey,

35 (Pages 134 to 137)

Page 138

1 I am here?
2   A   No. Because Andrew came in for a store
3 visit to make sure I was there.
4   Q   On July 4th, Sunday?
5   A   Yes.
6   Q   So Mr. Zuppa was also working that day?
7   A   Yes.
8   Q   Do you recall anything that Mr. Zuppa said
9 to you on Sunday, July 4th when he came to the store?
10   A   No.
11   Q   Do you recall how long he was there?
12   A   Not very long, maybe 15, 20 minutes.
13   Q   Do you recall if Sunday was a big day for
14 sales?
15   A   I don't recall this far away now.
16   Q   When was the -- the next day is Monday, the
17 5th. Did you have any interaction, communications at
18 all with Mr. Pepper or Mr. Zuppa on Monday?
19   A   No, I didn't.
20   Q   Did you work that day?
21   A   Yes, I did.
22   Q   And your next contact with Mr. Zuppa was on
23 July 6th?
24   A   Yes.
25   Q   And that's when he came to the store?

Page 139

1   A   Yes.
2   Q   Did you have any communication with him on
3 July 6 before he got to the store?
4   A   No.
5   Q   Did you have any communication with either
6 Mr. Pepper or Mr. Buscietta on July 6th?
7   A   No.
8   Q   Did you have any advance notice that
9 Mr. Zuppa would be visiting your store on July 6?
10   A   Not that I recall.
11   Q   Do you recall when it was that he came to
12 the store?
13   A   Sometime in the evening. I think I have it
14 written down.
15   Q   You're referring to Exhibit 15?
16   A   Yes.
17   Q   Page 28 has a note, July 6, 2004, 5:40 p.m.
18   A   Yeah. It was around 5:30, quarter to six.
19 Somewhere in there.
20   Q   So is the 5:40 note that's on Exhibit 15,
21 is that the time you wrote the note?
22   A   No.
23   Q   Or is that the time you thought Mr. Zuppa
24 came?
25   A   That would be the approximate time he came

Page 140

1 to the store.
2   Q   And when he came did you make a comment to
3 him that this must have something to do with my
4 conversation with Dale?
5   A   No.
6   Q   Do you remember whether that came up at all
7 in the meeting?
8   A   I sure don't.
9   Q   You recall that he told you that we're
10 going to go into a different direction in this store,
11 and we want you to go back into sales?
12   A   Yeah. After he took me upstairs to the
13 leather department, yes.
14   Q   And you immediately told him you couldn't
15 afford to do that?
16   A   I told him I can't do that.
17   Q   Did you say, I can't do it or I can't
18 afford to do it?
19   A   I told him first I can't do that, and then
20 I told him why I can't do that because I've got a
21 family to support. I'm the main breadwinner of my
22 family, and I can't take that kind of pay cut. Can't
23 do it.
24   Q   And did he say, I don't see why you can't
25 do it and think about it for a week?

Page 141

1   A   No.
2   Q   Did he say either of those things to you?
3   A   No.
4   Q   So he said we want you to go back into
5 sales, and you said, I can't do it, I can't afford to
6 do it, and, No, I won't do it?
7   A   I didn't say, no, I won't do that. I said
8 I can't do that. I can't afford the pay cut. I got
9 a family to support.
10   Q   Did you say anything else?
11   A   No.
12   Q   And then what happened next?
13   A   Then he opened up the folder and said, Here
14 you go. I need your keys and clean out your desk.
15   Q   And then what happened after that?
16   A   Then I went and gave him the keys and I
17 cleaned out my desk.
18   Q   Anything else happened that you recall?
19   A   I just kind of turned to him and told him
20 I'd see him in court.
21   Q   How many times did you tell him that?
22   A   Twice.
23   Q   Why is it that you told him that twice?
24   A   I just wanted to see his reaction. When I
25 turned around, his head went down and he looked on

Page 154

1  your age?
2     A   I felt that they were probably going to
3  bring a younger manager in there and pay them less
4  money, which I'm sure that's what they did.
5     Q   Well, if you thought there was age
6  discrimination involved, why didn't you contact
7  Mr. Jabs --
8     A   Why should I?
9     Q   -- who's the owner of the company and is in
10 his 70s?
11    A   I don't care.
12    Q   Who doesn't care?
13        MR. BUCHANAN: Object to the form.
14    A   I don't care.
15    Q   (BY MR. VOLIN) You didn't care to talk to
16 Mr. Jabs about age discrimination in his company?
17        MR. BUCHANAN: Object to the form.
18    A   No, I sure didn't.
19    Q   (BY MR. VOLIN) How about Ms. Hayes in
20 human resources, you knew that discrimination
21 complaints could be brought to her, right, you knew
22 that, didn't you?
23        MR. BUCHANAN: Object to the form.
24    A   I don't recall.
25    Q   (BY MR. VOLIN) You didn't know that

Page 155

1  discrimination issues could go to Crystal Hayes?
2        MR. BUCHANAN: Object to the form.
3     A   I was fired and I didn't -- at that point
4  it didn't matter.
5     Q   (BY MR. VOLIN) Well, after -- you claim
6  that you were fired. After this meeting with him
7  ended, didn't you think about contacting human
8  resources and saying I think there's a problem with
9  what happened?
10    A   No.
11    Q   Why not?
12    A   Because I didn't want to.
13    Q   And you didn't file a grievance about that
14 either, did you?
15    A   No, I didn't.
16    Q   Why didn't you file a grievance about it?
17    A   That's my decision. I don't have to if I
18 don't want to.
19    Q   Right. So why did you choose not to?
20    A   I'd rather talk to an attorney about it
21 which I did.
22    Q   And when did you first talk to an attorney
23 about this?
24    A   I don't recall the exact dates, but it was
25 about a week or two after.

