# EXHIBIT 20

Dale Alan Pepper

## Page 54

1  Q.  And how do you know that?
2  A.  He had told me Thursday or Friday of
3  that week.
4  Q.  The Thursday or Friday before --
5  A.  Following.
6  Q.  Okay.
7  A.  Following. So it would have been the
8  7th, 8th, or 9th date.
9  Q.  Do you know if Jake Jabs had any
10 input?
11 A.  I do not.
12 Q.  Do you know, one way or the other, if
13 he was, in fact, the one that suggested that?
14 A.  I do not.
15 Q.  Now, in a response to the EEOC, you
16 were listed by AFW as one of the people that would
17 have information about Jack Must speaking negatively
18 about AFW. I'm just telling you that for your
19 information. I'll show you the document, if we need
20 to.
21 A.  Okay.
22 Q.  Do you have any information about Jack
23 Must speaking negatively about AFW?
24 A.  I do not.
25 Q.  Am I'm accurate about this, that the

## Page 55

1  only conversations that you ever had with Jack Must
2  when you were his supervisor were the phone call on
3  July 2nd and the phone call you recited on Sunday,
4  July 4, '04?
5  A.  Yes.
6  Q.  And any previous interaction you had
7  with Jack Must was just in the context of being
8  fellow managers of AFW stores, at managers meetings
9  and the like?
10 A.  Correct.
11 Q.  And you've not had any contact with
12 him since?
13 A.  No.
14      MR. BUCHANAN: I have no further
15 questions.
16      MR. BENSON: I have nothing for the
17 witness, and I will handle getting Mr. Pepper a copy
18 of the transcript and giving him an opportunity to
19 review it.
20      MR. BUCHANAN: Thank you for coming
21 in.
22      THE DEPONENT: Thank you. Appreciate
23 it.
24      (WHEREUPON, the deposition was
25 concluded at 10:09 a.m.)

## Page 56

1  I have read the foregoing
2  transcript of my testimony and have indicated the
3  same by my signature.

_____
DALE ALAN PEPPER

STATE OF COLORADO
CITY AND COUNTY OF DENVER

Subscribed and sworn to before me by
DALE ALAN PEPPER on this _____,2007.
My commission expires:_____

_____
Notary Public

_____
Address

Reporter: DEE
Trial/Hearing Date: Unknown

## Page 57

CERTIFICATE
STATE OF COLORADO   )
                    )ss.
CITY AND COUNTY OF DENVER )

I, Dawn E. Eastman (Calderwood),
Certified Shorthand Reporter, Registered
Professional Reporter, and Notary Public for the
State of Colorado, do hereby certify that previous
to the commencement of the examination, the said
DALE ALAN PEPPER was duly sworn by me to testify the
truth in relation to the matters in controversy
between the said parties.
       I further certify that said deposition
was taken in shorthand by me and was reduced to
typewritten form by computer-aided transcription;
that the foregoing is a true transcript of the
questions asked, testimony given, and proceedings
had.
       I further certify that I am not an
attorney nor counsel nor in any way connected with
any attorney or counsel for any of the parties to
said action or otherwise interested in its event.
       IN WITNESS WHEREOF, I hereunto affix my
hand and notarial seal this 30th day of September,
2007. My commission expires September 20, 2010.

_____
Dawn E. Eastman (Calderwood)
CSR, RPR, Notary Public
Calderwood-Mackelprang, Inc.

Dale Alan Pepper

**Page 46**

1  the other day, even though I usually take off Sunday
2  and Monday? You would agree they could understand
3  it that way; right?
4     A.  They could, yes.
5     Q.  And that's, in fact, why you made
6  those phone calls?
7     A.  Correct.
8     Q.  And it turns out Jack, in fact, had
9  understood it that way; right?
10          MR. BENSON: Lack of foundation.
11     Q.  (By Mr. Buchanan) Isn't that true?
12          MR. BENSON: Same objection.
13          THE DEPONENT: I don't know if that's
14  how he understood it.
15     Q.  (By Mr. Benson) He had made plans
16  with his family; correct?
17     A.  Correct.
18     Q.  So he clearly did understand it that
19  way; would you agree?
20          MR. BENSON: Object to the form, lack
21  of foundation.
22     Q.  (By Mr. Buchanan) Let me ask the
23  question this way: You would agree, if he made
24  plans with his family to be gone on Sunday, let's
25  say -- and I'm not sure which day it was -- but be