Page 156

1     Q   And who did you talk to?
2     A   I talked to Ross Buchanan.
3     Q   So you talked to Mr. Buchanan in July
4  2004?
5        MR. BUCHANAN: I'm going to object to the
6  form.
7     A   I don't recall the date. It was sometime
8  after I was fired. I don't recall the date.
9     Q   (BY MR. VOLIN) Did you talk to
10 Mr. Buchanan before you got your next job?
11       MR. BUCHANAN: I'm going to object and
12 instruct you not to answer. We're getting close to
13 the attorney-client privilege here. In fact, I think
14 it's the attorney-client privilege, so I'm
15 instructing him not to answer that.
16    Q   (BY MR. VOLIN) I'm not going to ask you,
17 Mr. Must, about what you talked about with
18 Mr. Buchanan, but I am entitled to ask you when you
19 first contacted him.
20       MR. BUCHANAN: I don't believe you are, and
21 I am instructing my client not to answer the
22 question.
23       MR. VOLIN: Well, he's already answered
24 half a dozen questions about this topic --
25       MR. BUCHANAN: No, he hasn't.

Page 157

1        MR. VOLIN: -- and you didn't object, and
2  you've waived any objection, number one. And, number
3  two, it's not a valid objection on grounds of
4  privilege.
5        MR. BUCHANAN: It is a valid objection, and
6  we're going to stand on it. Move on.
7        (Deposition Exhibit 20 was marked.)
8        MR. BUCHANAN: Before we get into this,
9  what's your plan as far as timing? It's 12:19
10 according to this clock here.
11       MR. VOLIN: Let's go off the record.
12       (The deposition recessed at 12:19 p.m., to
13 reconvene at 1:20 p.m.)
14          AFTERNOON SESSION          1:22 p.m.
15       (The proceedings continued. Present were:
16 Deponent Must, Mr. Volin, Mr. Buchanan, Mr. Benson,
17 and Mr. Zuppa.)
18          EXAMINATION
19 BY MR. VOLIN:
20    Q   Mr. Must, before the break we had gone
21 through your employment at AFW from the time of your
22 hire in June of 1998 to the end of your employment
23 after this meeting with Mr. Zuppa on July 6, 2004.
24 Other than what you've already testified about, do
25 you recall any other events that took place during

Page 222

1  you applied with?
2  A   As far as I can remember, yes.
3       MR. VOLIN: Let's take a break.
4       (Recess taken, 2:37 p.m. to 2:47 p.m.)
5       (Deposition Exhibit 27 was marked.)
6  Q   (BY MR. VOLIN) Mr. Must, I've handed you
7  Exhibit 27, which is numbered at the bottom 49
8  through 54. And the first five pages are a letter
9  from your attorney, Mr. Buchanan, to the EEOC, and
10 the last page is a letter from the EEOC to your
11 attorney, Mr. Buchanan. Do you have Exhibit 27?
12 A   Yes.
13 Q   And did you review Mr. Buchanan's letter to
14 the EEOC, that's the first five pages of this
15 exhibit, before it was sent?
16 A   As far as I recall, I did.
17 Q   And did you think anything in this letter
18 was inaccurate?
19 A   No.
20 Q   Okay. Have your answers today to my
21 questions been accurate and truthful to the best of
22 your recollection?
23 A   Yes.
24 Q   Have you given any answers that were
25 deliberately false?

Page 223

1  A   No.
2  Q   And do you need to change any of your
3  testimony to the questions that I gave you?
4  A   No. Just the people that I've talked to, I
5  just -- you know, I talk to a lot of people, and I
6  talk about my job, my family. Some things about
7  what's going on here. You know, I just -- I just
8  don't have enough to give you that you might think I
9  can so...
10 Q   Have you understood my questions?
11 A   For the most part, yes.
12 Q   When there was a question that you didn't
13 understand, did you tell me that you didn't
14 understand it?
15 A   Yes.
16 Q   So any of the questions that you answered
17 without saying you didn't understand, you did
18 understood -- you did understand it; right?
19 A   You got me mixed up there.
20 Q   Okay. I'm sorry.
21     If you didn't tell me that you didn't
22 understand a question, then you did understand it;
23 correct?
24 A   Yes.
25     MR. VOLIN: I don't have any further

Page 224

1  questions for you at this time. Thank you.
2       (The proceedings were concluded at 2:50
3  p.m. on the 8th day of May, 2007.)

Page 225

1       I, JACK MUST, do hereby certify that I have
2  read the foregoing deposition, and that the foregoing
3  transcript and accompanying change sheets, if any,
4  constitute a true and complete transcript of my
5  testimony.

                    JACK MUST

() No changes         () Changes attached

       SUBSCRIBED AND SWORN TO before me
this       day of              , 2007.

               Notary Public
               Address


          My commission expires

57 (Pages 222 to 225)

HULAC COURT REPORTING, LLC
(303) 331-0131, (303) 331-9898 FAX