**Page 47**

1  gone one of those days, that, he, in fact,
2  interpreted this policy in a way that you had feared
3  managers might; correct?
4     A.  I wanted to make sure all managers
5  were aware the holiday date fell on a Sunday.
6     Q.  But that doesn't answer the question
7  as to whether they have to be there both days.
8     A.  That's why I made the phone call, to
9  assure them they needed to be there both days.
10     Q.  Right. And it started with you. You
11  realized there might be some confusion, and you
12  needed to clear it up; correct?
13          MR. BENSON: Object to form.
14          THE DEPONENT: They could have read it
15  as a Monday only holiday, yes.
16     Q.  (By Mr. Buchanan) And in point of
17  fact, that's exactly how Jack had read it; correct?
18          MR. BENSON: Object to form. Lack of
19  foundation.
20          THE DEPONENT: I don't know how he
21  read it.
22     Q.  (By Mr. Buchanan) Well, here's what
23  I'm trying to understand: Why is it that when you
24  initiate a phone call to clarify something because
25  you think people might be confused -- and, in fact,

**Page 48**

1  you find out that somebody was confused about
2  that -- why were you upset about that?
3          MR. BENSON: Object to the form of the
4  question.
5          THE DEPONENT: I was upset with his
6  response back to me, as upper management at that
7  particular time.
8     Q.  (By Mr. Buchanan) Okay. The business
9  about "We'll see"?
10     A.  Correct.
11     Q.  Was there any other source of your
12  displeasure about that?
13     A.  I don't understand what you're asking.
14     Q.  Other than what you've recited,
15  however you want to characterize that --
16  insubordination or whatever -- was there any other
17  source of you being upset such that you mentioned it
18  to Andrew Zuppa?
19     A.  No, that was the reason I was upset.
20     Q.  He said: Calm down?
21     A.  Yes.
22     Q.  Were you actually --
23     A.  I was pissed.
24     Q.  -- angry?
25     A.  I was pissed.

**Page 49**

1     Q.  Okay. Did you suggest that something
2  happen to Jack as a result of it?
3     A.  I was prepared to go out right then
4  and have Jack fired right there, and I was going to
5  close the store.
6     Q.  Close the Westminster store?
7     A.  At night, when the time to close it
8  was.
9     Q.  Oh, I see, close it for that evening?
10     A.  Yes, I would run it until closing
11  time.
12     Q.  I thought you meant the death penalty
13  for the store itself?
14     A.  No.
15     Q.  All right. And Zuppa said: I'll
16  handle it?
17     A.  Yes.
18     Q.  Was that the end of your involvement
19  in that issue until, as you recited, he called on
20  Sunday?
21     A.  Who called on --
22     Q.  Well, that's what I'm asking. Did
23  someone call you on Sunday?
24     A.  Jack Must called me.
25     Q.  Is that the end of your involvement in

13 (Pages 46 to 49)

Calderwood-Mackelprang, Inc. 303.477.3500

Page 42

```
1    A.   No.
2    Q.   Had there been any effort to contact
3  the managers regarding the interpretation of the
4  policy as it applied to the July 4th, 2004 holiday
5  before Friday, July 2nd?
6    A.   No.
7    Q.   Okay. You hadn't called them a week
8  before or two weeks before to clarify it, only on
9  the Friday before?
10   A.   Correct.
11   Q.   Prior to the July 4th holiday, had it
12 usually been the case that -- well, strike that.
13        I think you told me earlier that most
14 managers take Sunday and Monday off; correct?
15   A.   Correct.
16   Q.   And, obviously, on a holiday that is
17 recognized on a Monday, and, in fact, falls on a
18 Monday, they would normally need to be there on
19 Monday; but they could probably take Sunday off;
20 correct?
21   A.   Correct.
22   Q.   And that's the way it usually worked
23 when the holiday, in fact, fell on Monday; correct?
24   A.   Correct.
25   Q.   It amounted to a company policy to
```

Page 43

```
1  that effect; would you agree?
2    A.   Yes.
3    Q.   Did you regard the circumstance on the
4  July 4th, 2004, holiday as being a change in policy?
5    A.   No.
6    Q.   Why not?
7    A.   I didn't see it as a change. Because
8  it said: We need you here present on the holidays.
9    Q.   But the holiday in the -- on the
10 July 4th, 2004, weekend was on Sunday. So does it
11 stand to reason that, given that you normally get
12 one of the days off when it's a three-day holiday,
13 that the manager could take Monday off?
14   A.   No, only because most of the public is
15 still off on Mondays on these long weekends.
16   Q.   Okay. Did you have any other
17 interaction with Jack on July 4th, 2004?
18   A.   No.
19   Q.   Did you have any interaction with him
20 on July 5th, 2004?
21   A.   No.
22   Q.   Did you have any interaction with him
23 on July 6th, 2004?
24   A.   No.
25   Q.   Do you know -- or are you aware that
```

Page 44

```
1  Andrew Zuppa went to his store on Sunday, July 4th,
2  2004?
3    A.   No.
4    Q.   You weren't with him, I'm assuming.
5    A.   I was not with him.
6    Q.   Do you know whether Andrew Zuppa went
7  to any other stores, other than Westminster, on
8  July 4, 2004?
9         MR. BENSON: Object, lack of
10 foundation.
11        Go ahead and answer, if you can.
12        THE DEPONENT: I wouldn't know that.
13   Q.   (By Mr. Buchanan) Well, it sounds
14 like you wouldn't know that. I'm asking whether you
15 do know it from any source?
16   A.   No, I do not.
17   Q.   Okay.
18        THE DEPONENT: Can we take a break? I
19 need to put some money in the meter. I parked in
20 the wrong location.
21        (A recess was taken.)
22   Q.   (By Mr. Buchanan) Mr. Pepper, we're
23 back on the record.
24        Did you -- after you had the
25 conversation you recited for us on July 2nd, 2004,
```

Page 45

```
1  did you report that to Andrew Zuppa?
2    A.   Yes, I did.
3    Q.   What was Mr. Zuppa's reaction?
4    A.   He told me to calm down, specifically,
5  that he would take care of it.
6    Q.   "Calm down," meaning what?
7    A.   I was very upset with the reaction
8  that I received from the manager questioning
9  working.
10   Q.   I'm confused here. I'm genuinely
11 confused. Because it sounds like, from your
12 previous testimony, that there was enough confusion
13 about how this policy applied in the particular
14 circumstance of July 4th, 2004, that you felt it
15 necessary to call all nine managers and explain it
16 to them; correct?
17   A.   I didn't have to explain it to them.
18 I wanted to be sure they understood it.
19   Q.   Okay. But you'd agree there was a way
20 that they could understand it differently than you
21 wanted them to understand it; correct?
22   A.   Repeat that again.
23   Q.   It's at least possible that they would
24 have said: This is a three-day weekend. On
25 three-day weekends, I take off one day; and I work
```

Page 38:

1  Q.  Would that have been before or after
2  your telephone conversation with Jack Must; do you
3  know?
4  A.  That would have been after.
5  Q.  Did you get the managers' schedules
6  for the weekend for all managers?
7  A.  No.
8  Q.  Do you know if any other managers sent
9  you their schedules?
10 A.  None sent them to me.
11 Q.  And doesn't sound like this was sent
12 to you either, correct, Exhibit 18?
13 A.  Correct.
14 Q.  Do you know, one way or the other,
15 whether the other managers were requested to send
16 their schedules?
17 A.  No.
18 Q.  Have you ever seen any faxes
19 suggesting that the other managers also send in
20 their schedules?
21 A.  No.
22 Q.  Sounds to me, from your recitation of
23 the telephone conversation with Jack Must, that you
24 didn't request him to do that?
25 A.  No.

Page 39:

1  Q.  Do you know who did?
2  A.  I do not.
3  Q.  Just so we are clear about this, when
4  you saw this on Tuesday, was it news to you that he
5  had done this?
6       MR. BENSON: Object to the -- oh,
7  Tuesday, deposition prep. I forgot.
8       THE DEPONENT: Repeat that question.
9  I'm sorry.
10      MR. BENSON: I interrupted.
11 Q.  (By Mr. Buchanan) When you saw this
12 for the first time Tuesday, as you indicated you
13 did --
14 A.  Yes.
15 Q.  -- was it news to you at that time
16 that he had sent in his work schedule?
17 A.  Yes.
18 Q.  Did you work July 4th yourself?
19 A.  Yes.
20 Q.  Did you work July 5th?
21 A.  Yes.
22 Q.  Did you have any interaction with Jack
23 on either of those days?
24 A.  July 4th.
25 Q.  What was the interaction then?

Page 40:

1  A.  He contacted me by phone. His only
2  comment was: I'm here.
3  Q.  Okay. Called you at corporate
4  headquarters?
5  A.  Yes.
6  Q.  And so that would have been Sunday the
7  4th. Do you remember what time of day it was?
8  A.  I do not.
9  Q.  Was that all that was said?
10 A.  That's all that was said. My response
11 was: Good. We need you there.
12 Q.  How did you know it was Jack Must?
13 A.  He introduced -- he said: This is
14 Jack.
15 Q.  Okay.
16 A.  That's the only Jack I know.
17 Q.  And he said: I'm here?
18 A.  Yes.
19 Q.  And then you said: Good?
20 A.  Yes.
21 Q.  Anything else?
22 A.  That was it.
23 Q.  Can you bracket it for us in terms of
24 time? Was it in the morning, afternoon?
25 A.  I would say it would have been

Page 41:

1  midmorning.
2  Q.  Okay.
3  A.  If I recall.
4  Q.  All right. Did you pass that
5  information on to anyone?
6  A.  No.
7  Q.  Had you asked Jack to call you if he
8  came in?
9  A.  No.
10 Q.  Coming back to the conversation on
11 Friday the 2nd, do you recall saying to Jack: Jack,
12 the policy is that you be there Sunday and Monday.
13 But if you don't want to work Sunday, you don't have
14 to, or words substantially to that effect?
15 A.  My comment to him was -- when he said:
16 We'll see, my response was: We'll see. That was my
17 response to him.
18 Q.  Okay. Do you remember him making any
19 comments about why he felt that he was entitled to a
20 day off?
21 A.  He had plans.
22 Q.  Which were what?
23 A.  With his family.
24 Q.  Did he give you any more detail about
25 it?

**Page 34**

1  A.  Just one.
2  Q.  Who was that?
3  A.  Jack Must.
4  Q.  Did anybody say to you: Dale, why are
5  you calling me; this is ridiculous; this is the way
6  it is every weekend when there's a holiday?
7  A.  No.
8  Q.  So there was an issue there; would you
9  agree?
10      MR. BENSON: Object to the form.
11      THE DEPONENT: Yes.
12  Q.  (By Mr. Benson) You would agree that
13  there was an issue as to how this longstanding
14  policy would apply in the circumstance that we're
15  talking about, where the holiday actually falls on a
16  Sunday, and you want them to be there; and then you
17  want them to be there Monday, as well; correct?
18  A.  I need you to repeat that, please.
19  Q.  Well, what I'm -- I guess, to a
20  certain extent, we're repeating what I thought you
21  said earlier, because I'm a little confused.
22      But you would agree with me that the
23  application of this policy, Exhibit 14, was a little
24  bit unclear in the instance where the holiday
25  actually falls on a Sunday as opposed to it falling

**Page 35**

1  on a Monday?
2  A.  I guess my explanation was to make
3  sure everybody understood Independence Day fell on a
4  Sunday, and that would be a workday.
5  Q.  Right. But the point is that you
6  initiated the phone call. So you believed, in your
7  own mind, that there might be some confusion about
8  that?
9  A.  Correct.
10  Q.  Did Andrew Zuppa ask you to make those
11  phone calls?
12  A.  No.
13  Q.  Now, did you also ask the managers to
14  submit their schedule for the weekend?
15  A.  No, I do not recall that.
16  Q.  I'm showing you what has been marked
17  as Exhibit 18 to a previous deposition. And if you
18  can read that, I will just tell you that the
19  evidence is that this is a schedule of the managers
20  that were going to be working at the Westminster
21  store over the 4th of July holiday, 2004. Okay?
22  A.  Okay.
23  Q.  And the evidence, again, is that Jack
24  Must prepared this. And he probably was the one who
25  actually faxed it to wherever it was faxed.

**Page 36**

1  A.  Okay.
2  Q.  Let me ask you: Do you recognize this
3  fax banner, what that telephone number is there?
4  A.  I believe that's the fax number to
5  Westminster.
6  Q.  Okay. Do you know -- let me look at
7  this, myself, for a second. I thought I had this
8  figured out.
9      Okay. Where it says destination
10  address (720) 873-8600, who is that?
11  A.  That would be -- I'm going to guess
12  that would be the corporate fax to Jake's assistant,
13  Charlie.
14  Q.  Charlie what?
15      MR. BENSON: She can't help you.
16      THE DEPONENT: I know. I don't
17  remember Charlie's last name. Charlie Shalis; I
18  don't remember.
19  Q.  You're going to have spell it for her?
20  A.  I don't remember the last name.
21  Shalis, S-h-a-l-i-s, I believe.
22  Q.  Let me ask you this: The first line
23  of this document, Exhibit 18, says: Managers send
24  your work weekend schedule fax back to the number we
25  just read.

**Page 37**

1  A.  Okay.
2  Q.  Do you recognize that handwriting?
3  A.  No.
4  Q.  Then there's a table down here,
5  obviously setting forth Jack Must and his assistant
6  and turnkey manager and their schedules over the
7  weekend.
8      Do you know whose writing that is?
9  A.  No.
10  Q.  Okay. Have you ever seen that
11  document before today?
12  A.  Tuesday -- I recall seeing it Tuesday.
13  Q.  In preparation for your deposition?
14  A.  In preparation.
15  Q.  Do you remember seeing it when it came
16  into the corporate headquarters?
17  A.  No.
18  Q.  Do you have any reason to believe that
19  it was not received at the corporate headquarters?
20  A.  No.
21  Q.  And it appears that it was received
22  there on -- sorry about that -- according to the
23  banner, it was received there Friday, July 2nd,
24  2004, about 1:10 in the afternoon; correct?
25  A.  Correct.

Dale Alan Pepper

Page 30

1  Friday the 2nd, I guess; right?
2     A.  Yes, I guess.
3     Q.  And this is a call you made from your
4  office there at Compark?
5     A.  Yes.
6     Q.  And why did you make that call?
7     A.  To make sure all managers were aware
8  of the dates falling on a holiday.
9     Q.  Now, it has always been the case at
10 AFW that you work holidays; correct?
11    A.  Correct.
12    Q.  And there's, in fact, a memo that
13 we're going to look at in a minute -- well, why
14 don't we do that right now.
15       (Discussion off the record.)
16    Q.  (By Mr. Buchanan)  Mr. Pepper, I'm
17 going to show you what we have marked in a previous
18 deposition as Exhibit 14, which is a memo dated
19 March 4, 2003.
20       It's addressed, obviously, to the
21 people it says it's addressed to, but certainly a
22 whole variety of managers and leadership type
23 people.  And it's from Mike Buscietta, and it's
24 talking about mandatory workdays.
25       I'm just summarizing the document, but

Page 31

1  the substance of it is:  We need managers to work
2  the actual holidays; correct?
3     A.  Correct.
4     Q.  Now, that had been the policy for --
5  since at least 2003; correct?
6     A.  Yes.
7     Q.  And you had understood that as a store
8  manager during that period of time?
9     A.  Yes.
10    Q.  And you had understood it before that;
11 correct?
12    A.  Yes.
13    Q.  So why were you calling the store
14 managers to tell them that?
15    A.  Because the 4th of July fell on a
16 Sunday that particular year.
17    Q.  Tell me why that created an issue?
18    A.  Because normally they're Monday
19 recognized, like Memorial Day.  This holiday coming
20 up this weekend, we work Monday because of the Labor
21 Day weekend.  We get Sunday off.
22       This one, because the 4th of July was
23 physically on a Sunday, I wanted to make sure that
24 the managers were aware that it was on a Sunday, and
25 that we would need them there both days.

Page 32

1     Q.  Both Sunday and Monday?
2     A.  Correct.
3     Q.  Is it true that most managers have
4  Sunday and Monday off?
5     A.  Yes.
6     Q.  Was that also part of the reason?
7     A.  I don't understand.
8     Q.  Well, was that also part of the reason
9  that you called them, was that you normally take
10 Sunday and Monday off?
11    A.  Yes.
12    Q.  And, obviously, if it was a holiday
13 that was recognized on a Monday, you'd have to be
14 there on Monday.  But in this particular instance,
15 the holiday is on Sunday, so you can't take that
16 off; and we also want you on Monday.
17    A.  Correct.
18    Q.  So you're not going to get any days
19 off this week?
20    A.  Correct.
21    Q.  And that was different than most
22 holidays; correct?
23    A.  Yes.
24    Q.  And that's the reason you called them?
25    A.  Yes.

Page 33

1     Q.  It's at least possible that people
2  would be under the impression that they could take
3  at least one of those days off?
4     A.  Yes.
5     Q.  And you wanted to avoid any
6  misunderstanding?
7     A.  Correct.
8     Q.  All right.  And you called all store
9  managers, which would have amounted to, say, nine
10 people?
11    A.  Correct.
12    Q.  And when you spoke to the other store
13 managers, did they also acknowledge that there was
14 some confusion, and, you know, that they realized
15 that this was a little different than other holidays
16 had been?
17    A.  They had recognized it was different,
18 but they felt that that probably would have been the
19 case.
20    Q.  Did some of them indicate that they
21 were disappointed that it was the case?
22    A.  No.
23    Q.  Did any of them tell you that they had
24 made plans, based on the theory that they would get
25 at least one of those days off?

9 (Pages 30 to 33)

Calderwood-Mackelprang, Inc. 303.477.3500

Dale Alan Pepper

Page 26

1  Q. Would any of them report to you?
2  A. On contacts, yes.
3  Q. What do you mean by that?
4  A. Well, if they needed time off,
5  vacation, had a doctor's appointment, leaving the
6  store, they would be able to contact me for those.
7  Q. You called them "contacts"?
8  A. Call, phone.
9  Q. Oh, phone contact?
10 A. Phone contact.
11 Q. But, otherwise, in terms of store
12 issues and performance and so forth, they would
13 report directly to Andrew?
14 A. Yes.
15 Q. Give me some idea what the division of
16 labor was -- well, first of all, let me ask you
17 this: Before you were promoted to assistant general
18 manager, was there a predecessor in that position?
19 A. Well, Andrew Zuppa had had the title
20 Assistant GM.
21 Q. And he assisted Mike Buscietta?
22 A. Correct.
23 Q. Had there been an assistant general
24 manager before Zuppa?
25 A. No.

Page 27

1  Q. Is it your understanding that that
2  position has been essentially permanently dissolved?
3  A. Yes.
4  Q. Why?
5  A. There was really no reason for it. My
6  type of role was operations. It got to where, with
7  the establishment of our company, things like the
8  trash for our companies was pretty well handled now,
9  taken care of; the warehouse manager could oversee
10 things like that.
11     So what my duties were, we could
12 absorb into other areas; and I could be sent out to
13 stores in need of filling positions and things like
14 that. Because I'm able to now travel, so to speak,
15 so I can go wherever I'm needed.
16 Q. Just so I'm clear about that: When
17 you say "now," your daughter is grown up?
18 A. Yes, I have three granddaughters. I'm
19 an old man.
20 Q. Like hell.
21 A. Seriously.
22 Q. I say it that way because you are
23 three months older than I am.
24 A. Three beautiful granddaughters.
25 Q. Good for you. That's wonderful.

Page 28

1    (Discussion off the record.)
2  Q. (By Mr. Buchanan) What was your first
3  interaction with Jack Must in your position as the
4  assistant general manager?
5  A. My first interactions? I don't
6  understand what you mean by that word.
7  Q. Well, let me just tell you that it's
8  my understanding that you had a telephone exchange
9  with Jack on the issue of working on the 4th of July
10 weekend?
11 A. Correct.
12 Q. Do you remember that?
13 A. Yes.
14 Q. Had you ever -- before that time, had
15 you ever had any significant contact with Jack about
16 any other issues?
17 A. No.
18 Q. Tell me what you remember about that
19 contact.
20 A. About the 4th of July?
21 Q. Yeah, the 4th of July issue.
22 A. The 4th of July fell on a Sunday. As
23 a working manager of a company, we need to have our
24 managers at our locations on holidays. I had
25 notified Jack that the holiday fell on a Sunday,

Page 29

1  that we needed the store managers there, because we
2  felt the business needed to have many managers -- as
3  many managers as the store had there to supervise,
4  to make sure customers were taken care of.
5      During the phone call, Jack had
6  basically said he wasn't going to work Sunday, that
7  Monday was enough. And I said: No, I need you
8  there Sunday. That is the holiday.
9  Q. Okay.
10 A. His comment back to me was: Well,
11 we'll see.
12     My comment back was: Yes, we will
13 see.
14 Q. Okay.
15 A. That was the end of the phone call.
16 Q. How long did that last?
17 A. Three minutes.
18 Q. Now, it was a phone call that you
19 initiated?
20 A. Yes.
21 Q. And it sounds like it would have been
22 the end of the week before the Sunday, July 4th
23 holiday?
24 A. Yes, it was a Friday.
25 Q. So whatever that is, Friday the 1st?

Dale Alan Pepper

```
 1            IN THE UNITED STATES DISTRICT COURT
 2               FOR THE DISTRICT OF COLORADO
 3   Civil Case No. 06-CV-01872-RPM-MEH
 4   JACK MUST,
 5   Plaintiff
 6   vs.
 7   AMERICAN FURNITURE WAREHOUSE CO., a Colorado
     corporation d/b/a/ AMERICAN FURNITURE WAREHOUSE,
 8
 9   Defendant.
10
11   _____
12              DEPOSITION OF DALE ALAN PEPPER
13   _____
14
15           PURSUANT TO NOTICE, the above-
16   entitled deposition was taken on behalf of the
17   Plaintiff at 1621 18th Street, Suite 260, Denver,
18   Colorado, on August 31, 2007, at 9:05 a.m., before
19   Dawn E.  Eastman (Calderwood), Certified Shorthand
20   Reporter, Registered Professional Reporter, and
21   Notary Public.
22
23
24
25
```